**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 16-CR-065 (BAH)** |
| v. | |
| **GERARDO GONZALEZ-VALENCIA,** | |
| Defendant. | |

**DEFENDANT GERARDO GONZALEZ-VALENCIA'S MOTION TO DISMISS THE INDICTMENT ON STATUTE OF LIMITATIONS GROUNDS OR IN THE ALTERNATIVE FOR A BILL OF PARTICULARS AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES**

NOW COMES, the Defendant, Gerardo Gonzalez-Valencia, and respectfully moves this Court to dismiss the Indictment [Doc. 1] on statute of limitations grounds or, in the alternative, to provide Mr. Gonzalez-Valencia with a bill of particulars requiring the Government to provide all evidence purportedly establishing that Mr. Gonzalez-Valencia is in fact "Silverio" in the BlackBerry messages.  Assuming *arguendo* that Mr. Gonzalez-Valencia was at one time a member of the alleged conspiracy, he withdrew from the alleged conspiracy more than five years prior to the return of the Indictment.  Specifically, Mr. Gonzalez-Valencia withdrew from the alleged conspiracy in 2009, when he started a new life by opening a convenience store in Buenos Aires, Argentina. He then relocated his wife and children to Buenos Aires (and later Uruguay). Accordingly, the applicable five-year limitations period established by 18 U.S.C. § 3282 bars his prosecution for the charged offense.

## I.    BACKGROUND

Mr. Gonzalez-Valencia did not choose to join a cartel.  Rather, he was born into a family which has allegedly participated in cartel operations.  Mr. Gonzalez-Valencia, however, did make the bold choice to *leave* the life foisted upon him by his unfortunate upbringing when he withdrew

from the conspiracy in 2009, started a new life, and uprooted his family to Argentina (and later Uruguay).  Specifically, Mr. Gonzalez-Valencia started a new life by opening a convenience store in Buenos Aires, Argentina in 2009. He moved to Buenos Aires to run his business, which expanded to include additional locations, before he again relocated with his family to Uruguay to further escape any past affiliations brought about by his family history.

In this case, the Government has charged Mr. Gonzalez-Valencia with offenses related to his alleged involvement in a drug distribution conspiracy "[f]rom in or about January 2003." *See* Doc. 1 at 1.  The April 19, 2016 Indictment, however, neglects to mention that Mr. Gonzalez-Valencia affirmatively and completely withdrew from the conspiracy well before April 19, 2011— five years before the Government obtained the Indictment charging Mr. Gonzalez-Valencia with the alleged conspiracy.  The sole evidence the Government identifies to purportedly link Mr. Gonzalez-Valencia to the alleged conspiracy after the statute of limitations ran in 2011 comes in the form of BlackBerry message interceptions from 2013 using aliases that the Government believes may refer to Mr. Gonzalez-Valencia.  But, the Government cannot establish that any of the aliases used in the intercepted communications refer to Mr. Gonzalez-Valencia.[1]  Accordingly, the five-year statute of limitations bars Mr. Gonzalez-Valencia's prosecution and provides grounds for dismissal in this case.

## II.    LEGAL STANDARD

Preliminarily, 18 U.S.C. § 3282 establishes a five-year statute of limitations for the conspiracy-related offenses Mr. Gonzalez-Valencia faces.  18 U.S.C. § 3282(a) ("[N]o person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the

---

[1] In addition, Mr. Gonzalez-Valencia is simultaneously filing his *Motion to Strike Improper Aliases and Related Evidence and Memorandum of Points and Authorities in Support Thereof*, , which further negates the Government's alias-based argument.

information is instituted within five years next after such offense shall have been committed[.]"). To support a conspiracy charge, the Government must prove, among other elements, that the defendant joined a conspiracy to violate the law *and* that the conspiracy persisted during the limitations period. Otherwise, the statute of limitations bars his prosecution for alleged acts committed outside of the limitations period, which ran on April 19, 2011 based on the April 19, 2016 date of the Indictment. *See generally* Indictment.

