**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   CRIMINAL NO.: 16-CR-065 |
| | ) |
| GERARDO GONZALEZ-VALENCIA, | ) |
| also known as "Lalo," "Flaco," | ) |
| "Silver," "Silverio," "Eduardo," and | ) |
| "Laline," | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS EVIDENCE**

The United States respectfully submits this Opposition to Defendant Gerardo Gonzalez

Valencia's Motion to Suppress Evidence [Docket No. 36-5] ("Motion" or "Mot."). The Motion

seeks the suppression of evidence related to a self-propelled semi-submersible vessel ("semi-

submersible") carrying cocaine intercepted by the United States Coast Guard ("USCG") in

August of 2007. As set forth below, the Defendant's challenges go to the weight, not the

admissibility, of the evidence. Accordingly, the Motion should be denied.

I.      **BACKGROUND**[1]

On August 21, 2007, while on routine patrol in the Eastern Pacific Ocean, a USCG

maritime patrol aircraft (MPA) identified what appeared to be a semi-submersible located at 09-

53N/094-17W, approximately 300 nautical miles south-southwest of the Guatemala and Mexico

land border in international waters. While the MPA maintained sight of the semi-submersible,

---

[1] All factual statements in the Background section are derived from the materials attached to the
Defendant's Motion, which were produced to defense counsel in discovery. *See* Docket No. 36-
9.

the USS De Wert prepared to conduct a right-of-visit boarding on the vessel, which displayed no indicia of nationality, and launched an attached rigid-hulled inflatable boat with a boarding crew. The MPA then observed four crew members jump from the semi-submersible into the water moments before the semi-submersible sank below the water. With the MPA still maintaining visual coverage, the boarding team on the inflatable boat recovered the four crew members who were still floating in the water and brought them back to the USS De Wert, where they were detained. Immediately thereafter, the boarding team returned to search the area where the semi-submersible sank and the four crew members were recovered. At that location, the USCG recovered 11 bales[2] and 54 individual kilogram-sized bricks of cocaine from the water and returned the contraband to the USS De Wert. Members of the USCG then returned to the location where the semi-submersible sank, and the USCG recovered an additional six kilograms of cocaine in the water, for a total of approximately 280 kilograms of cocaine recovered. Field tests indicated that the substance recovered was cocaine. The next morning a USCG helicopter again searched the area where the semi-submersible sank but did not find additional contraband.

On August 28, 2007, personnel from the USS De Wert transferred the four detained crew members and a 20-kilogram representative sample of the seized cocaine to Drug Enforcement Administration (DEA) Special Agent Rick Greer and USCG Special Agent Bill Coker in Guatemala. Special Agents Greer and Coker transported the detainees and the sample of cocaine to Tampa, Florida by air. Upon arriving in Tampa, Florida, SA Greer transferred the sample of cocaine to DEA Special Agent Scott Schoonover, who secured the sample in an evidence vault in Tampa. On October 10, 2017, Special Agent Schoonover transferred the representative sample

---

[2] One bale typically contains approximately 20 kilograms of cocaine.

to the DEA Southeast Regional Laboratory in Miami, Florida.  On November 19, 2017, a forensic chemist at that DEA laboratory took photos of the representative sample and analyzed the representative sample, which tested positive for cocaine hydrochloride.

On October 5, 2007, DEA Special Agent Scot Schoonover and DEA Special Agent Scott Sieben took custody of the bulk seizure from USCG personnel on the USS Kalkring in Jacksonville, Florida and transported it to Miami, Florida where it was stored in evidence for processing.  On October 10, 2007, Special Agent Schoonover, Special Agent Greer, and members of a law enforcement strike force processed the bulk seizure, and Special Agent Greer transferred the roughly 260 kilograms of cocaine to the DEA Southeast Regional Laboratory in Miami, Florida.  On November 19, 2007, a DEA forensic chemist took photographs of the bulk seizure and analyzed the substance, which tested positive for cocaine hydrochloride.

All four crew members were convicted of drug trafficking offenses in the U.S. District Court for the Middle District of Florida.  After the crew members had been sentenced and no appeals had been filed, DEA destroyed the bulk seizure and the representative sample according to standard DEA procedures.

