**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO.: 16-CR-065** |
| | ) | |
| **GERARDO GONZALEZ-VALENCIA,** | ) | |
| also known as "Lalo," "Flaco," | ) | |
| "Silver," "Silverio," "Eduardo," and | ) | |
| "Laline," | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE INDICTMENT ON STATUTE OF LIMITATIONS**
**GROUNDS OR IN THE ALTERNATIVE FOR A BILL OF PARTICULARS**

The United States respectfully submits this Opposition to Defendant Gerardo Gonzalez Valencia's Motion to Dismiss the Indictment on Statute of Limitations Grounds [Docket No. 35] ("Motion" or "Mot.").

In his Motion, the Defendant asserts that he left the Mexican cartel "foisted upon him" by moving his family to Argentina and, later, to a multi-million dollar estate in a resort town in Uruguay. Proceeding solely by proffer, he insists that he became a "convenience store owner" in Buenos Aires, "starting a new life" apart from the drug cartel in Mexico that he and his siblings led. He concedes that he did frequently travel to Mexico to visit his family, who were still operating the criminal enterprise that he allegedly left behind. And he concedes that he, purportedly a mere convenience store owner, continued to own a luxury beach hotel in Mexico— although he fails to mention that the hotel itself was designated by the Department of the Treasury's Office of Foreign Assets Control ("OFAC") in 2015 for its connection to drug cartels— well within the limitations period. He even concedes much of the relevant law governing withdrawal, acknowledging that a defendant asserting a withdrawal defense must undertake an

1

"affirmative action to *disavow or defeat* the purpose of the conspiracy." Mot. at 3 (emphasis added) (quoting *Smith v. United States*, 568 U.S. 106, 111 (2013)). But he offers not a shred of evidence or even a proffer that he told his co-conspirators that he wanted out, that he refused any kind of request or tasking from the cartel, that he made any report to law enforcement, or did anything else to "disavow or defeat" the cartel. Instead, he insists, simply moving to Argentina and Uruguay—while still maintaining business interests and taking frequent trips to his co-conspirators in Mexico—is equivalent to affirmative steps like "coming clean to authorities" or "communicating abandonment to co-conspirators," as this Court has explained is required to show withdrawal. *See United States v. Apodaca*, 275 F. Supp. 3d 123, 134 (D.D.C. 2017).

Because the Defendant has not offered any competent evidence in support of his Motion that suffices to establish his withdrawal from the conspiracy, on which he alone bears the burden of proof, his Motion should be denied.[1]

I.   **BACKGROUND**

On April 19, 2016, a federal grand jury sitting in the District of Columbia returned an indictment charging the Defendant with conspiracy to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, and conspiracy to distribute five hundred grams or more of a mixture or substance containing a detectable amount of methamphetamine, knowing and intending that such substances would be unlawfully imported

---

[1] Additionally, to the extent that the Defendant's Motion raises questions of fact as to whether and when he withdrew from the charged conspiracy, those issues must be determined by the jury. *See Smith*, 568 U.S. at 109 (jury instructions given for withdrawal defense). This provides an additional basis to deny the Defendant's Motion, without prejudice to his arguing the defense at trial if the evidence warrants it.

into the United States from a place outside thereof, in violation of 21 U.S.C. §§ 959(a), 963, and 960 and 18 U.S.C. § 2. *See* Docket No. 1 (the "Indictment").

For purposes of this Motion, the Court can assume that the Defendant was a member of the charged conspiracy prior to April 19, 2011, as the only question for a statute of limitations defense based on withdrawal is whether a defendant withdrew from a conspiracy prior to the relevant statute of limitations date.[2] The government will not detail here, therefore, its inculpatory evidence of the Defendant's criminal activity and his involvement in the charged conspiracy before 2011.

