# **EXHIBIT A**

*[Handwritten annotations in margin:]*
- 🟧 INACCURATE/WRONG
- 🟦 UNITED STATES HAS WITHDRAWN ALLEGATION; THUS EVIDENCE IS WITHDRAWN
- 🟪 CONCLUSORY STATEMENT ≠ EVIDENCE
- 39

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § § | Criminal No. 1:16-CR-00065 |
| Gerardo Gonzalez-Valencia a.k.a. "Lalo," "Flaco," "Silver," "Silverio," "Eduardo," and "Laline" | § § § | |

### AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION

I, Kyle J. Mori, being duly sworn, hereby depose and state:

1.  I am a citizen of the United States of America, residing in the State of California.

2.  I am a Special Agent with the United States Drug Enforcement Administration (DEA), currently working in Los Angeles, California. I have been assigned to work as a criminal investigator with the DEA for eight years and have been a sworn law enforcement officer for fifteen years. The DEA is the law enforcement agency within the United States government primarily responsible for enforcing federal drug laws.

3.  As a Special Agent with the DEA, I have personally conducted and participated in numerous investigations that have resulted in the arrests and convictions of individuals responsible for drug trafficking. Based on my training and experience, I am familiar with the means and methods that drug traffickers use to import illicit drugs, and the support and assistance drug trafficking organizations (DTOs) require to conduct their illegal activities. I have also become knowledgeable about the criminal statutes of the United States, and in particular, the federal narcotics statutes.

1

4.    In the course of my official duties, I have become familiar with the charges and evidence in the case against Gerardo Gonzalez-Valencia (hereinafter, Gonzalez-Valencia), captioned United States of America v. Gerardo Gonzalez-Valencia, also known as "Lalo," "Flaco," "Silver," "Silverio," "Eduardo," and "Laline," Criminal No. 1:16-CR-00065, which arose out of a conspiracy to import and distribute cocaine and methamphetamine into and within the United States. As one of the lead investigators in this matter, I am familiar with the evidence in this case.

## I. Background

5.    The investigation revealed that from about January 2003 to April 19, 2016, Gonzalez-Valencia, the leader of a Mexico-based DTO, transported multi-ton quantity shipments of cocaine and methamphetamine from Mexico, for importation and distribution into the United States. Cooperating witnesses (CWs) stated that Gonzalez-Valencia arranged the importation and transportation of the cocaine from Colombia via tractor-trailers, speed boats, submarines, and other smuggling methods to Mexico, ultimately destined to the United States. On August 20, 2007, the United States Coast Guard (USCG) seized approximately 280 kilograms of cocaine attributed to Gonzalez-Valencia. Gonzalez-Valencia was also involved in the transportation, production, and importation of methamphetamine into the United States. Gonzalez-Valencia received precursor chemicals from Honduras to produce methamphetamine and transported it via private planes from Mexico for distribution into the United States.

6.    The evidence against Gonzalez-Valencia consists of various types of evidence, including witness testimony, physical and documentary evidence, and other evidence.

## II. The Evidence

### A. Statements of CW-1

7. CW-1, a former leader of a Mexico-based DTO, was responsible for transporting large amounts of cocaine into the United States. CW-1 voluntarily spoke with law enforcement authorities, to whom he provided the following information.

8. In 2000, CW-1 was first introduced to Gonzalez-Valencia as significant drug trafficker.

9. On August 20, 2007, the USCG pursued and interdicted a submarine in international waters of the Pacific Ocean approximately 200 miles from the Guatemala-Mexico border. USCG personnel witnessed the occupants of the submarine attempting to sink it. The USCG assumed jurisdiction over the vessel and recovered approximately 280 kilograms of a substance which later tested positive for cocaine. Four crew members were arrested and prosecuted in the United States.

10. CW-1 told law enforcement authorities that Gonzalez-Valencia, CW-1, and other co-conspirators arranged for the transportation of the August 20, 2007 cocaine shipment. According to CW-1, Gonzalez-Valencia and his DTO were responsible for the transportation of several tons of cocaine from Colombia via speed boats to Mexico for importation and distribution into the United States. CW-1 stated that Gonzalez-Valencia and his brother, Abigael Gonzalez-Valencia, arranged the transportation of the cocaine and maintained contact with the source of supply for the cocaine in Colombia. CW-1 indicated that Gonzalez-Valencia and CW-1 participated in multiple drug trafficking meetings where the August 20, 2007 cocaine shipment was discussed. CW-1 stated that CW-1 paid Gonzalez-Valencia and Abigael Gonzalez-Valencia for CW-1's share of the investment in the August 20, 2007 cocaine shipment.

3

11. According to CW-1, during the drug trafficking meetings, Gonzalez-Valencia admitted that he controlled drug routes from Mexico to Los Angeles and New York, and that his family members received the drug shipments in the United States.

