# **EXHIBIT E**

Supreme Court of Justice

ADDRESS Human Rights Passage 1310

CEDULÓN

GONZALEZ VALENCIA GERARDO

Montevideo, February 11, 2020

In cars:

GONZALEZ VALENCIA, GERARDOEXTRADITION

File 474-76/2016

Processed before this Headquarters, it has been arranged to notify you of the following order:

tencia No.18 MINISTER EDITOR: DOCTOR ELENA MARTINEZ Montevideo, eleventh of February of two thousand and twenty.

SEEN: For final judgment, these cars caratulados:


 "GONZALEZ VALENCIA, GERARDO. EXTRADITION - CRIMINAL CASSATION" - IUE: 474-76/2016.
RESULTING:

I) By judgment No. 13, dated August 28, 2017, the Court of First Instance in The Criminal Specialized in Organized Crime of 1st Shift, ruled: "Grant the extradition of Gerardo González Valencia requested by the competent authorities of the United States, under the following conditions:

I) the surrender is deferred until the requested obtains his provisional release or definitive freedom in the case that follows him in Uruguay before before the following this Headquarters IUE 2-37467/2016;

(II) Extradition granted is conditional on the authorities of the requesting State ensuring that the person requested shall not be tried or convicted of offences other than those referred to in the request for extradition, with the exception of the cases enshrined in paragraphs 1 and 2 of that article;

III) the extradition granted is conditional on the requesting authorities granting guarantees considered sufficient by the national authorities involved in this process, that in the event that Gerardo González Valencia is convicted in the criminal proceedings that are intended to be initiated in the requesting country, no death penalty or life imprisonment will be imposed;

(IV) the competent authorities of the requesting State shall express whether they accept the conditions set out in the preceding paragraphs, within forty days of notification of this judgment (?)" (fs. 238/250).

II) By judgment No. 208, issued on October 2, 2018, by the Court of Criminal Appeals of 4th Shift, it was ordered: "Confirm the sentence of first instance appealed. (?)" (fs. 317/321 vta.).

III) Against the aforementioned judgment, the defense of GONZALEZ VALENCIA filed the appeal in cassation under study (fs. 334/344). In that regard, he maintained, in summary, the following.

(a) Initially, it stated that the Court erred in applying the Treaty on Extradition and Cooperation in Criminal Matters concluded between the United States of America and the Eastern Republic of Uruguay (dated 6 April 1973, signed in Washington), since that agreement does not concern the present case. He recalled that GONZÁLEZ is not being prosecuted or convicted, as required by article 1 "eiusdem". He understood that the Treaty applicable to the case is that of Mutual Legal Assistance in Criminal Matters concluded on May 6, 1991 and ratified by our country through Law 16,431.

(b) It alleged, as another defect of the attacked device, that no evidence was required for the purposes of verifying the facts narrated by the requesting State. He insisted that Article 10 of the Treaty in its nral. 3 states that "the requested party may request that the applicant provide sufficient evidence to establish 'prima facie' that the person sought has committed the offence for which the extradition is formulates, and the requested party may refuse extradition if an examination of the case shows that the arrest warrant is manifestly unfounded." He mentioned that the simple tax return is not evidence. He also questioned the role of protected witnesses and the evidentiary value that U.S. authorities place on text messages.

(c) He indicated that, in his opinion, the statute of limitations for the offences to be charged has been stressed. He emphasized that in the best case the alleged illicit occurred in the month of August 2007, while the accusation dates from April 19, 2016. Consequently, he asserted that after more than five years the crime is prescribed, in accordance with the rules of the requesting country.

(d) Raised the risk of human rights violations if extradition is granted. He mentioned - by way of example - that the High Court of Justice of Ireland rejected the United States' request to extradite an individual facing trial due to the harsh conditions of detention in that country. In addition, he said that in the event of being extradited, he runs the risk of being sentenced to life imprisonment or even the death penalty. e) He said that it should also be considered that GONZÁLEZ has a case in Uruguay, where the defense, when answering the prosecutor's accusation, requested the extension of the accused and maintained that it corresponds to the law that he is available in our country for said case until he is convicted. As is apparent from article 8 of both Treaties in question, that of 1973 and that of 1991, Uruguay has the power to postpone extradition if it is granted until the conclusion of the criminal proceedings to which it is subject in our country.

(f) Finally, it stated that the maximum penalty to be applied should be limited to the most burdensome "quantum" established by Decree-Law No. 14,294 and Law No. 17,016, with respect to the crime of a similar nature, which is that established in article 31, that is, 18 years of penitentiary. He understood that it should be added as a condition, in the event that extradition takes place, that the maximum penalty to be awarded is 18 years because it is the legal limit for a similar crime in our country.

IV) By order No. 219, dated February 20, 2019 (p. 357), it was ordered to enter the mobilized cassation appeal.

V) Once the respective transfers had been granted, Mr. Prosecutor Specialized in Organized Crime appeared, requesting the rejection of the challenge (fs. 363/366); in the same vein, the Court Prosecutor (fs. 399/404) ruled.

VI) By Decree No. 883 of May 16, 2019 (pages 406), the passage of the documents under study was ordered (fs. 406); Once the study was completed, the sentence was agreed for today. CONSIDERING:

I) The Supreme Court of Justice, by unanimity of its natural members, will dismiss the appeal of cassation filed by the defendant, for the legal bases that will be expressed, since the grievances articulated as support of the challenge are not efficient to resolve in the opposite direction to what was decided in the second instance.

II) Of the extradition that it processes in the file and of the grievances articulated in cassation. The present case concerns the extradition request made by the United States of America against Gerardo GONZÁLEZ VALENCIA, who is accused of committing repeated crimes related to drug trafficking. In this context, two judgments of merit were handed down that enabled the delivery of GONZÁLEZ VALENCIA to the authorities of the requesting State, which motivated, on the part of the appointee, the presentation of the appeal in cassation under study. Specifically, the following grievances can be identified from the impugning libel:

1) grievances related to the application in the case of the Treaty on Extradition and Cooperation in Criminal Matters concluded in 1973 between the Oriental Republic of Uruguay and the United States of America (ratified in our country by Decree-Law No. 15,476);

2) grievances relating to the alleged absence of sufficient evidence to grant extradition;

3) grievances relating to the alleged statute of limitations for the offences for which extradition was requested;

4) grievances related to the alleged risk of human rights violations if extradition is granted;

5) grievances associated with the invoked error in having deferred delivery until the obtaining of provisional release or final release; and

(6) grievances linked to the alleged error in the failure to make extradition conditional on the maximum penalty to be applied in the requesting State being 18 years' imprisonment. In the order proposed, they will be analyzed in the future.

III.1) Of the grievances relating to the application in the case of the Treaty on Extradition and Cooperation in Criminal Matters concluded in 1973 between the Eastern Republic of Uruguay and the United States of America (ratified in our country by Decree-Law No. 15.476) III.1.1) As a first line of defense, the appellant points out that the Court of Appeals erred in law in holding that the applicable Treaty in relation to the request for extradition therefore is the one ratified by Decree-Law No. 15.476. It considers that the request was made for the purpose of bringing Mr. GONZÁLEZ VALENCIA to trial and that the request is based on a Treaty which is not applicable, because it contravenes the legal status of the defendant, who, having not been prosecuted or convicted, is not subject to the Treaty of 6 April 1973. It insists that, in kind, the applicable Treaty is the treaty concluded on 6 May 1991 between the

Uruguayan State and the United States of America, on Mutual Legal Assistance in Criminal Matters, ratified by Law No. 16,431. In the opinion of the Court, the recursive proposal is not acceptable, since the normative framing of the case made in both judgments of merit is irreproachable. In this regard, the Treaty on Extradition and Cooperation in Criminal Matters signed in Washington (USA) on 6 April 1973, approved by Decree-Law No. 15,476 (hereinafter: Treaty of 1973), applies; on the understanding that the legal situation of GONZÁLEZ VALENCIA is perfectly suited to the case provided for by the aforementioned bilateral rule. Contrary to the appellant's statements, the 1973 Treaty has not been repealed, modified or replaced by the provisions of the Treaty on Mutual Legal Assistance in Criminal Matters concluded in Montevideo on 6 May 1991, ratified by Law No. 16,431 (hereinafter: Treaty of 1991). While that Treaty is later, it certainly regulates another type of mutual legal assistance in criminal matters and not strictly extradition. Indeed, the hypotheses governed by the 1991 Treaty do not refer to the extradition of persons (the bilateral rule at no time speaks of extradition), but refers to other types of assistance in criminal matters. In other words: the 1991 Treaty does not apply because it refers to degrees of cooperation of less intensity to extradition, namely: "a. service of documents; b. receipt of testimonies or statements of persons, as well as the carrying out of expert reports and examination of objects and places; c. location or identification of persons; d. notification of witnesses or experts for voluntary appearance to give testimony in the requesting State; e. transfer of persons subject to criminal proceedings for the purpose of appearing as witnesses or for other purposes expressly indicated in the request; f. Precautionary measures or freezing of assets; g. compliance with applications for registration and kidnapping; h. delivery of documents and other evidence; i. immobilization, confiscation or transfer of confiscated property, as well as in the matter of compensation and fines imposed by criminal sentence; and j. any other form of assistance not prohibited by the laws of the State requested for the investigation and prosecution of crimes" (art. 2). In the latter sense, the reference to "purposes expressly indicated in the request" (lit. e), as noted by Mr. Fiscal Letrado, "cannot be understood that extradition can be requested in this way, since extradition is a process subject to multiple conditions and requirements, which must be expressly provided for in the bilateral rule (crimes included,  excluded offences, time limits for processing the application, preventive arrest, required documentation, formalities, etc.) which are not in the 1991 Treaty" (fs. 363 vta.). This is enough to repel this first sector of grievance.

