UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.: 16-CR-65 |
| | ) | |
| GERARDO GONZALEZ-VALENCIA, | ) | |
|   also known as "Lalo," "Flaco," | ) | |
|   "Silver," "Silverio," "Eduardo," and | ) | |
|   "Laline," | ) | |
| | ) | |
| Defendant. | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.: 16-CR-192 |
| | ) | |
| JOSE GONZALEZ-VALENCIA, | ) | |
|   also known as "Jafett Arias-Becerra," | ) | |
|   "Chepa," "Camaron," "Santy," | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S REPLY IN SUPPORT OF
MOTION FOR JOINDER OF DEFENDANTS FOR TRIAL**

The government respectfully submits this reply in support of its Motion for Joinder of Defendants for Trial. Dkt. Nos. 72 (-065 case) and 14 (-192 case) (the "Motion"). Defendants Gerardo Gonzalez Valencia and his brother Jose Gonzalez Valencia (together, the "Defendants") have both opposed the government's Motion. Dkt. Nos. 77 ("Gerardo Opposition") and 20 ("Jose Opposition").

The sole issue before the Court is the government's request that the Defendants be joined for trial pursuant to Fed. R. Crim. P. 13. Having missed the 2:00 p.m., November 17th, 2021 filing deadline for their opposition without explanation or excuse, counsel for Defendant Gerardo

1

Gonzalez Valencia (hereinafter "Gerardo") tellingly spend the first 15 pages of their 22-page filing focusing on everything *but* government's motion for joinder.  A year and a half after first arriving in the United States, and after spending four years unsuccessfully fighting his extradition in the Uruguayan courts, Gerardo now insists for the first time that this Court does not even have *jurisdiction* over him because of supposed defects in his Uruguayan extradition proceedings.  *See* Gerardo Opposition at 6-7.  Gerardo's accusations of government misconduct are entirely unwarranted and manifestly false, but they are also irrelevant to the issue before the Court here: joinder with his brother and co-conspirator for trial.  On the relevant factors, Gerardo's opposition comes up short, presenting no compelling argument against joinder.

His brother Jose Gonzalez Valencia (hereinafter "Jose") takes a different tack, focusing on the joinder issue directly, and his arguments are just two:  that the time periods charged against each of the brothers for their involvement in the conspiracy are slightly different (one being involved for three years longer than the other), and that Gerardo's indictment charged methamphetamine *and* cocaine rather than just cocaine.  The latter point is easily disposed of, as the government has already explained that it does not intend to proceed at trial on the methamphetamine conspiracy as to Gerardo.[1]  And the former argument does not carry the day, either, given that jury instructions can ensure that any evidence of the small, non-overlapping time

---

[1] As the government has explained before, this is not because of any doubts about its evidence or witness credibility, but merely a strategic decision about how to most efficiently and effectively marshal its resources in preparing for a jury trial.  Narrowing an indictment before trial is commonplace and unquestionably permissible.  *See United States v. Miller*, 471 U.S. 130, 144 (1985) ("explicitly reject[ing]" the proposition that "a narrowing of [an] indictment constitutes an amendment that renders the indictment void," and affirming it as "common practice" to "withdraw[] from the jury's consideration one count of an indictment while submitting others for its verdict") (internal quotation marks and citation omitted).

2

frame of the two indictments is appropriately compartmentalized against one defendant and not the other.

Ultimately, in asking the Court to deny joinder, the Defendants ask this Court to sit in judgment of the same case twice, calling two juries to hear the same evidence, from the same witnesses, doubling the amount of time and the Court resources necessary to bring the Defendants to justice. As the government explained in its Motion, these two Defendants are accused of participating in the same scheme, and the trial presentation will include nearly all of the same evidence and nearly all of the same witnesses. *See United States v. Ford*, 870 F.2d 729, 731 (D.C. Cir. 1989) (describing the "joinder presumption" as "especially strong" in such cases). The government's joinder motion should be granted.

