**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 16-CR-065 (BAH)** |
| v. | |
| **JOSE GONZALEZ-VALENCIA &** | |
| **GERARDO GONZALEZ-VALENCIA,** | |
| Defendants. | |

**DEFENDANT GERARDO GONZALEZ-VALENCIA'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR *IN CAMERA* REVIEW, AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES**

**FILED UNDER SEAL**

## TABLE OF CONTENTS

**Page**

I.   BACKGROUND ........................................................................................................4

    A.   The Extradition Affidavit................................................................................ 5

    B.   The Extradition Process ................................................................................. 8

    C.   Salient Facts Learned After Mr. Gonzalez-Valencia's Extradition .................... 11

II.  ARGUMENT .......................................................................................................13

    A.   Jurisdiction................................................................................................. 13

    B.   This Court Should Review *De Novo* the Sufficiency of the Evidence of Probable
           Cause in the Extradition Package ................................................................. 13

    C.   The Government Failed to Offer Sufficient Evidence of Probable Cause That Mr.
           Gonzalez-Valencia Engaged in a Conspiracy to Distribute Cocaine and
           Methamphetamine Including and Through the Limitations Period...................... 15

           1.   Standing Alone, the BBM Exchange Does Not, as a Matter of Law,
                Support Probable Cause........................................................................... 19

           2.   The BBM Exchange is Not Evidence of Probable Cause in Support of a
                Conspiracy Tied to Prior Events. ............................................................ 26

                (i)   2007............................................................................................. 27

                (ii)   2009............................................................................................ 28

                (iii)   The BBM Exchange is Not Connected to the Limitations Period 29

    D.   The Government Failed to Provide any Evidence to Identify Mr. Gonzalez-
           Valencia as a Participant in the BBM Exchange. ................................................ 31

    E.   The Government is Required to Provide Sufficient Evidence of Probable Cause
           Under the Treaty. ......................................................................................... 34

    F.   Uruguay Failed to Apply the Correct Legal Standard in Granting Mr. Gonzalez-
           Valencia's Extradition. ................................................................................. 37

    G.   Requested Relief ........................................................................................ 39

           1.   The Court Should Exercise its Supervisory Powers and Dismiss the
                Indictment with Prejudice. ...................................................................... 40

                (i)   International Comity and Deterrence Requires Dismissal............ 44

                (ii)   The Government's Misconduct Requires Dismissal.................... 46

           2.   Alternatively, Before Ruling on the Motion to Dismiss, the Court Should
                Conduct an *In Camera* Review of the Grand Jury Record ...................... 48

III.  CONCLUSION....................................................................................................50

**FILED UNDER SEAL**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afanasjev v. Hurlburt,*
  418 F.3d 1159 (11th Cir. 2005) ...........................................................................................34

*Aguilar v. Texas,*
  378 U.S. 108 (1964)............................................................................................................16

*Baker v. McCollan,*
  443 U.S. 137 (1979)......................................................................................................34, 42

*Bank of Nova Scotia v. United States,*
  487 U.S. 250 (1988)............................................................................................................41

*Barr v. U.S. Dep't of Just.,*
  819 F.2d 25 (2d Cir. 1987).................................................................................................43

*Beck v. Ohio,*
  379 U.S. 89 (1964)..............................................................................................................38

*Borchardt v. United States,*
  469 U.S. 937 (1984) ...........................................................................................................17

*Brady v. Maryland,*
  373 U.S. 83 (1963)..................................................................................................12, 49, 50

*Caltagirone v. Grant,*
  629 F.2d 739 (2d Cir. 1980)........................................................................................36, 42

*In re Capitol Breach Grand Jury Investigations Within D.C.,*
  339 F.R.D. 1 (D.D.C. 2021) ...............................................................................................49

*Collins v. Loisel,*
  259 U.S. 309 (1922)............................................................................................................33

*Commonwealth v. McCarthy,*
  385 Mass. 160 (1982) .........................................................................................................31

*Cook v. City of Antioch,*
  No. 19-CV-01370-PJH, 2020 WL 9066046 (N.D. Cal. May 12, 2020)...............................43

*Coppedge v. United States,*
  311 F.2d 128 (D.C. Cir. 1962)......................................................................................16, 48

**FILED UNDER SEAL**

*County of Riverside v. McLaughlin,*
   500 U.S. 44 (1991).........................................................................................42, 44

*Dorsey v. District of Columbia,*
   234 F. Supp. 3d 1 (D.D.C. 2017) ...................................................................42

*Ellison v. United States,*
   238 A.3d 944 (D.C. 2020) ...............................................................................21

*In re Extradition of Garcia,*
   825 F. Supp. 2d 810 (S.D. Tex. 2011) ...........................................................34

*In re Extradition of Platko,*
   213 F. Supp. 2d 1229 (S.D. Cal. 2002)......................................................16, 32

*In re Extradition of Singh,*
   124 F.R.D. 571 (D.N.J. 1987)........................................................................34

*In re Extradition of Singh,*
   No. 01-6215 OWW, 98-5489 OWW, 2005 WL 3030819 (E.D. Cal. Nov. 9,
   2005) ..............................................................................................................33

*In re Extradition of Suyanoff,*
   No. 12-MJ-462 JMA, 2012 WL 4328523 (E.D.N.Y. Sept. 20, 2012)..............32

*In re Extradition of Trinidad,*
   754 F. Supp. 2d 1075 (N.D. Cal. 2010) .........................................................16

*Fisher v. United States,*
   328 U.S. 463 (1946).......................................................................................40

*Fox v. Tomczak,*
   No. 04 C 7309, 2006 WL 1157466 (N.D. Ill. Apr. 26, 2006)..........................43

*Furtado v. Maloney,*
   125 F. App'x 318 (1st Cir. 2005)....................................................................31

*Petition of Geisser,*
   627 F.2d 745 (5th Cir. 1980) .........................................................................43

*Gerstein v. Pugh,*
   420 U.S. 103 (1975)............................................................................... *passim*

*Giordenello v. United States,*
   357 U.S. 480 (1958).......................................................................................16

*Goodwine v. Lee,*
   No. 10 CV 6019 (VB), 2016 WL 6834017 (S.D.N.Y. Nov. 17, 2016) .............31

FILED UNDER SEAL

*In re Grand Jury Investigation*,
 No. 18-GJ-00008 (BAH) (D.D.C. Apr. 1, 2020) ................................................................. 48

*Hill v. Virginia*,
 379 S.E.2d 134 (Va. Ct. App. 1989) ...................................................................................... 21

*Illinois v. Gates*,
 462 U.S. 213 (1983) ........................................................................................................ 32, 33

*Jones v. United States*,
 342 F.2d 863 (D.C. Cir. 1964) ............................................................................................... 40

*Kirkland v. Preston*,
 385 F.2d 670 (D.C. Cir. 1967) ............................................................................................... 15

*Manta v. Chertoff*,
 518 F.3d 1134 (9th Cir. 2008) .............................................................................................. 43

*Manuel v. City of Joliet, Illinois*,
 137 S. Ct. 911 (2017) ............................................................................................................. 20

*McFadden v. United States*,
 576 U.S. 186 (2015) ........................................................................................................ 19, 27

*McNabb v. United States*,
 318 U.S. 332 (1943) ............................................................................................................... 41

*Meshal v. Higgenbotham*,
 47 F. Supp. 3d 115 (D.D.C. 2014), *aff'd*, 804 F.3d 417 (D.C. Cir. 2015) .................. 34, 35, 43

*New York v. Swamp*,
 84 N.Y.2d 725 (1995) ............................................................................................................ 21

*North Carolina v. Turshizi*,
 625 S.E.2d 604 (N.C. Ct. App. 2006), *writ denied, review denied sub nom.*
 *North Carolina v. Ahmadi-Turshizi*, 631 S.E.2d 133 (N.C. 2006) .......................................... 21

*North Dakota v. Turbeville*,
 895 N.W.2d 758 (N.D. 2017) ................................................................................................ 21

*Ohio v. Jackson*,
 980 N.E.2d 1032 (Ohio 2012) ............................................................................................... 21

*Olmstead v. United States*,
 277 U.S. 438 (1928) ............................................................................................................... 42

*Olson v. Tyler*,
 771 F.2d 277 (7th Cir. 1985) ................................................................................................ 42

FILED UNDER SEAL

*Reid v. Covert*,
354 U.S. 1 (1957)................................................................................................34, 43

*In re Ribaudo*,
No. 00 Crim. Misc. 1 Pg. (KNF), 2004 WL 213021 (S.D.N.Y. Feb. 3, 2004).......................32

*Ridings v. Dep't of Just.*,
38 F. App'x 20, 2002 WL 1359490 (D.C. Cir. 2002)..............................................49

*Simmons v. Braun*,
627 F.2d 635 (2d Cir. 1980)................................................................................33

*Sivard v. Pulaski County*,
959 F.2d 662 (7th Cir. 1992) ...............................................................................42

*United States v. Alvarez-Machain*,
504 U.S. 655 (1992)..............................................................................................46

*United States v. Baggot*,
463 U.S. 476 (1983)..............................................................................................48

*United States v. Brodie*,
403 F.3d 123 (3d Cir. 2005)..................................................................................27

*United States v. Buckland*,
289 F.3d 558 (9th Cir. 2002) ...............................................................................22

*United States v. Bundy*,
968 F.3d 1019 (9th Cir. 2020) .............................................................................41

*United States v. Burnett*,
No. 12-CR-00042-BAH-3, 2013 WL 12430549 (D.D.C. Mar. 21, 2013), *aff'd*,
827 F.3d 1108 (D.C. Cir. 2016)............................................................................32

*United States v. Childress*,
58 F.3d 693 (D.C. Cir. 1995)................................................................................19

*United States v. Davis*,
863 F.3d 894 (D.C. Cir. 2017)..............................................................................26

*United States v. Duarte*,
No. 15-20540-CR, 2018 WL 310025 (S.D. Fla. Jan. 4, 2018), *aff'd sub nom.*
*United States v. Mejia-Duarte*, 780 F. App'x 730 (11th Cir. 2019).......................35

*United States v. Dumes*,
313 F.3d 372 (7th Cir. 2002) ...............................................................................17

FILED UNDER SEAL

*United States v. Dunn,*
  No. 05-CR-127 (KMK), 2005 WL 1705303 (S.D.N.Y. July 19, 2005) ................................49

*United States v. Fernandez,*
  694 F. Supp. 858 (S.D. Fla. 1988) ........................................................................................17

*United States v. Fernandez-Morris,*
  99 F. Supp. 2d 1358 (S.D. Fla. 1999) ...................................................................................16

*United States v. Fiorito,*
  499 F.2d 106 (7th Cir. 1974) ................................................................................................18

*United States v. Garcia,*
  497 F.3d 964 (9th Cir. 2007) ................................................................................................20

*United States v. Gardner,*
  488 F.3d 700 (6th Cir. 2007) ................................................................................................27

*United States v. Gaskins,*
  690 F.3d 569 (D.C. Cir. 2012) ..............................................................19, 20, 26, 27

*United States v. Graham,*
  83 F.3d 1466 (D.C. Cir. 1996) ..............................................................................................18

*United States v. Hassan,*
  578 F.3d 108 (2d Cir. 2008) .................................................................................................19

*United States v. Hasting,*
  461 U.S. 499 (1983) .............................................................................................................41

*United States v. Holder,*
  990 F.2d 1327 (D.C. Cir. 1993) ............................................................................................17

*United States v. Hunte,*
  196 F.3d 687 (7th Cir. 1999) ................................................................................................26

*United States v. Isgro,*
  974 F.2d 1091 (9th Cir.1992) ...............................................................................................41

*United States v. Knight,*
  No. 3:19-CR-00038-MMD-CLB, 2021 WL 134589 (D. Nev. Jan. 13, 2021) ......................31

*United States v. Laughlin,*
  226 F. Supp. 112 (D.D.C. 1964) ...........................................................................................49

*United States v. Manafort,*
  314 F. Supp. 3d 258 (D.D.C. 2018) ......................................................................................32

**FILED UNDER SEAL**

*United States v. Matta-Ballesteros,*
  71 F.3d 754 (9th Cir. 1995) ...........................................................................41

*United States v. Morgan,*
  385 F.3d 196 (2d Cir. 2004)............................................................................19

*United States v. Naegele,*
  474 F.Supp.2d 9 (D.D.C.2007) ......................................................................49

*United States v. Navarez,*
  954 F.2d 1375 (7th Cir. 1992) ........................................................................26

*United States v. Nolan,*
  651 F. Supp. 2d 784 (N.D. Ill. 2009) .............................................................16

*United States v. Osunde,*
  638 F. Supp. 171 (N.D. Cal. 1986) .................................................................44

*United States v. Paul,*
  73 M.J. 274 (C.A.A.F. 2014) ..........................................................................20

*United States v. Pena-Bencosme,*
  No. 05-M-1518 (SMG), 2006 WL 3290361 (E.D.N.Y. Nov. 13, 2006) ...............34

*United States v. Perry,*
  353 F. Supp. 1235 (D.D.C. 1973) ...................................................................44

*United States v. Puentes,*
  50 F.3d 1567 (11th Cir. 1995) ...............................................................35, 36

*United States v. Sells Eng'g, Inc.,*
  463 U.S. 418 (1983)..........................................................................................48

*\*United States v. Sensi,*
  664 F. Supp. 566 (D.D.C. 1987) .....................................................................14

*\*United States v. Sensi,*
  879 F.2d 888 (D.C. Cir. 1989)..........................................................13, 14, 15

*United States v. Simpson,*
  927 F.2d 1088 (9th Cir. 1991) ........................................................................41

*United States v. Siriprechapong,*
  181 F.R.D. 416 (N.D. Cal. 1998).....................................................................41

*\*United States v. Sitzmann,*
  74 F. Supp. 3d 96 (D.D.C. 2014)..........................................................17, 18, 49

FILED UNDER SEAL

*United States v. Smith,*
        373 F. Supp. 3d 223 (D.D.C. 2019) ........................................................................16

*United States v. Townsend,*
        924 F.2d 1385 (7th Cir. 1991) ................................................................................18

*\*United States v. Trabelsi,*
        845 F.3d 1181 (D.C. Cir. 2017) .............................................................13, 14, 15, 37

*United States v. Turner,*
        319 F.3d 716 (5th Cir. 2003) ..................................................................................17

*United States v. Twersky,*
        No. S2 92 CR. 1082 (SWK), 1994 WL 319367 (S.D.N.Y. June 29, 1994) ...........49

*United States v. Vera,*
        770 F.3d 1232 (9th Cir. 2014) ................................................................................22

*United States v. Wardell,*
        591 F.3d 1279 (10th Cir. 2009) ..............................................................................27

*United States v. Wexler,*
        838 F.2d 88 (3d Cir. 1988), *abrogated on other grounds by United States v.*
        *Caraballo-Rodriguez,* 726 F.3d 418 (3d Cir. 2013) .............................................20

*United States v. Williams,*
        784 F.3d 798 (D.C. Cir. 2015) ................................................................................17

*United States v. Wolff,*
        840 F. Supp. 322 (M.D. Pa. 1993) .........................................................................49

*Wesby v. District of Columbia,*
        765 F.3d 13 (D.C. Cir. 2014) ..................................................................................38

*In re Zhenly Ye Gon,*
        No. 08-596(JMF), 2010 WL 169468 (D.D.C. Jan. 8, 2010).................................43