Importantly, when a defendant withdraws from a conspiracy, the Government can no longer hold him liable for the later acts of his former co-conspirators. *Smith v. United States*, 568 U.S. 106, 111 (2013) ("Withdrawal terminates the defendant's liability for postwithdrawal acts of his co-conspirators."). Withdrawal is therefore an affirmative defense to conspiracy charges. *Id.* at 112. So, even if the Government is able to carry its burden of proving the existence of a conspiracy involving a defendant, the defendant may nevertheless avoid liability for later acts of the conspiracy if he demonstrates under a preponderance of the evidence standard that he withdrew from the conspiracy. *Id.* at 112–14 (the defendant gets the opportunity to prove the affirmative defense of withdrawal from a conspiracy); *United States v. Apodaca*, 275 F. Supp. 3d 123, 135 (D.D.C. 2017) (the defendant bears the burden of proof on withdrawal from a conspiracy by a preponderance of the evidence).

To prove withdrawal, the defendant must engage in an "affirmative action to disavow or defeat the purpose of the conspiracy." *Smith*, 568 U.S. at 113 (alterations omitted). However, the law does not provide a single way through which the defendant must establish withdrawal. Instead, the Supreme Court has specifically cautioned courts against placing "confining blinders" on "the jury's freedom to consider evidence regarding the continuing participation of alleged conspirators in the charged conspiracy." *United States v. United States Gypsum Co.*, 438 U.S. 422, 464 (1978).

3

"Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *Id.* at 464–65. Accordingly, courts have significant latitude to consider different methods of withdrawal, which presents a highly contextual inquiry.

In this jurisdiction, "[t]o withdraw from a conspiracy, an individual must come clean to the authorities *or* communicate his or her abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Bostick*, 791 F.3d 127, 143 (D.C. Cir. 2015) (internal quotation marks and citation omitted) (emphasis added)). Accordingly, withdrawal requires the defendant to take some "affirmative step," *Bahlul v. United States*, 840 F.3d 757, 800 (D.C. Cir. 2016) (Wilkins, J., concurring), rather than simply "[p]assive nonparticipation in the continuing scheme," *Smith*, 568 U.S. at 112.

Stated another way, to amount to withdrawal, a defendant's disassociation from a criminal organization "must be sufficiently clear and delivered to those with authority in the conspiracy such that a jury could conclude that it was reasonably calculated to make the dissociation known to the organization." *United States v. Randall*, 661 F.3d 1291, 1295 (10th Cir. 2011) ("Simply not spending time with coconspirators is not enough to satisfy this standard."). Yet, nothing in the law "requires the hiring of a calligrapher to print formal notices of withdrawal to be served upon coconspirators." *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988) (actions that "disabled [a defendant] from further participation and made that disability known to [his co-conspirators] . . . is enough" to establish withdrawal).

III.    ANALYSIS

I.    **Mr. Gonzalez-Valencia Withdrew From The Alleged Conspiracy Before April 2011**

The Court should dismiss the Indictment against Mr. Gonzalez-Valencia on statute of limitations grounds because he withdrew from the conspiracy before April 19, 2011.  By opening his convenience store in Argentina, moving out of Mexico, and starting a new life away from his cartel-associated family, Mr. Gonzalez-Valencia withdrew from any conspiracy in which he allegedly, previously took part.  Indeed, Mr. Gonzalez-Valencia's new venture was known to his alleged co-conspirators up to the highest levels of the cartel—most notably, his brother, Abigael González-Valencia.  Accordingly, his move and disassociation with any cartel activities "clearly and unequivocally said to [his co-conspirators] that he no longer wanted to be part of the conspiracy."  *See United States v. Greenfield*, 44 F.3d 1141, 1145 (2d Cir. 1995) (holding that, if true, the defendant's claims that he "explained that he no longer wished to be part of the conspiracy" to his co-conspirators "clearly communicated an 'abandonment [of the conspiracy] in a manner reasonably calculated to reach coconspirators,'  and thus adequately established his withdrawal" (alterations in original)); *see also Nerlinger*, 862 F.2d at 974 (known actions that "disabled . . . further participation" in the conspiracy establish withdrawal).