Cooperating witnesses familiar with the semi-submersible shipment are expected to testify at trial that the Defendant was one of the major investors in the shipment of cocaine.  The witnesses are also expected to testify that the Defendant was part of an agreement to transport several thousand kilograms of cocaine on the semi-submersible that the USCG ultimately interdicted.

## II.    LEGAL STANDARD

To authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  Under Rule 901,

"a complete chain of custody need not always be proved." 2 McCormick on Evid. § 213 (8th ed. 2020). Rather, "[t]he government's burden to show a proper chain of custody only requires it to demonstrate that, 'as a matter of reasonable probability,' possibilities of misidentification and adulteration have been eliminated." *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997) (holding that unexplained 12-day delay between placement of drugs in police vault and their retrieval at testing laboratory did not break chain of custody for the drugs because there was no suggestion that drugs left vault during that period and chemist who analyzed drug sample found no evidence of tampering).

Generally, "a challenge to the chain of custody goes to weight rather than admissibility." *United States v. Mejia*, 597 F.3d 1329, 1335 (D.C. Cir. 2010);[3] *see also United States v. Roberson*, 897 F.2d 1092, 1096 (11th Cir. 1990) ("[G]aps in the chain of custody affect only the weight of the evidence and not its admissibility."). Evidence may be admissible notwithstanding an interrupted chain where there is "nonetheless ample corroborative evidence as to its acquisition and subsequent custody." *Mejia*, 597 F.3d at 1336–37 (holding that district court did not abuse discretion in admitting handwritten note, even though seizing officer was not identified, because agent found note in defendant's wallet ten minutes after defendant's arrest).

## III.   ANALYSIS

Evidence of the cocaine seizure can be properly authenticated because there is sufficiently reliable evidence that the cocaine tested at the DEA laboratory in Miami is the cocaine seized from the semi-submersible used by the Defendant and his co-conspirators. The

---

[3] The Defendant cites *Mejia* for the proposition that "[i]n many cases, 'an unbroken chain of custody is a prerequisite to admissibility,'" Mot. 3, when in fact, *Mejia* expressly states that the D.C. Circuit has "retreated" from that position, which is no longer the applicable standard. *See Mejia*, 597 F.3d at 1335.

Defendant raises three challenges to the chain of custody, questioning the origin, transfer, and testing of the cocaine. Each of the Defendant's challenges goes to the weight of the evidence, not its admissibility. Accordingly, the Motion should be denied.

First, the evidence reliably establishes that the seized cocaine came from the semi-submersible. A reasonable jury can infer that drugs floating in the water near an interdicted vessel were previously on the vessel. *See, e.g., United States v. Valencia*, 169 F. App'x 565, 573 (11th Cir. 2006) (finding that jury could reasonably conclude bails of cocaine found floating in water behind boat were jettisoned by defendants on boat, even though law enforcement did not see defendants throw the cocaine); *United States v. Cardales*, 168 F.3d 548 (1st Cir. 1999) (affirming guilty verdicts of crewmen of go-fast boat where boat had fled from Navy and bales of drugs later were found floating in the vicinity). Here, the USCG's seizure of the cocaine occurred close in time and space to the sinking of the semi-submersible such that a reasonable jury could infer that the semi-submersible was the source of the cocaine. After the MPA located the semi-submersible, it maintained sight of that location as the crew scuttled the vessel, jumped into the water, and were recovered by USCG personnel in an inflatable boat. The USCG personnel transported the crew to the USS De Wert, where the crew was detained, and immediately returned to the same location where the semi-submersible sank and the crew had been floating in the water. At that same location the USCG recovered the cocaine. The MPA's sighting of the semi-submersible and the seizure of the cocaine occurred on the same day, presumably within a matter of hours. A reasonable jury therefore could find that the semi-submersible was the source of the cocaine found floating in the water.

Second, there is no apparent gap in the chain of custody for the representative sample, and any gap in the chain of custody for the bulk seizure does not render it inadmissible because

there is "ample evidence as to its acquisition and subsequent custody." *See Mejia*, 597 F.3d at

1336. Regarding the 20-kilogram representative sample, the record is clear that USCG personnel

on the USS De Wert prepared the sample from the cocaine they seized on August 21, 2007, and

transferred the sample to Special Agent Greer and Special Agent Coker on August 28, 2007.