The picture painted by the Defendant of his supposed withdrawal, though, is incomplete and merits further detail. First, the Defendant asserts that he left Mexico to open a convenience store in Argentina, apparently indenting to imply a humble existence after "bold[ly] . . . leav[ing] the life foisted upon him by his unfortunate upbringing." *See* Mot. at 2. The reality was more complex, far less modest, and still very much entangled with the drug conspiracy that the Defendant claims to have left behind. Specifically, in Mexico, the Defendant and others co-owned a company called Circulo Commercial Total de Productos, S.A. de C.V. ("Circulo Mexico"). The government has reviewed Mexican corporate registration documents for that entity, which show that the Defendant co-owned it with a number of other persons, one of whom was Juan Manuel Abouzaid El Bayeh, a co-conspirator and indicted defendant in this district. *See United States v. Abouzaid El Bayeh*, No. 17-cr-0094 (BAH).[3] Those corporate documents also do not indicate that Circulo Mexico was ever dissolved, or that the Defendant otherwise ended his financial entanglements with Abouzaid El Bayeh. █████████████████████████████

---

[2] *Cf. Smith*, 568 U.S. at 110–11 ("Far from contradicting an element of the offense, withdrawal presupposes that the defendant committed the offense.").

[3] Abouzaid El Bayeh was arrested in Mexico in approximately March of this year and remains in Mexican custody today.

Circulo Mexico, in turn, funded an Argentinian company called Circulo Internacional S.A. ("Circulo Argentina"), which provided money in approximately 2010 to "CORNER," a small chain of Argentinian convenience stores.  These are the convenience stores that the Defendant contends establish his withdrawal from the cartel.  Corporate documents relating to Circulo Argentina were in the Defendant's possession when he was arrested in Uruguay in 2016.

In 2011, the Defendant moved from Buenos Aires to Punta del Este, Uruguay, a seaside resort town.  To purchase a home for his family there, the Defendant negotiated a purchase price of $2 million USD (in a country where the GDP per capita is approximately one fifth that of the United States), and at closing, the property was purchased by a Panama-registered company, Montella Global S.A., which appears to have been controlled by the Defendant's wife.  Montella Global S.A. had been registered to the Defendant's wife by the Panamanian law firm Mossack Fonseca, which itself shuttered in 2018 following the disclosure of the so-called "Panama Papers" detailing alleged tax evasion schemes facilitated by the firm on behalf of its clients.

The Defendant's family grew during this time period, as well, with children born in 2005, 2009, and 2012.  In all three instances, the Defendant's wife, a non-U.S. citizen, gave birth to the children in California.  The Defendant himself, though, did not attend the children's births despite being a dual U.S. national who could have lawfully traveled into the United States.  It is unclear

whether this was because the Defendant feared prosecution on the international drug trafficking crimes for which he was later indicted, whether he was trying to avoid arrest on still-pending federal charges for his escape from a federal detention facility in 2001, *see United States v. Valencia Gonzalez* [sic], No. 4:06-cr-106 (N.D. Cal. 2006), or for some other reason.

During this time, the Defendant also continued an association with business interests in Mexico.  In addition to his continued ownership of Circulo Mexico, described above, the Defendant was the beneficial owner of Hotelito Desconocido, a luxury resort hotel in Puerto Vallarta, Mexico.  Hotelito Desconocido was legally owned by "W&G Arquitectos," a Mexican corporation that counted the Defendant's wife among its shareholders. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ It is unclear why his ownership was not formally registered, but because the Defendant in his Motion asserts that he sometimes traveled to Mexico to visit a "hotel he owned," he appears to concede that he was the beneficial owner of the property.

According to the Defendant's wife, the Defendant frequently invited local politicians and Mexican military commanders to the hotel, where he let them stay *gratis*, as late as 2013.  On August 19, 2015, Hotelito Desconocido itself and the Defendant's wife were designated by OFAC pursuant to the Foreign Narcotics Kingpin Designation Act (the "Kingpin Act"), and the hotel was seized by Mexican authorities on or about the same day, pursuant to their own legal authorities for seizure and forfeiture.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

One or more cooperating witnesses who may testify at trial have also informed the Government that they had the impression that the Defendant was living in Mexico in approximately 2015.