### B. Statements of CW-2

12. CW-2, a former leader of a Mexico-based DTO, was supervised by CW-1 and was responsible for transporting large amounts of cocaine into the United States. CW-2 voluntarily spoke with law enforcement authorities, to whom he provided the following information.

13. In 2006, CW-2 was first introduced to Gonzalez-Valencia. From 2006 to 2007, CW-2 met with Gonzalez-Valencia to discuss drug trafficking operations. According to CW-2, during this time, Gonzalez-Valencia indicated that he, Gonzalez-Valencia, and two other drug traffickers had a van available that could fit 400 kilograms of cocaine within a hidden compartment. The van was parked at a warehouse in Mexico and was used to transport cocaine and money.

14. CW-2 corroborated the August 20, 2007 cocaine shipment, as described by CW-1. CW-2 indicated that Gonzalez-Valencia and CW-2 held several discussions about the August 20, 2007 cocaine shipment and that Gonzalez-Valencia assisted in arranging the transportation of the cocaine from Colombia. CW-2 stated that, after the cocaine shipment was seized by the USCG, CW-2 paid Gonzalez-Valencia in United States currency and drugs to reimburse him for the cost of the seized cocaine.

15. CW-2 indicated that in 2009, one of CW-2's associates imported ephedrine and other methamphetamine pre-cursor chemicals from China to Honduras. CW-2 stated that CW-2 received 169 drums of ephedrine in pill form his associate. CW-2 then delivered 72 drums of ephedrine to Gonzalez-Valencia, knowing that Gonzalez-Valencia would produce methamphetamine in Mexico, ultimately destined to the United States.

4

16. CW-2 stated that in 2009, in an apartment in Mexico, CW-2 discussed with Gonzalez-Valencia and his brother the shipment of 2,000 kilograms of cocaine from Costa Rica to Mexico, ultimately destined to the United States. According to CW-2, Gonzalez-Valencia asked CW-2 to arrange the transportation for this cocaine shipment. CW-2 indicated that this shipment was successfully delivered to Gonzalez-Valencia and Abigael Gonzalez-Valencia in Mexico and that Gonzalez-Valencia paid CW-2 a percentage of the value of the cocaine shipment in United States currency. During the meetings, Gonzalez-Valencia told CW-2 that that he controlled a successful drug route from Mexico to the United States.

17. CW-2 stated that in 2009, in an apartment in Mexico, Gonzalez-Valencia and Abigael Gonzalez-Valencia asked CW-2 to assist in the transportation of 400 kilograms of cocaine within Mexico for a fee. After CW-2 successfully delivered the cocaine shipment, CW-2 was paid by a relative of Gonzalez-Valencia in United States currency. CW-2 indicated that during the meetings to arrange this shipment of cocaine, Gonzalez-Valencia again stated that he controlled a successful transportation route from Mexico to the United States.

### D. Lawfully-Intercepted Electronic Communications

18. As part of this investigation, law enforcement authorities lawfully intercepted and recorded Gonzalez-Valencia and his co-conspirators via electronic communications. The following is a summary of a lawfully-intercepted text messages in California between Gonzalez-Valencia and a co-conspirator.

19. One June 26, 2013, during a lawfully-intercepted text messages, Gonzalez-Valencia and a co-conspirator discussed whether a drug trafficking transaction was complete. Gonzalez-Valencia and his co-conspirator discussed 85 units of drugs which belonged to the co-conspirator as well as 15 more units that Gonzalez-Valencia was saving. Gonzalez-Valencia and his co-conspirator

5

further discussed a drug sample. Based on my training and experience, and knowledge of this investigation, drug traffickers usually request a drug sample before agreeing to a large drug purchase. Gonzalez-Valencia also discussed additional drug amounts which were being prepared for shipment "up there," which I believe is a reference to the United States, the intended shipment point for those drugs.

### III. Identification

20. Gerardo Gonzalez-Valencia, also known as "Lalo," "Flaco," "Silver," "Silverio," "Eduardo," and "Laline," is a citizen of the United States, born on May 11, 1977, in San Jose, California, United States. A certified copy of his United States birth certificate is attached as **Exhibit E-1**. A copy of his known fingerprints, provided by the United States Federal Bureau of Investigation, are attached as **Exhibit E-2**. Gonzalez-Valencia is also the holder of Mexican Passport number G08747371, which is attached as **Exhibit E-3**.

21. Attached to this affidavit as **Exhibit E-3** is a photograph of Gerardo Gonzalez-Valencia. CW-1 and CW-2, who have personal knowledge of Gerardo Gonzalez-Valencia and his participation in the criminal activity described herein, each have looked at the attached photograph in **Exhibit E-3** and confirmed that the person depicted in **Exhibit E-3** is Gerardo Gonzalez-Valencia, the person whose criminal conduct is described in this affidavit and who has been charged in this case. In addition, law enforcement agents in Uruguay have viewed **Exhibit E-3** and have confirmed that the person in **Exhibit E-3** is Gerardo Gonzalez-Valencia, the