III.1.2) In another order, as a subsidiary defense, GONZÁLEZ VALENCIA argues that he has not been prosecuted or convicted in the United States of America, so that in his respect the requirements required by Article 1 of the 1973 Treaty to grant the extradition. Again, he is right. In the Court's view, the appellant makes a biased reading of Article 1 of the bilateral rule to maintain that extradition cannot be granted until there is a prosecution. First, in general terms, such an interpretation is in acquator with the foundations and principles of international judicial cooperation in criminal matters. It cannot be lost sight of the fact that when interpreting the Treaties (unlike the interpretation made by the challenger) it must be done in the way that favors the purpose for which they were agreed, on the understanding that the premises of cooperation between states and the protection of society must govern beyond the physical place where the subject to whom the offense is intended to be imputed must govern. As the Minister of the Court, Dr. Tabaré SOSA AGUIRRE, has argued in this regard: "... the criterion for international legal assistance should be to facilitate, extend and shorten the relevant procedural procedures and reduce the conditions at the substantive level" (cf. "Judicial independence as a condition for international cooperation", published in "Curso de Cooperación Penal Internacional", Rio de Janeiro 1994, Ed. Carlos Álvarez, First Edition,  Montevideo, 1994, p. 141). Secondly, with specific reference to

the interpretation of the terms "prosecuted" and "convicted", used by the aforementioned article 1 of the 1973 Treaty, the Court considers that it must be done through the application of the logical-systematic criterion or method, according to which it is appropriate to resort to the normative context, that is, to the rest of the articles of the international instrument itself under analysis (in addition to the preamble and its annexes), for the purpose of inquiring whether the Treaty itself contains any definition of the terms to be interpreted (art. 31.1 of the Vienna Convention on the Law of Treaties). Hence, the defendant's defense is wrong to pretend that the prosecution required by the rule should be understood in terms similar to domestic law. In this sense, the 1973 Treaty itself refers, in its article 10 nral. 3, that where "the injunction concerns a person who has not yet been convicted, it must be accompanied by an arrest or detention order or equivalent indictment issued by the competent authority of the requesting Party" (as verified by "infolios"). To pretend that prosecution or conviction is required in light of the terms of our law is to limit cooperation in matters of extradition to subjects who escaped before or after the prosecution, or to whom a trial was carried out in absentia against them. It happens that the interpretation made by the defense clashes with basic edges of the extradition institute itself. In this regard, Manuel A. VIEIRA and Carlos GARCÍA ALTOLAGUIRRE express: "... when the person under investigation (person against whom the evidence required by domestic law to be brought to trial has been gathered and so requested by the Public Prosecutor's Office), the accused (person against whom an indictment has been issued) or the convicted person (person against whom a final sentence of conviction has been handed down) is not within the territorial jurisdiction of the judge hearing his case, but he is in another country and is not willing to appear voluntarily before it, that is, he has no will to abide by the procedural subjection that corresponds to him, said Magistrate has a tool aimed at remedying this difficulty, and ensuring the result of the process under his charge, which is the institute of extradition" (cf. "Extradition", Ed. FCU, First Edition, Montevideo, 2001, p.125). There is constant jurisprudence of the Supreme Court of Justice on the understanding that the requirement must be limited to the subject being able to exercise his right of defense in the process (v.gr: judgment No. 274/2002). Consequently, numerous judgements resulted in extraditions in cases whose prosecution occurred in absentia. In coincidental terms, the Minister of the Court Dr. Tabaré SOSA AGUIRRE, being head of the Court of First Instance in Criminal and Juvenile Matters of 2nd Shift, by sentence issued on May 19, 1989, laid the following interpretative bases: "... that the requested person has never testified before a judicial authority is a request of principle, since it is not possible to put as a condition what is precisely the object of the extradition process and that this is a presy of the prosecution in our law, it cannot be extended to other legislations. The only requirement (and considered when ratifying the Treaty) is that the guarantees of due process of law exist in the requesting State, where appropriate, but the specific characteristics or modalities that in each country assume this guarantee are specific to each State and in this it is not possible to interfere" (cf. LJU, case individualized with No. 11.475). With those considerations in mind, it is appropriate to approach the analysis of this stage of the grievance. The defense of GONZÁLEZ VALENCIA interprets that the reference to people who have been "prosecuted" implies submission to criminal proceedings in terms comparable to the prosecution regulated in the Code of Domestic Criminal Procedure of 1980. However, as has been said, the interpretation it formulates is absolutely partial and does not respond to the natural and obvious meaning that is inferred from the contextual analysis of the provisions of the Treaty. In the case, the disjunctive conjunction "or" contained in the last rule cited, indicates the existence of alternatives between various options provided for in the Treaty, not requiring that the subject subject of extradition has been rightly subjected to criminal proceedings -in the terms defined by the vernacular regulations-. The rule admits

that the request for extradition may be accompanied by an arrest or detention order, which are broader hypotheses of prosecution, associated with an accusation for certain crimes, which require legal subjection to criminal proceedings. As mr. Prosecutor of the Court points out: "The clear text of the rule does not leave any doubt as to whether the request for extradition is admissible, even if the person is not "prosecuted", since the arrest warrant is sufficient to give rise to that request. And this point is fulfilled in the present proceedings since, saving the differences in terminology and procedure, the formal arrest warrant against Gerardo González Valencia, issued by the United States District Court for the District of Colombia dated April 19, 2016 (fs. 82), is added in the file." (fs. 402 vta.). In the appellant's logic, the extradition of subjects who have been -at least- prosecuted in the requested country could only be required, a hypothesis that could only occur in cases of processes in absentia without the physical presence of the extraditable or in cases of escape. Of course, this interpretation put forward by the challenger is unreasonable, because it would restrict the scope of the Treaty. In short, within the framework of the multi-cited Treaty of 1973, it is not shareable to require prosecution or conviction by the requesting State in order for our country to make room for the requested extradition.

III.2) Of the grievances related to the alleged absence of sufficient evidence to grant extradition. In this area, the 1973 Treaty requires - as has already been seen - that where the person whose extradition is impeded has not been convicted, the request must be accompanied by: "an arrest or detention order or an equivalent judicial indictment issued by the competent authority of the requesting Party." It adds that: "The requested Party may request that the requesting Party provide sufficient evidence to establish 'Prima facie' that the person sought has committed the offence for which the extradition is formulated. The requested Party may refuse extradition if an examination of the case shows that the arrest warrant is manifestly unfounded." (art. 10.3). In his expression of grievances, GONZÁLEZ VALENCIA asserted that the Court has incorrectly applied this rule, because it has accepted without question the "saying" of prosecutors and agents of the United States government. He said that the statements of government officials of the requesting country were considered as evidentiary elements, which strictly speaking do not constitute evidence. He insisted that the opinion of these agents is not evidence. The contrariness to the law of the sentence -as stated in the challenge- would derive from the court accepting that GONZÁLEZ VALENCIA be extradited without having previously been shown that they exist sufficient evidence to provide semi-full evidence to grant extradition. It claims that Uruguay must be more demanding and request at least an extension of the evidence presented, for not complying with the standard of semi-full test. It recognizes that although in the extradition trial the requested jurisdiction should not examine the evidentiary merit of the case to determine whether the requested person is guilty or innocent, it must be established that there are elements that constitute semi-full evidence, as required by Uruguayan jurisprudence to issue an indictment. In short, it states that the affidavit of officials of the government of the requesting State does not satisfy the requirements of the Treaty in order to prove the probable cause of extradition, since there is a wealth of vague and confusing statements such as those that indicate that Mr. GONZÁLEZ VALENCIA is a drug trafficker, which are not evidence, nor do they form indications to justify the decision to extradite him to the United States of America. On that point, the appellant is also not right. A reading of the 1973 Treaty does not give way to a departure from the system that, as a rule, operates in our country in the field of extradition, which is the so-called "Belgian-Dutch system", according to which only a formal analysis of the extradition request can be carried out, without requiring an analysis of the merits of the matter, nor the proof of the facts attributed to the extraditable subject. The judge does not declare whether the requested person is innocent or guilty, but whether the application made satisfies the formal

requirements laid down in the Treaty. In this regard, as mr. Fiscal Letrado (fs. 364 vta.) recalls, the Court has ruled on multiple occasions (judgments Nos. 216/2003, 191/2005, 341/2006, 219/2007, 640/2012, 769/2012 and 125/2015). In any event, as mr. Fiscal Letrado rightly points out when evacuating the transfer of the appeal, the Treaty empowers, but does not require requesting that the requesting State provide sufficient evidence to establish, "prima facie", that the person sought has committed the crime for which the extradition is formulated. Indeed, the request for evidence under Article 10 of the 1973 Treaty is a power granted to the Judge by using the verb "may"; Assertion that it is verified from the provisions of the final part of the precept, where the refusal of extradition is authorized only "if an examination of the case shows that the arrest warrant is manifestly unfounded", a concept that does not say relation to the analysis and evaluation of the evidentiary elements. On the other hand, as mr. Prosecutor of the Court points out: "The discretionary nature of the rule then determines that it cannot be pointed out as an error of law in this instance" (fs. 403). In any case, it is not possible to notice, from the examination of the extradition request, that the arrest warrant issued by the authorities of the requesting State is "manifestly unfounded", so that there is no illegitimacy in the work of the organs of merit in having granted the extradition of marras. The appellant seeks to ignore that the arguments concerning the sufficiency of the evidentiary elements, in order to prove the commission of the crime, are the subject of the trial to be carried out in the United States of America, but alien to this jurisdictional process (cf. judgment of the S.C.J. No. 145/2002, published in LJU, case No. 14.492; and judgment s / n,  dated 26/12/1984, issued by tap 3º T., published in the LJU, case No. 10.356). On the point, our jurisprudence has said: "... in addition, the possibility for the requesting State to provide sufficient evidence is a power of the requested State, the text reads 'the requested Party may request that the requesting Party provide sufficient evidence''. The appellant's criticism of the evidence in the num. 13 of fs. 202, in short, they speak of the seriousness of the applicant's proceedings, and if the participation of the requested party in the wrongs attributed to him is not finally proven, surely like the others involved in the facts, he will emerge unscathed from the trial that follows him. The effectiveness of the evidence is not a matter in which our courts must pronounce but it is up to the courts responsible for administering justice in the requesting State to do so, otherwise it would be an inadmissible interference. Granting the extradition of none This means that the extradited person will be convicted, but only that he will be put on trial with all the guarantees of due law with all the assurances that this entails" (cf. judgment No. 283/2000 of TAP 2nd T., published in the LJU, case No. 14.131). Corollary of the foregoing is that there is, in the opinion of the Court, no reproach to the judicial work carried out, on the understanding that the formal requirements (especially those provided for in article 10 of the Treaty), were met. The reproaches that are made to the evidence (mainly to the statement of certain witnesses, evidence mentioned by the prosecutor and text message, among others), will be the subject of discussion before the US justice once the subject is extradited. Drs. VIEIRA and GARCÍA ALTOLAGUIRRE, in this regard, synthesized: "... Uruguayan jurisprudence, in relation to the provision of evidence in extradition proceedings, is clear and uniform in the sense of maintaining that in the continental system to which our legal order is affiliated, there is no room for the admission of evidence aimed at distorting or verifying the facts related in the extraditional request. This means that in the extradition process it is not possible to judge the offence for which the defendant is requested, nor to carry out judicial control over the consistency of the evidence on which the extradition request is based" (ob. cit., p. 430). Likewise, on the issue under analysis, this Collegiate has said in judgment No. 125/2015: "It should be borne in mind that, as the Corporation has repeatedly maintained, in the scope of the extradition process it is not appropriate to enter into the treatment of substantive issues, but that