## DISCUSSION

**I.  Gerardo Gonzalez Valencia's Allegations of Misconduct and Lack of Jurisdiction Are Not Squarely Before the Court on This Motion, and In Any Event Are Meritless**

The majority of Gerardo's opposition is spent arguing defects in his extradition, faulting Uruguay for extraditing him, alleging that the United States government did not submit enough evidence to Uruguay despite the fact that Uruguay thought otherwise, and generally casting baseless aspersions of government misconduct. Although none of these issues are squarely before the Court in the government's motion for joinder—presumably being shoe-horned into Gerardo's opposition papers because the pre-trial motions deadline has passed without Gerardo previously raising these claims—the government must briefly address them here.[2]

---

[2] To the extent that Gerardo is permitted to advance these arguments through a separate submission or by converting his opposition to a late pre-trial motion, the government reserves its right to respond in more detail.

As the Court is aware, Gerardo was extradited to this district on May 14, 2020. Prior to that point, he had been in custody in Uruguay for over four years, vigorously contesting his extradition in the Uruguayan legal system, culminating in a lengthy decision by the Uruguayan Supreme Court that Gerardo attached to his opposition as Dkt. No. 77-5. Gerardo appears to have been in possession of the extradition request submitted by the United States to Uruguay in support of his extradition since early in his time in custody there.

Upon his extradition here, Gerardo wasted no time in seeking recourse from this Court where he felt it necessary, filing a Motion for a Bill of Particulars (later withdrawn) within weeks of his arrival. *See* Dkt. No. 18. Thereafter, government prosecutors assigned to the case engaged in lengthy informal conversations with Gerardo's counsel, assisting Gerardo's counsel in navigating voluminous Title III wiretap discovery, and providing "attorney reverse proffers" by phone in which the government described the scope of its case and provided sketches of the evidence the government intended to adduce through witnesses that were not otherwise revealed in Rule 16 discovery. At no time did Gerardo's counsel ever raise any question—either to government counsel or the Court—about the Court's jurisdiction over his case based on the extradition proceedings, even as they now assert that the extradition affidavits were *facially* deficient, *see* Gerardo Opposition at 10, and that the Uruguayan court decisions were legally improper by their own terms, *see id.* at 13. Only now that he faces an impending trial does Gerardo allege that the government's extradition affidavits, which have been in his possession for years, demonstrate "misconduct" warranting dismissal of the charges against him, *see id.* at 5, or that the rulings of the Uruguayan courts were too deferential to the government's extradition request, *see id.* at 12-13.

The parties requested a trial date during the May 21, 2021 status conference in this matter, and the Court set the current trial date of February 7, 2022, with a pre-trial motions deadline of October 4, 2021. On October 4, 2021, Gerardo filed a number of pre-trial motions seeking dismissal and suppression on various issues. The only motion that even arguably related to his extradition was a motion to dismiss arguing that the government had not provided the grand jury that indicted him with sufficient probable cause to indict. This was also framed as a dismissal related to his extradition because—criminal defendants generally not having access to grand jury materials—Gerardo was drawing an inference that the grand jury had been presented with the same evidence detailed in extradition affidavits to Uruguay. *See* Dkt. No. 36-8 (redacted and publicly available at Dkt. No. 64) at 3-4.

That motion emphatically did *not* raise the issues now asserted for the first time in Gerardo's opposition to the government's joinder motion. One can search Gerardo's previous motion in vain for *any* mention of "jurisdiction," *any* mention of the U.S.-Uruguay extradition treaty, *any* mention of foundational extradition principle of the "Rule of Specialty," or *any* citation whatsoever to the primary cases on which Gerardo now relies, such as *United States v. Trabelsi*, 845 F.3d 1181, 1186 (D.C. Cir. 2017) (*see* Gerardo Opposition at 6) and the *Ker/Frisbie* doctrine (*see* Gerardo Opposition at 7). Thus, it reeks of bad faith and lack of candor to the Court for Gerardo to insist that he "squarely put before this Court in his Motion to Dismiss the Indictment (Dkt. No. 64)" the question of the Court's "jurisdiction to review Uruguay's extradition decision." Gerardo Opposition at 6.[3]

---

[3] The fact that Gerardo did not previously raise this issue for the Court is also, in a sense, self-evident in that if he *had* put the same argument before the Court in a previous filing, he presumably would not have needed 15 pages to detail it here.

Even if this Court were to reach the merits of the extradition question, Gerardo's arguments fail. To begin with, as even Gerardo's lead case makes clear, *if* a court has jurisdiction to review the propriety of an extradition, it must start with the "terms of the [extradition] treaty." *Trabelsi*, 845 F.3d at 1183. Even then, a reviewing court conducts only a "highly deferential" review with a "presumption" that an extradition was lawful. *Id.* at 1186.