**Statutes**

18 U.S.C. § 2 ...................................................................................................................4

18 U.S.C. § 3282 .............................................................................................................4

21 U.S.C. § 801 .............................................................................................................17

21 U.S.C. § 846 .............................................................................................................17

21 U.S.C. § 959(a) ...........................................................................................................4

**FILED UNDER SEAL**

21 U.S.C. § 960 ................................................................................................4

21 U.S.C. § 963 ................................................................................................4

1 Ohio Criminal Practice and Procedure § 6.101 (2021) ...............................22

1 Ninth Circuit Criminal Handbook § 10.04 (2021) ......................................22

1 Virginia Criminal Law Case Finder § 6-71 (2021) .....................................22

**Other Authorities**

ABA Crim. Just. Standards for the Prosecution Function Rule 3-1.4(a) .........7

ABA Crim. Just Standards for the Prosecution Function Rule 3-1.4(b) .........7

David O. Stewart, *The Price of Vengeance: U.S. Feels Heat for Ruling that Permits Government Kidnapping*, 78-Nov A.B.A. J. 50 (1992) ..............................46

DOJ, *Narcotic and Dangerous Drug Section (NDDS)*, https://www.justice.gov/criminal/ndds ...................................................22

European Migration Network, *Ad-Hoc Query on* Expulsion *Definition of Manifestly Unfounded as Related to Directive 2008/115/EC* (2014), https://www.udi.no/globalassets/global/european-migration-network_i/ad-hoc-queries/ad-hoc-query-expulsion-definition-unfounded-2014.pdf ..............38

Fed. R. Crim. P. 6(e)(3)(E)(i) ................................................................ *passim*

Fed. R. Crim. P. 6(e)(3)(E)(ii) ..............................................................1, 39, 49

Fed. R. Crim. P. 12 .........................................................................................1

Fed. R. Crim. P. 12(b)(2) ................................................................................1

John J. Privitera, *Toward a Remedy for Int'l Extradition by Fraud: The Case of Leonard Peltier*, 2:49 Yale L. & Pol'y Rev. 49, 57 (1983), available at https://openyls.law.yale.edu/bitstream/handle/20.500.13051/16936/06_2YaleL _PolyRev49_1983_1984_.pdf?sequence=2&isAllowed=y ..............................45

Pablo Sandonato de Leon, *Update: A Guide to Uruguay's Legal System and Research*, Hauser Global Law School Program at NYU School of Law, at § 3.1 (July/Aug. 2016), https://www.nyulawglobal.org/globalex/Uruguay1.html ..............36, 37

Press Release, DEA, *2,669 Pounds of Methamphetamine, Two Kilograms of Cocaine, One Kilogram of Tar Heroin Seized in Joint DEA Investigation* (Feb. 28, 2020), https://www.dea.gov/press-releases/2020/02/28/2669-pounds-methamphetamine-two-kilograms-cocaine-one-kilogram-tar-heroin ..............2, 7, 22

FILED UNDER SEAL

Sen. Exec. Rep. No. 105-23 (1998), available at
    https://www.govinfo.gov/content/pkg/CRPT-105erpt23/html/CRPT-
    105erpt23.htm ...................................................................................................45

Vol. 7, Foreign Affs. Manual §§ 1614.1, 1615 .............................................................10

UN High Commissioner for Refugees (UNHCR), UN High Commissioner for
    Refugees (UNHCR), *The Problem of Manifestly Unfounded or Abusive
    Applications for Refugee Status or Asylum,* Executive Committee Conclusion
    No 30 (Oct. 20, 1983), https://www.unhcr.org/en-
    us/excom/exconc/3ae68c6118/problem-manifestly-unfounded-abusive-
    applications-refugee-status-asylum.html ...............................................................38

**FILED UNDER SEAL**

NOW COMES, the Defendant, Gerardo Gonzalez-Valencia, by and through undersigned counsel, and respectfully moves this Honorable Court, through its exercise of supervisory powers, to dismiss the indictment pending against Mr. Gonzalez-Valencia pursuant to Rule 12 of the Federal Rules of Criminal Procedure and the Due Process Clause of the United States Constitution, or, in the alternative, conduct an *in camera* review of the grand jury proceedings against Mr. Gonzalez-Valencia pursuant to Rules 12(b)(2), 6(e)(3)(E)(i) and 6(e)(3)(E)(ii) of the Federal Rules of Criminal Procedure, and in support thereof states as follows:

The United States Government (the "Government") knowingly or, with willful ignorance, violated the constitutional rights of Mr. Gonzalez-Valencia, a U.S. citizen, by unlawfully seizing, detaining *for years,* and extraditing him from Uruguay without probable cause.

The Government made a formal extradition request to Uruguay to extradite Mr. Gonzalez-Valencia to the United States on a charge of conspiracy to distribute cocaine and methamphetamine from 2003–2016.  In support of probable cause, the Government included an affidavit from Drug Enforcement Agency ("DEA") Special Agent Kyle Mori ("Agent Mori") (the "Extradition Affidavit").  The Extradition Affidavit, however, failed to allege any relevant evidence that the conspiracy continued into the five-year statute of limitations period.  The Government's *sole* offer of proof within the limitations period to support probable cause is a 2013 Blackberry Messenger exchange (the "BBM Exchange") which, on its face, is so vague that Agent Mori could not state in his affidavit that this exchange involved **cocaine, methamphetamine, a Schedule I controlled substance, or even illegal drugs.**  Agent Mori also failed to offer any requisite proof that Mr. Gonzalez-Valencia was indeed a participant to the BBM Exchange.  Further, the Extradition Affidavit is utterly devoid of evidence tying the BBM Exchange to any earlier events, so it could not support a charge of conspiracy.

FILED UNDER SEAL

The most basic tenet of a drug prosecution is that, even at the probable cause stage, the Government must offer sufficient evidence of the specific drug charged in the indictment within the limitations period.[1]  Yet, not only did the Government fail in its burden, the Department of Justice ("DOJ") trial attorney swore under oath to Uruguay that she is "particularly knowledgeable in the area of law relating to violations of the federal narcotics statutes," that "[she had] reviewed the affidavit of DEA Special Agent Kyle J. Mori and the evidence in this case," and "that the prosecution of the charge in this case is . . . not barred by the statute of limitations."[2]  She even continued that the Extradition Package demonstrated not only probable cause, but Mr. Gonzalez-Valencia's **guilt**.[3]  That is extraordinary: the Government's failure in its offering of proof is so basic that its sworn statement could only have been offered in bad faith.

The Government's conduct became more egregious after Mr. Gonzalez-Valencia was seized and detained in Uruguay.  A Uruguayan court made repeated requests to the Government for all the evidence surrounding the case and, particularly, the BBM Exchange.  For over *eight months, and while Mr. Gonzalez-Valencia was detained solely on its extradition warrant*, the Government ignored and then ultimately refused the Uruguayan court's multiple requests for additional evidence.

The prejudice to Mr. Gonzalez-Valencia was cemented when the Uruguayan court acknowledged it did not assess the evidence submitted by the Government[4]—a manifest violation of its duty to make a determination of the sufficiency of the evidence under the standard of

---

[1]  *See infra* note 56 (explaining that identification of the drug in question is a fundamental requirement of a narcotics charge, as explained in prosecution manuals and treatises published throughout the country).

[2]  Ex. A (Req. for Extradition (June 1, 2016)) at 12, 15, 17–18 ¶¶ 4, 13, 23 (*Aff. in Supp. of Req. for Extradition*, signed by Amanda N. Liskamm (May 6, 2016)).

[3]  *Id.* at 17–18 ¶ 23.

[4]  Indeed, as explained herein, the Uruguayan court could not possibly have assessed the sufficiency of the evidence because the Government's proof was insufficient as a matter of law.

FILED UNDER SEAL

probable cause pursuant to the United States-Uruguay Extradition Treaty (the "Treaty"), as expressly acknowledged by the Government in this case and others.  Instead, in granting extradition, the Uruguayan court succumbed to the pressure of the Government and reviewed the Government's offering of proof only to make sure the charge was "not manifestly unfounded," a standard found nowhere in American jurisprudence.

Conveniently, and only after Mr. Gonzalez-Valencia was extradited to the United States, the Government abandoned the prosecution of the charge of conspiracy to distribute methamphetamine.  It can be presumed that the Government lacked sufficient evidence that Mr. Gonzalez-Valencia conspired to distribute methamphetamine and so it dropped the charge.  This late determination reinforces the Government's indifference to Mr. Gonzalez-Valencia's due process rights through the extradition process.  Despite declaring under oath to the contrary and despite refusing to substantively respond to Uruguay, the Government apparently assessed fundamental concerns relating to the strength of its evidence only after Mr. Gonzalez-Valencia had been extradited to the United States.

Respectfully, for the aforementioned reasons that are further detailed herein, this Court should condemn the egregious conduct by the Government in violation of Mr. Gonzalez-Valencia's constitutional rights.  The appropriate redress will also help restore the delicate balance of international comity and the integrity of the Government in prospective extradition requests with Uruguay and other foreign sovereigns.  Dismissal of the Indictment is warranted.[5] Alternatively, if the Court wishes to review the entire record before ruling on this Motion, this Court should conduct an evidentiary hearing to determine the true extent of the Government's

---

[5]  At a minimum and as discussed herein, we respectfully request this Court to release Mr. Gonzalez-Valencia from his illegal detention, waive any state or federal detainers as against Mr. Gonzalez-Valencia while he seeks renewal of his United States passport, order the Department of State to renew Mr. Gonzalez-Valencia's passport and allow him safe passage from the United States.

FILED UNDER SEAL

misconduct and to perform an *in camera* review of the evidentiary proof within the limitations period submitted to the grand jury to determine whether the lack of competent evidence within the limitations period also infected the grand jury process.

## I.     BACKGROUND

On April 19, 2016, the Government obtained an indictment charging Mr. Gonzalez-Valencia with conspiracy to distribute cocaine and methamphetamine, in violation of 21 U.S.C. §§ 959(a), 960, and 963, and 18 U.S.C. § 2.[6]  A five-year statute of limitations applies to these charges pursuant to 18 U.S.C. § 3282.

On June 1, 2016, the Government sought Mr. Gonzalez-Valencia's extradition from Uruguay.[7]  The documents that the Government sent to Uruguay in support of extradition (collectively, the "Extradition Package") consisted of: a Diplomatic Note from the Embassy of the United States,[8] certifications by the United States Department of State and the DOJ,[9] and an affidavit of DOJ Trial Attorney Amanda Liskamm (the "Liskamm Affidavit").[10]  Appended to the Liskamm Affidavit were four exhibits: (a) the relevant United States statutes,[11] (b) the Indictment,[12] (c) the arrest warrant,[13] (d) the Extradition Affidavit,[14] and (e) identifying information, including Mr. Gonzalez-Valencia's United States birth certificate, fingerprints, and Mexican passport.[15]

---

[6] Dkt. 1 (Indictment).

[7] Ex. A.

[8] *Id.* at 2–8 (Diplomatic Note No. 125).

[9] *Id.* at 9–11.

[10] *Id.* at 12–18 (*Aff. in Supp. of Req. for Extradition*, signed by Amanda N. Liskamm (May 6, 2016)).

[11] *Id.* at 20–30 (annexed to the Liskamm Affidavit as Exhibit A).

[12] *Id.* at 31–35 (annexed to the Liskamm Affidavit as Exhibit B).

[13] *Id.* at 36–37 (annexed to the Liskamm Affidavit as Exhibit C).

[14] *Id.* at 38–45 (*Aff. in Supp. of Req. for Extradition*, signed by Kyle J. Mori (May 5, 2016)) (annexed to the Liskamm Affidavit as Exhibit D).

[15] *Id.* at 46–53 (annexed to the Liskamm Affidavit as Exhibits E-1–E-3).

FILED UNDER SEAL

A.        **The Extradition Affidavit**

The Extradition Affidavit would not support a finding of probable cause in any United States federal or state court.  It suffers from several fatal defects in its offering of proof, most notably the absence of evidence that Mr. Gonzalez-Valencia (i) committed any act in furtherance of the alleged conspiracy to distribute cocaine and methamphetamine within the limitations period; (ii) entered into an agreement with a unified purpose to conspire to distribute cocaine and methamphetamine during the limitations period; and (iii) was a participant in the BBM Exchange that served as the sole evidence within the limitations period.

First, the Extradition Affidavit purports to summarize the BBM Exchange, a series of Blackberry messages between two unidentified individuals where undefined "units" of an unknown drug were discussed.  Notably, the native BBM Exchange is not included with the Extradition Affidavit, presumably because any review of the messages would further highlight the Extradition Affidavit's fatal defects.[16]  ***Critically, while Agent Mori swore before a United States Magistrate Judge that the discussion concerned drugs, he did not state that this conversation concerned cocaine, methamphetamine, a controlled substance, or any other type of illegal drug***:

> One [*sic*] June 26, 2013, during a lawfully-intercepted text messages [*sic*], Gonzalez-Valencia and a co-conspirator discussed whether a drug trafficking transaction was complete.  Gonzalez-Valencia and his co-conspirator discussed 85 units of drugs which belonged to the co-conspirator as well as 15 more units that Gonzalez-Valencia was saving.  Gonzalez-Valencia and his co-conspirator further discussed a drug sample.  Based on my training and experience, and knowledge of this investigation, drug traffickers usually request a drug sample before agreeing to a large drug purchase.  Gonzalez-Valencia also discussed additional drug amounts which were being prepared for shipment "up there," which I believe is a reference to the United States, the intended shipment point for those drugs.[17]

Second, the Extradition Affidavit does not allege any facts that evidence an agreement with

---

[16]  The native BBM Exchange and Government-produced translation are attached hereto as Exhibit B for the Court's review and consideration of this Motion.

[17]  Ex. A at 43–44 ¶ 19.

FILED UNDER SEAL

a unified purpose by Mr. Gonzalez-Valencia and others to conspire to distribute cocaine and methamphetamine during the limitations period. The Extradition Affidavit declares without any factual predicate that Mr. Gonzalez-Valencia is the leader of a Mexican-based drug trafficking organization, without naming others, and then details conduct purportedly involving Mr. Gonzalez-Valencia in 2007 and 2009 and the BBM Exchange in 2013. The 2007 and 2009 events seem to have a relationship with one another, but there is no proof that these events are, in any way, connected to the purported BBM Exchange in 2013. In fact, the evidence as offered suggests that no relationship exists between the BBM Exchange and other events. The only alleged event in 2007 was self-contained and ended with the interdiction of the vessel allegedly carrying the drugs in question, rendering it impossible for the conduct six years later to be linked to the same drugs. The allegations in 2009 relate to both cocaine and precursor chemicals to make methamphetamine. By comparison, the allegations during the limitations period do not specify any particular drug. The Extradition Affidavit's failure to identify the drugs in question in the 2013 BBM Exchange works against the Government as the discussion could have just as easily involved other types of drugs such as heroin, fentanyl, or marijuana.[18] The Extradition Affidavit also does not tie the conduct discussed in the BBM Exchange to the same drug routes discussed in earlier events, the same people or their known associates, or even the same type of drug.[19]

Third, Paragraph 19 of the Extradition Affidavit also failed to present any evidence that Mr. Gonzalez-Valencia participated in the BBM Exchange. In its native form, the BBM Exchange

---

[18] *See infra* note 68 for discussion of other drugs the DEA has publicly attributed to Mexico-based drug trafficking organizations ("DTOs").