In fact, the evidence that the Government seized during Mr. Gonzalez-Valencia's arrest in Uruguay corroborates Mr. Gonzalez-Valencia's withdrawal.  Specifically, the Government provided Mr. Gonzalez-Valencia's counsel with copies of information obtained from hard drives, cell phones, and cameras seized at the time of Mr. Gonzalez-Valencia's arrest.  None of that discovery includes any related communications with cartel members, nor does it include any communications about the alleged conspiracy for which Mr. Gonzalez-Valencia is charged. Instead, the record is clear that Mr. Gonzalez-Valencia charted a new course for his family when

he opened his convenience store in Argentina in 2009—one plainly divorced from the life and family he left behind.  *See Gall v. United States*, 552 U.S. 38, 57 (2007) (identifying circumstances surrounding a defendant's "voluntary withdrawal"—including that the defendant stopped participating in illicit activities, moved twice to escape past affiliations, and entered a new line of work—which provided a "greater justification for believing [the defendant's] turnaround was genuine").

To be sure, Mr. Gonzalez-Valencia occasionally traveled back to Mexico to check on a hotel he owned and visit family—after all, they are his family—following his departure.  But, even if the Government is able to prove that Mr. Gonzalez-Valencia once took part in a conspiracy, it has provided no admissible evidence demonstrating Mr. Gonzalez-Valencia's continued involvement during the limitations period.[2]  Mr. Gonzalez-Valencia affirmatively withdrew from the alleged conspiracy in 2009, creating his new life in Argentina.  Mr. Gonzalez-Valencia's affirmative withdrawal from the alleged conspiracy, even assuming he once participated in it, shows that the five-year statute of limitations ran out before the Government obtained the Indictment charging Mr. Gonzalez-Valencia with conspiracy in April 2016.

## II.   The Government's Reliance On Aliases Used In Wiretaps To Attempt To Link Mr. Gonzalez-Valencia To The Alleged Conspiracy After 2011 Is Misplaced

Although we have repeatedly explained to the Government Mr. Gonzalez-Valencia's withdrawal defense, the Government continues to rely upon BlackBerry messages from 2013 that it believes refer to Mr. Gonzalez-Valencia in connection with the alleged conspiracy.  The Government, however, cannot establish that the aliases used in the BlackBerry messages refer to Mr. Gonzalez-Valencia.  In particular, the Government relies on references to someone using the

---

[2] In fact, the evidence the Government has provided fails to establish that Mr. Gonzalez-Valencia participated as a member of the cartel at all during the time period referenced in the Indictment.

name "Silverio."   Mr. Gonzalez-Valencia's passport demonstrates that he cannot possible be

Silverio.  This proves fatal to the Government's argument.

It may be true that Mr. Gonzalez-Valencia traveled to Mexico at the same time as the

BlackBerry messages indicate that Silverio was in Mexico.  However this does not equate to Mr.

Gonzalez-Valencia being Silverio in the messages.  Although summer travel by Mr. Gonzalez-

Valencia to visit his family may be the source of the Government's misunderstanding, Mr.

Gonzalez-Valencia went to Mexico strictly to visit his family, not for any conspiracy-related

purpose.  He was not then a part of the alleged conspiracy.  Indeed, the information provided by

Mr. Gonzalez-Valencia's passport demonstrates that he cannot possibly be Silverio.  Specifically,

Mr. Gonzalez-Valencia cannot be Silverio because Silverio's whereabouts, according to

intercepted BlackBerry messages, and Mr. Gonzalez-Valencia's location, confirmed by his

passport, conflict on at least three occasions.