Those agents transferred the sample to Special Agent Schoonover, who secured the sample in an

evidence vault in Tampa, Florida until October 10, 2017, when Special Agent Schoonover

transferred the representative sample to the DEA Southeast Regional Laboratory in Miami,

Florida for testing. The reports do not detail, with precise specificity, how the 260-kilogram bulk

seizure was transferred from the USS De Wert to the USS Kalkring, which delivered the bulk

seizure to DEA. However, the weight of the bulk seizure transferred to DEA comports with a

280-kilogram seizure that had a 20-kilogram representative sample removed. The chain of

custody following the transfer from the USS Kalkring to DEA Special Agents Schoonover and

Sieben is clearly documented, and the DEA laboratory did not identify any signs of adulteration.

The Government has therefore met its burden to establish that, as a matter of reasonable

probability, the cocaine tested by the DEA laboratory in Miami was the same cocaine seized by

the USS De Wert without adulteration.

Third, the Defendant is incorrect that because DEA destroyed the cocaine, "the

Government cannot authenticate what it seeks to offer as evidence of cocaine trafficking as

originating from the intercepted submarine." *See* Mot. at 8. The Government intends to

introduce secondary evidence of the seizure at trial, including law enforcement testimony,

laboratory reports, and photographs related to the interdiction of the semi-submersible and

seizure of the cocaine from the location where it sank. When drug evidence is destroyed, the

introduction of a drug seizure through secondary evidence is permissible absent a showing that

the destruction of the drugs was in bad faith. *See United States v. Burnett*, 827 F.3d 1108, 1116 (D.C. Cir. 2016); *see also United States v. Benoit*, 730 F.3d 280, 289 (3d Cir. 2013) (finding "government did not need to submit the cocaine into evidence" because "evidence of chain of custody was sufficient," even though one person in chain did not testify, and forensic chemist testified that substance was cocaine hydrochloride). The Defendant has not argued that the destruction of the drugs was in bad faith. Indeed, the DEA reports attached to the Defendant's Motion clearly document that the cocaine was destroyed because DEA no longer believed the evidence was necessary after all four semi-submersible crew members had been sentenced. Accordingly, the Government can introduce the drug seizure at trial through secondary evidence.

Furthermore, it is unclear how re-testing the seized cocaine or testing "the entire lot" of the cocaine, rather than a representative sample, is necessary to prove that the cocaine originated from the semi-submersible. *See* Mot. at 5, 8. The cocaine was tested by a trained forensic chemist using standard DEA procedures, which includes testing representative samples. The Defendant has not identified anything improper about the testing procedures, let alone something so irregular as to warrant suppression. To the extent the Defendant wishes to challenge the testing of the cocaine, the Government anticipates that it is likely to call a forensic chemist in its case-in-chief at trial, who defense counsel will be free to cross-examine concerning the practices and procedures used by the DEA laboratory.[4]

Finally, cooperating witnesses have knowledge of the cocaine shipment on the semi-submersible independent of the evidence seized by the USCG. Even assuming *arguendo* that the

---

[4] The Government anticipates seeking a stipulation from the Defendant as to the conclusions of the DEA laboratory analysis of the seized cocaine, as such stipulations are quite common in international narcotics cases, but of course the Defendant is under no obligation to enter into one.

semi-submersible evidence collected by the USCG and DEA should be suppressed due to insufficient chain of custody, that would not prevent the cooperating witnesses from testifying about the Defendant's involvement in a conspiracy to transport several thousand kilograms of cocaine for eventual importation into the United States via a semi-submersible. Thus, to the extent the Defendant seeks to suppress *all* evidence related to the semi-submersible, even if derived from cooperating witness testimony rather than the seized cocaine, the Motion should also be denied.

## IV.     CONCLUSION

To the foregoing reasons, the United States respectfully requests that the Court deny the Defendant's Motion.


Respectfully submitted this 18th day of October, 2021.


ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice

By:     ___/s/_____
Kaitlin Sahni, Trial Attorney
Kate Naseef, Trial Attorney
Brett Reynolds, Trial Attorney
United States Department of Justice
Narcotic and Dangerous Drug Section
145 N Street, Northeast
East Wing, Second Floor
Washington, D.C. 20530
(202) 514-0917

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via ECF to counsel of record for the

Defendant, this 18th day of October, 2021.

By:      /s/
         Kaitlin Sahni
         Trial Attorney
         Narcotic and Dangerous Drug Section
         Criminal Division
         U.S. Department of Justice