By April 2016, however, it appears that the Defendant and his wife had moved back to Uruguay and may have been living together again, because the Defendant was arrested by Uruguayan authorities on or about April 21, 2016, with his wife arrested by Uruguayan authorities shortly thereafter.  At the time of the arrest, Uruguayan authorities seized various cellular phones and other electronic devices, passports, financial documents, and other evidence.  Among the documents seized (copies of which have been provided to the U.S. government and have been provided to the Defendant in discovery) were two Mexican passports bearing the Defendant's photograph.  One was in his name, "Gerardo Gonzalez Valencia," and the other was in the name of "Francisco Ibarra Torres."  The Ibarra Torres passport had been issued by Mexico in 2014, and in 2018, Uruguayan authorities asked the Defendant about that passport in a custodial interview. He admitted that he had obtained it in a false name, although he explained that it was not necessarily "fake" because he had obtained it from an official government office, by employing a "functionary who takes you to the passport office" to obtain the passport in a false name without taking fingerprints.  Also at the time of the Defendant's arrest, a Mexican Instituto Federal Elector ("IFE") card—a Mexican voter registration card that is a commonly-used form of identification in Mexico—was seized bearing the same false name.  That card had been issued in 2013 and indicated that "Ibarra Torres" (again with the Defendant's photograph) lived in Tepalitlan de Morelos, Jalisco, a town approximately 20 miles from Guadalajara.

Separate from this evidence of the Defendant's continued presence in Mexico, the government conducted a judicially-authorized Title III wiretap of BlackBerry Messenger ("BBM") devices between 2013 and 2014. In the course of that BBM wiretap investigation, the government identified various BBM users, including the Defendant's brother, Abigael Gonzalez Valencia (who is indicted in this district and awaiting extradition to the United States); the Defendant's brother-in-law, Nemesio Ruben Oseguera Cervantes (known as "Mencho," who is an indicted fugitive in this district); the Defendant's nephew, Ruben Oseguera Gonzalez (known as "Menchito," who is in custody pending trial in this district); and others. The government will not detail all of its BBM evidence here, but will briefly summarize some of the ways in which it can tie certain devices with a screen name of "Silverio" to the Defendant:

- In one conversation during a time period that passport records show the Defendant to be present in Mexico, Abigael Gonzalez Valencia, the defendant's brother, exchanges messages with the user of a BBM device using the screen name "Silverio." Abigael indicates that his father had a cerebral hemorrhage and is on the way to San Javier Hospital (a hospital in Guadalajara). He asks "Silverio" to go to the hospital and to ask for a doctor who he identifies by name. (Open source records confirm this doctor to be a neurosurgeon at San Javier Hospital in Guadalajara.) Shortly thereafter, Abigael tells a co-conspirator that "my brother Lalo" is at San Javier Hospital. Cooperating witnesses and confidential sources have told the Government that the Defendant is known as "Lalo," and "Lalo" is also a common nickname for Gerardo and Eduardo in Spanish. None of the Defendant's other brothers are named Gerardo or Eduardo.

- In another conversation, on July 5, 2013, "Silverio" tells Abigael that he had traveled to "eu" via "df" (D.F. being a common abbreviation and conversational shorthand for Mexico City) rather than traveling via Panama.[5] Immigration records

---

[5] The Defendant's Motion asserts that the user of the "Siliverio" device said that he was in "the EU" and speculates that "EU" categorically means "United States" or "European Union." *See* Motion at 7. (The Defendant also asserts that this is what the *government* believes, which is not accurate.) But the actual, Spanish original message did not capitalize "EU" or include a definite article. ("Yo ya estoy aca en eu.") Additionally, the BBM wiretap as a whole is replete with coded language and abbreviations, which is extraordinarily common in narcotics trafficking. Seen in context, with evidence that "Silverio" departed Mexico on the same day that the Defendant departed Mexico for Uruguay, it is equally plausible that this is a phonetic code for "U̲ruguay."

7

show that on that exact day, the Defendant left Mexico for Uruguay.  In that conversation, "Silverio" indicates to his brother that his "black" appears to be working for him (recall that this is a BlackBerry conversation), and that it should also therefore work when he brings it with him "hunting." Days later, travel records show that the Defendant departed on a multi-week trip through Namibia, Botswana, and South Africa.  Photographs seized from the Defendant's residence upon his arrest in Uruguay show the Defendant, his wife, and what appears to be his oldest child on what appears to be an African hunting safari, including photographs of the Defendant, his wife, and child surrounding a dead leopard, a dead zebra, and a dead impala (a species of antelope native to southern and east Africa), with both the Defendant and his young son holding rifles in proximity to these animals in various photographs.