the court must limit itself to controlling the formal regularity of the request and compliance with the requirements established in the applicable treaties (cfme. Judgments of the Supreme Court of Justice Nos. 154/000 and 191/005, among many others). That conceptual premise is a consequence of the adoption by the applicable treaty legislation of the Belgian-Dutch system which, unlike others contained in comparative law, limits the powers of the requested State by preventing it from ruling on the probability or plausibility of the facts attributed. In the extradition procedure, the only thing that must be assessed is the formal legitimacy of the request, since any other consideration of the substance, i.e. the typicity of the offence or offences for which the request is made, is in absolute breach of the principle of competence of the requesting authorities. The courts of the requested country that accept or do not accept the extradition request are not competent to judge the merits of the case. In this sense De Olarte in his treatise on ? Extradition?, p. 49, affirmed that the Judge who intervenes is not summoned to declare innocence or guilt, because "extradition does not matter trial or punishment", limiting its function to verify whether the request is adjusted to the formalities and substantial requirements of the International Treaty ratified by the two States ...? (cf. Judgment of the Supreme Court of Justice No. 154/999)" (see also Court Judgment No. 145/2002, published in LJU, case No. 14.492). This justifies the rejection of this second stage of the challenge.

III.3) Of the grievances relating to the invoked statute of limitations for the offences for which extradition was requested. The appellant's third statement refers to the alleged statute of limitations for the crimes that are intended to be imputed to him, in so far as , always in his opinion - it would have emerge from the evidence provided by the United States of America that the alleged criminal act would have taken place on August 20, 2007, so that, at the date on which the formal accusation was made (April 19, 2016),  the five-year limitation period provided for in the legislation in force in the requesting State had expired. Specifically, it states that in the evidence provided by the United States of America, there are two collaborating witnesses, former leaders of a narcotics organization in Mexico, who refer to a cocaine shipment on August 20, 2007 and identify GONZÁLEZ VALENCIA in that action. Therefore, in the case, he points out that the indictment dates from April 19, 2016, when more than five years had already elapsed, for which, the crime expired. In the court's view, the grievance results from rejection, due to the lack of legal virtuality and the scarce convicting power of its foundation. It emerges from the affidavit – in support of the extradition request – provided by the Trial Prosecutor of the Narcotics and Dangerous Drugs Unit of the Criminal Division of the United States Department of Justice that: "Because the applicable statute of limitations is five years, and because the indictment, which alleges criminal violations that occurred between January 2003 and April 2016,  was filed on April 19, 2016, González Valencia was charged within the expected period of five years. So the statute of limitations does not prohibit criminal prosecution in this case." (fs. 60). It should be noted that Section No. 18 U.S. Code 3282– Non-Capital Crimes provides that: "In general, with the exceptions expressly provided for by law, no person shall be prosecuted, or punished for any non-capital offense, unless the indictment is founded or the information is instituted within five years after the crime has been committed." (fs. 67). So, if we stick to the indictment made by the Jury of Inquiry before the U.S. District Court, District of Columbia, the requested GONZÁLEZ VALENCIA: "From approximately January 2003, and permanently thereafter, until the date of presentation of this Accusation, inclusive, both dates being approximate and inclusive, in the countries of Mexico, the United States and elsewhere, the defendant, GERARDO GONZÁLEZ VALENCIA, alias "Lalo", "Flaco", "Silver", "Silverio", "Eduardo", and "Laline", along with others, both known and unknown to the Investigating Jury, consciously, intentionally and deliberately conspired to: (1) consciously and intentionally distribute five (5) kilograms or more of a mixture and substance

containing a detectable amount of cocaine,  a Schedule II controlled substance; (2) knowingly and intentionally distribute (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, intending and knowing that such substances would be smuggled into States from an external territory?" (fs. 77/78, the highlight is in the original). It means that, as both the acting Prosecutor and the Court Prosecutor point out, the charges for the crimes against him refer to facts that extend from 2003 until approximately the moment in which the formal accusation crystallizes in the United States. The appellant, in a biased manner, intends to locate the alleged commission of the crimes in 2007, based on the testimonial statements of the collaborating witnesses, but this is based on an isolated assessment of the documents that accompany the extradition request. Precisely because the appellant fails to indicate that the affidavit of the DEA Special Agent, Mr. Kyle J. MORI, explains that: "The investigation revealed that from approximately January 2003 to April 19, 2016, González Valencia, the leader of a Drug Trafficking Organization based in Mexico, transported shipments in quantities of multiple tons of cocaine and methamphetamine from Mexico,  for introduction and distribution in the United States?" (fs. 85) and the investigator added that as part of the investigation there were legally intercepted electronic communications. In fact, the aforementioned Agent pointed out that: "As part of this investigation, the public order authorities legally intercepted González Valencia and his co-conspirators for electronic communications. What follows is a summary of text messages, legally intercepted in California, between González Valencia and a co-conspirator. On June 26, 2013, in legally intercepted text messages, González Valencia and a co-conspirator argued over whether a drug trafficking transaction was consummated? Gonzalez Valencia also talked about additional amounts of drugs that were being prepared to ship "up there," which I think is a reference to the United States." Therefore, the appellant's argument that criminal proceedings are time-barred is devoid of any support. In particular, because the Charges do not relate exclusively to events dating from August 2007 (cargo to which collaborating witnesses refer), but to maneuvers extended over time, based on evidence by telephone interceptions. In the "sub-exámine", taking into consideration the evidence on the exchanges by text messages, between GONZÁLEZ VALENCIA and a co-conspirator, dating from 2013, the statute of limitations of the criminal action cannot reasonably be understood to have been operated, since the formal accusation was presented on April 19, 2016, without having passed the 5 years to which the regulations in force in the United States refer. According to article 5.3 of the 1973 Treaty, extradition may not be granted under any circumstances when the action or penalty has been prescribed under the laws of the requested or requesting State. Therefore, it remains to analyze whether according to the internal regulations of the Oriental Republic of Uruguay, the action is (or not) prescribed. Article 117 of the Criminal Code, for cases such as the case of the case (which would fall within article 31 of Decree-Law 14,294), has a punitive penalty of two to ten years of penitentiary, for referring to an organized criminal group. Based on this, paragraph c) of article 117 of the Criminal Code prescribes that in the case of crimes with a penitentiary sentence whose maximum is greater than two years to ten years, the crime expires after ten years, so - from this point of view - there is no doubt that criminal action is not prescribed. In short, it cannot be concluded, at least with the elements in sight, that the offence for which extradition is requested is time-barred. In addition, in the case of interactive conduct for which extradition is requested (continuity or repetition of criminal proceedings), whatever the system, the beginning of the prescriptive computation is the cessation of illegality, an extreme that was not even alleged by the legal defense. Again, it should be stressed that the powers of the requested State are limited in the matter, since the so-called Belgian-Dutch system is applicable, according to which that State must be at the result of the request of the requesting State, so that, if it

emerges from it that the crime would have been committed permanently until April 2016,  it is on that date that it must be the beginning of the limitation period. Logically, this does not imply a definitive or binding judgment for the requesting State regarding the non-prescription of the crime imputed to the extraditable subject, since it will be up to the authorities of that State to determine, within the framework of the trial to be followed to the extradited subject, whether or not the statute of limitations of the crime for which his surrender is granted was configured.