Here, the core of Gerardo's argument is that his extradition lacked probable cause, both because the Uruguayan courts did not conduct an "independent review of the evidence to assess probable cause" and because the diplomatic documents submitted by the United States to Uruguay were "insufficient for [] a probable cause determination." *See* Gerardo Opposition at 11, 16. Although he asks this Court to take up the issue, the U.S.-Uruguay Extradition Treaty (the "Treaty") itself explains the source of applicable law and the forum for any grievance:

> ARTICLE 9. The determination that extradition should or should not be granted shall be made in accordance with this Treaty and the law of the requested Party [*i.e. Uruguay*]. The person whose extradition is sought shall have the right to use such remedies and recourses as are provided by the law of the requested Party.

Dkt. No. 77-4 at 7.

Next, quite contrary to Gerardo's insistence that the United States was "required" to provide probable cause to Uruguay, *see* Gerardo Opposition at 11, the Treaty makes plain that any such requirement was permissive at Uruguay's option:

> ARTICLE 10. [. . .] The requested Party *may* require the requesting Party to produce evidence to establish probable cause that the person claimed has committed the offense for which extradition is requested. The requested Party *may* refuse the extradition request if an examination of the case in question shows that the warrant is manifestly ill-founded.

Dkt. No. 77-4 at 7 (emphases added). And this permissive "may" language stands in stark contrast to other aspects of the same article of the Treaty that have mandatory "shall" or "must" language. *See, e.g., id.* ("The request for extradition *shall* be made through the diplomatic channel . . . . When

6

the request relates to a person who has not yet been convicted, it *must* be accompanied by a warrant of arrest . . . .").

When Gerardo litigated these issues in the forum provided for in the Treaty—*i.e.* the Uruguayan courts—the Uruguayan Supreme Court addressed this precise argument:

> [Gonzalez Valencia] claims that Uruguay must be more demanding and request at least an extension of the evidence presented . . . . In short, [he] states that the affidavit of officials of the requesting State does not satisfy the requirements of the Treaty in order to prove the probable cause of extradition . . . . On that point, the appellant is also not right . . . .
>
> [T]he Treaty empowers, but *does not require* requesting that the requesting State provide sufficient evidence to establish, prima facie, that the person sought has committed he crime for which the extradition is formulated. Indeed, the request for evidence under Article 10 of the 1973 Treaty is a power granted to the Judge by using the verb "may."

Dkt. No. 77-5 at 7-8 (emphasis added).[4]

Thus, as the Uruguayan Supreme Court held, and as is evident from the plain text of the Treaty itself, the Treaty does not even require what Gerardo insists the government failed to provide. With Gerardo having lost this challenge in Uruguay, the sole forum identified in the Treaty for mounting it, this Court should not revisit it here. Even if the Court were to revisit Uruguay's decision and conduct a probable cause analysis not warranted by governing case law, the government rejects the contention that the extradition affidavits Gerardo seeks to put at issue show a lack of probable cause. Among other things, the affidavits detailed cooperating witness testimony tying Gerardo to a large cocaine shipment seized by the United States Coast Guard and a lawfully-intercepted wiretap in which the government identified Gerardo and his co-conspirators

---

[4] The government is here relying on the translation of the Uruguayan Supreme Court opinion attached to Gerardo's opposition, which appears to have been machine-generated, and therefore reserves the right to re-address its contents with the aid of a qualified translation should the Court require full briefing on Gerardo's extradition argument.

discussing drug trafficking. Additionally, as noted above, Gerardo's belated extradition argument can be rejected as irrelevant to the joinder issue presently before the Court as a result of the Motion.

### II. Joinder of the Defendants' Trials Is Appropriate

Both Gerardo and Jose oppose the government's Motion, on separate grounds. Neither is persuasive when measured against the "strong interests favoring joint trials" advanced in the Motion, "particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors." *United States v. Mardian*, 546 F.2d 973, 979 (D.C. Cir. 1976).