[19] Agent Mori vaguely asserts that Mr. Gonzalez-Valencia "discussed additional drug amounts which were being prepared for shipment 'up there.'" Ex. A at 43–44 ¶ 19. Without any factual basis, Agent Mori concluded that "up there" referred to the United States to the exclusion of all other possibilities, such as Canada or Europe. *Id.* Agent Mori also did not identify who stated to whom that the "drug amounts" were being prepared for shipment "up there," yet used this to purportedly establish probable cause as to the charges against Mr. Gonzalez-Valencia.

**FILED UNDER SEAL**

merely contains a series of letters and numbers and arbitrary screen names that identify the specific Blackberry Messenger devices.  Instead of explaining the evidentiary basis tying Mr. Gonzalez-Valencia to one of the Blackberry Messenger devices, Agent Mori simply asserted "Gonzalez-Valencia" engaged in this exchange.[20]  The native format of the BBM Exchange never identifies Mr. Gonzalez-Valencia or provides any factual predicate to tie him to this exchange, and the law does not permit such a conclusory assertion without a proper factual predicate.[21]

The Extradition Affidavit was also sworn to in the wrong court and captioned with the incorrect court and case.  The Extradition Affidavit purports to be executed in a case before the Honorable Andrew J. Wistrich, United States Magistrate Judge for the Central District of California, captioned *United States v. Gerardo Gonzalez-Valencia*, Criminal No. 1:16-CR-00065.  Yet, no such case exists in that court or before Judge Wistrich.  Thus, the Extradition Affidavit gives the appearance that it is sanctioned by the court before which Mr. Gonzalez-Valencia would appear, but that is not so.

In her accompanying affidavit, DOJ Trial Attorney Amanda Liskamm swore that she is "particularly knowledgeable in the area of law relating to violations of the federal narcotics statutes," that "[she had] reviewed the affidavit of DEA Special Agent Kyle J. Mori and the evidence in this case," and that "the prosecution of the charge in this case . . . is not barred by the statute of limitations."[22]  She then continued that the Extradition Package demonstrated not only probable cause, but Mr. Gonzalez-Valencia's ***guilt***.[23]

---

[20] *Id.*

[21] *See infra* Section II.D for a discussion of why conclusory assertions are insufficient to establish probable cause.

[22] Ex. A at 12, 15, 17–18 ¶¶ 4, 13, 23.

[23] *Id.* at 17–18 ¶ 23.  Notably, as a federal prosecutor, DOJ Attorney Liskamm has a "heightened duty of candor to the courts and in fulfilling other professional obligations."  ABA Crim. Just. Standards for the Prosecution Function Rule 3-1.4(a).  Moreover, "[t]he prosecutor should not make a statement of fact or law, or offer evidence, that the prosecutor does not reasonably believe to be true, to a court, lawyer, witness, or third party."  *Id.* Rule 3-1.4(b).

FILED UNDER SEAL

## B.      The Extradition Process

Uruguay seized and detained Mr. Gonzalez-Valencia for nearly two years—from June 27, 2018 until May 14, 2020—solely at the request of the Government for extradition to the United States.[24]  For *eight months* during this period,[25] and after its initial ruling, the Uruguayan court of first instance repeatedly asked for additional information from the Government in support of its Extradition Package, yet the Uruguayan court's requests were ignored and ultimately refused.[26] These requests asked for all evidence in the Government's possession relating to the crime for which the Government requested extradition and specifically asked for a copy of the BBM Exchange referenced in the Extradition Affidavit.[27]

On or around November 20, 2018, the Uruguayan court[28] hand-delivered its first request to the Embassy of the United States in Montevideo, seeking:

> ***everything related to the evidence in your possession for the alleged crime for which the extradition of Gerardo González Valencia was requested, including the text of the alleged message linking him to the offense of drug trafficking.[29]***

Despite knowing that Mr. Gonzalez-Valencia had been seized and was being detained by Uruguay at the time, the Government **did not respond**.

On or around February 22, 2019, the Uruguayan court hand-delivered a second request for more evidence to the United States Embassy in Montevideo.[30]  The second request reiterated its

---

24 Ex. C (Oficio No 334/2020 (July 28, 2020)) (translated to English).
25 From November 20, 2018, through July 16, 2019.
26 Ex. D (Oficio No. 950/2018 (Nov. 20, 2018)) (translated to English); Ex. E (Oficio No 75/2019 (Feb. 22, 2019)) (translated to English).  Both requests were produced by the Government to Mr. Gonzalez-Valencia as part of his extradition file during discovery in the present case.
27 Exs. D, E.
28 The Uruguayan court making the request was the Criminal Court of First Instance Organized Crime 1st Term.
29 Ex. D (emphasis added).
30 Ex. E.

FILED UNDER SEAL

prior request, highlighted the Government's failure to respond to its previous request for three months and, in bold capitalized letters, emphatically stated the request was ***urgent***:

> [B]y ruling No. 763 dated 11/09/2018, everything related to the evidence in your possession for the alleged crime for which the extradition of Gerardo González Valencia was requested, including the text of the alleged message linking him to the offense of drug trafficking. . . .
> **THIS SERVICE IS URGENT** THIS IS A RENOTIFICATION OF THE OFFICIAL LETTER NO. 950/2018.[31]

The Government did not respond for an additional *five months*, during which Mr. Gonzalez-Valencia was still being detained pending extradition to the United States. Finally, on July 16, 2019, the Government notified Uruguay that (i) the Government had "attached ***all evidentiary documentation to***" its extradition request provided to the government of Uruguay on June 1, 2016 "***that establishes probable cause***," and (ii) "***the [June 1, 2016] extradition request includes all evidence supporting the narcotics charge***."[32] The Government made this statement despite possessing the specific BBM Exchange requested by the Uruguayan court (*i.e.*, "the text of the alleged message linking him to the offense of drug trafficking").

On March 2, 2022, counsel for Mr. Gonzalez-Valencia wrote to the DOJ requesting additional detail and clarity concerning the Government's response to the requests from the Uruguayan court.[33] Incredibly, on March 7, 2022, the DOJ responded that:

> The Diplomatic Note was not written by the Department of Justice. The Department of Justice did not adopt the Diplomatic Note as its own statement. Nor does the Diplomatic Note purport to be a statement of the Department of Justice.[34]

---

[31] *Id.* (emphasis in original).

[32] Ex. F (Diplomatic Note No. 273 from the U.S. Embassy to the Ministry of Foreign Affairs of Uruguay (July 16, 2019)) at 2–3 (emphasis added). Importantly, Mr. Gonzalez-Valencia must rely on the evidence produced to him by the Government, yet the Government's extradition file as produced to Mr. Gonzalez-Valencia was incomplete. The record indicates that the English version of Diplomatic Note No. 273 was the version sent to Uruguay by the Government. However, the Spanish translation was the only version produced to counsel by the Government as part of Mr. Gonzalez-Valencia's extradition file. Counsel obtained the original English version from Mr. Gonzalez-Valencia's Uruguayan counsel. For completeness, both versions are included in Exhibit F.

[33] Ex. G (Letter from Stephen A. Best to Kaitlin Sahni, Kate Nassef & Kirk Handrich (Mar. 2, 2022)).

[34] Ex. H (Letter from Arthur G. Wyatt to Stephen A. Best & Lilly Ann Sanchez (Mar. 7, 2022)).

FILED UNDER SEAL

In other words, the DOJ, i.e., the Government agency purported to have particular knowledge of the facts and the criminal law guiding this matter, conceded it did not know of or participate in any way in responding to Uruguay's requests for additional evidence.  The only reasonable inference to be drawn from the DOJ's response is that, in apparent violation of its own guidance,[35] the U.S. Embassy in Montevideo did not share the Uruguayan court's repeated requests with the DOJ.[36] The facts before this Court are that apparently an unidentified person(s) from the wrong governmental agency ignored the Uruguayan court's repeated requests while Mr. Gonzalez-Valencia was illegally detained.  Worse, this unidentified person, without consulting the DOJ, unilaterally refused the Uruguayan court's request and, in the process, made representations to Uruguay that the offering of proof was sufficient to establish probable cause.

The Uruguayan court of first instance ordered the extradition of Mr. Gonzalez-Valencia because it determined that the Government's request was not "clearly unfounded."[37]   The Uruguayan court conceded that it did not assess any of the evidence provided by the Government.[38] Despite the Government's refusal to provide any additional evidence to support the charge as requested, Uruguay's highest judicial body deferred to the Government and entered a final judgment in favor of extradition on February 11, 2020, again without analyzing the sufficiency of the evidence to support a probable cause determination.[39]   On May 14, 2020, Mr. Gonzalez-Valencia was extradited to the United States.

---

[35] *See* Vol. 7, Foreign Affs. Manual §§ 1614.1, 1615.

[36] Ex. H.

[37] Ex. I (Sentencia Nro. 13/2017 (Aug. 28, 2017)) at 00054535.

[38] *Id.* at 00054534 ("It is then not appropriate to assess the evidence produced by the requesting State, but rather only to assess it to determine that the extradition request and the arrest warrant are not manifestly unfounded.") (translated to English).

[39] Ex. J (Cedulón Nro 203/2020, IUE 474-76/2016 (Feb. 11, 2020)) (translated to English).

FILED UNDER SEAL

### C.   Salient Facts Learned After Mr. Gonzalez-Valencia's Extradition

During a call on November 12, 2020, the Government informed Mr. Gonzalez-Valencia's counsel, who took detailed and contemporaneous notes of the conversation, that it did not yet have any witnesses that would provide testimony of events occurring within five years of the Indictment.[40]  Thus, the evidence in the Extradition Package regarding Mr. Gonzalez-Valencia's alleged criminal conduct within five years of the Indictment consisted solely of the BBM Exchange.[41]  However, during a call on January 22, 2021, the Government informed counsel that an additional witness had come to its attention who would testify as to the alleged conspiracy during the 2013–2015 time frame.[42]  The Government stated that it wanted to raise this additional witness to counsel's attention because they are relevant to the statute of limitations issue that counsel had previously brought to the Government's attention.  The attached declaration of Tiffany Lietz details the almost verbatim and contemporaneous notes of the meeting with the Government.[43]

In addition, on November 19, 2021, the Government declared before this Court its intent to abandon the charge of conspiracy to distribute methamphetamine.[44]  On January 11, 2022, when pressed by the Court, the Government stated on the record that it did not intend to pursue the charge.[45]

Earlier this week, on April 12, 2022, over six months since Mr. Gonzalez-Valencia moved

---

[40] *See* Ex. K (Decl. of T. Lietz (Apr. 15, 2022) at ¶ 5).
[41] While the 2013 wiretap was provided in full to counsel as part of the Government's discovery, the only evidence in the Extradition Affidavit from the wiretap during the limitations period is the BBM Exchange.
[42] Ex. K at ¶ 8.
[43] *Id.* at ¶¶ 6, 9.
[44] Dkt. 83 (Tr. of Mot. Hr'g) at 11:18–24.
[45] Dkt. 88 (Tr. of Mot. Hr'g) at 20:1–6.

FILED UNDER SEAL

for timely disclosure of *Brady* material,[46] and after the Government represented that it had turned over all *Brady* material,[47] the Government sent a letter to undersigned counsel stating in part:

> In late October 2015, the Government obtained an assessment, based on information from sources unknown to the Government, that the Los Cuinis drug trafficking organization, made up of the Gonzalez Valencia siblings . . . **was not directly involved in the production, movement, or distribution of drugs.[48]**

This assessment not only directly contradicts Agent Mori's Extradition Affidavit in all material respects, it is foundational proof that, in 2016, at the time the Government requested extradition, it had no relevant evidence of Mr. Gonzalez-Valencia's participation in a conspiracy to distribute cocaine or methamphetamine within the limitations period.

Despite possessing this critical exculpatory information since October 2015, the Government did not furnish it to Uruguay as part of the Extradition Package or upon Uruguay's specific requests for this information. This exculpatory information further calls into question the veracity of DOJ Attorney Liskamm's sworn statement and the Government's later statement to Uruguay that, **"*the [June 1, 2016] extradition request includes all evidence supporting the narcotics charge.*"**[49] Finally, this exculpatory information further supports Mr. Gonzalez-Valencia's position that the Government had no competent evidence that Mr. Gonzalez-Valencia engaged in a conspiracy to distribute cocaine or methamphetamine within the limitations period to present to the grand jury.

---

[46] On October 4, 2021, Mr. Gonzalez-Valencia filed his Motion for Timely Disclosure of *Brady/Giglio* Materials and Early Disclosure of *Jencks* Material. Dkt. 32.

[47] On November 9, 2021, counsel for Mr. Gonzalez-Valencia sent a formal demand letter to the Government for *Brady* material. Ex. L (Letter from Stephen A. Best to Brett Reynolds, Kaitlin Sahni & Kate Naseef (Nov. 9, 2021)). On November 11, 2021, in a response to this Court's November 9, 2021 Minute Order, the Government stated it "is currently in compliance with [its disclosure requirements under *Brady*] because it has turned over all such information to the defense that is currently known to and in the possession of the prosecution team." Dkt. 70.

[48] Ex. M (Letter from Arthur G. Wyatt to Stephen A. Best & Lilly Ann Sanchez (Apr. 12, 2022)) (emphasis added).

[49] Ex. F at 2–3 (emphasis added).

FILED UNDER SEAL

## II.     ARGUMENT

### A.     Jurisdiction

As a preliminary matter, this Court has jurisdiction to hear this Motion.  Mr. Gonzalez-Valencia was indicted in this District.  The Government's conduct at issue occurred in this District.  Mr. Gonzalez-Valencia's constitutional rights were abridged by foreign agents working on behalf of Government agents from this District.   Accordingly, the Court has jurisdiction to review Uruguay's extradition decision for purposes of this Motion.  *United States v. Sensi*, 879 F.2d 888, 896 (D.C. Cir. 1989); *see also United States v. Trabelsi*, 845 F.3d 1181, 1186 (D.C. Cir. 2017).

### B.     This Court Should Review *De Novo* the Sufficiency of the Evidence of Probable Cause in the Extradition Package

U.S. courts have the authority and responsibility to review foreign extradition decisions to ensure their compliance with all applicable requirements, including sufficiency of the evidence to establish probable cause.  *Sensi,* 879 F.2d at 896 ("Our final task is to determine whether the evidence submitted with the United States' request for extradition sufficiently established the facts underlying Sensi's prosecution."); *see also Trabelsi*, 845 F.3d at 1186 ("We hold that we have jurisdiction to review [a foreign country's extradition] decision.").

D.C. Circuit cases provide two different standards of review for addressing whether a foreign court has properly granted extradition.  In challenges to the *sufficiency of the evidence* to support a request for extradition, the D.C. Circuit applies a *de novo* review.  By contrast, in challenges to *legal determinations* by foreign courts in granting extraditions, the D.C. Circuit applies a standard whereby, absent evidence to the contrary, there is a rebuttable presumption that the extraditing nation has complied with its obligations under the treaty and that the extradition is lawful.  Here, Mr. Gonzalez-Valencia's extradition does not survive either standard of review; the Government presented no evidence to support a probable cause determination for extradition and

**FILED UNDER SEAL**

the uncontroverted Uruguayan court record shows that the foreign court applied the wrong legal standard in determining to grant extradition, overcoming any presumption that Mr. Gonzalez-Valencia's extradition was lawful.