First, BlackBerry messages reveal that Silverio told "Boss" on July 5, 2013 that he was in

the "EU" (European Union) that day, which the Government, as indicated in its BlackBerry

message translations, believes may actually refer to the United States.  The messages also state

that Silverio would be in the EU on Monday, July 8, 2013.  Regardless of whether "EU" refers to

the European Union or the United States, Mr. Gonzalez-Valencia could not have been in either the

European Union or the United States on July 5, 2013.  To the contrary, Mr. Gonzalez-Valencia's

passport confirms that he was traveling from Mexico, which he entered on April 21, 2013, to

Uruguay on July 5, 2013.  Indeed, Mr. Gonzalez-Valencia's passport is stamped upon his entrance

into Uruguay on July 5, 2013 and again when he left Uruguay and traveled to Brazil on Monday,

July 8, 2013.

Additionally, on September 12, 2013, Silverio said that he would "stay here in the D.F.," which the Government has defined as an abbreviation for Mexico City, Mexico. Later that month, Silverio stated in BlackBerry messages that he was in Sweden on September 24, 2013. On the other hand, passport stamps confirm that Mr. Gonzalez-Valencia was in Uruguay from September 6, 2013 through December 4, 2013. So, Mr. Gonzalez-Valencia could not possibly be Silverio— who stated that he was in Mexico City and Sweden in September 2013 while Mr. Gonzalez-Valencia was in Uruguay. Accordingly, the wiretap evidence that the Government mistakenly relies upon in its attempt to link Mr. Gonzalez-Valencia to the alleged conspiracy after 2011 falls flat.

More significantly, at the time of the BlackBerry interceptions, the Government had the technology to trace where the BlackBerry messages were coming from and chose to ignore that, as it surely would have proved that Mr. Gonzalez-Valencia and Silverio were in separate locations.

Without any evidence to rebut Mr. Gonzalez-Valencia's uncontroverted evidence of withdrawal, the statute of limitations bars this prosecution and the Court should dismiss the Indictment against Mr. Gonzalez-Valencia.

In the alternative, even if this Court were to find that the Government's interpretation of the BlackBerry messages was correct in identifying Mr. Gonzalez-Valencia as Silverio, the BlackBerry messages show nothing more than family-related conversations consistent with Mr. Gonzalez-Valencia visiting his family over the summer of 2013.

## IV.   CONCLUSION

Based on the foregoing, Mr. Gonzalez-Valencia respectfully requests that the Court dismiss the Indictment.

In the alternative, Mr. Gonzalez-Valencia respectfully requests a bill of particulars requiring the Government to provide all of its evidence purportedly establishing that Mr. Gonzalez-Valencia is in fact "Silverio" in the BlackBerry messages.

Dated: October 4, 2021

Respectfully submitted,

*/s/ Stephen A. Best*

**BROWN RUDNICK LLP**

Stephen A. Best (DC Bar No. 428447)
Tiffany B. Lietz (admitted *pro hac vice*)
Brown Rudnick LLP
601 13th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 536-1737
Email: sbest@brownrudnick.com

-and-

**The L●S LAW FIRM**
Lilly Ann Sanchez (admitted pro hac vice)
Four Seasons Tower, Suite 1200
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 503-5503
Email: lsanchez@thelsfirm.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 4, 2021, I electronically filed the foregoing document with the Clerk of the U.S. District Court for the District of Columbia by using the CM/ECF system. All participants registered through the Court's electronic filing system will be served by the CM/ECF system as required to be served by Federal Rule of Civil Procedure 5(a).

Dated: October 4, 2021

<div style="margin-left: 40%;">

*/s/ Stephen A. Best*
Stephen A. Best
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005
Telephone: (202) 536-1737
Facsimile: (202) 536-1701
sbest@brownrudnick.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

</div>