The BBM wiretap not only establishes the user of the "Silverio" device as the Defendant through these and other messages, but shows various co-conspirators involved in moving, shipping, producing, and selling cocaine and methamphetamine.  Various conversations also establish the Defendant, using the "Silverio" device, continuing to be involved in that drug distribution conspiracy as late as 2013-14.  But because the Defendant's Motion does not challenge that "Silverio" was engaged in drug trafficking on the BBM wiretap, and only challenges the government's identification of "Silverio" as the Defendant, the government will not detail them here.[6]

---

The Defendant also points to other BlackBerry messages where "Silverio" asserts that he is in "Sweden" or "D.F." on a day that he was supposedly demonstrably at home in Uruguay.  These, too, are unpersuasive—and at a minimum are an issue for the trier of fact—because they may be coded language.  And it also almost goes without saying that because these are the Defendant's own statements, there is always a chance that they are self-serving subterfuge.  If all it took to defeat a wiretap identification as a matter of law and secure the dismissal of an indictment was a single instance of a criminal defendant's own say-so claiming that he was in a location far from the crime, every criminal who suspected they were being wiretapped could be expected to frequently drop references to other locations in order to create fake alibis.

[6] The Defendant contends that the "Government had the technology to trace where the BlackBerry messages were coming from," but chose not to do so.  Mot. at 8.  This assertion is not technologically accurate, and moreover, the Title III authorizations at issue here did not authorize geolocation even if it were technically feasible for BlackBerry Messenger wiretaps at the time.

Finally, the government has interviewed a number of cooperating witnesses and confidential sources about the Defendant, and has received no indication from any of them that they ever heard him disavow the drug conspiracy or purport to withdraw from it. Additionally, at least one cooperating witness who the government anticipates calling at trial has first-hand knowledge of the Defendant's involvement in large cocaine shipments at least as late as 2013.

## II.   LEGAL STANDARDS

As this Court has explained, "[t]he law is well-established that '[c]onspiracy is a crime that presumes continuity until accomplishment or termination; once a defendant becomes a member of a conspiracy, he remains a member until he affirmatively withdraws or the conspiracy ends.'" *Apodaca*, 275 F. Supp. 3d at 134 (quoting *United States v. Moore*, 651 F.3d 30, 90 (D.C. Cir. 2011)). Withdrawal can be established only where a defendant shows that he has taken "affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *Id.* (quoting *Osborn v. Visa, Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015). The affirmative act must be an action that "defeat[s] or disavow[s]" the purpose of the conspiracy. *United States v. Garrett*, 720 F.2d 705, 714 (D.C. Cir. 1983). And withdrawal is not lightly found: "withdrawal from a conspiracy is difficult, requiring an affirmative step." *Bahlul v. United States*, 840 F.3d 757, 800 (D.C. Cir. 2016). Thus, as this Court succinctly put it, "withdrawal requires either coming clean to authorities or communicating abandonment to co-conspirators." *Apodaca*, 275 F.3d at 134. The burden, moreover, lies on the defendant advancing the defense.[7] *See id.* at 135 (collecting cases).

---

[7] The Defendant appears to misunderstand this critical point in his Motion, pointing to the 2013-2014 BBMs as the "sole evidence the *Government identifies* to purportedly link" him to the conspiracy after 2011, implying that it is the Government's burden to prove his continued presence in the conspiracy. Mot. at 2 (emphasis added). This is an elementary error. Because withdrawal

Under these standards, this Court held in *Apodaca* that the fact that a defendant is arrested and incarcerated does not necessarily mean that he has withdrawn from an ongoing conspiracy. *See id*.  In *Smith*, too, the Supreme Court held that a defendant who had been in prison for six years prior to indictment on a conspiracy with a five-year statute of limitations could not be said to have withdrawn merely because he was incapacitated from further participation in the conspiracy: "[p]assive nonparticipation in the continuing scheme is not enough to sever the meeting of minds that constitutes the conspiracy."  *Smith*, 568 U.S. at 112–13.  In other words, a defendant's membership in a conspiracy "endures even if he is entirely *inactive* after joining it."  *Id.* at 114.

Under the well-established purposes of conspiratorial liability, this is eminently sensible. As the Supreme Court explained, when a conspiracy defendant "join[s] forces to achieve collectively more evil than he could accomplish alone," the defendant "tie[s] his fate to that of the group."  *Id.*  Any "individual change of heart," even if it actually occurs, will not "put the conspiracy genie back in the bottle."  *Id.*  Only an active, affirmative withdrawal—one that "disavow[s] or defeat[s]" the purpose of the conspiracy—can start the limitations clock.  *Id.* at 113 (citing *Hyde v. United States*, 225 U.S. 347, 369 (1912)).  And even then, the affirmative defense of withdrawal "does not render the underlying conduct noncriminal."  *Smith*, 568 U.S. at 112.  *See also id.* ("A statute of limitations defense does not call the criminality of the defendant's conduct into question.").