III.4) Of the grievances related to the alleged risk of violation of human rights in case of granting extradition. The appellant was aggrieved on the grounds that, if extradition is granted, there is a risk that he will be sentenced to death or life imprisonment in the United States. In addition, he denounced that the conditions of confinement in the United States do not provide any guarantee. In the opinion of the Court, the grievance is frank and total rejection. To tell the truth, the defense does not identify what would be the rule of law violated by the sentence attacked, limiting itself to making a series of generic assessments on alleged violations of human rights in that country, but without using a valid ground enabling cassation, so that the proposal does not satisfy the requirements of article 272 of the C.P.P. of 1980,  that ground being sufficient to dismiss this stage of the challenge. Moreover, there is no grievance as regards the possible imposition of the death penalty, which is the only one provided for in Article 7 of the Binding Treaty to make the granting of extradition conditional on the requesting party granting guarantees considered sufficient by the requested party in the sense that such a sanction will not be imposed or that,  if imposed, such a penalty shall not apply. It should then be noted that the penalty to be applied is provided for in the Treaty only in two cases, namely, the minimum punitive period of one year's imprisonment to be served (art. 2 in fine) and the maximum penalty (death) where it is empowered to provide as a condition that it will not be applied (art. 7). In light of this conclusion, it is clearly inappropriate to take into account the penalty (whether in its content, amount or form of application), except for these two exceptional cases, to deny or condition extradition. In the opinion of the Court, whatever the interpretative method, the primacy of any extradition treaty signed by the State cannot be ignored, given its specific nature and its original source of provisions that cannot be altered except by means of another treaty or denunciation of the existing one in accordance with the applicable rules of public international law. In fact, by the Extradition Treaties, the State limits its sovereign rights in favor of what is stipulated in them, so that no other provision than that recorded in its normative body can prevail. Furthermore, the wording of the provisions of Article 9 of the Treaty itself is also clear in the sense that the interpretative method must be the textual one (in conjunction with the methods and rules of interpretation enshrined in the Vienna Convention of 1969). Finally, it is necessary to mean that this obligatory, specific and exhaustive character is imposed on all the organs of the State of destination, whether jurisdictional or not (judges or prosecutors respectively). Moreover, according to the above, in so far as the Extradition Treaty is in force and has not been denounced, it cannot be a valid argument for denying extradition that of the conditions for serving the sentence in the requesting State. If there were such a risk, it would be appropriate for the Uruguayan State to denounce the Treaty; but it is not a valid argument for breaching - in short, this is what the impugante proposes - the treaty in force. On the other hand, the risk of being sentenced to life imprisonment or the death penalty is conjured up because the sentence of first instance (confirmed by the contested one) conditioned the granting of extradition on the intervening authorities ensuring that, in case of being convicted, gonzález valencia will not be sentenced to death or life imprisonment (see the operative part of the sentence of first instance). to fs. 250). In short, the grievance must be dismissed for the above reasons.

III.5) Of the grievances associated with the invoked error in having deferred the surrender until the provisional release or definitive release is obtained. In this regard, the defense points out that there was an error in the sentence of the first degree, confirmed by the attacked, when it is stated that the surrender is deferred until the requested person obtains his provisional release or definitive freedom, since article 8 of the Treaty of 1973 provides that the surrender may be postponed "until the conclusion of the process and, in case of conviction until the extinction or execution of the sentence", without mentioning the freedom obtained provisionally. In the point, it is also not noticed that the judgments of merit have incurred in error of law, so this sector of the challenge will also be dismissed. Article 8 of the 1973 Treaty provides: "Where the person whose extradition is requested is subject to trial or serving a sentence in the territory of the requested Party for an offence other than that for which extradition is requested, his surrender may be postponed until the conclusion of the proceedings and, in the event of a conviction, until the death or execution of the sentence." Certainly, the rule empowers the requested State to postpone the surrender of the extradited person, in the event that the extradited person had previously been convicted in that country, until the sentence has been extinguished or completed. However, this does not mean that the requested State must necessarily defer the surrender of the extraditable until the sentence is served or extinguished in its entirety. This is a condition that the requested State may or may not impose when granting extradition. Consequently, there is no illegitimacy in the fact of allowing that, eventually, the delivery of the requested subject is made before the extinction or total fulfillment of the sentence, if the provisional release of the extraditable was previously verified.

III.6) Of the grievances linked to the alleged error in the non-condition of extradition to the maximum penalty to be applied in the requesting State is 18 years of penitentiary. The appellant's last point is that extradition, if granted, should be conditional on the maximum penalty to be applied to the extradited being limited to More burdensome "quantum" established by our criminal legislation (Decree-Law No. 14,294 and Law No. 17,016) with respect to the crime of a similar nature, that is, 18 years of penitentiary. Nor is he right on the point. The Treaty of 1973, nor the Treaties of Montevideo of 1889 and 1940 applicable in subsidy, provide that the requested State imposes such a condition at the time of granting extradition. The determination of the punitive "quantum" shall be carried out by the judicial authorities of the requesting State, in accordance with the applicable legislation, with the limitations indicated in the judgment of first instance. With such criteria in mind, it is correct to conclude that the individualization of the penalty will be imposed by the requesting State, in accordance with its domestic regulations, conditioned in the present case on the fact that no life imprisonment or death penalty may be imposed. The imposition of penalties, within the minimum and maximum provided for in the law of the requesting State, is a matter exclusive to the judicial authorities of the latter State, and the judicial authorities of the requested State must not interfere in this. Consequently, as it is said, the contested device does not suffer from defects that cause nullity, which determines the rejection solution announced.

IV) Costs and costs. There is no merit for imposing causidic sentences in the degree (arts. 56.1 and 279 of the C.G.P and art. 688 of the C.C.). On the above grounds, the Supreme Court of Justice, unanimously, RULES: I) DISMISS THE APPEAL FILED; NO SPECIAL PROCEDURAL CONVICTION. (II) SET THE FEES AT 20 B.P.C. III) BE NOTIFIED AND, IN DUE COURSE, RETURNED. DR. BERNADETTE MINVIELLE PRESIDENT OF THE SUPREME COURT OF JUSTICE DR. ELENA MARTÍNEZ MINISTER OF THE SUPREME COURT OF JUSTICE DR. EDUARDO TURELL MINISTER OF THE SUPREME COURT OF JUSTICE DR. LUIS TOSI BOERI MINISTER OF

THE SUPREME COURT OF JUSTICE DR. TABARÉ SOSA AGUIRRE MINISTER OF THE SUPREME COURT OF JUSTICE DR. GUSTAVO NICASTRO SEOANE LEGAL SECRETARY OF THE SUPREME COURT OF JUSTICE

Suprema Corte de Justicia

DIRECCIÓN Pasaje de los Derechos Humanos 1310

CEDULÓN

GONZALEZ VALENCIA GERARDO

Montevideo, 11 de febrero de 2020

En autos caratulados:

GONZALEZ VALENCIA, GERARDOEXTRADICION

Ficha 474-76/2016

Tramitados ante esta Sede se ha dispuesto notificar a Ud. la providencia que a continuación se transcribe:

//tencia No.18 MINISTRA REDACTORA: DOCTORA ELENA MARTINEZ Montevideo, once de febrero de dos mil veinte. VISTOS: Para sentencia definitiva, estos autos caratulados: "GONZALEZ VALENCIA, GERARDO. EXTRADICIÓN - CASACIÓN PENAL" - IUE: 474-76/2016. RESULTANDO: I) Por sentencia No. 13, de fecha 28 de agosto de 2017, el Juzgado Letrado de Primera Instancia en lo Penal Especializado en Crimen Organizado de 1° Turno, falló: "Concédese la extradición de Gerardo González Valencia solicitada por las autoridades competentes de Estados Unidos, bajo las siguientes condiciones: I) se difiere la entrega hasta que el requerido obtenga su excarcelación provisional o libertad definitiva en la causa que se le sigue en Uruguay ante esta Sede IUE 2-37467/2016; II) Se condiciona la extradición concedida a que las autoridades del Estado requirente aseguren que no se juzgará ni condenará al requerido por delitos distintos a los que refiere la solicitud de extradición, a excepción de los supuestos consagrados en los numerales 1 y 2 del citado artículo; III) se condiciona la extradición concedida a que las autoridades requirentes otorguen garantías consideradas suficientes por las autoridades nacionales intervinientes en este proceso, que en caso que Gerardo González Valencia resulte condenado en el proceso penal que se le pretende iniciar en el país requirente no se le impondrá pena de muerte ni pena de prisión perpetua; IV) las autoridades competentes del Estado requirente deberán expresar si aceptan las condiciones dispuestas en los numerales anteriores, dentro del plazo de cuarenta días a partir de la notificación del presente fallo (?)" (fs. 238/250). II) Por sentencia No. 208, dictada el día 2 de octubre de 2018, por el Tribunal de Apelaciones en lo Penal de 4° Turno, se dispuso: "Confirmase la sentencia de primera instancia apelada. (?)" (fs. 317/321 vta.). III) Contra el antedicho fallo, la defensa de GONZALEZ VALENCIA interpuso el recurso de casación en estudio (fs. 334/344). En tal sentido, sostuvo, en síntesis, lo siguiente. a) Inicialmente, expresó que el Tribunal erró al aplicar el Tratado de Extradición y Cooperación en materia penal celebrado entre Estados Unidos de América y la República Oriental del Uruguay (de fecha 6 de abril de 1973 firmado en la ciudad de Washington), dado que tal acuerdo no refiere al caso de autos. Recordó que GONZÁLEZ no se encuentra procesado o condenado, tal como exige el art. 1º "eiusdem". Entendió que el Tratado aplicable a la causa es el de Asistencia Jurídica mutua en asuntos penales celebrado el 6 de mayo de 1991 y ratificado por nuestro país a través de la ley 16.431. b) Alegó, como otro vicio del dispositivo atacado, que no se exigió prueba a los efectos de constatar los hechos narrados por el estado requirente. Insistió en que el art. 10 del Tratado en su nral. 3 indica que "la parte requerida podrá solicitar que la requirente presente pruebas suficientes para