#### A. Gerardo's Arguments

Gerardo's first argument is that the government's motion is untimely, and the government "could have moved to join these defendants at any point during the last five years." Gerardo Opposition at 16. But joinder pursuant to Rule 13 is joinder *for trial*. *See* Fed. R. Crim. P. 13 ("The court may order that separate cases be *tried* together . . . .") (emphasis added). Prior to both Defendants being present in this district, it would have made no sense to make a motion asking that they be tried together. Indeed, had the government made the trial joinder motion while Gerardo was in custody in this District but Jose was still in Brazil, awaiting extradition, it would have amounted to a motion for an indeterminate delay of Gerardo's trial. *Cf. United States v. Richards*, 94 F. Supp. 2d 304, 311 (E.D.N.Y. 2000) ("Tarantola was still a fugitive at the time the indictments were unsealed, and remained so until July of 1999. A joint indictment would have made little sense under such circumstances: had Tarantola remained at large, the government would now be moving for severance rather than joinder."). And once both Defendants were in custody in this District, the government did not delay, filing its joinder motion as soon as Jose made his initial appearance.

Gerardo also insists that it would be "judicially improper" to force his brother Jose to proceed to trial, and that Gerardo should not have to be tied to a "co-defendant who is (understandably) completely unprepared to move forward." Gerardo Opposition at 16. But Jose is perfectly capable of speaking for himself in terms of his readiness to proceed to trial, and although he opposes joinder, he does not identify the time to trial or his supposed unpreparedness as a basis for his opposition. *See* Jose Opposition at 2-3.[5]

Gerardo next turns to prejudice, insisting that he will face "extreme" and "substantial" prejudice if he had to face a jury alongside his brother. *See* Gerardo Opposition at 17-18. As the government explained in its Motion, its case against the Defendants involves a near-complete overlap of witnesses and evidence, and the Defendants are accused of participating in the same conspiracy with one another. So it is hardly a case in which there are "various crimes charged" where "no corroboration exists" between the two Defendants, as in the primary case cited by Gerardo. Gerardo Opposition at 18. The only difference to which Gerardo points is that he intends to raise a withdrawal defense whereas (so far as he knows) his brother does not. But he gives no reason to think that this difference in defenses is inherently prejudicial, offering only the superficial and conclusory assertion that there is a "risk" of spillover evidence between the two. But without any particular facts proffered as to why that is so, it could just as well be that advancing a withdrawal defense next to a co-defendant who does not do so *enhances* the claimed withdrawal by highlighting the difference in conduct. And in any event, any risk is appropriately handled with jury instructions. As the D.C. Circuit has explained, "[a]bsent a dramatic disparity of evidence,

---

[5] Gerardo asserts that the government has "not yet even produced Rule 16 discovery" to Jose. Gerardo Opposition at 17. This is no longer true, as the government has now produced nearly all of the Rule 16 discovery in Gerardo's possession to Jose, with the exception of forensic images of cellular devices that were in Gerardo's possession at his arrest.

any prejudice caused by joinder is best dealt with by instructions to the jury to give individual consideration to each defendant." *United States v. Slade*, 627 F.2d 293, 309 (D.C. Cir. 1980) (internal citations omitted).[6]

Finally, Gerardo asserts that joinder would violate the rule of specialty in the Treaty because Uruguay was not "fully appraised of the charges and circumstances before it agreed to extradite." Gerardo Opposition at 19. But this improperly attempts to expand what the rule requires. The rule of specialty is simply "a doctrine that an internationally extradited defendant may be tried only for the offenses specified in the warrant of extradition." *United States v. Apodaca*, 275 F. Supp. 3d 123, 140 (D.D.C. 2017) (internal citations and quotations omitted). "[T]he specialty doctrine has never been construed to permit foreign intrusion into the evidentiary or procedural rules of the requisitioning state." *United States v. Nosov*, 153 F. Supp. 2d 477, 481 (S.D.N.Y. 2001) (internal citations and quotations omitted) (rejecting defendant's claims that government violated rule of specialty by bringing new counts against extradited defendant's co-defendants). Gerardo's citation to *Trabelsi*, 845 F.3d at 1196, which he fails to note is from a concurring opinion, does not create a different standard. That opinion makes clear that the