In *Sensi*, the Circuit Court addressed whether a foreign court had insufficient evidence to extradite for the charges in the indictment.  879 F.2d at 896.  The Circuit Court held that it was necessary to independently determine whether the evidence submitted with the extradition request was sufficient to support extradition under a treaty with the United Kingdom.  *Id.* (analyzing *de novo* "whether the evidence submitted with the United States' request for extradition sufficiently established the facts underlying [the defendant's] prosecution").  Although the Circuit Court agreed with the District Court that the evidence there was sufficient, importantly, it recognized that the District Court correctly applied a *de novo* review to preserve the defendant's constitutional rights when the District Court stated:

> Although the Treaty between the United States and The United Kingdom is a contract between the governments of those nations, it is also the supreme law of this land by virtue of the Constitution (Article VI). For the United States "government to detain [a] person for trial on any [non-extradited] charge would be not only an infraction of the contract between the parties to the treaty, but also a violation of the supreme law of this land in a matter directly involving his personal rights." *Ex Parte Hibbs*, 26 F. 431 (D. Or. 1886). Therefore, the Court concludes it is sound to allow defendant to invoke the doctrine in challenging the manner of his extradition. *See id.* at 430–31, and cases cited therein.

*United States v. Sensi*, 664 F. Supp. 566, 570–71 (D.D.C. 1987) (alteration in original) (basing sufficiency of the indictment upon "*[t]he Court's own analysis of the evidence*") (emphasis added).

In *Trabelsi*, the D.C. Circuit Court of Appeals applied a standard of deference to a foreign court's *legal determinations* when confronted with whether an extradition would violate an extradition treaty with Belgium by granting extradition where the defendant claimed he had been prosecuted and adjudicated for the same offenses in Belgium.  845 F.3d at 1185–86.  The Circuit

FILED UNDER SEAL

Court stated that while courts "presume, absent evidence to the contrary, that the extraditing nation has complied with its obligations under the treaty and that the extradition is lawful," that presumption is rebuttable.  *Id.* at 1186.  One can overcome the presumption by showing (1) "misconduct on the part of the United States in procuring an extradition," (2) "the absence of review of the extradition request by the requested party," or (3) "that the requested state or party did not apply the correct legal standard adopted in the Treaty."  *Id.* at 1189.

Given the clear language of *Sensi*, as well as the paramount importance of Mr. Gonzalez-Valencia's constitutional rights surrounding his pre-trial detention and extradition, *de novo* review of the sufficiency of the evidence for a probable cause determination is appropriate.[50] Alternatively, under *Trabelsi*, the record is unequivocal that the Uruguayan court did not comply with its obligations under the Treaty insofar as it did not apply the correct legal standard adopted by the Treaty with respect to probable cause and the sufficiency of the evidence, and that the Government engaged in misconduct in procuring Mr. Gonzalez-Valencia's extradition.

C.      **The Government Failed to Offer Sufficient Evidence of Probable Cause That Mr. Gonzalez-Valencia Engaged in a Conspiracy to Distribute Cocaine and Methamphetamine Including and Through the Limitations Period.**

As a matter of law, the facts articulated in the Extradition Affidavit do not support a probable cause determination.  The only evidence adduced within the limitations period, *i.e.*, Agent Mori's description of the BBM Exchange (rather than the BBM Exchange itself), is not sufficient

---

[50] *See Gerstein v. Pugh*, 420 U.S. 103, 111–12 (1975) (stating that "[b]oth the standards and procedures for arrest and detention have been derived from the Fourth Amendment and its common-law antecedents" and "[t]o implement the Fourth Amendment's protection against unfounded invasions of liberty and privacy, the Court has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible"); *see also Kirkland v. Preston*, 385 F.2d 670, 676 (D.C. Cir. 1967) (noting that "[t]he law appreciates the hardship which extradition can involve: not only the suspension of one's liberty, but his deportation from the state in which he lives into another jurisdiction which may be hundreds of miles from his home. The law accordingly surrounds the accused with considerable procedural protection to stave off wrongful rendition") (footnotes omitted).

FILED UNDER SEAL

evidence to sustain the charge. *Cf. Coppedge v. United States*, 311 F.2d 128, 132 (D.C. Cir. 1962)

(finding there must be at least "some competent evidence to sustain the charge").

To determine probable cause, a court must review the evidence presented and make an

independent determination that the accused committed the crime alleged. As stated by the

Supreme Court:

> The Commissioner must judge for himself the persuasiveness of the *facts* relied
> upon by a complaining officer to show probable cause. He should not accept
> without question the complainant's mere conclusion that the person whose arrest is
> sought has committed a crime.

*Giordenello v. United States*, 357 U.S. 480, 486 (1958) (emphasis added); *see, e.g.*, *United States*

*v. Nolan*, 651 F. Supp. 2d 784, 810 (N.D. Ill. 2009) ("This Court must make an independent

assessment of the evidence offered in support of an extradition request and determine if it is

sufficient to sustain a finding of probable cause."); *In re Extradition of Platko*, 213 F. Supp. 2d

1229, 1239 (S.D. Cal. 2002) ("To make the probable cause determination, a judge is to review the

evidence presented and make an independent determination that the accused committed the crimes

alleged." (internal quotations and citation omitted)). This independent review allows a court to

perform a "neutral and detached function and not serve merely as a rubber stamp." *Aguilar v.*

*Texas*, 378 U.S. 108, 111 (1964) (internal quotations omitted); *In re Extradition of Trinidad*, 754

F. Supp. 2d 1075, 1082 (N.D. Cal. 2010); *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358,

1365 (S.D. Fla. 1999).

The evidence is sufficient and probable cause is established if a person of ordinary

prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the

accused. *Gerstein*, 420 U.S. at 111; *United States v. Smith*, 373 F. Supp. 3d 223, 242 (D.D.C.

2019) ("Probable cause to arrest exists only 'if a reasonable and prudent officer would conclude

from the totality of the circumstances that a crime has been or is being committed.'") (quoting

FILED UNDER SEAL

*United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993)).  This is the standard against which the independent determination of probable cause must be made.

For a drug conspiracy charge, the Government must offer sufficient proof that: (1) two or more persons, directly or indirectly, reached an agreement to violate the Controlled Substances Act, 21 U.S.C. § 801, et *seq.*; (2) those persons knew of the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully.  *See United States v. Williams*, 784 F.3d 798, 801 (D.C. Cir. 2015); *United States v. Turner*, 319 F.3d 716, 721 (5th Cir. 2003); *United States v. Dumes*, 313 F.3d 372, 382 (7th Cir. 2002).

The sufficiency of the evidence determination begins with an analysis of the purported conduct within the limitations period.  "In a prosecution for conspiracy under 21 U.S.C. § 846, the government must prove that the conspiracy continued into the five-year statute of limitations period."  *United States v. Sitzmann*, 74 F. Supp. 3d 96, 107 (D.D.C. 2014).  Specifically, the Government must allege that Mr. Gonzalez-Valencia knowingly and willingly entered into an agreement with others to distribute cocaine and methamphetamine into the United States and that agreement continued into the limitations period.  *Id.*; *see also United States v. Fernandez*, 694 F. Supp. 858, 862 (S.D. Fla. 1988) ("The time period requirement is met where the government proves that the conspiracy was in existence within five years of the date of the indictment.").

Here, the Government relies on a continuing conspiracy theory and, as such, it must show that the conduct in question was part and parcel to a continuing conspiracy, rather than isolated events.  *Borchardt v. United States*, 469 U.S. 937, 940 n.1 (1984) (Brennan, J., dissenting from denial of certiorari) (finding "the Government's proof on the cocaine charge rested on entirely different overt acts from [other] charges," so the offenses did not qualify as "segments of an overarching continuing conspiracy to import drugs").  In other words, the Government's evidence

FILED UNDER SEAL

must show "that the conspiracy that existed during the statute of limitations period in this case was the same one that had existed all along." *Sitzmann*, 74 F. Supp. 3d at 110. "In determining whether a single conspiracy exist[s], as opposed to separate unrelated activities or multiple conspiracies, [courts] look for several factors, including whether participants shared a common goal . . . ; interdependence between the alleged participants in the conspiracy; and, though less significant, overlap among alleged participants." *United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996); *see also Sitzmann*, 74 F. Supp 3d at 110 (finding that the government's evidence that "virtually all of [the defendant's] activities, including those that occurred during the limitations period, involved the same core group of people and the same goal" was sufficient to establish the conspiracy continued into the statute of limitations period). By contrast, courts have held that isolated incidents related to a narcotics transaction are not necessarily related to a larger drug conspiracy. *See e.g.*, *United States v. Townsend*, 924 F.2d 1385, 1391, 1395–1402 (7th Cir. 1991) (holding that there were three separate conspiracies between three different suppliers and a common purchaser); *United States v. Fiorito*, 499 F.2d 106, 109 (7th Cir. 1974) (finding that even if an isolated phone call referred to a narcotics transaction between defendant and a co-conspirator it was insufficient to establish that the defendant was part of a larger narcotics conspiracy).

Accordingly, the Government must offer sufficient proof for probable cause that Mr. Gonzalez-Valencia knowingly and with criminal intent reached an agreement with one or more persons, directly or indirectly, to distribute cocaine and methamphetamine and that the alleged conduct in 2013 (i) evidences this agreement on its own; or (ii) is connected to the described events in 2007 or 2009.

"[C]onspiracy is a 'specific intent' crime" and the Government must establish "proof of specific intent to further the conspiracy's objective," in this case, to distribute cocaine and

FILED UNDER SEAL

methamphetamine. *United States v. Childress*, 58 F.3d 693, 707–08 (D.C. Cir. 1995); *United States v. Gaskins*, 690 F.3d 569, 572 (D.C. Cir. 2012) ("To convict a defendant of conspiracy to distribute a controlled substance, the government must prove, beyond a reasonable doubt, that the defendant knowingly entered into the conspiracy with the specific intent to further the unlawful objective of drug distribution."); *see also McFadden v. United States*, 576 U.S. 186, 194 (2015) (holding that, to prove the knowledge element under the Controlled Substances Act, the government must establish that either "a defendant knew that the substance with which he was dealing is some controlled substance" or "the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue"). Thus, "[i]n a conspiracy case, 'proof that the defendant knew that *some* crime would be committed is not enough.'" *United States v. Hassan*, 578 F.3d 108, 130 (2d Cir. 2008) (quoting *United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004)) (emphasis in original).

Whether the Government is alleging that the BBM Exchange is either stand-alone evidence within the limitations period or a continuing course of conduct connected to earlier events, both theories fail because the Government did not offer any proof that the conduct within the limitations period involved conduct in furtherance of a conspiracy to knowingly distribute cocaine and methamphetamine.

### 1.    Standing Alone, the BBM Exchange Does Not, as a Matter of Law, Support Probable Cause.

As sworn before a United States Magistrate Judge, Agent Mori's sole description of conduct within the limitations period is contained in Paragraph 19 of the Extradition Affidavit. As discussed above in Section I.A, the conclusory statements offered by Agent Mori include an allegation of Mr. Gonzalez-Valencia discussing with a purported and unidentified "co-conspirator"

FILED UNDER SEAL

via Blackberry Messenger the movement of unidentified drugs.[51]  *Critically, while Agent Mori averred that the discussion concerned drugs, he did not state that the drug units being discussed in this conversation were cocaine, methamphetamine, a controlled substance, or any other type of illegal drug.*

Where there is no evidence of illegal drugs, no probable cause exists for pretrial detention. *See Manuel v. City of Joliet, Illinois*, 137 S. Ct. 911, 915 (2017).  The Supreme Court, in *Manuel*, considered whether the defendant could bring a claim against the Government for violating his civil rights by (i) arresting him for no reason and (ii) detaining him for 48 days "based entirely on made-up evidence." *Id.* at 916.  The defendant was arrested "without probable cause, based solely on his possession of pills that had field tested negative for an illegal substance." *Id.* at 919.  The Court found that "because Manuel's subsequent weeks in custody were *also* unsupported by probable cause" (where the laboratory tests returned negative), his detention was "*also* constitutionally unreasonable." *Id.* (emphasis in original).

Courts have repeatedly held that the Government must offer sufficient evidence that identifies the specific drugs in question, *e.g.*, cocaine or methamphetamine, to support probable cause or guilt. *See Gaskins*, 690 F.3d at 578 (observing that evidence of a sale of a quarter ounce of crack cocaine was irrelevant for proving any of the elements of the charged offense in that the cocaine sale was unrelated to the charged conspiracy to distribute heroin); *United States v. Garcia*, 497 F.3d 964, 967 (9th Cir. 2007) (vacating conviction because evidence of cocaine sales did not establish conspiracy to distribute methamphetamine, the specific drug charged); *United States v. Paul*, 73 M.J. 274, 277 (C.A.A.F. 2014) (finding proof to support conviction was insufficient where evidence showed that the defendant used ecstasy, not MDMA as charged); *United States v.*

---

[51]  Ex. A at 43–44 ¶ 19.

FILED UNDER SEAL

*Wexler*, 838 F.2d 88, 92 (3d Cir. 1988) (finding that evidence failed to "support a holding that the government met its burden to prove beyond a reasonable doubt that [the defendant] knew this was a conspiracy to transport hashish"), *abrogated on other grounds by United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013); *Hill v. Virginia*, 379 S.E.2d 134, 136 (Va. Ct. App. 1989) (holding that the "nature of the illegal substance" must be demonstrated either by direct or circumstantial evidence); *North Carolina v. Turshizi*, 625 S.E.2d 604, 606 (N.C. Ct. App. 2006) (holding that an indictment was "fatally flawed" because it failed to include the full name of a controlled substance as provided in Controlled Substances Act), *writ denied, review denied sub nom. North Carolina v. Ahmadi-Turshizi*, 631 S.E.2d 133 (N.C. 2006); *Ohio v. Jackson*, 980 N.E.2d 1032, 1033 (Ohio 2012) (holding "an indictment charging a defendant with trafficking in drugs" must, at a minimum, "identify[ ] the schedule in which a drug appears"); *New York v. Swamp*, 84 N.Y.2d 725, 732–33, 778 (1995) (requiring *prima facie* evidence of the presence of a particular controlled substance to support an indictment).

Evidence of a specific drug can take myriad forms—a physical description,[52] a field test,[53] a lab test,[54] or some other competent testimony[55]—but there must be evidence. Here, no physical description of the drug units is provided. No counterparty to the conversation has ever stated that the discussion was about cocaine or methamphetamine and no witness has provided a statement that the drug units in question were cocaine or methamphetamine.

---

[52] *Ellison v. United States*, 238 A.3d 944, 951–52 (D.C. 2020).

[53] *Swamp*, 84 N.Y.2d at 731.

[54] *Id.* at 730–31.

[55] *North Dakota v. Turbeville*, 895 N.W.2d 758, 763 (N.D. 2017) (noting that "[t]he evidence presented included: testimony an officer found 'a sizable amount of marijuana that looked like it had been processed into smaller, equal pieces for distribution,' a 'box to a small pocket scale,' a grinder, baggies containing marijuana, and $379.00 in cash in Turbeville's bedroom. The officer also testified, based on his training and experience, the fact the marijuana had been divided into equal portions and the presence of baggies containing marijuana, Turbeville was more than a casual user").