---

is an affirmative defense on which the *Defendant* bears the burden, the government is not required to point to evidence linking the Defendant to the conspiracy after 2011.  It is *his* burden to show that he withdrew.  That said, the government has proffered assorted evidence in this response of the Defendant's involvement with his co-conspirators after 2011—in addition to the BBMs—and certainly reserves the right to present a full rebuttal case should the Defendant raise the withdrawal defense at trial.

### III.    ANALYSIS

Applying these standards to the Defendant's proffered facts, there is no basis to find that the Defendant withdrew from the charged conspiracy.  On the applicable law, the Defendant appears to concede—as he must—that he bears the burden to demonstrate withdrawal, and that any such withdrawal must be clearly communicated to co-conspirators.  *See* Mot. at 3.  In support, he properly cites the Supreme Court's decision in *Smith* and this Court's opinion in *Apodaca*.

Thereafter, though, the Defendant's Motion turns to old, out-of-circuit caselaw for the proposition that moving away and "disassociat[ing]" from cartel activities can constitute withdrawal.  Mot. at 5.  In *United States v. Greenfield*, 44 F.3d 1141 (2d Cir. 1995), the defendant had provided evidence at sentencing that he had "clearly and unequivocally said to [his co-conspirator] that he no longer wanted to be part of the conspiracy."  *Id.* at 1145.  If accepted by the sentencing judge, this would have the effect of lowering his Guidelines level by limiting his exposure for an "amount of loss" calculation.  The district court assumed for the sake of analysis that his proffered unequivocal statement of withdrawal was true, but nonetheless rejected the defendant's withdrawal claim.  *See id.* at 1150.  The government conceded on appeal that the district court had erred, and the Second Circuit remanded the case to reconsider the withdrawal claim.  *See id.*

The second case relied on by the Defendant here is *United States v. Nerlinger*, 862 F.2d 967 (2d Cir. 1988).  In that case, the Second Circuit affirmed a conviction where one evidentiary issue at trial had been whether co-conspirator statements could be admitted against the defendant if they were made after the defendant withdrew from the conspiracy.  *See id.* at 974.  The Second Circuit concluded that because the object of the fraud conspiracy had been to transfer money to the bank accounts of various participants, including the defendant, the defendant thwarted the

11

purpose of the conspiracy when he closed the bank account that he used for his role in the conspiracy. *See id.* at 974–75. Thus, according to the *Nerlinger* court, co-conspirator statements made after the defendant's withdrawal could not be attributed to the defendant for purposes of the hearsay exclusion of Fed. R. Evid. 801(d)(2)(E), although the court held that any error in admitting those statements had been harmless. *See id.*

Here, unlike in *Greenfield*, the Defendant has offered no evidence—not even a proffer—that he "clearly and unequivocally said" to his co-conspirators that he did not want to continue in their international narcotics conspiracy. He merely asserts that his move to Argentina "was known" to his co-conspirators, including his brother Abigael, who he tags as the "highest level[] of the cartel." Mot. at 5. This stands in stark contrast to the *Greenfield* defendant's proffered *statement* to his co-conspirator that he no longer wanted to participate in the conspiracy, and it's a conspicuous omission, given that the Defendant admits that he frequently returned to Mexico to "check on [his] hotel" and visit the very family members involved in the conspiracy. Mot. at 6. If he had truly withdrawn, the topic undoubtedly would have come up in discussion with those family members on the Defendant's extended visits; and if he discussed it with them, he surely would have asserted as much in his Motion. But, as even the *Greenfield* court explained, it is "all too easy after the fact for a defendant to claim that he or she withdrew," and so more is required than passive nonparticipation. *See Greenfield*, 44 F.3d at 1149–50.