establecer 'prima facie' que la persona reclamada ha cometido el delito por el cual la extradición se formula, pudiendo la parte requerida denegar la extradición si un examen del caso demuestra que la orden de arresto es manifiestamente infundada". Mencionó que la simple declaración fiscal no es evidencia. Asimismo, cuestionó el rol que cumplen los testigos protegidos y el valor probatorio que las autoridades norteamericanas le otorgan a los mensajes de texto. c) Indicó que a su criterio ha operado la prescripción de los delitos que se pretenden imputar. Enfatizó que en el mejor de los casos el presunto ilícito ocurrió en el mes de agosto de 2007, mientras que la acusación data de fecha 19 de abril de 2016. En consecuencia, aseveró que habiendo pasado más de cinco años el delito se encuentra prescripto, de acuerdo con las normas del país requirente. d) Esgrimió peligro de viola-ción de los derechos humanos en caso de concederse la extradición. Mencionó -a vía de ejemplo- que el Tribunal Superior de Justicia de Irlanda rechazó la solicitud de los Estados Unidos de extraditar a un individuo que enfrenta un juicio debido a las severas condiciones de reclusión en dicho país. Además, manifestó que para el caso de ser extraditado corre riesgo de ser condenado a cadena perpetua o incluso a la pena de muerte. e) Refirió que debe conside-rarse también que GONZÁLEZ tiene una causa en Uruguay, donde la defensa al contestar la acusación fiscal solicitó la declaración ampliatoria del reo y sostuvo que corresponde a Derecho que esté en nuestro país a disposición de dicha causa hasta que sea condenado. Tal como surge del art. 8 de ambos Tratados en cuestión, el de 1973 y el de 1991, Uruguay tiene la facultad de aplazar la extradición en caso de que fuera concedida hasta la conclusión del proceso penal al que se encuentra sometido en nuestro país. f) Finalmente, afirmó que la pena máxima a aplicar debería ser limitada al "quántum" más gravoso que establece el decreto-ley No. 14.294 y la ley No. 17.016, respecto al delito de análoga naturaleza, que es la establecida en el art. 31, o sea 18 años de penitenciaría. Entendió que se debe de agregar como condición, para el caso de que se haga lugar a la extradición, que la pena máxima a recaer sea de 18 años por ser el tope legal para un delito similar en nuestro país. IV) Por providencia No. 219, de fecha 20 de febrero de 2019 (foja 357), se ordenó dar ingreso al recurso de casación movilizado. V) Conferidos los respectivos traslados, compareció el Sr. Fiscal Letrado Especializado en Crimen Organizado, solicitando el rechazo de la impugnación (fs. 363/366); en igual sentido se pronunció el Sr. Fiscal de Corte (fs. 399/404). VI) Por decreto No. 883, de 16 de mayo de 2019 (fojas 406), se dispuso el pasaje de los autos a estudio (fs. 406); concluido el estudio se acordó el dictado de sentencia para el día de hoy. CONSIDERANDO: I) La Suprema Corte de Justicia, por unanimidad de sus miembros naturales, desestimará el recurso de casación interpuesto por el encausado, por los fundamentos jurídicos que se expresarán, pues los agravios articulados como sustento de la impugnación no resultan eficientes para resolver en sentido opuesto a lo decidido en segunda instancia. II) De la extradición que tramita en autos y de los agravios articulados en casación. La presente causa trata de la solicitud de extradición impetrada por Estados Unidos de América contra Gerardo GONZÁLEZ VALENCIA, a quien se le imputa la comisión de reiterados delitos vinculados con el tráfico de estupefacientes. En dicho marco, recayeron sendas sentencias de mérito que habilitaron la entrega de GONZÁLEZ VALENCIA a las autoridades del Estado requirente, lo que motivó, por parte del nombrado, la presentación del recurso de casación en estudio. En concreto, del libelo impugnativo se pueden identificar los siguientes agravios: 1) agravios referidos a la aplicación en el caso del Tratado de Extradición y Cooperación en materia penal celebrado en el año 1973 entre la República Oriental del Uruguay y los Estados Unidos de América (ratificado en nuestro país por decreto-ley No. 15.476); 2) agravios relacionados con la alegada ausencia de prueba suficiente para conceder la extradición; 3) agravios relativos a la invocada prescripción de los delitos por los cuales se solicitó la extradición; 4) agravios vinculados al supuesto riesgo de violación a los derechos humanos en caso de concederse la

extradición; 5) agravios asociados al invocado error al haberse diferido la entrega hasta la obtención de la excarcelación provisional o de la libertad definitiva; y 6) agravios ligados al pretendido error al no haberse condicionado la extradición a que la pena máxima a ser aplicada en el Estado requirente sea la de 18 años de penitenciaría. En el orden propuesto, serán analizados en lo sucesivo. III.1) De los agravios referidos a la aplicación en el caso del Tratado de Extradición y Cooperación en materia penal celebrado en el año 1973 entre la República Oriental del Uruguay y los Estados Unidos de América (ratificado en nuestro país por decreto-ley nro. 15.476) III.1.1) Como primera línea de defensa, el recurrente señala que el Tribunal de Apelaciones incurrió en un error de derecho al sostener que el Tratado aplicable en relación a la solicitud de extradición incoada es el ratificado por el decreto-ley nro. 15.476. Entiende que la solicitud se cursó a los efectos de someter a juicio al Sr. GONZÁLEZ VALENCIA y que dicha solicitud está basada en un Tratado que no resulta aplicable, por contravenir el estatuto jurídico del denunciado, quien al no haber sido procesado ni penado, no está sujeto al Tratado de 6 de abril de 1973. Insiste en que, en la especie, el Tratado aplicable es el celebrado el 6 de mayo de 1991 entre el Estado Uruguayo y los Estados Unidos de América, sobre Asistencia Jurídica Mutua en Asuntos Penales, ratificado por ley No. 16.431. A juicio de la Corte, el planteo recursivo no es de recibo, pues el encuadre normativo del caso efectuado en ambas sentencias de mérito, resulta irreprochable. En efecto, en el particular, se aplica el Tratado de Extradición y Cooperación en Materia Penal suscrito en Washington (EE.UU.), el 6 de abril de 1973, aprobado por decreto-ley No. 15.476 (en adelante: Tratado de 1973); en el entendido de que la situación jurídica de GONZÁLEZ VALENCIA se acopla perfectamente al supuesto previsto por la mentada norma bilateral. Contra lo que dice el recurrente, el Tratado de 1973 no se ha visto derogado, modificado o sustituido por las previsiones del Tratado de Asistencia Jurídica Mutua en Asuntos Penales celebrado en Montevideo, el 6 de mayo de 1991, ratificado por ley No. 16.431 (en adelante: Tratado de 1991). Si bien dicho Tratado es posterior, ciertamente regula otro tipo de asistencia jurídica mutua en asuntos penales y no estrictamente a la extradición. En verdad, las hipótesis que regula el Tratado de 1991 no refieren a la extradición de personas (la norma bilateral en ningún momento habla de extradición), sino que refiere a otro tipo de asistencia en materia penal. En otras palabras: no resulta de aplicación el Tratado de 1991, por referir a grados de cooperación de menor intensidad a la extradición, a saber: "a. notificación de documentos; b. recepción de testimonios o declaraciones de personas, así como también la realización de peritajes y examen de objetos y lugares; c. localización o identificación de personas; d. notificación a testigos o peritos para la comparecencia voluntaria para prestar testimonios en el Estado requirente; e. traslado de personas sujetas a un proceso penal a efectos de comparecer como testigos o con otros propósitos expresamente indicados en la solicitud; f. Medidas cautelares o inmovilización de bienes; g. cumplimiento de solicitudes de registro y secuestro; h. entrega de documentos y otros elementos de prueba; i. inmovilización, confiscación o transferencia de bienes confiscados, así como en materia de indemnizaciones y multas impuestas por sentencia penal; y j. cualquier otra forma de asistencia no prohibida por las leyes del Estado requerido para la investigación y enjuiciamiento de delitos" (art. 2). En este último sentido, la referencia a "propósitos expresamente indicados en la solicitud" (lit. e), como bien anota el Sr. Fiscal Letrado, "no puede entenderse que pueda solicitarse por esta vía una extradición, pues se trata la extradición de un proceso sujeto a múltiples condiciones y requisitos, que deben estar expresamente previstos en la norma bilateral (delitos incluidos, delitos excluidos, plazos para cursar la solicitud, arresto preventivo, documentación exigible, formalidades, etc.) que no lo están en el Tratado de 1991" (fs. 363 vta.). Lo dicho resulta suficiente para repeler este primer sector del agravio. III.1.2) En otro orden, como defensa subsidiaria, GONZÁLEZ VALENCIA aduce que no ha sido procesado ni condenado en los Estados Unidos de América, por lo que a

su respecto no se verificarían los requisitos exigidos por el art. 1º del Tratado de 1973 para conceder la extradición. Nuevamente, no le asiste razón. A juicio de la Corte, el recurrente efectúa una lectura sesgada del art. 1º de la norma bilateral para sostener que hasta tanto no exista un procesamiento no se puede hacer lugar a la extradición. En primer lugar, con criterio general, tal interpretación colide con los fundamentos y principios de la cooperación judicial internacional en materia penal. No puede perderse de vista que a la hora de interpretar los Tratados (a diferencia de la interpretación que efectúa el impugnante) debe hacerse en la forma que favorezca el fin por el que fueron convenidos, en el entendido de que deben regir las premisas de cooperación entre los estados y la tutela de la sociedad más allá del lugar físico en donde se encuentre el sujeto al cual se le pretende imputar el ilícito. Tal como sobre el particular ha sostenido el Sr. Ministro de la Corte Dr. Tabaré SOSA AGUIRRE: "...el criterio en materia de asistencia judicial internacional ha de ser de facilitarla, ampliarla y abreviar los trámites pertinentes en el aspecto procesal y reducir las condiciones en el plano sustantivo" (cf. "Independencia judicial como condición para la cooperación internacional", publicado en "Curso de Cooperación Penal Internacional", Río de Janeiro 1994, Ed. Carlos Álvarez, Primera Edición, Montevideo, 1994, pág. 141). En segundo lugar, en específica referencia a la interpretación de los términos "procesadas" y "condenadas", utilizados por el citado art. 1° del Tratado de 1973, estima la Corte que debe hacerse mediante la aplicación del criterio o método lógico-sistemático, conforme con el cual, corresponde acudir al contexto normativo, esto es, al resto del articulado del propio instrumento internacional en análisis (además del preámbulo y sus anexos), a efectos de indagar si el propio Tratado contiene alguna definición de los términos a ser interpretados (art. 31.1 de la Convención de Viena sobre el derecho de los tratados). De ahí que la defensa del encausado se equivoca en pretender que el procesamiento exigido por la norma debe entenderse en los términos similares al ordenamiento doméstico. En tal sentido, el propio Tratado de 1973 refiere, en su art. 10 nral. 3, que cuando "el requerimiento se refiera a una persona que aún no ha sido condenada, deberá ser acompañado de una orden de detención o de prisión o auto de procesamiento judicial equivalente, emanado de la autoridad competente de la Parte requirente" (tal como se verifica "infolios"). Pretender sostener que se requiera procesamiento o condena a la luz de los términos que maneja nuestro ordenamiento es limitar la cooperación en materia de extradición a sujetos que se fugaron con anterioridad o posterioridad al procesamiento, o a quienes se les realizó un juicio en rebeldía en su contra. Sucede que la interpretación efectuada por la defensa choca con aristas básicas del propio instituto de la extradición. Al respecto, Manuel A. VIEIRA y Carlos GARCÍA ALTOLAGUIRRE expresan: "...cuando el indagado (persona contra la cual se ha reunido la prueba requerida por la ley interna para ser sometida a proceso y así lo ha requerido el Ministerio Público), el imputado (persona contra la cual se ha dictado un auto de procesamiento) o el condenado (persona contra la cual ha recaído una sentencia definitiva de condena) no se encuentra dentro de la jurisdicción territorial del juez que entienda en su causa, sino que se halla en otro país y no está dispuesto a comparecer voluntariamente ante el mismo, o sea, no tiene voluntad de acatar la sujeción procesal que le corresponde, dicho Magistrado cuenta con una herramienta tendiente a remediar esta dificultad, y asegurar el resultado del proceso a su cargo, que es el instituto de la extradición" (cf. "Extradición", Ed. FCU, Primera Edición, Montevideo, 2001, pág.125). Existe jurisprudencia constante de la Suprema Corte de Justicia en el entendido de que la exigencia debe limitarse a que el sujeto pueda ejercer su derecho de defensa en el proceso (v.gr: sentencia No. 274/2002). En consecuencia, en numerosos fallos hizo lugar a extradiciones en causas cuyo procesamiento ocurrió en rebeldía. En términos coincidentes, el Sr. Ministro de la Corte Dr. Tabaré SOSA AGUIRRE, siendo titular del Juzgado Letrado de Primera Instancia en lo Penal y de Menores de 2º Turno, por sentencia dictada el 19 de mayo de 1989, sentó las siguientes