---

[6] Gerardo also compares himself to the District of North Dakota prosecution of Steven Pinto, who was arrested and served the entirety of his pretrial detention in the United States. *See* Gerardo Opposition at 16-17. But that court's decision rejecting joinder was premised on Sixth Amendment speedy trial concerns. *See United States v. Berry*, No. 3:17-CR-00206-02 and 05, 2021 WL 848175, at *4-*7 (D.N.D. Mar. 5, 2021). Gerardo has not advanced such an argument here, nor could he: the vast majority of his time since indictment was spent contesting his extradition, and once in custody here, neither he nor the government has ever sought a continuance of the trial date once it was set. A comparison to Pinto's co-conspirator, Daniel Vivas Ceron, is more apt. Vivas Ceron spent years in custody in Panama fighting extradition. *United States v. Ceron*, No. 2:15-CR-055, 2018 WL 6305663, at *1 (D.N.D. Dec. 3, 2018). Once extradited, the district court granted the government's motion to join Pinto's and Ceron's cases for trial, concluding that even though the defendants were charged in separate indictments, joinder was proper "[b]ecause the Defendants are charged in the same conspiracy, the evidence and witnesses largely overlap, and joint trials will conserve scarce judicial resources." *Id.* at *2.

"specified purposes" or "certain conditions" of extradition to which it refers are the "limits the requested country places on its decree granting extradition." *Id.* Here, Uruguay did not impose a condition that Gerardo Gonzalez Valencia's be tried alone without any co-conspirators.[7]

### B. Jose's Arguments

Jose's first argument is that because Gerardo's charged conspiracy runs from 2003-2016 while Jose's runs from 2006-2016, any pre-2006 evidence adduced against Gerardo will be necessarily prejudicial to Jose. As the government explained in its Motion, though, it expects that the vast majority of the evidence it will introduce at trial against both Defendants comes from 2006 and later. *See* Motion at 5 n.2. To the extent there is a difference in evidence against the two, it will not be "dramatic," and therefore "any prejudice caused by joinder is best dealt with by instructions to the jury to give individual consideration to each defendant." *Slade*, 627 F.2d at 309. As the D.C. Circuit has recently explained, in language cited by Jose himself, "[t]he varying roles played by members of a conspiracy will not render joint trial inappropriate as long as the jury can reasonably compartmentalize the substantial and independent evidence against each defendant." *United States v. Tucker*, 12 F.4th 804, 825 (D.C. Cir. 2021).

Second, Jose argues that there is a risk of prejudice in that Gerardo was charged with a methamphetamine conspiracy in addition to the cocaine conspiracy that Jose is also charged with. *See* Jose Opposition at 3-4. But as the government has previously explained, it does not intend to proceed at trial on the methamphetamine element of the indictment as to Gerardo in order to narrow

---

[7] Additionally, as this Court has recognized, there is doubt as to whether a defendant in this Circuit even has standing to raise an objection to the rule of specialty in an extradition. *See Apodaca*, 275 F. Supp. 3d at 140 ("[T]he D.C. Circuit has declined to resolve conflicting authority and opine 'as to whether a criminal defendant—as opposed to the extraditing state—has standing to assert the doctrine of specialty.'") (quoting *United States v. Lopesierra–Gutierrez*, 708 F.3d 193, 206 (D.C. Cir. 2013)).

the issues before the jury and streamline its trial presentation. Thus, there is no risk of prejudicial spillover in a jury attributing methamphetamine evidence against Gerardo to Jose.

## CONCLUSION

For these reasons, as well as those advanced in the government's Motion, the Government respectfully requests that the Court grant its motion for joinder.

Respectfully submitted this 18th day of November, 2021.

                                        Arthur G. Wyatt, Chief
                                      Narcotic and Dangerous Drug Section
                                      Criminal Division
                                      United States Department of Justice

By:      /s/_____
                    Kate Naseef, Trial Attorney
                    Kaitlin Sahni, Trial Attorney
                    Brett Reynolds, Trial Attorney
                    United States Department of Justice
                    Narcotic and Dangerous Drug Section
                    145 N Street, Northeast
                    East Wing, Second Floor
                    Washington, D.C. 20530
                    Kate.Naseef@usdoj.gov
                    (202) 514-0917

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing was sent via ECF to counsel of record for the Defendants, this 18th day of November, 2021.

                By:      /s/
                        Kate Naseef
                        Trial Attorney
                        Narcotic and Dangerous Drug Section
                        Criminal Division
                        U.S. Department of Justice