**FILED UNDER SEAL**

Critically, the Extradition Affidavit fundamentally failed to identify that the "drugs" purportedly referenced in the BBM Exchange (the sole evidence within the limitations period) were specifically ***cocaine or methamphetamine***.  This failure is fatal to the Government.[56]  There are no predicate facts in the native BBM Exchange or in any of the Government's evidence that would allow Agent Mori to reasonably conclude that the BBM Exchange was about cocaine or methamphetamine.  The discussion was about units.  Nothing more.  There was no discussion about the weight[57], price[58] or origin of the units, for example, which could allow Agent Mori to render an informed opinion about the type of drug involved.

When the facts allow, Agent Mori includes in his narrative the specific type of drug at issue.  In the Extradition Affidavit, Agent Mori specifically referenced the drugs at issue as cocaine when discussing events in 2007 and 2009.  *Compare* Ex. A at 43–44 ¶ 19, with Ex. A at 40–43 ¶¶ 5–10, 14, 16–17.  In a separate affidavit in support of an application to intercept electronic

---

[56]  Counsel finds it difficult to believe that Agent Mori or DOJ Attorney Liskamm would have made such a basic blunder in the Government's proof.  It is "Prosecution 101" that the type of drug must be identified, as demonstrated in prosecution manuals and treatises published throughout the country:

- "After *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Ninth Circuit treats drug quantity and type—which fix the maximum sentence for a conviction—as elements of the crime: they must be charged in the indictment, submitted to the jury, subject to the rules of evidence, and proved beyond a reasonable doubt." *United States v. Buckland*, 289 F.3d 558, 568 (9th Cir. 2002); *see also United States v. Vera*, 770 F.3d 1232 (9th Cir. 2014)."  1 Ninth Circuit Criminal Handbook § 10.04 (2021).
- "To sustain a drug conviction, it is advisable to allege and prove the specific controlled substance that is at issue. *In re D.F.*, 193 Ohio App. 3d 78, 2011-Ohio-1004, 951 N.E.2d 99 (7th Dist.)."  1 Ohio Criminal Practice and Procedure § 6.101 (2021).
- "(1988)–*Graves v. Commonwealth*, 234 Va. 578, 363 S.E.2d 705. Since indictment charged defendant with conspiracy to distribute more than one-half ounce of marijuana, Commonwealth was required to prove agreement to distribute proscribed substance and to prove both identity and quantity of substance contemplated by agreement."  1 Virginia Criminal Law Case Finder § 6-71 (2021).

[57] Large quantities of methamphetamine and marijuana, for instance, are most commonly weighed by pounds whereas large quantities of cocaine and heroin are measured in kilograms. *See, e.g.*, Press Release, DEA, *2,669 Pounds of Methamphetamine, Two Kilograms of Cocaine, One Kilogram of Tar Heroin Seized in Joint DEA Investigation* (Feb. 28, 2020), https://www.dea.gov/press-releases/2020/02/28/2669-pounds-methamphetamine-two-kilograms-cocaine-one-kilogram-tar-heroin (quantifying methamphetamine in pounds and cocaine and heroin in kilograms); DOJ, *Narcotic and Dangerous Drug Section (NDDS)*, https://www.justice.gov/criminal/ndds (quantifying cocaine and heroin in kilograms and marijuana in pounds).

[58] As an expert in narcotics trafficking in 2016, Agent Mori knew the approximate price for various drugs being trafficked yet because there was absolutely no predicate facts speaking about the costs of the units, he was not able to discern the type of drug purportedly being discussed.

FILED UNDER SEAL

communications for another individual, Agent Mori detailed certain intercepted communications

where the parties purportedly spoke in code regarding a drug transaction:

> On April 8, 2013, agents intercepted an electronic communication between TARGET DEVICE #1 (screen name "[X]") and BlackBerry PIN ████████ (screen name "[Y]")(the user of TARGET DEVICE #8). [X] and [Y] greet each other. [Y] tells [X] that he . . . has a friend "over there" that wants to "buy 300." [Y] continues and asks [X] if he . . . has anyone in Venezuela that "has any" and at what "price would be there." [X] relies [sic], "yes, I do," and explains that he . . . does not want [Y] to be busy with anything at the moment. [X] tells [Y] not to be busy until "we get done with this," because "this week it is going to be busy."[59]

Agent Mori was able to articulate his belief that the discussion involved cocaine because the

exchange included an additional key fact: the purported drugs discussed were coming from

Venezuela, and Agent Mori stated he knew from his lengthy investigation that the target subject

traffics in cocaine:

> I know that Venezuela is a source country for cocaine. Moreover, I know that TARGET SUBJECT [X] traffics large quantities of cocaine. I therefore believe [Y] is asking [X] for 300 kilograms of cocaine for a third party to purchase.[60]

Conversely, when there are no other predicate facts present in an intercepted exchange,

Agent Mori does not name the specific type of drug at issue.  In an exchange remarkably similar

to the BBM Exchange, Agent Mori describes a discussion about "apples," which he believed was

code for drugs.  Since there were no other predicate facts, Agent Mori could not discern the type

of drugs purportedly being discussed:

> Based on my training, experience, and knowledge of this investigation I believe [X] and [Y] are discussing drug trafficking. For example, when [X] refers to the "apple," I believe they are using coded language to refer to drugs. [X] then asks [Y] if the "apple" or almost [sic]. I believe [X] is asking [Y] if the quantity of drugs is prepared. [Y] replies "it" might be ready tomorrow. I believe [Y] is informing [X] that the drugs may be ready the next day. [X] replies that hopefully everything will be fine. I believe [X] is telling [Y] that he hopes that the drugs will be prepared and no problems will arise. [X] then says "one of the five." I believe [X] is telling [Y] that he ([X]) is already in possession of one of the five. ***Based on the limited***

---

[59] Ex. N (*Aff. In Supp. of Appl. to Intercept Electronic Communications*, signed by K. Mori (May 31, 2013)) at ¶ 58.
[60] *Id.* at ¶ 59.

FILED UNDER SEAL

***information, it is impossible to tell what type of drugs are being discussed*** and how many units [X] and [Y] are discussing (i.e., literally five units, 500 units, or 5,000 units).[61]

In another text exchange cited in Agent Mori's wire-intercept affidavit, he describes a discussion about "500" being sent and "arriving tomorrow."[62]  Again, without any other predicate facts, Agent Mori does not render an opinion as to the identity of the drug being discussed: "***From the intercepted information, I have no way of knowing which drug [X] is referring to***."[63]

Importantly, Agent Mori does not always expressly state his inability to name the drug in question.   In the wire-intercept affidavit, Agent Mori articulates his interpretation of those conversations without rendering his view of the purported drug being discussed, with no further commentary:

> When [X] tells [Y] the "captain" wants to pickup "things" for Holland, I believe [X] is informing [Y] that the captain is willing to transport ***drugs*** from South America to Europe.[64]
>
> When [X] tells [Y] he has a "good job" for him, I believe he is referring to a shipment of ***drugs***. I know that Mexican traffickers often refer to ***drug*** shipments as "jobs." [X] then tells [Y] he will pay him 100,000 dollars for completing the ***drug*** transaction or shipment. [X] tells [Y] the "job," or drugs, are in Morelia, which is a city in Michoacán, Mexico. [Y] later responds "Okay, done."[65]

---

[61] *Id.* at ¶ 27 (emphasis added). Similarly, in an affidavit in support of a wiretap application dated December 19, 2013, Agent Mori stated:

> Based on my training, experience, and knowledge of this investigation, I believe [X] and [Y] are discussing narcotic trafficking in the United States. When [X] mentions checking on "[Z]" and states, "Maybe there is someone willing with the 12," I believe [X] is asking [Y] if an unknown subject would be willing to transport 12 units of narcotics to Tennessee. [Y] responds by telling [X] that "there is 10" and states, "I'll put two." I believe [Y] is informing [X] that 10 units of narcotics are available and [Y] would be willing to add 2 units of narcotics for a total of 12 units. . . . ***Based on the conversation, I have no way of knowing what type of drug [Y] and [X] are discussing transporting***.

Ex. O (*Aff. In Supp. of Appl. to Intercept Electronic Communications*, signed by K. Mori (Dec. 19, 2013)) at ¶ 25 (emphasis added).

[62] Ex. N at ¶ 54.

[63] *Id.* at ¶ 55 (emphasis added).

[64] *Id.* at ¶ 46 (emphasis added).

[65] *Id.* at ¶ 51 (emphasis added).

FILED UNDER SEAL

The Extradition Affidavit also details alleged conduct by Mr. Gonzalez-Valencia in 2009 involving both cocaine and the importation of precursor chemicals to make and ship methamphetamine (which related to a component of the Indictment that the Government has abandoned).[66] Thus, the Extradition Affidavit itself states that Mr. Gonzalez-Valencia is purportedly engaging in drug distribution involving a variety of drugs. Because nothing in the BBM Exchange identifies the drug as cocaine or methamphetamine and because Agent Mori cannot state what type of drugs are being discussed, the reader is left to speculate.[67] Given this statement, it is just as likely that the units being discussed in the BBM Exchange were some other type of drug. The DEA itself has publicized that Mexican-based DTOs are known distributors of numerous types of illegal drugs such as marijuana, heroin, ecstasy and many other controlled substances aside from cocaine and methamphetamine.[68] Thus, the Government was required to offer proof that the purported drug units being discussed in the limitations period were cocaine or methamphetamine to exclude all other possibilities.

---

[66] Ex. A at 42 ¶ 15.

[67] In fact, Mr. Gonzalez-Valencia disputes the conclusion that the conversation even relates to drugs—the plain meaning of the text does not support the notion that the participants, whoever they were, contemplated a drug transaction.

[68] This Court can take judicial notice that the Government has repeatedly and publicly stated that Mexican-based DTOs are involved in a vast array of drug distribution across multiple continents, including, but not limited to, methamphetamine, heroin, fentanyl, cocaine, and marijuana. Ex. P (Press Release, DEA, High-Level CJNG Assoc. Financially Sanctioned (Mar. 3, 2021), https://www.dea.gov/press-releases/2021/03/03/high-level-cjng-associate-financially-sanctioned) (describing CJNG as being "responsible for trafficking a significant proportion of the fentanyl and other deadly drugs that enter the United States"); Ex. Q (Press Release, U.S. Atty.'s Off., W.D. Va., Fed. Grand Jury Indicts 12 Members of Jalisco New Generation Cartel (CJNG) (Mar. 25, 2019), https://www.justice.gov/usao-wdva/pr/federal-grand-jury-indicts-12-members-jalisco-new-generation-cartel-cjng) (detailing that indicted members of CJNG allegedly held various properties for the "purpose of receiving, storing, packaging, and distributing multiple kilograms of cocaine and multiple pounds of marijuana which they had received directly from members of CJNG"); Ex. R (Press Release, DOJ, Just., Treasury, and State Dep'ts. Announce Coordinated Enf't Efforts Against Cartel Jalisco Nueva Generacion (Oct. 16, 2018), https://www.justice.gov/opa/pr/justice-treasury-and-state-departments-announce-coordinated-enforcement-efforts-against) (alleging that "[t]he cartel has also expanded globally, with significant presence and illicit business not only throughout the United States and Mexico, but also Europe, Asia, and Australia").

FILED UNDER SEAL

Without naming the alleged drug in question in the sole piece of evidence within the limitations period, the evidence, as a matter of law, cannot support a probable cause determination. Nor, as discussed next, can the Government link the BBM Exchange to cocaine or methamphetamine transactions in 2007 or 2009.

### 2. The BBM Exchange is Not Evidence of Probable Cause in Support of a Conspiracy Tied to Prior Events.

Because the BBM Exchange does not, by itself, support probable cause, the Government must evidence that the conversation relates back in some way to an earlier purported event(s) as a continuing course of conduct. Critically, however, the Extradition Affidavit fails to link the BBM Exchange to any conspiratorial agreement or explain how it relates in any way to prior events outside the limitations period.

Absent proof of the essential facts regarding unity of interest and actions in furtherance of the conspiracy's objective during the limitations period, probable cause does not exist. *Gaskins*, 690 F.3d 569; *see also United States v. Davis*, 863 F.3d 894, 904–06 (D.C. Cir. 2017) (finding evidence insufficient to support conviction for conspiracy to commit tax fraud because defendant's participation in preparing tax returns, without more, "was insufficient to demonstrate that [defendant] knowingly joined [the] conspiracy"); *United States v. Hunte*, 196 F.3d 687, 691 (7th Cir. 1999) (holding that in drug conspiracy cases, the Government must establish "a 'participatory link' between the conspiracy and the defendant" which "must be established by sufficient evidence demonstrating that the defendant knew of the conspiracy and intended to join its criminal purpose") (quoting *United States v. Navarez*, 954 F.2d 1375, 1380–81 (7th Cir. 1992)). In *Gaskins*, the Government attempted to link the defendant to the conspiracy with evidence of his name being listed on utility bills and the lease of a residence where there was ample evidence of a drug distribution operation. 690 F.3d at 574–75. The D.C. Circuit Court of Appeals rejected such

**FILED UNDER SEAL**

evidence as insufficient to establish knowledge and intent because the Government did not offer evidence that Gaskins knew that the apartment and the utility bills were indeed in his name. *Id.* at 578; *see also United States v. Gardner*, 488 F.3d 700, 711 (6th Cir. 2007) ("[M]ere association with conspirators is not enough to establish participation."); *McFadden*, 576 U.S. at 194 (holding that to prove knowledge under the Controlled Substances Act, the government must prove that either "a defendant knew that the substance with which he was dealing was a 'controlled substance'" or "that the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue").

Here, the Extradition Affidavit provides ***no evidence*** linking the BBM Exchange to a larger or existing conspiratorial agreement or continuing course of conduct. Agent Mori alleges that Mr. Gonzalez-Valencia was involved in a thirteen-year conspiracy to distribute cocaine and methamphetamine, spanning from approximately January 2003 to April 19, 2016.[69] But the Extradition Affidavit speaks only to specific individual events prior to the limitations period, none of which are alleged to have any factual ties to the purported BBM Exchange, which has not even been shown to involve cocaine or methamphetamine.

### (i) 2007

The first purported event described in the Extradition Affidavit is an alleged arrangement between Mr. Gonzalez-Valencia, CW-1, Abigael Gonzalez-Valencia ("Abigael") and possibly unnamed others for an August 20, 2007 shipment of cocaine from an unknown origin to Mexico

---

[69] Ex. A at 40 ¶ 5. As discussed above, the Extradition Affidavit is missing any discussion of an agreement or unified purpose of individuals to conspire to distribute cocaine or methamphetamine. A conspiratorial agreement can be shown by direct or circumstantial evidence. *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). But there must be evidence which is sufficient in nature to allow for a probable cause determination. "Relevant circumstantial evidence [may] include[]: the joint appearance of defendants at transactions and negotiations in furtherance of the conspiracy; the relationship among codefendants; mutual representation of defendants to third parties; and other evidence suggesting unity of purpose or common design and understanding among conspirators to accomplish the objects of the conspiracy." *United States v. Wardell*, 591 F.3d 1279, 1287–88 (10th Cir. 2009) (internal quotations omitted).

by way of submarine.[70]   The U.S. Coast Guard interdicted the vessel and the drugs were

confiscated by the Government.[71]

### (ii)   2009

The Extradition Affidavit contains a relatively clear and detailed discussion tying the

purported event(s) in 2007 to the events that allegedly took place in 2009 through the introduction

of evidence obtained from CW-2, ████████████████████

   █ ████████████████████

   █ ████████████████████████████████████████

   █ ████████████████████████████████████████

In 2009, CW-2 purportedly had at least two separate discussions with Mr. Gonzalez-

Valencia and Abigael about cocaine trafficking. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████   ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████████

---

[70] Ex. A at 40 ¶ 5.  The Extradition Affidavit makes clear the sources of the information of Mr. Gonzalez-Valencia's
purported involvement are CW-1 and CW-2, though only CW-1 participated in the described events.