*Nerlinger* also provides little support for the Defendant here. Even if it squarely applied— and it is a 33-year-old out-of-circuit case concerning the admissibility of co-conspirator statements—the *Nerlinger* defendant definitively thwarted the agreed object of the conspiracy when he closed the bank account that was being used to receive funds from the fraud scheme at issue. *See* 862 F.2d at 974 (explaining that the "principal objective of the conspiracy" was to

12

commit fraud by directing money into co-conspirators' accounts, including the defendant's). Here, by contrast, the object of the Defendant's conspiracy was the international sale, distribution, and transportation of illegal narcotics, knowing or intending that they would be transported into the United States. The Defendant does not even try to allege that his move to Argentina thwarted this conspiratorial objective, and even as he seeks credit for his "bold choice" to move to Buenos Aires, *see* Mot. at 1–2, he does not claim that his move stopped a single kilogram of cocaine or a single pound of methamphetamine from reaching the United States. Under the law of this circuit, therefore, he cannot be said to have taken "'an affirmative act inconsistent with the object of the conspiracy.'" *Osborn*, 797 F.3d at 1067 (quoting *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 464 (1978)).

A variety of cases from other circuits have similarly held that merely moving away is not sufficient to constitute withdrawal. *See, e.g., United States v. Starrett*, 55 F.3d 1525, 1550–51 (11th Cir. 1995) (holding that even where a gang member added an "out date" to his gang tattoo, sold his motorcycle, joined a church, got a job, moved away, and cut off contact with his gang members, a jury could reasonably find that he had not sufficiently withdrawn from the conspiracy by reporting to authorities or communicating his intentions to his co-conspirators); *United States v. Harris*, 695 F.3d 1125, 1136–38 (10th Cir. 2012) (holding that even with evidence that the defendant became religious and came to view his old gang as antithetical to his faith, mentioned to a police officer that he "used to be" a member of the gang but had left it years earlier, and was not present at required gang meetings, a jury could reasonably conclude that the defendant had not withdrawn); *United States v. Belanger*, 890 F.3d 13, 31–32 (1st Cir. 2018) (holding that defendant's move from Maine to California, even with testimony that he had done so to "straighten out his life," was not sufficient to require a finding of withdrawal where there was evidence that

13

he continued to interact with and eventually returned to his co-conspirators in Maine); *United States v. Ciresi*, 697 F.3d 19, 27–28 (1st Cir. 2012) (holding that even when co-conspirators told one another that they thought the defendant was "out" and that he "doesn't want nothing doin,'" he still could not be deemed to have withdrawn without a more unequivocal statement of withdrawal to his co-conspirators or a confession to the authorities); *United States v. Gutierrez*, 963 F.3d 320, 338 (4th Cir. 2020) (affirming district court's decision not to instruct the jury on withdrawal even when defendant had been "inactive" in a gang during the relevant limitations period).

These cases are entirely consistent with this Court's opinion in *Apodaca* and the Supreme Court's in *Smith*.  In *Smith*, after all, the Supreme Court held that a defendant's membership in a conspiracy "endures even if he is entirely *inactive* after joining it," without additional evidence of affirmative withdrawal.  568 U.S. at 114.  And in *Apodaca*, this Court explained that passive nonparticipation is not enough:  a defendant must "communicat[e] abandonment" to his co-conspirators. 275 F.3d at 134.

In light of these precedents and the government's additional factual context as proffered above, the Defendant's Motion does not establish as a matter of law that he withdrew from the alleged conspiracy.  If appropriate in light of the evidence presented at trial, withdrawal could become a factual question for the jury.  But on the present record, there is no basis to dismiss the Indictment on account of the Defendant's alleged withdrawal prior to the relevant statute of limitations date in 2011.  His Motion should therefore be denied.

## IV.     CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the

Defendant's Motion in its entirety.


Respectfully submitted this 18th day of October, 2021.


ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice

By:     \_\_\_\_/s/_____
Kaitlin Sahni, Trial Attorney
Kate Naseef, Trial Attorney
Brett Reynolds, Trial Attorney
United States Department of Justice
Narcotic and Dangerous Drug Section
145 N Street, Northeast
East Wing, Second Floor
Washington, D.C. 20530
(202) 514-0917

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via e-mail to counsel of record for the Defendant, this 18th day of October, 2021.

By:       /s/
            Kaitlin Sahni
            Trial Attorney
            Narcotic and Dangerous Drug Section
            Criminal Division
            U.S. Department of Justice

16