bases interpretativas: "...que la persona requerida nunca haya declarado ante una autoridad judicial es una petición de principio, pues no se puede poner como condición lo que es precisamente el objeto del proceso de extradición y que ello sea un presupuesto del enjuiciamiento en nuestro derecho, no cabe extenderlo a otras legislaciones. El único requisito (y considerado al ratificar el Tratado) es que existan en el Estado peticionante, en su caso, las garantías del debido proceso legal, pero las características o modalidades concretas que en cada país asume esta garantía es propio de cada Estado y en ello no cabe inmiscuirse" (cf. LJU, caso individualizado con el No. 11.475). Pues bien, con tales consideraciones en mente, corresponde abordar el análisis de esta fase del agravio. La defensa de GONZÁLEZ VALENCIA interpreta que la referencia a personas que hayan sido "procesadas" implica el sometimiento al proceso penal en términos parangonables con el procesamiento regulado en el Código de Proceso Penal doméstico de 1980. Sin embargo, como viene de decirse, la interpretación que formula es absolutamente parcial y no responde al sentido natural y obvio que se infiere del análisis contextual de las disposiciones del Tratado. En el caso, la conjunción disyuntiva "o" contenida en la norma última citada, indica la existencia de alternativas entre diversas opciones previstas en el Tratado, no exigiéndose que el sujeto objeto de la extradición haya sido derechamente sometido a proceso penal - en los términos definidos por la normativa vernácula-. La norma admite que la solicitud de extradición pueda estar acompañada de una orden de detención o de prisión, que son hipótesis más amplias al procesamiento, asociadas a un señalamiento por determinados delitos, que requieren la sujeción jurídica a un proceso penal. Como bien señala el Sr. Fiscal de Corte: "El claro texto de la norma, no deja de dudas en cuanto a que resulta admisible la solicitud de extradición, aún cuando la persona no se encuentre "procesada", ya que para dar andamiento a esa petición, es suficiente la orden de detención. Y tal extremo se cumple en las presentes actuaciones ya que, salvando las diferencias de terminología y procedimiento, surge agregada en autos, la formal orden de captura contra Gerardo González Valencia, emitida por el Tribunal de Distrito de Estados Unidos para el Distrito de Colombia fechada el 19 de abril de 2016 (fs. 82)." (fs. 402 vta.). En la lógica del recurrente, únicamente podría requerirse la extradición de sujetos que hubieren sido -al menos- procesados en el país requerido, hipótesis que solo se podría dar en supuestos de procesos en rebeldía sin la presencia física del extraditable o en supuestos de fuga. Naturalmente, esta interpretación que formula el impugnante no resulta razonable, porque restringiría el campo de aplicación del Tratado. En suma, en el marco del multicitado Tratado de 1973, no resulta compartible exigir el procesamiento o la condena por parte del Estado requirente para que nuestro país haga lugar a la extradición solicitada. III.2) De los agravios relacionados a la alegada ausencia de prueba suficiente para conceder la extradición. En este ámbito, el Tratado de 1973 requiere -como ya se vio- que cuando la persona cuya extradición se impetra no haya sido condenada, la solicitud deberá ser acompañada de: "?una orden de detención o de prisión o del auto de procesamiento judicial equivalente, emanado de la autoridad competente de la Parte requirente.". A esto añade que: "La Parte requerida podrá solicitar que la requirente presente pruebas suficientes para establecer 'Prima facie' que la persona reclamada ha cometido el delito por el cual la extradición se formula. La Parte requerida puede denegar la extradición si un examen del caso demuestra que la orden de arresto es manifiestamente infundada." (art. 10.3). En su expresión de agravios, GONZÁLEZ VALENCIA aseveró que el Tribunal ha aplicado incorrectamente esta norma, porque ha aceptado sin cuestionamiento el "decir" de fiscales y agentes del gobierno de Estados Unidos. Refirió que se consideraron como elementos probatorios los dichos de funcionarios gubernamentales del país requirente, que en estricto rigor no constituyen elementos de prueba. Insistió en que la opinión de estos agentes no es una evidencia. La contrariedad a Derecho de la sentencia -según se afirma en la impugnación- derivaría de que el Tribunal

aceptó que se extradite a GONZÁLEZ VALENCIA sin que previamente se haya demostrado que existen evidencias suficientes que conformen semiplena prueba para conceder la extradición. Reclama que Uruguay debe ser más exigente y solicitar al menos una ampliación de las evidencias presentadas, por no cumplir con el estándar de semiplena prueba. Reconoce que si bien en el juicio de extradición la jurisdicción requerida no debe examinar el mérito probatorio de la causa para determinar si el requerido es culpable o inocente, sí debe establecerse que existen elementos que configuran semiplena prueba, tal como lo exige la jurisprudencia uruguaya para dictar un auto de procesamiento. En suma, refiere que la declaración jurada de funcionarios del gobierno del Estado requirente no satisfacen los requisitos del Tratado en orden a acreditar la causa probable de la extradición, pues se hace caudal de afirmaciones vagas y confusas como las que indican que el Sr. GONZÁLEZ VALENCIA es un narcotraficante, que no son evidencia, ni conforman indicios para justificar la decisión de extraditarlo a Estados Unidos de América. Pues bien, en cuanto a este punto, tampoco le asiste razón a la recurrente. De la lectura del Tratado de 1973 no emerge un apartamiento del sistema que, de regla, opera en nuestro país en materia de extradición, que es el llamado "sistema belga-holandés", según el cual solo cabe realizar un análisis formal de la solicitud de extradición, sin requerir un análisis sobre el fondo de la cuestión, ni la prueba de los hechos que se le atribuyen al sujeto extraditable. El juez no declara si el requerido es inocente o culpable, sino si la solicitud cursada satisface los requisitos formales previstos en el Tratado. En tal sentido, tal como recuerda el Sr. Fiscal Letrado (fs. 364 vta.), la Corte se ha pronunciado en múltiples oportunidades (sentencias Nos. 216/2003, 191/2005, 341/2006, 219/2007, 640/2012, 769/2012 y 125/2015). En todo caso, como bien lo señala el Sr. Fiscal Letrado al evacuar el traslado del recurso, el Tratado faculta, pero no exige solicitar que el Estado requirente presente pruebas suficientes para establecer, "prima facie", que la persona reclamada ha cometido el delito por el cual la extradición se formula. En efecto, la solicitud de prueba al amparo del art. 10 del Tratado de 1973 es una facultad que se le otorga al Juez al utilizar el verbo "podrá"; aserto que se verifica a partir de lo dispuesto en la parte final del precepto, donde se habilita la denegación de la extradición solo "si un examen del caso demuestra que la orden de arresto es manifiestamente infundada", concepto que no dice relación con el análisis y valoración de los elementos probatorios. Por otra parte, como bien indica el Sr. Fiscal de Corte: "La naturaleza discrecional de la norma, determina entonces que no pueda señalarse como error de derecho en esta instancia" (fs. 403). En cualquier caso, no es posible advertir, a partir del examen de la solicitud de extradición, que la orden de arresto librada por las autoridades del Estado requirente sea "manifiestamente infundada", por lo que no se verifica ilegitimidad en el obrar de los órganos de mérito al haber concedido la extradición de marras. El recurrente busca desconocer que los argumentos concernientes a la suficiencia de los elementos probatorios, en orden a acreditar la comisión del delito, son materia del juicio a desarrollarse en Estados Unidos de América, pero ajenos a este proceso jurisdiccional (cf. sentencia de la S.C.J. No. 145/2002, publicada en LJU, caso No. 14.492; y sentencia s/n, de fecha 26/12/1984, dictada por el TAP 3º T., publicada en la LJU, caso No. 10.356). Sobre el punto, nuestra jurisprudencia ha dicho: "...además, esa posibilidad de que el estado requirente presente pruebas suficientes es una potestad del Estado requerido, el texto dice 'la Parte requerida podrá solicitar que la requirente presente pruebas suficientes ?'. La crítica que la recurrente hace de las pruebas de cargo en el num. 13 de fs. 202, en resumidas cuentas hablan de la seriedad de los procedimientos del requirente, y si finalmente no se prueba la participación del requerido en los ilícitos que se le atribuyen, seguramente al igual que los restantes involucrados en los hechos, saldrá indemne del juicio que se le siga. La eficacia de las pruebas no es asunto en que deban pronunciarse nuestros tribunales sino que le corresponde hacerlo a los tribunales encargados de administrar justicia en el