[71] *Id.*
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

[72] *Id.* at 42–43 ¶¶ 12–17.

[73] *Id.* at 43 ¶ 16.

[74] *Id.*

[75] *Id.*



       **(iii)**       **The BBM Exchange is Not Connected to the Limitations Period**

The Extradition Affidavit's description of the BBM Exchange in 2013, the sole evidence within the limitations period, is completely devoid of any relevant facts that tie the conversation back in any way to either the 2007 or 2009 events or an overarching conspiracy to distribute cocaine and methamphetamine among the participants. There is no evidence whatsoever of commonality between the BBM Exchange and any of the earlier alleged events.

If the Government contends that these events are indeed connected, then the Government has the duty to demonstrate such a connection, but nothing in the Extradition Affidavit ties the conduct alleged in 2013 to any prior conduct touching on an agreement, unity of purpose, or common design and understanding to accomplish the object of the charged conspiracy— conspiring to distribute cocaine and methamphetamine into the United States.

The Extradition Affidavit itself suggests that the BBM Exchange is unrelated to earlier events.  For example, the alleged arrangement in 2007 is a self-contained event that ended with the U.S. Coast Guard's interdiction of the vessel.[79]  The conversation in Paragraph 19 of the BBM

---

[76] *Id.* at 43 ¶ 17.

[77] *Id.*

[78] *Id.* at 42 ¶ 15.

[79] *Id.* at 40 ¶ 5.

FILED UNDER SEAL

Exchange concerning "85 units of drugs which belonged to the co-conspirator as well as 15 more units that Gonzalez-Valencia was saving" could not possibly relate back to that event because the 2007 contraband had been seized.[80]

The Extradition Affidavit also details alleged conduct by Mr. Gonzalez-Valencia in 2009 involving both cocaine and the importation of precursor chemicals to make and ship methamphetamine.[81]  The Extradition Affidavit's lack of clarity as to the specific type of drugs at issue in the BBM Exchange coupled with the inclusion of facts that Mr. Gonzalez-Valencia was "the leader of a Mexico-based DTO,"[82] and the Government's own publication of press releases stating that Mexico-based DTOs are involved in distribution of many other types of drugs such as fentanyl, heroin and marijuana[83] proves again fatal to the Government; one cannot even reasonably guess what is being discussed in the BBM Exchange much less state with reasonable probability that it involved cocaine or methamphetamine and was a continuation of an overarching conspiracy.

Moreover, the Extradition Affidavit does not state that either CW-1, CW-2 or Abigael, or one of their known affiliates, was the counterparty in the BBM Exchange; it simply states that the counterparty was a "co-conspirator" without anything more.  This is a conclusory statement, not evidence.[84]  While a discussion of Mr. Gonzalez-Valencia purportedly controlling drug routes into the United States in 2007 and 2009 is described, Agent Mori does not state that these routes were exclusive to cocaine or methamphetamine or that Mr. Gonzalez-Valencia continued to control these routes through the limitations period.  The spatial sequencing between these events supports the reasoned conclusion that indeed there is no connection between the events; the time between

---

[80] *Id.* at 43-44 ¶ 19.

[81] *Id.* at 42 ¶ 15.

[82] Ex. A at 40 ¶ 5.

[83] *See supra* note 68.

[84] *See infra* Section II.D for further discussion of proper summary evidence versus conclusory statements.

**FILED UNDER SEAL**

earlier events and the BBM Exchange is ***not*** four hours, four days, four weeks or four months. ***Four years*** passed between the alleged events, leading to only one plausible conclusion—that absent evidence to the contrary, the BBM Exchange cannot relate to these earlier described events.

> **D.      The Government Failed to Provide any Evidence to Identify Mr. Gonzalez-Valencia as a Participant in the BBM Exchange.**

As a matter of law, the Government has also failed to prove the identity of Mr. Gonzalez-Valencia as one of the participants in the BBM Exchange.[85] Where the Government fails to present sufficient evidence that identifies the accused as the person who committed the alleged crime, there can be no probable cause. *See, e.g.*, *United States v. Knight*, No. 3:19-CR-00038-MMD-CLB, 2021 WL 134589, at *1 (D. Nev. Jan. 13, 2021) (finding lack of competent identification evidence plausibly meant "grand jury was not provided with the evidence needed to support probable cause" and "grounds for dismissal may exist"); *Commonwealth v. McCarthy*, 385 Mass. 160, 164 (1982) (dismissing indictment because "the grand jury had no evidence before it" that the defendant was the person who committed or participated in the alleged assault).

Evidence of identity can be in direct form through the counterparty or another eyewitness, or through circumstantial evidence. *Goodwine v. Lee*, No. 10 CV 6019 (VB), 2016 WL 6834017, at *4 (S.D.N.Y. Nov. 17, 2016) ("[E]ven in the absence of a direct identification, the circumstantial evidence against petitioner was undoubtedly sufficient to establish probable cause."); *Furtado v. Maloney*, 125 F. App'x 318, 320 (1st Cir. 2005) (allowing circumstantial identification evidence). Proof, however, cannot be assumed through conclusory self-serving statements without any evidentiary support. A conclusory statement gives "virtually no basis" to determine probable

---

[85] Or, for that matter, that the counterparty was indeed a co-conspirator to the conspiracy alleged or that Mr. Gonzalez-Valencia was "the" leader of a Mexico-based DTO. Agent Mori begins his affidavit by conclusively stating that Mr. Gonzalez-Valencia is "the leader of a Mexico-based DTO." Ex. A at 40 ¶ 5. The Extradition Affidavit failed to explain how a trier of fact could reasonably infer that Mr. Gonzalez-Valencia was the "leader of a Mexico-based DTO." The Government was required to offer evidence to support such a claim but failed to do so.

**FILED UNDER SEAL**

cause where it is a "mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239 (1983); *see also In re Extradition of Suyanoff*, No. 12-MJ-462 JMA, 2012 WL 4328523, at *4 (E.D.N.Y. Sept. 20, 2012) ("A magistrate may not . . . merely ratify conclusory statements that a fugitive committed a crime.").  An affidavit relying on conclusory statements precludes a determination of probable cause.  *United States v. Manafort*, 314 F. Supp. 3d 258, 266 (D.D.C. 2018) ("The law is clear that an affidavit in support of a warrant application 'must provide the magistrate with a substantial basis for determining the existence of probable cause,' and it cannot consist of 'wholly conclusory statement[s].'") (quoting *Gates*, 462 U.S. at 239); *United States v. Burnett*, No. 12-CR-00042-BAH-3, 2013 WL 12430549, at *3 (D.D.C. Mar. 21, 2013) (Howell, J.) ("[P]robable cause may not be based on mere allegations or conclusory statements."), *aff'd*, 827 F.3d 1108 (D.C. Cir. 2016); *see also In re Ribaudo*, No. 00 Crim. Misc. 1 Pg. (KNF), 2004 WL 213021, at *6 (S.D.N.Y. Feb. 3, 2004) (holding the Government's contention that the word "shoes" was code for "heroin" in phone conversations without transcripts or summaries of the conversations was "entirely conclusory"); *Platko*, 213 F. Supp. 2d at 1239 (noting affidavits "must identify the facts and go beyond conclusory characterizations" to demonstrate probable cause).

Nothing in the native format of the BBM Exchange identifies Mr. Gonzalez-Valencia as a participant, which is perhaps why the Government refused to provide it to the Uruguayan court even when specifically requested.  Yet, Agent Mori not only concluded that Mr. Gonzalez-Valencia was involved, but that he was messaging with an unidentified "co-conspirator."[86]  That is not tenable.

---

[86] Ex. A at 43–44 ¶¶ 18–19.

FILED UNDER SEAL

The messages at issue are in Spanish with only Blackberry Messenger pin numbers, dates and times, and unattributable screen names[87] as identifiers of the messaging devices:



**Wed 26 Jun 2013**
**19:05:31**[88]

Nowhere does the native BBM Exchange identify Mr. Gonzalez-Valencia as one of the persons messaging.  Moreover, Agent Mori, in his own words, has explained how challenging it is to identify users of Blackberry devices when he stated, "I know that narcotics traffickers and money launderers frequently obtain telephones in third party names and addresses to avoid detection by law enforcement."[89]  Yet, the Extradition Affidavit purports to provide "a summary of a lawfully intercepted text messages [*sic*] in California between Gonzalez-Valencia and a co-conspirator."[90]  It further states that "One [*sic*] June 26, 2013, during a lawfully-intercepted text messages [*sic*], Gonzalez-Valencia and a co-conspirator discussed whether a drug trafficking transaction was complete."[91]  Agent Mori did not elaborate how he concluded that one of the individuals communicating in the BBM Exchange was Mr. Gonzalez-Valencia.  This conclusion is not proper summary evidence; it is a conclusory statement with no factual predicate.[92]  *Gates*, 462 U.S. at

---

[87]  Agent Mori conclusively states that Mr. Gonzalez-Valencia is also known as "Silverio." *Id.* at 44 ¶ 20.  One of the BBM pin numbers is paired with the screen name "Silverio," but Agent Mori fails to explain the purported link between Mr. Gonzalez-Valencia and "Silverio" in the Extradition Affidavit, stating only that the conversation is "between Gonzalez-Valencia and a co-conspirator."  *Id.* at 43 ¶ 18.  The Government has informed Mr. Gonzalez-Valencia, through his counsel, that it does not have a single witness who knows of Mr. Gonzalez-Valencia as "Silverio."  Moreover, the wiretap affidavits provided to counsel by the Government do not conclusively identify Mr. Gonzalez-Valencia as "Silverio."  Rather, Agent Mori states that "Eduardo Gonzalez-Valencia" is only a "possible user" of the target device with the screen name "Silverio."  Ex. O at ¶ 1.

[88]  *See* Ex. B at 00025524–29.

[89]  Ex. N at ¶ 67.

[90]  Ex. A at 43 ¶ 18.

[91]  *Id.* at 43–44 ¶ 19.

[92]  Affidavits offered in support of extradition may include detailed summary statements. *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (citing *Collins v. Loisel*, 259 U.S. 309, 317 (1922)).  The credibility of summarized statements is determined by the extradition judge. *In re Extradition of Singh*, No. 01-6215 OWW, 98-5489 OWW,

FILED UNDER SEAL

239 (holding that a "wholly conclusory statement" in an affidavit fails to support a finding of probable cause). Equally unsupported was Agent Mori's conclusory assertion regarding the unnamed "co-conspirator."

This failure demonstrates again that the Extradition Affidavit, as a matter of law, does not support probable cause.

E.   **The Government is Required to Provide Sufficient Evidence of Probable Cause Under the Treaty.**

It is axiomatic that pursuant to the U.S. Constitution, the detention of a U.S. citizen requires a showing of probable cause. The Fourth Amendment requires a "fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. 137, 142 (1979) (citing *Gerstein*, 420 U.S. 103). This principle applies with equal force to the Government regardless of whether the seizure and detention is within the confines of the United States or abroad. *See Reid v. Covert*, 354 U.S. 1, 6 (1957) ("When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land."); *Meshal v. Higgenbotham*, 47 F. Supp. 3d 115, 120 (D.D.C. 2014) ("It has been well settled for over fifty years that the Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed at United States

---

2005 WL 3030819, at *55 (E.D. Cal. Nov. 9, 2005) (ordering a trial to resolve conflicts in proffered affidavits). Summary statements may consist of "hearsay statements of witnesses" summarized in a foreign official's affidavit. *United States v. Pena-Bencosme*, No. 05-M-1518 (SMG), 2006 WL 3290361, at *2, *8 (E.D.N.Y. Nov. 13, 2006) (finding the government's inclusion of four witness statements, ballistics test results, and pathology reports "sufficient to establish probable cause to support the homicide charge" against the defendant); *see also Afanasjev v. Hurlburt*, 418 F.3d 1159, 1165 (11th Cir. 2005) (Lithuanian prosecutor's 106-page bill of indictment summarizing victims' statements supported a finding of probable cause). However, summary statements that lack specificity or adequate detail may not be sufficient to support a finding of probable cause. *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 830 (S.D. Tex. 2011) ("[W]hen a court in an extradition proceeding is presented with evidence through affidavits, the court may conclude, on a review of the affidavits submitted, that there are insufficient [or sufficient] indicia of reliability or credibility to establish probable cause." (citing *In re Extradition of Singh*, 124 F.R.D. 571, 577 (D.N.J. 1987))).

**FILED UNDER SEAL**

citizens.") (internal quotation and citation omitted), *aff'd*, 804 F.3d 417 (D.C. Cir. 2015).  This

principle also applies whether the seizure and detention are made directly by the Government or

through foreign agents acting at the Government's direction. *Meshal*, 47 F. Supp. 3d at 120.

Recognizing this foundational principle, the Executive Branch, in executing the Treaty

with Uruguay, incorporated a probable cause requirement.  Specifically, Article 10 provides:

> When the request relates to a person who has not yet been convicted, it must be
> accompanied by a warrant of arrest issued by a judge or other judicial officer of the
> requesting Party.
>
> The requested Party may ***require the requesting Party to produce evidence to
> establish probable cause*** that the person claimed has committed the offense for
> which extradition is requested.  The requested Party may refuse the extradition
> request if an examination of the case in question shows that the warrant is
> manifestly ill-founded.[93]

Courts have found that this Treaty requires a probable cause determination to support extradition.

In *United States v. Puentes*, for example, the court approved an extradition from Uruguay because

"***in the Uruguayan court's opinion, the United States had submitted sufficient evidence to***

***establish probable cause*** to believe that Puentes had committed the offense charged."  50 F.3d

1567, 1576 (11th Cir. 1995) (emphasis added).  Indeed, in that case, the Uruguayan Court of

Appeal found that in order to extradite an individual from Uruguay to the United States, "complete

certainty is not required, ***but only a plausible, a judgment of probability, a '*fumus bonis juris**,*'*"[94]

which the Eleventh Circuit interpreted to mean probable cause.  *Puentes*, 50 F.3d at 1576; *see also*

*United States v. Duarte*, No. 15-20540-CR, 2018 WL 310025, at *3 (S.D. Fla. Jan. 4, 2018)

(explaining that the *Puentes* court "focused on the fact that the extradition order was based on the

Uruguayan court's determination of the existence of probable cause" to uphold the validity of the

---

[93]  Ex. S (Uruguay International Extradition Treaty with the United States, art. 1, Apr. 11, 1984, TIAS 10850)
(emphasis added).
[94]  Ex. T (UY/JUR/15/1991) at 16 (emphasis added).

FILED UNDER SEAL

extradition (citing *Puentes*, 50 F.3d at 1576)), *aff'd sub nom. United States v. Mejia-Duarte*, 780

F. App'x 730 (11th Cir. 2019).  Other Uruguayan courts have likewise found that a finding of

"fumus bonis juris," *i.e.*, probable cause, is required.[95]

Indeed, U.S. courts have found that treaties cannot be interpreted to absolve the requesting

party from demonstrating probable cause.  *See Caltagirone v. Grant*, 629 F.2d 739, 747–48 (2d

Cir. 1980) (rejecting the government's argument that the treaty at issue did not require showing of

probable cause because "the Government's view raises grave questions concerning the

constitutional proprietary of any interpretation of [the treaty] which does not require a showing of

probable cause").  Of course, if an individual waives their challenge to extradition, as is often the

case, the requesting country may be relieved of its burden to establish probable cause.  But the

Treaty cannot reasonably be interpreted to permit the Government to extradite an individual

without probable cause if, such as here, the individual is contesting extradition.