Estado requirente, lo contrario sería una intromisión inadmisible. El conceder la extradición de ninguna manera significa que el extraditado vaya a ser condenado sino únicamente que será sometido a juicio con todas las garantías del debido con todas las seguridades que ello conlleva" (cf. sentencia No. 283/2000 del TAP 2º T., publicado en la LJU, caso No. 14.131). Corolario de lo anterior es que no existe, a juicio de la Corte, reproche alguno a la labor jurisdiccional cumplida, en el entendido de que los requisitos formales (en especial los previstos en el artículo 10 del Tratado), fueron cumplidos. Los reproches que se efectúan a la prueba (fundamentalmente a la declaración de determinados testigos, evidencias que menciona el fiscal y mensaje de texto, entre otros), serán objeto de discusión ante la justicia estadounidense una vez que el sujeto sea extraditado. Los Dres. VIEIRA y GARCÍA ALTOLAGUIRRE, en tal aspecto, sintetizaron: "...la jurisprudencia uruguaya, en relación con la aportación de pruebas en el procedimiento de extradición es clara y uniforme en el sentido de mantener que en el sistema continental al que se afilia nuestro orden jurídico, no cabe la admisión de pruebas dirigidas a desvirtuar o a verificar los hechos relatados en la demanda extradicional. Esto quiere decir, que en el proceso de extradición no se puede juzgar, sobre el delito por el que se solicita al reclamado, ni realizar el control jurisdiccional sobre la consistencia de las pruebas en que se apoya la solicitud de extradición" (ob. cit., pág. 430). Asimismo, sobre la cuestión en análisis, este Colegiado ha dicho en sentencia No. 125/2015: "Corresponde tener presente que, como reiteradamente lo ha sostenido la Corporación, en el ámbito del proceso de extradición no corresponde ingresar al tratamiento de cuestiones de fondo, sino que el órgano jurisdiccional debe limitarse a controlar la regularidad formal del pedido y el cumplimiento de los requisitos establecidos en los tratados aplicables (cfme. Sentencias de la Suprema Corte de Justicia Nos. 154/000 y 191/005, entre muchas otras). Dicha premisa conceptual es consecuencia de la adopción por parte de la normativa convencional aplicable del sistema belga-holandés que, a diferencia de otros recogidos en derecho comparado, limita los poderes del Estado requerido impidiéndole pronunciarse sobre la probabilidad o verosimilitud de los hechos atribuidos. En el procedimiento de extradición, lo único que debe valorarse es la legitimidad formal del pedido, puesto que toda otra consideración acerca del fondo, es decir de la tipicidad del o de los delitos por los que se cursa la solicitud, son absolutamente violatorios del principio de competencia de las autoridades requirentes. Los tribunales del país requerido que aceptan o no el pedido de extradición no son competentes para juzgar el mérito de la causa. En tal sentido De Olarte en su tratado sobre ?Extradición?, pág. 49, afirmaba que el Juez que interviene no es convocado para declarar la inocencia o culpabilidad, porque ?la extradición no importa juicio ni castigo?, limitándose su función a verificar si la solicitud es ajustada a las formalidades y exigencias sustanciales del Tratado Internacional ratificado por los dos Estados...? (cfme. Sentencia de la Suprema Corte de Justicia No. 154/999)" (ver además sentencia de la Corte No. 145/2002, publicada en LJU, caso No. 14.492). Lo dicho justifica el rechazo de esta segunda fase de la impugnación. III.3) De los agravios relativos a la invocada prescripción de los delitos por los cuales se solicitó la extradición. El tercer planteo del recurrente refiere a la alegada prescripción de los delitos que se le pretenden imputar, en tanto -siempre a su criterio- emergería de la prueba aportada por los Estados Unidos de América que el presunto hecho delictivo habría tenido lugar el 20 de agosto de 2007, por lo que, a la fecha en que se realizó la acusación formal (19 de abril de 2016), había vencido el plazo de prescripción de cinco años previsto en la normativa vigente en el Estado requirente. En concreto, afirma que en la prueba aportada por los Estados Unidos de América, existen dos testigos colaboradores, ex líderes de una organización de estupefacientes en México, que refieren a un cargamento de cocaína el 20 de agosto de 2007 e individualizan a GONZÁLEZ VALENCIA en ese accionar. Por lo tanto, en el caso, señala que la acusación formal data del 19 de abril de 2016, cuando ya

habían transcurrido más de cinco años, por lo cual, el delito prescribió. Pues bien, a criterio de la Corte, el agravio resulta de rechazo, por la carencia de virtualidad jurídica y del escaso poder convictivo de su fundamentación. Surge de la declaración jurada -en apoyo de la solicitud de extradición- prestada por la Fiscal Litigante de la Unidad Contra Narcóticos y Drogas Peligrosas de la División Penal del Departamento de Justicia de Estados Unidos que: "Debido a que la ley de prescripción aplicable es de cinco años, y a que la acusación, la cual alega violaciones penales que ocurrían entre enero de 2003 y abril de 2016, se presentó el 19 de abril de 2016, se le acusó a González Valencia dentro del plazo previsto de cinco años. De manera que la ley de prescripción no prohíbe la persecución penal en esta causa." (fs. 60). Debe de verse que la Sección nro. 3282 del Título 18 del Código de Estados Unidos-Delitos no capitales, dispone que: "En general, con las excepciones expresamente previstas por la ley, ninguna persona será enjuiciada, o sancionada por ningún delito no capital, al menos que la acusación formal se funde o de la información se instituya dentro de los cinco años siguientes después de que dicho delito se haya cometido." (fs. 67). Entonces, si nos atenemos a la acusación formal realizada por el Jurado Indagatorio ante el Tribunal de Distrito de EE.UU., Distrito de Columbia, el requerido GONZÁLEZ VALENCIA: "Desde aproximadamente enero de 2003, y de forma permanente a partir de entonces, hasta la fecha de presentación de esta Acusación, inclusive, siendo ambas fechas aproximadas e inclusive, en los países de México, Estados Unidos y otros lugares, el acusado, GERARDO GONZÁLEZ VALENCIA, alias "Lalo", "Flaco", "Silver", "Silverio", "Eduardo", y "Laline", junto con otros, tanto conocidos como desconocidos al Jurado Indagatorio, conspiraron a consciente, intencionada y deliberadamente para: (1) de manera consciente e intencionada, distribuir cinco (5) kilogramos o más de una mezcla y sustancia que contenía una cantidad detectable de cocaína, una sustancia controlada de la Lista II; (2) de manera consciente e intencionada, distribuir (500) gramos o más de una mezcla o sustancia que contenía cantidad detectable de metanfetaminas, una sustancia controlada de la Lista II, pretendiendo y sabiendo que dichas sustancias serían introducidas ilícitamente en Estados desde un territorio externo?" (fs. 77/78, el destacado está en el original). Quiere decir que, como bien destacan tanto el Fiscal actuante, como el Sr. Fiscal de Corte, los cargos por los delitos que se le imputan refieren a hechos que se extienden desde el año 2003 hasta aproximadamente el momento en el que se cristaliza la acusación formal en Estados Unidos. El recurrente, en forma parcializada, pretende ubicar la supuesta comisión de los delitos en el año 2007, a partir de las declaraciones testimoniales de los testigos colaboradores, pero ello se basa en una valoración aislada de los documentos que acompañan la solicitud de extradición. Precisamente, porque el recurrente omite indicar que en la declaración jurada del Agente Especial de la DEA, Sr. Kyle J. MORI, se explica que: "La investigación reveló que desde aproximadamente desde enero de 2003 hasta el 19 de abril de 2016, González Valencia, el dirigente de una organización de tráfico de estupefacientes basada en México, transportó cargamentos en cantidades de múltiples toneladas de cocaína y metanfetaminas desde México, para introducción y distribución en Estados Unidos?" (fs. 85) y el investigador añadió que como parte de la investigación existieron comunicaciones electrónicas legalmente interceptadas. En efecto, el mentado Agente señaló que: "Como parte de esta investigación, las autoridades del orden público legalmente interceptaron a González Valencia y sus co conspiradores por comunicaciones electrónicas. Lo que sigue a continuación es un resumen de unos mensajes de texto, legalmente interceptados en California, entre González Valencia y un co-conspirador. El 26 de junio de 2013, en unos mensajes de texto legalmente interceptados, González Valencia y un co conspirador discutieron sobre si una transacción de narcotráfico fue consumada?González Valencia también habló sobre cantidades adicionales de drogas que se estaban preparando para enviar "allá arriba", lo cual creo que es una referencia a los Estados Unidos?". Por lo tanto, el argumento del