The Government has previously recognized, if not conceded, *in this case* that the Treaty

requires it to establish probable cause.  In its July 16, 2019 response to the Uruguayan court's

request for supplemental proof to support the charge, the Government stated:

> The United States affirms that the extradition request provided to the Government
> of Uruguay on June 1, 2016 **includes all requirements enumerated in Article 10
> of the Treaty**.  The Embassy of the United States **attached all evidentiary
> documentation to this Diplomatic Note that establishes probable cause.**[96]

---

[95]  Ex. U (UY/JUR/27/1989) at 17 (finding evidence requirement is "fumus bonis juris" which means "probability or likelihood or the alleged facts or claimed rights").  In the Uruguayan legal system, decisions by Uruguayan courts do not constitute legal precedent and subsequent decisions by higher courts do not supersede prior decisions or decisions by lower courts.  *See* Pablo Sandonato de Leon, *Update: A Guide to Uruguay's Legal System and Research*, Hauser Global Law School Program at NYU School of Law, at § 3.1 (July/Aug. 2016), https://www.nyulawglobal.org/globalex/Uruguay1.html.  Accordingly, the Uruguayan Supreme Court of Justice's erroneous decision to extradite Mr. Gonzalez-Valencia without probable cause has no bearing on the *Puentes* decision or other decisions, nor does it establish legal precedent in Uruguay.

[96]  Ex. F at 2 (emphasis added).

FILED UNDER SEAL

Thus, the Government expressly stated that the "requirements enumerated in Article 10" required it to provide "all evidentiary documentation . . . that establishes probable cause."[97]

### F.   Uruguay Failed to Apply the Correct Legal Standard in Granting Mr. Gonzalez-Valencia's Extradition.

Uruguay failed to apply the correct legal standard by granting the Government's extradition request without assessing the evidence to determine probable cause. Accordingly, any presumption under *Trabelsi* that the extradition is lawful is clearly and conclusively rebutted. 845 F.3d at 1189 (holding presumption is rebutted if the "requested state or party did not apply the correct legal standard adopted in the Treaty").

The Uruguayan court ordered the extradition of Mr. Gonzalez-Valencia because it determined that the Government's request was not "clearly unfounded."[98] The Uruguayan court conceded that it did not assess any of the "evidence" provided by the "requesting state" (*i.e.*, the United States). The court of first instance in Uruguay issued an order granting extradition, stating:

> [T]he only thing the judge has to do is control the formal regularity of the request and compliance with the requirements of the Treaty applicable to the case.
>
> *It is then not appropriate to assess the evidence produced by the requesting State, but rather only to assess it to determine that the extradition request and the arrest warrant are not manifestly unfounded*, in accordance with the provisions of Art. 10.3 *in fine* of the Treaty, which establishes that "the party subject to the request may ask that the requesting party to submit sufficient evidence to establish *prima facie* that the person subject to the request has committed the crime for which the extradition is made."[99]

After the Government refused to provide any additional evidence as requested, Uruguay's highest judicial body nevertheless entered a final judgment in favor of extradition on February 11, 2020, again without analyzing the sufficiency of the evidence.[100]

---

[97]  *Id.*

[98]  Ex. I at 00054535.

[99]  *Id.* at 00054534 (emphasis added).

[100]  Ex. J.

FILED UNDER SEAL

The Uruguayan courts' determination that the extradition request was "not manifestly unfounded" does not satisfy the requirements of the Treaty.  Importantly, "not manifestly unfounded" is not a standard of proof in American jurisprudence, nor in any extradition proceeding.  By no stretch is it equivalent to "probable cause."[101]  The U.N. defines "manifestly unfounded" applications as "clearly fraudulent or not related to the criteria for the granting of refugee status laid down in the 1951 United Nations Convention . . . nor to any other criteria justifying the granting of asylum."[102]

"The assessment of probable cause is an objective one."  *Wesby v. District of Columbia,* 765 F.3d 13, 19 (D.C. Cir. 2014).  Probable cause exists if "the facts and circumstances . . . were sufficient to warrant a prudent man in believing that the suspect has committed or is committing a crime."  *Id*.  (citing *Beck v. Ohio*, 379 U.S. 89 (1964)) (internal quotations omitted).  This Circuit looks to each element of the offense, including *mens rea*, to determine if probable cause existed. *Id.* at 20.  By contrast, "not manifestly unfounded" requires only the slightest showing that the

---

[101]  In fact, "not manifestly unfounded" is the international asylum screening standard.  The United Nations High Commissioner for Refugees established the standard of "manifestly unfounded" to identify asylum claims that "are considered so obviously without foundation as not to merit full examination at every level of the procedure."  UN High Commissioner for Refugees (UNHCR), UN High Commissioner for Refugees (UNHCR), *The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum,* Executive Committee Conclusion No 30 (Oct. 20, 1983), https://www.unhcr.org/en-us/excom/exconc/3ae68c6118/problem-manifestly-unfounded-abusive-applications-refugee-status-asylum.html. In 2014, the Norwegian Immigration Appeals Board openly discussed how to interpret the meaning of the term "manifestly unfounded":

> When implementing the Directive in the Norwegian Immigration Act, our legislator states, *inter alia*, that the legal exclusion provision was not intended to be applied in most cases, but in cases where the application ***is presumed to be mainly based on false information.***  There must be a causal link between the incorrect information and the decision to reject the application for a permit. Illustrative examples: (i) if a foreigner alleged problems related to economic conditions and unemployment as the basis for his application or if (ii) the applicant provides false identity, or (iii) the asylum explanation is fabricated, and / or if (iv) the applicant comes from an EU country or another country which is normally considered safe for return.

European Migration Network, *Ad-Hoc Query on* Expulsion *Definition of Manifestly Unfounded as Related to Directive 2008/115/EC* (2014), https://www.udi no/globalassets/global/european-migration-network_i/ad-hoc-queries/ad-hoc-query-expulsion-definition-unfounded-2014.pdf (emphasis added).

[102]  UN High Commissioner for Refugees (UNHCR), *supra* note 101.

FILED UNDER SEAL

allegation is not clearly fraudulent or has even the slightest merit.  It is arguably a much lower standard of proof than any standard of proof in American jurisprudence, including civil cases. Even in civil cases, the burden of persuasion to prove a claim by "a preponderance of the evidence" requires a showing that a particular fact or event was more likely than not to have occurred.[103]

When this review is conducted through the lens of a mere cursory review of the Extradition Package, it is undeniable that the wrong legal standard was applied; no court could find probable cause on the evidence submitted.  The Government effectively strong-armed Uruguay by submitting affidavits from self-described experts that essentially told Uruguay "this is more than enough," and then refused Uruguay's request for more evidence on the particular point at issue— the BBM Exchange.  The Uruguayan court succumbed to the Government even though Uruguayan courts had previously recognized their obligation to assess the evidence to determine probable cause.  As such, the extradition of Mr. Gonzalez-Valencia at the request of the Government was improper and deprived Mr. Gonzalez-Valencia of his constitutional rights.

### G.   Requested Relief

We respectfully move this Court to dismiss the Indictment with prejudice without further review and order the immediate release of Mr. Gonzalez-Valencia from custody.  In the alternative, and before ruling on dismissal, we respectfully move pursuant to Rules 6(e)(3)(E)(i) and (ii) of the Federal Rules of Criminal Procedure for the Court to conduct an *in camera* review of the grand jury record on the narrow issue of whether there was any competent evidence adduced within the limitations period.

In the counter-alternative, we move this Court to order the Government to expedite the renewal of Mr. Gonzalez-Valencia's passport and his safe passage out of the United States to the

---

[103]  Burden of Proof (D.C. Std. Civ. Jury Instr. No. 2-3).

**FILED UNDER SEAL**

country of his choosing, and to not file any detainers or cause any detainers to be filed against Mr. Gonzalez-Valencia for at least ninety days from his departure from this country. This minimal remedy, however, acts only as a reset for the Government and does not address the harm to Mr. Gonzalez-Valencia, sanction the Government for its egregious misconduct, or act as a deterrent to the Government committing similar misconduct in future extraditions.

Given the egregious misconduct of the Government here, any remedy short of dismissal with prejudice would fail to right the harm to Mr. Gonzalez-Valencia or restore the integrity of the extradition process.

### 1.    The Court Should Exercise its Supervisory Powers and Dismiss the Indictment with Prejudice.

This case presents an issue of first impression as to an appropriate remedy. What is the appropriate remedy when the Government, pursuant to a Treaty, initiates extradition proceedings against a U.S. citizen but violates the Treaty by causing the seizure, detention and eventual extradition of that U.S. citizen abroad without probable cause? Notably, this Court is empowered to hold the Government to the highest of standards in matters concerning the constitutional rights of U.S. citizens, including when those citizens are abroad. The D.C. Circuit Court of Appeals has articulated the following view regarding judicial oversight against due process concerns caused by Government misconduct:

> In *Fisher v. United States*, 328 U.S. 463, 476 (1946), the Supreme Court said: "Matters relating to law enforcement in the District are entrusted to the courts of the District." . . . The "Court, in its decisions, and Congress, in its enactment of statutes, have often recognized the appropriateness of one rule for the District and another for other jurisdictions so far as they are subject to federal law." *Griffin v. United States*, 336 U.S. 704, 712 (1949). ***The courts of the District of Columbia should not concern themselves with enforcing the minimum standards which the Constitution requires. They should also set for the Nation an example of respect for the rights of citizens.***

*Jones v. United States*, 342 F.2d 863, 868 (D.C. Cir. 1964) (emphasis added).

FILED UNDER SEAL

In this case, the Court has the power to protect the integrity of the United States in prospective extradition requests and, more generally, in international relations. Moreover, it has the power to remedy the egregious constitutional violations suffered by Mr. Gonzalez-Valencia at the hands of the Government. Put simply, justice demands dismissal.

Courts may dismiss an indictment under their supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995) (citing *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)); *United States v. Hasting*, 461 U.S. 499, 505 (1983). The defendant must demonstrate prejudice, such as through an "abrogation of constitutional rights," before the court may exercise its supervisory powers to dismiss an indictment. *United States v. Siriprechapong*, 181 F.R.D. 416, 423 (N.D. Cal. 1998) (holding dismissal may rest on "abrogation of constitutional rights sufficient to support dismissal of an indictment" (citing *United States v. Isgro*, 974 F.2d 1091, 1096 (9th Cir.1992)); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988). "The court's exercise of its supervisory powers protects the integrity of the federal courts and prevents the courts from making themselves accomplices in willful disobedience of law." *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (quoting *McNabb v. United States*, 318 U.S. 332, 345 (1943) (internal quotation marks and modifications omitted)).

In exercising its supervisory powers, the Court should also keep in mind the significance of the Government's actions, as a leader among nations in the international arena. As Justice Brandeis cautioned:

> In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent

FILED UNDER SEAL

teacher.  For good or for ill, it teaches the whole people by its example.  Crime is contagious.  If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution.[104]

"[T]he Fourth Amendment requires . . . a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Baker*, 443 U.S. at 142 (citing *Gerstein*, 420 U.S. at 95); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 52–53 (1991) (finding absent extraordinary circumstance, detention of more than 48 hours without probable cause determination is unconstitutional); *Caltagirone*, 629 F.2d at 747 (noting that detention of individual pending extradition without probable cause "raises grave questions concerning the constitutional propriety").  Accordingly, "[w]hen an individual is deprived of his liberty pursuant to a warrant that does not conform to the requirements of the [F]ourth [A]mendment, he is deprived of liberty without due process of law."  *Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir. 1985) (citing *Baker*, 443 U.S. at 143–44).

Detention based on a probable cause determination that is not "fair and reasonable" is an unconstitutional violation of due process.  *See, e.g., id.*; *Dorsey v. District of Columbia*, 234 F. Supp. 3d 1, 8 (D.D.C. 2017) ("The Fourth Amendment is therefore violated when a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant, if the allegedly false statement is necessary to the finding of probable cause.") (internal quotations and citation omitted).  For example, courts have routinely found an actionable and unconstitutional due process violation when a government official knew or should have known that an individual was being detained without probable cause.  *Sivard v. Pulaski County*, 959 F.2d 662 (7th Cir. 1992) (finding continued detention where sheriff knew it was wrongful states claim under Section

---

[104] *Olmstead v. United States*, 277 U.S. 438, 468 (1928) (Brandeis, J., dissenting).

FILED UNDER SEAL

1983 for due process violation); *Cook v. City of Antioch*, No. 19-CV-01370-PJH, 2020 WL 9066046, at *1 (N.D. Cal. May 12, 2020) (finding detention violates due process "if the arrest was without probable cause or other justification and the defendant knew or should have known that plaintiff was entitled to release"); *Fox v. Tomczak*, No. 04 C 7309, 2006 WL 1157466, at *3 (N.D. Ill. Apr. 26, 2006) ("An allegation that a public official knew of a plaintiff's wrongful detention and continued to detain him despite this knowledge is sufficient to state a cause of action under Section 1983 for a public official's personal involvement in an unconstitutional deprivation of due process."); *see also In re Zhenly Ye Gon*, No. 08-596(JMF), 2010 WL 169468, at *3 (D.D.C. Jan. 8, 2010) ("Surely, a man who is imprisoned to await extradition has been deprived of his liberty, and that deprivation is without due process of law when the government conceals information that would negate the probable cause offered by the demanding state.").[105]

In *Meshal*, for example, the defendant, a U.S. citizen, was traveling abroad when he was detained and held for over four months by foreign agents at the direction of the Government. 47 F. Supp. 3d at 117–18. Judge Sullivan of this Court found that the facts alleged were "deeply troubling" and that Meshal had sufficiently alleged deprivation of his constitutional rights. *Id.* at 121 ("Plaintiff has alleged that Defendants violated his Fourth Amendment rights by detaining him for four months without a probable cause hearing . . . Plaintiff has plausibly alleged that his detention without a hearing for four months . . . is unreasonable.").

---

[105] The fact that Mr. Gonzalez-Valencia was detained pursuant to the Treaty does not strip him of his Fourth Amendment protections. *Manta v. Chertoff*, 518 F.3d 1134, 1147 (9th Cir. 2008) ("[T]he Fourth Amendment's protections extend to those arrested pursuant to treaties."); *Reid*, 354 U.S. at 16 ("[N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution."); *Barr v. U.S. Dep't of Just.*, 819 F.2d 25, 27 (2d Cir. 1987) ("[I]t is unquestionably the law that a treaty may authorize only such governmental action as is in conformity with the Constitution."); *Petition of Geisser*, 627 F.2d 745, 750 (5th Cir. 1980) ("[A] purported treaty obligation of the United States government cannot override an individual constitutional right")).