recurrente de que la acción penal está prescripta, carece de todo asidero. En particular, porque los cargos no refieren exclusivamente a hechos que datan de agosto de 2007 (cargamento al que hacen referencia testigos colaboradores), sino a maniobras extendidas en el tiempo, en base a evidencia por interceptaciones telefónicas. En el "sub-exámine", teniendo en consideración la evidencia sobre los intercambios por mensajes de texto, entre GONZÁLEZ VALENCIA y un co-conspirador, que datan del año 2013, no puede razonablemente entenderse operada la prescripción de la acción penal, ya que la acusación formal fue presentada el 19 de abril de 2016, sin haber pasado los 5 años a los que refiere la normativa vigente en Estados Unidos. De acuerdo al art. 5.3 del Tratado de 1973, no podrá concederse la extradición en ninguna circunstancia cuando la acción o la pena haya prescripto según las leyes del Estado requerido o requirente. Por lo tanto, resta analizar si de acuerdo a la normativa interna de la República Oriental del Uruguay, la acción está (o no) prescripta. El art. 117 del Código Penal, para supuestos como el de autos (que encuadraría en el art. 31 del Decreto-Ley 14.294), tiene un guarismo punitivo de dos a diez años de penitenciaría, por referir a un grupo delictivo organizado. En función de ello, el literal c) del art. 117 del Código Penal prescribe que tratándose de delitos con una pena de penitenciaría cuyo máximo es mayor a dos años hasta los diez años, el delito prescribe a los diez años, por lo que -desde esta óptica- no cabe duda que la acción penal no está prescripta. En suma, no puede concluirse, al menos con los elementos a la vista, que el delito por el que se solicita la extradición se encuentre prescripto. Además, tratándose de conductas interactivas por las que se reclama la extradición (continuidad o reiteración delictual), sea cual fuere el sistema, el comienzo del cómputo prescriptivo es la cesación de la ilicitud, extremo que ni siguiera fue alegado por la defensa letrada. Nuevamente, cabe insistir en que las facultades del Estado requerido se encuentran limitadas en la materia, por resultar de aplicación del llamado sistema belga-holandés, según el cual aquel Estado debe estar a las resultancias de la solicitud del Estado requirente, por lo que, si surge de ésta que el delito se habría cometido de forma permanente hasta abril de 2016, es a dicha fecha que debe estarse como inicio del plazo de prescripción. Lógicamente, ello no supone un juicio definitivo ni vinculante para el Estado requirente respecto a la no prescripción del delito imputado al sujeto extraditable, pues corresponderá a las autoridades de aquel Estado determinar, en el marco del juicio que habrá de seguirse al sujeto extraditado, si se configuró o no la prescripción del delito por el cual se concede su entrega. III.4) De los agravios vinculados al supuesto riesgo de violación de los derechos humanos en caso de concederse la extradición. El recurrente se agravió por entender que, de concederse la extradición, existe riesgo que se le imponga la pena de muerte o de prisión perpetua en Estados Unidos. Además, denunció que las condiciones de reclusión en Estados Unidos no brindan garantía alguna. A criterio de la Corte, el agravio es de franco y total rechazo. A decir verdad, la defensa no identifica cuál sería la regla de derecho violada por la sentencia atacada, limitándose a realizar una serie de apreciaciones genéricas sobre supuestas violaciones a los derechos humanos en aquel país, pero sin esgrimir un motivo válido habilitante de casación, por lo que el planteo no satisface las exigencias del art. 272 del C.P.P. de 1980, siendo este motivo suficiente para desestimar esta fase de la impugnación. Más aún, no existe agravio en lo atinente a la eventual imposición de la pena de muerte, que es la única que contempla el Tratado vinculante en su artículo 7 para supeditar el otorgamiento de la extradición a que la parte requirente otorgue garantías consideradas suficientes por la parte requerida en el sentido que no será impuesta dicha sanción o que, de ser impuesta, tal pena no se aplicará. Cabe observar entonces que la pena a aplicar está prevista en el Tratado sólo en dos supuestos, a saber, el mínimo punitorio de un año de prisión a cumplir (art. 2 in fine) y la máxima pena (la de muerte) donde se faculta a disponer como condición que la misma no será aplicada (art. 7). A la luz de esta conclusión, es

claramente improcedente tomar en cuenta la penalidad (ya sea en su contenido, monto o forma de aplicación), salvo esos dos excepcionales supuestos, para negar o condicionar la extradición. En opinión de la Corte, sea cual fuere el método interpretativo, no puede desconocerse la primacía que tiene todo Tratado de extradición firmado por el Estado, dada su naturaleza específica y de fuente original de previsiones que no pueden alterarse salvo por medio de otro tratado o denuncia del vigente de acuerdo con las normas de derecho internacional público aplicables. En efecto, por los Tratados de extradición, el Estado limita sus derechos soberanos en favor de lo que en aquellos se estipula, por lo que no puede prevalecer otra previsión que la consignada en su cuerpo normativo. Asimismo, el tenor de lo previsto por el art. 9 del propio Tratado es por demás claro en el sentido que el método interpretativo ha de ser el textual (de consuno con los métodos y reglas de interpretación consagrados en la Convención de Viena de 1969). Por último, forzoso es significar que este carácter obligatorio, específico y taxativo, se impone a todos los órganos del Estado destinatario, sean jurisdiccionales o no (jueces o fiscales respectivamente). Por otra parte, de acuerdo con lo dicho, en la medida de que el Tratado de extradición se encuentra vigente y no ha sido denunciado, no puede ser un argumento válido para negar la extradición el de las condiciones de cumplimiento de la pena en el Estado requirente. Si existiera ese riesgo, lo que correspondería es que el Estado uruguayo denunciara el Tratado; pero no resulta un argumento válido para incumplir -en definitiva esto es lo que propone el impugnante- el Tratado vigente. Por otra parte, el riesgo de que se le imponga la pena de prisión perpetua o la pena de muerte, está conjurada porque la sentencia de primera instancia (confirmada por la impugnada) condicionó la concesión de la extradición a que las autoridades intervinientes aseguren que, en caso de ser condenado, no se le impondrá a GONZÁLEZ VALENCIA la pena de muerte ni de prisión perpetua (ver la parte dispositiva de la sentencia de primera instancia a fs. 250). En suma, el agravio habrá de ser desestimado por las razones referidas. III.5) De los agravios asociados al invocado error al haberse diferido la entrega hasta la obtención de la excarcelación provisional o de la libertad definitiva. Al respecto, la defensa señala que se padeció error en la sentencia de primer grado, confirmada por la atacada, al afirmarse que se difiere la entrega hasta que el requerido obtenga su excarcelación provisional o libertad definitiva, pues el art. 8 del Tratado de 1973 dispone que la entrega podrá ser postergada "hasta la conclusión del proceso y, en caso de condena hasta la extinción o cumplimiento de la pena", sin hacer mención a la libertad obtenida en forma provisional. En el punto, tampoco se advierte que las sentencias de mérito hayan incurrido en error de derecho, por lo que este sector de la impugnación también será desestimado. El art. 8 del Tratado de 1973 establece: "Cuando la persona cuya extradición se solicita estuviera sometida a proceso o cumpliendo una condena en el territorio de la Parte requerida por un delito distinto a aquel por el que se solicita la extradición su entrega podrá ser postergada hasta la conclusión del proceso y, en caso de condena hasta la extinción o cumplimiento de la pena". Ciertamente, la norma faculta al Estado requerido a postergar la entrega del extraditado, en caso de que éste hubiera sido previamente condenado en aquel país, hasta la extinción o cumplimiento de la pena. Empero, ello no supone que el Estado requerido deba necesariamente diferir la entrega del extraditable hasta que se cumpla o extinga la pena en su totalidad. Se trata de una condicionante que el Estado requerido puede o no imponer al conceder la extradición. En consecuencia, no existe ilegitimidad alguna en el hecho de permitir que, eventualmente, la entrega del sujeto requerido se haga antes de la extinción o cumplimiento total de la pena, si es que se verificara previamente la excarcelación provisional del extraditable. III.6) De los agravios ligados al pretendido error al no haberse condicionado la extradición a que la pena máxima a ser aplicada en el Estado requirente sea la de 18 años de penitenciaría. El último planteo del recurrente consiste en señalar que la extradición, en caso de

concederse, debería condicionarse a que la pena máxima a aplicar al extraditado sea limitada al "quantum" más gravoso que establece nuestra legislación penal (decreto-ley No. 14.294 y ley No. 17.016) respecto al delito de análoga naturaleza, o sea, 18 años de penitenciaría. Tampoco le asiste razón en el punto. El Tratado de 1973, ni los Tratados de Montevideo de 1889 y 1940 aplicables en subsidio, prevén que el Estado requerido imponga tal condición al momento de conceder la extradición. La determinación del "quantum" punitivo corresponderá que sea efectuada por las autoridades judiciales del Estado requirente, de acuerdo a la legislación aplicable, con las limitantes indicadas en la sentencia de primera instancia. Con tales criterios en mente, es correcto concluir que la individualización de la pena será impuesta por el Estado requirente, conforme a su normativa interna, condicionada en el presente caso a que no podrá imponerse prisión perpetua, ni pena de muerte. La imposición de las penas, dentro de los mínimos y máximos previstos en la legislación del Estado requirente, es una cuestión privativa de las autoridades judiciales de este último Estado, y en ello las autoridades judiciales del Estado requerido no deben inmiscuirse. En consecuencia, por cuanto viene de decirse, el dispositivo impugnado no adolece de vicios que causen nulidad, lo cual determina la solución desestimatoria anunciada. IV) De las costas y costos. No existe mérito para imponer condenas causídicas en el grado (arts. 56.1 y 279 del C.G.P y art. 688 del C.C.). Por los fundamentos expuestos, la Suprema Corte de Justicia, por unanimidad, FALLA: I) DESESTÍMASE EL RECURSO DE CASACIÓN INTERPUESTO; SIN ESPECIAL CONDENA PROCESAL. II) ESTÍMANSE LOS HONORARIOS FICTOS EN 20 B.P.C. III) NOTIFÍQUESE Y, OPORTUNAMENTE, DEVUÉLVESE. DRA. BERNADETTE MINVIELLE PRESIDENTE DE LA SUPREMA CORTE DE JUSTICIA DRA. ELENA MARTÍNEZ MINISTRA DE LA SUPREMA CORTE DE JUSTICIA DR. EDUARDO TURELL MINISTRO DE LA SUPREMA CORTE DE JUSTICIA DR. LUIS TOSI BOERI MINISTRO DE LA SUPREMA CORTE DE JUSTICIA DR. TABARÉ SOSA AGUIRRE MINISTRO DE LA SUPREMA CORTE DE JUSTICIA DR. GUSTAVO NICASTRO SEOANE SECRETARIO LETRADO DE LA SUPREMA CORTE DE JUSTICIA