FILED UNDER SEAL

Mr. Gonzalez-Valencia's lengthy detention for nearly *two years* based solely on the Government's deficient Extradition Package is *de facto* prejudice warranting dismissal of the Indictment.   While detained in Uruguay, Mr. Gonzalez-Valencia was not able to have regular access to his family including his three young children.   Moreover, he has been deprived of his ability to support his family.   *See McLaughlin*, 500 U.S. at 52 ("[P]rolonged detention based on incorrect or unfounded suspicion may unjustly 'imperil [a] suspect's job, interrupt his source of income, and impair his family relationships.'" (quoting *Gerstein*, 420 U.S. at 114)).   His detention has prejudiced his ability to defend this charge in that he intends on asserting a defense of withdrawal from the conspiracy.   His ability to contact key witnesses with whom he has personal relationships in both Argentina and Uruguay, who could have assisted Mr. Gonzalez-Valencia in his defense, has been critically impaired.   *See United States v. Perry*, 353 F. Supp. 1235, 1240 (D.D.C. 1973) (explaining that lengthy delay "must inevitably impair the case of both the prosecution and the defense.   The memory of witnesses for both prosecution and defense fade and become confused . . . [and] [s]ome witnesses for both sides may become unavailable.").

In other contexts, courts have held that lengthy detention without a probable cause determination was sufficiently severe to warrant dismissal of the indictment.   *See United States v. Osunde*, 638 F. Supp. 171, 175–77 (N.D. Cal. 1986) (dismissing an indictment with prejudice because "the passage of 106 days between the defendant's arrest and his first appearance before [a magistrate judge] was, without a doubt, a grossly unnecessary delay" and the 118-day delay between defendant's arrest and indictment "was entirely the fault of the government").

### (i)     International Comity and Deterrence Requires Dismissal.

Extradition treaties serve the several purposes of promoting the enforcement of criminal law, protecting the sovereignty of each signatory nation over its own territory, and providing

FILED UNDER SEAL

safeguards for the civil liberties of citizens and other individuals in inter-state surrenders.   As

Senator Helms stated in a 1998 Committee on Foreign Relations Report:

> Extradition relationships have long been a basis of bilateral relationships, and
> represent a recognition by the United States of the legitimacy of a country's judicial
> system. Respect for a treaty partner's judicial system is essential since the treaties
> permit the transfer of individuals to another country in order to stand trial for
> alleged crimes.[106]

The conduct of the Government here is antithetical to these principles.   As Senator Helms

noted, the Government's decision to enter a bilateral extradition treaty is predicated on both its

view of the legitimacy of a country's judicial system and *respect*.   Indeed, the ability for national

governments to trust other nations to comply with their treaty obligations lies at the heart of

international diplomacy.   As one scholar eloquently explained:

> If sovereign nations are to trust one another in carrying out their treaty obligations,
> there must be an obligation of fair dealing, good faith and truthfulness imposed on
> every contracting state making sworn representations in the tribunals of another
> sovereign.   Admittedly,   extradition   treaties   generally   contain   no   explicit
> requirement that a requesting state be truthful in the presentation of evidence to the
> judicial body of the requested state. However, implicit in any workable contract
> between nations in which they agree to submit evidence in support of probable
> cause to the courts of either state must be an understanding that the parties will not
> defraud one another. This understanding provides the necessary foundation for
> international relations. . . . Whether fraud in the execution of treaty obligations is
> barred by the fundamentals of natural law, international public policy, imperative
> norms, customary law, morality, or the requirement of public order is immaterial.
> No school of thought on the subject would argue that misrepresentation should be
> allowed to go uncorrected. The nations of the world have a vital obligation not only
> to one another to preserve the international rule of law against illegal usurpation by
> another state but also to their own citizenry to redress fraud which taints their
> judicial institutions.[107]

---

[106]     Sen.   Exec.   Rep.   No.   105-23   (1998),   available   at   https://www.govinfo.gov/content/pkg/CRPT-105erpt23/html/CRPT-105erpt23.htm.

[107]   John J. Privitera, *Toward a Remedy for Int'l Extradition by Fraud: The Case of Leonard Peltier*, 2:49 Yale L. &
Pol'y   Rev.   49,   57   (1983),   available   at
https://openyls.law.yale.edu/bitstream/handle/20.500.13051/16936/06_2YaleL_PolyRev49_1983_1984_.pdf?sequen
ce=2&isAllowed=y (footnotes omitted).

FILED UNDER SEAL

Considering these principles, the Government's egregious gamesmanship and lack of respect for Uruguay in procuring Mr. Gonzalez-Valencia's prolonged detention and extradition to the United States requires nothing short of dismissal with prejudice, as it challenges the very foundation of international relations.  This Court must do what the Government chooses not to—show respect for a foreign country's legal system and right the extreme wrong here.  The message to Uruguay cannot be that the Government may demand extradition from Uruguay despite an objective failure to meet the requirements of the Treaty.  Indeed, Uruguay (and other nations) have already heavily criticized the Supreme Court's decision in *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), which permitted the Government to circumvent the United States' treaty obligations to kidnap a defendant.[108]  This continued behavior, if left unbridled and uncensured, will only serve to deteriorate already delicate foreign relations.  Accordingly, dismissal with prejudice is necessary.

### (ii)     The Government's Misconduct Requires Dismissal.

The Government's misconduct and blatant disregard for Mr. Gonzalez-Valencia's right to due process serves as an alternative basis for dismissal, and this conduct begins with the woefully deficient Extradition Affidavit.  As explained above, the Extradition Affidavit would not survive a probable cause determination in any court in this country, yet the Government requested that Uruguay detain and extradite Mr. Gonzalez-Valencia on that basis.  The threshold element needed to establish probable cause is proof of the identity of the specific drug, yet Agent Mori failed to identify the "units" as cocaine or methamphetamine.  It is abundantly clear in reviewing both the Extradition Affidavit and Agent Mori's affidavit in support of a wiretap that DOJ Attorney

---

[108] *See* David O. Stewart, *The Price of Vengeance: U.S. Feels Heat for Ruling that Permits Government Kidnapping*, 78-Nov A.B.A. J. 50 (1992) ("[A] resolution adopted by the lower house of the parliament of Uruguay asserted that the [*Alvarez-Machain*] decision shows 'a lack of understanding of the most elemental norms of international law, and in particular an absolute perversion of the function of extradition treaties.'").

FILED UNDER SEAL

Liskamm and Agent Mori understand the critical importance of naming the controlled substance at issue.  This is why, at minimum, the Court's *in camera* review of the evidence adduced within the limitations period is so critical; if the Government indeed produced competent evidence within the limitations period before the grand jury, this is the best evidence that the Government's deficient offering of proof to extradite Mr. Gonzalez-Valencia was by design and not mistake.

Despite the absence of any evidence in the Extradition Affidavit that Mr. Gonzalez-Valencia conspired to distribute cocaine or methamphetamine within the limitations period, and instead of requiring Agent Mori to correct these fatal errors, DOJ Attorney Liskamm stated that, "[she had] reviewed the affidavit of DEA Special Agent Kyle J. Mori and the evidence in this case," and, "the prosecution of the charge in this case . . . is not barred by the statute of limitations."[109]  She went even further to state that the Extradition Package demonstrated not only probable cause, but Mr. Gonzalez-Valencia's **guilt**.[110]  Uruguay then *twice* asked for additional evidence.  The Government, in blatant disregard of the Uruguayan court's multiple requests and Mr. Gonzalez-Valencia's constitutional right to due process, ignored Uruguay's requests and then outright refused to provide additional proof.  With no further recourse, Uruguay simply deferred to the Government and granted its extradition request.

Moreover, not only did Mr. Gonzalez-Valencia's detention without probable cause itself violate the Treaty, but the length of his prolonged detention also was in direct violation of the Treaty.  Article 11 of the Treaty requires release of a detained individual if "within **forty-five calendar days** from the date of provisional arrest, the requesting Party fails to present the formal request for extradition . . . **supported by the documents required by Article 10**."[111]  Similarly,

---

[109]  Ex. A at 15, 17 ¶ 13, 23.

[110]  *Id.* at 17–18 ¶ 23.

[111]  Ex. S art. 11 (emphasis added).

FILED UNDER SEAL

Article 12 of the Treaty requires the timely provision of additional evidence requested by the requested party and if the additional evidence is "not sufficient" or not provided timely, requires release of the detained individual.[112]   Despite these requirements, the Government failed to respond to the Uruguayan court's multiple requests for additional information for **eight months**, during which time Mr. Gonzalez-Valencia was detained in Uruguay solely on the Government's extradition request.   Then, when the Government eventually did respond, the response came from someone purportedly from the Department of State **without consulting the DOJ**.   Someone unilaterally decided on their own to refuse the Uruguayan court's request for the underlying evidence of the BBM Exchange central to the issue of the statute of limitations defense.   The Department of State's role in the extradition process is not to make unilateral decisions on important matters by and between the requesting and requested sovereigns.

The Government's documented flagrant and unconscionable misconduct in this case in violation of the Treaty, and the resulting deprivation of Mr. Gonzalez-Valencia's liberty, serves as a standalone basis for this Court to exercise its supervisory powers and dismiss the Indictment.

> **2.      Alternatively, Before Ruling on the Motion to Dismiss, the Court Should Conduct an *In Camera* Review of the Grand Jury Record**

In the alternative, and before ruling on dismissal, we respectfully move for the Court pursuant to Rules 6(e)(3)(E)(i) and (ii) of the Federal Rules of Criminal Procedure to conduct an *in camera* review of the grand jury record on the narrow issue of whether there was any competent evidence adduced within the limitations period.[113] *See Coppedge*, 311 F.2d at 131–32 (holding

---

[112]  *Id.* art. 12.

[113]  Rule 6(e)(3)(E)(i) of the Federal Rules of Criminal Procedure allows for disclosure of grand jury material where the petitioner makes "a strong showing of particularized need," *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983), that "the materials sought [are] 'needed to avoid a possible injustice in another judicial proceeding' and the moving party's request be 'structured to cover only material so needed.'" Mem. Op. at 5, *In re Grand Jury Investigation*, No. 18-GJ-00008 (BAH) (D.D.C. Apr. 1, 2020) (quoting *United States v. Baggot*, 463 U.S. 476, 480

**FILED UNDER SEAL**

that there must be at least some evidence to support the charge); *United States v. Laughlin*, 226 F. Supp. 112, 114 (D.D.C. 1964) (holding that an indictment without competent evidence must be dismissed); *United States v. Wolff*, 840 F. Supp. 322, 323 (M.D. Pa. 1993) (dismissing an indictment because there was no evidentiary basis on which the grand jury could have found probable cause to indict the defendant).

There is a clear and particularized need for this narrow, *in camera* review—there has been a detailed showing that the Government likely did not adduce any competent evidence within the limitations period. Agent Mori is presumed to have testified before the grand jury consistent with his sworn affidavit a mere two weeks later. That testimony cannot identify the units in the BBM Exchange as cocaine or methamphetamine. There is no factual basis for anyone to reasonably conclude that the discussion in the BBM Exchange involved cocaine or methamphetamine and Agent Mori himself did not conclude that the BBM Exchange concerned cocaine or methamphetamine. Importantly, had he testified before the grand jury that, in his opinion, the BBM Exchange involved a discussion of cocaine or methamphetamine, this would be in material conflict with his sworn affidavit and thus, constitute evidence that tended to exculpate Mr. Gonzalez-Valencia under *Brady v. Maryland*, 373 U.S. 83 (1963). The Government, to date, has

---

n.4 (1983)). In addition, grand jury material may be disclosed "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii); *Sitzmann*, 74 F. Supp. 3d at 124 n.12. "While there is some small disagreement among courts regarding what precise standard a defendant must meet in order to gain disclosure of grand jury materials under Rule 6(e)(3)(E)(ii), most courts have held that the appropriate standard is that of 'particularized need,' borrowed from the standard under the case law applying to Rule 6(e)(3)(E)(i)." *United States v. Naegele,* 474 F.Supp.2d 9, 10 (D.D.C.2007) (citing *Ridings v. Dep't of Just.*, 38 F. App'x 20, 21, 2002 WL 1359490, *1 (D.C. Cir. 2002) (per curiam (unpublished)). "This standard applies both to in camera review and disclosure to the parties of grand jury minutes." *United States v. Dunn*, No. 05-CR-127 (KMK), 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005). The "particularized need" must outweigh the Government's interest in maintaining the secrecy of the grand jury proceeding. *United States v. Twersky*, No. S2 92 CR. 1082 (SWK), 1994 WL 319367, at *5 (S.D.N.Y. June 29, 1994). "Generally, however, once an investigation is over, most of the policies which warrant maintaining the secrecy of the grand jury proceeding, including, preventing the escape of those not yet indicted, are no longer present." *Id.*; *cf. In re Capitol Breach Grand Jury Investigations Within D.C.*, 339 F.R.D. 1, 24 (D.D.C. 2021) (Howell, C.J.) (noting interests in grand jury secrecy "are at their strongest when a grand jury investigation, and grand jury proceedings, are ongoing").

**FILED UNDER SEAL**

not indicated that it is in possession of any *Brady* material relating to Agent Mori's testimony, and we therefore rely on the Government's recognition of its obligations under *Brady* to presume that Agent Mori did not testify before the grand jury that the BBM Exchange involved cocaine or methamphetamine.[114]  Moreover, during a teleconference on November 12, 2020, DOJ attorneys informed Mr. Gonzalez-Valencia's counsel that, in essence, this BBM Exchange was the sole evidence adduced before the grand jury.[115]

An *in camera* review will lead to one of two possible conclusions—either the Government provided the same evidence to the grand jury that it provided to Uruguay, which does not demonstrate probable cause; or the Government's failure to provide sufficient evidence to establish probable cause to Uruguay and subsequent failure to provide *Brady* material to Mr. Gonzalez-Valencia was by design and not by mistake, providing the Court further justification to conduct a show cause hearing regarding the extent of the discovered misconduct.[116]  Either conclusion, we respectfully submit, mandates this Court's dismissal of the Indictment.

## III.   CONCLUSION

Accordingly, we respectfully implore this Court to use its supervisory powers to dismiss this case with prejudice or, alternatively, before ruling on the motion to dismiss, to conduct an *in camera* review of the grand jury record, or any further relief the Court deems just and proper.

---

[114] *See supra* Section I.C (discussing the Government's first *Brady* disclosure on the eve of the filing of this Motion).

[115] Ex. K, Lietz Decl. at ¶ 5.

[116]  The show cause hearing, we submit, creates "another judicial proceeding" under Federal Rule of Criminal Procedure 6(e)(3)(E)(i) which allows this Court, in its exercise of its supervisory powers, to conduct an *in camera* review narrowly tailored to determine whether the Government engaged in other misconduct by requesting that the grand jury return an indictment when they knew, or should have known, there was no evidence to sustain the charge.

**FILED UNDER SEAL**

Dated: April 15, 2022

Respectfully submitted,

 */s/ Stephen A. Best*

**BROWN RUDNICK LLP**

Stephen A. Best (DC Bar No. 428447)
Tiffany B. Lietz (admitted *pro hac vice*)
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005
Telephone: (202) 536-1737
sbest@brownrudnick.com

-and-

**The L●S LAW FIRM**

Lilly Ann Sanchez (admitted *pro hac vice*)
Four Seasons Tower, Suite 1200
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 503-5503
lsanchez@thelsfirm.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2022, I electronically filed the foregoing document with the Clerk of the U.S. District Court for the District of Columbia by using the CM/ECF system. All participants registered through the Court's electronic filing system will be served by the CM/ECF system as required to be served by Federal Rule of Criminal Procedure 49(a)(3)(A).

Date: April 15, 2022

*/s/ Stephen A. Best*
Stephen A. Best
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005
Telephone: (202) 536-1737
sbest@brownrudnick.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*