# EXHIBIT T



Documento

Voces:
ESTADOS UNIDOS ~ EXTRADICION ~ PROCEDIMIENTO PENAL
Publicado en: LJU Tomo 104, 01/07/1992, 5
Cita Online: UY/JUR/15/1991

Sumarios:
1 . 1.    El Tratado de extradición que vincula nuestro país con Es-tados Unidos de Norte América no vulnera las garantías constitucionales del debido proceso, porque la extradición en sí misma no es un juicio, sino un procedimiento por el que se enjuiciará a un sujeto y se determinará la culpabi-lidad o inculpabilidad del extraditado.

2 . 2.    El agravio consistente en la posibilidad de que recaiga pe-na de prisión perpetua, que no existe en nuestro derecho, debe ser desechado porque no parece que eventualmente pueda recaer una pena de este tipo en la sentencia que se referirá sólo a algunos delitos y no a todos por los cuales se solicitó la extradición.La extradición se condiciona al cumplimiento de los pre-ceptos de orden público que están vigentes en nuestra Constitución.

3 . 3.    El procedimiento realizado en los Estados Unidos, donde un Gran Jurado determina que un sujeto debe ser juzgado por determinados delitos por lo que después solicita su extradición, no constituye un juicio en rebeldía.El estado requirente todavía no ha dado comienzo al juicio y la extradición se pide para poder llevar a cabo ese enjuiciamiento.

4 . 4.    Es correcta la prueba producida en un tribunal de los Es-tados Unidos de Norte América cuando ella se ha llevado a cabo en un procedimiento con respaldo jurídico penal y con autorización de un Magistrado judicial de ese país.

5 . 5.    Debe considerarse como prueba el memorándum policial, las declaraciones del Fiscal y demás investigadores del ca-so en el país requirente, que forman parte del Departa-mento de Justicia y son los funcionarios encargados de realizar la imputación. Estas deposiciones fueron estudia-das por el Gran Jurado norteamericano que intervino en el caso y consideradas como prueba a efectos de pedir el pro-cesamiento. Esto es perfectamente equivalente a nuestro concepto de "elementos de convicción suficientes" que equivalen a una prueba incompleta o semi plena.

6 . 6.    La conducta por la cual el imputado planificó y organizó un envío de cocaína a bordo de un buque de carga para in-troducirlo a EE.UU. cumple con el principio de la doble incriminación puesto que en nuestro país está tipificada como delito en el art. 31 del D.L. 14294.

7 . 7.    El núcleo verbal "importar" debe interpretarse en sentido amplio: como cualquier entrada o salida de las mercade-rías contenidas en las listas I y II de la Convención de Nueva York y I de la de Viena.

8 . 8.    Las operaciones tendientes a introducir cocaína en EE.UU. se adapta a nuestra forma tipo prevista en el art. 32 del decreto ley citado, uno de cuyos verbos es "organizar" que significa ordenar, distribuir, estructurar.

9 . 9.    Cabe suponer que se cumplió por parte del imputado alguna de las actividades castigadas por el art. 34 de la ci-tada normativa, puesto que sin duda la introducción de la droga fue para colocar comercialmente el producto su-ministrado, entregando, promoviendo, facilitando, que son todas formas típicas previstas en la disposición citada.

10 . 10.   No corresponde conceder la extradición por el delito de lavado de dinero porque fue creado por la ley norteameri-cana con fecha posterior a la suscripción del Tratado de Extradición con Uruguay.

11 . 11.   No configura el encubrimiento previsto en el art. 197 del C.P., participar en operaciones tendientes a limpiar el di-nero mal habido, a través de actividades delictivas en las que el imputado participaba con otras personas, lo que lo sindica como un codelincuente de otros tipos penales, en el caso, tráfico de cocaína.El encubrimiento es una figura autónoma que entre sus presupuestos requiere que el sujeto no haya participado en la actividad delictiva que se encubre y que no tuviera conocimiento de ella antes de prestar su colaboración encu-bridora.

12 . 12.   La forma en que según las autoridades requirentes el im-putado actuó con otros miembros de la organización cri-minal para importar cocaína desde un lugar ajeno a los EE.UU., participa de una simple codelincuencia y no de un delito de asociación para delinquir.Existió una reunión improvisada que es una forma de cons-piración. Esa forma del íter críminis no es penada en nues-tro derecho por lo menos para las actividades por las que se solicita la extradición en la especie.

13 . 13.   Frente a la concurrencia de pedidos se debe hacer lugar al pedido de EE.UU. porque la gravedad de los delitos por los que se requiere al imputado es evidentemente mayor que la acusación formulada por las autoridades españolas, tanto desde el punto de vista punitivo como del concurso delictual y del volumen de la actividad desplegada.También utilizando el criterio subsidiario de la prelación, tiene preferencia el requerimiento de EE.UU. que intro-dujo el respectivo exhorto diplomático con anterioridad al de España (1a. instancia).

14 . 14.   Aunque el Tratado de Extradición de Criminales celebra-do entre nuestro país y España no comprende entre los delitos extraditables el tráfico de estupefacientes, ello no es óbice para dar curso al pedido, pues la convención debe complementarse con lo dispuesto en la Convención Unica de Estupefacientes de 1961, ratificada por el D.L. 14222, art. 36 párrafo 2 (1a. instancia).

15 . 15.   No es válido el agravio referente a la ilegalidad de la inter-ceptación telefónica admitida en el Estado requirente y llevada a cabo con la debida autorización judicial.Por otra parte, aunque no es necesario que la prueba sea admitida por nuestro derecho adjetivo interno, la Sede admite la validez de dichas pruebas en virtud de lo estable-cido en el C.P.P., art. 212 (1a. instancia).

16 . 16.   Las Fiscalías Letradas Departamentales tienen ingerencia preceptiva en los diligenciamientos de exhortos de autori-dades extranjeras en materia penal dentro de su jurisdic-ción (1a. instancia).

Clasificación:

EXTRADICIÓN

+Solicitada por EE.UU. (Tratado aprobado 28/10/83)

+No vulnera garantías constitucionales

+Del de-bido proceso

+Porque extradición no es un juicio

+Prohibi-ción pena prisión perpetua

+No es probable porque sentencia deberá referirse sólo a delitos ley 14294, arts. 31, 32 y 34-

+Procedimiento estado requirente

+Actuación Gran Jurado

+No constituye juicio en rebeldía

+Prueba

+Validez

+Por ser realizada en procedimiento jurídico penal y con autorización de Magistrado

+La constituye

+Memorándum policial

+De-claraciones de funcionarios encargados de realizar imputación

+Procedencia

+Planificar y organizar envío de cocaína para in-troducirlo en EE.UU. (delitos arts. 31, 32 y 34 ley 14294)

+Improcedencia

+Delito de lavado de dinero

+Por ser creado con posterioridad a suscripción tratado

+Coparticipar en tráfi-co cocaína y luego coparticipar en lavado de dinero producto de esa actividad delictiva

+No configura encubrimiento

+Reunión improvisada de codelincuentes

+No configura aso-ciación para delinquir

+Concurrencia de pedidos

+Preferen-cia según gravedad delitos

+Aplicación criterio subsidiario de prelación

+Tratado con España

+Convención Unica de Estu-pefacientes de 1961

+Prueba

+Interceptación telefónica

+Validez

+Procedimiento

+Fiscalía Letrada Departamental

+Ingerencia preceptiva.

DELITOS LEY 14294 (ESTUPEFACIENTES)

+"Importar" (art. 31)

+Interpretación amplia

+Cualquier entrada o salida mercaderías listas Convención N.Y. (I y II) y Viena (I)

+"Organizar" (art. 32)

+Significa ordenar, distribuir, estructurar.

1.     El Tratado de extradición que vincula nuestro país con Es-tados Unidos de Norte América no vulnera las garantías constitucionales del debido proceso, porque la extradición en sí misma no es un juicio, sino un procedimiento por el que se enjuiciará a un sujeto y se determinará la culpabi-lidad o inculpabilidad del extraditado.

2.     El agravio consistente en la posibilidad de que recaiga pe-na de prisión perpetua, que no existe en nuestro derecho, debe ser desechado porque no parece que eventualmente pueda recaer una pena de este tipo en la sentencia que se referirá sólo a algunos delitos y no a todos por los cuales se solicitó la extradición.

La extradición se condiciona al cumplimiento de los pre-ceptos de orden público que están vigentes en nuestra Constitución.

3.     El procedimiento realizado en los Estados Unidos, donde un Gran Jurado determina que un sujeto debe ser juzgado por determinados delitos por lo que después solicita su extradición, no constituye un juicio en rebeldía.

El estado requirente todavía no ha dado comienzo al juicio y la extradición se pide para poder llevar a cabo ese enjuiciamiento.

4.     Es correcta la prueba producida en un tribunal de los Es-tados Unidos de Norte América cuando ella se ha llevado a cabo en un procedimiento con respaldo jurídico penal y con autorización de un Magistrado judicial de ese país.

5.     Debe considerarse como prueba el memorándum policial, las declaraciones del Fiscal y demás investigadores del ca-so en el país requirente, que forman parte del Departa-mento de Justicia y son los funcionarios encargados de realizar la imputación. Estas deposiciones fueron estudia-das por el Gran Jurado norteamericano que intervino en el caso y consideradas como prueba a efectos de pedir el pro-cesamiento. Esto es perfectamente equivalente a nuestro concepto de "elementos de convicción suficientes" que equivalen a una prueba incompleta o semi plena.

6.     La conducta por la cual el imputado planificó y organizó un envío de cocaína a bordo de un buque de carga para in-troducirlo a EE.UU. cumple con el principio de la doble incriminación puesto que en nuestro país está tipificada como delito en el art. 31 del D.L. 14294.

7.     El núcleo verbal "importar" debe interpretarse en sentido amplio: como cualquier entrada o salida de las mercade-rías contenidas en las listas I y II de la Convención de Nueva York y I de la de Viena.

8.     Las operaciones tendientes a introducir cocaína en EE.UU. se adapta a nuestra forma tipo prevista en el art. 32 del decreto ley citado, uno de cuyos verbos es "organizar" que significa ordenar, distribuir, estructurar.

9.     Cabe suponer que se cumplió por parte del imputado alguna de las actividades castigadas por el art. 34 de la ci-tada normativa, puesto que sin duda la introducción de la droga fue para colocar comercialmente el producto su-ministrado, entregando, promoviendo, facilitando, que son todas formas típicas previstas en la disposición citada.

10.    No corresponde conceder la extradición por el delito de lavado de dinero porque fue creado por la ley norteameri-cana con fecha posterior a la suscripción del Tratado de Extradición con Uruguay.

11.    No configura el encubrimiento previsto en el art. 197 del C.P., participar en operaciones tendientes a limpiar el di-nero mal habido, a través de actividades delictivas en las que el imputado participaba con otras personas, lo que lo sindica como un codelincuente de otros tipos penales, en el caso, tráfico de cocaína.

El encubrimiento es una figura autónoma que entre sus presupuestos requiere que el sujeto no haya participado en la actividad delictiva que se encubre y que no tuviera conocimiento de ella antes de prestar su colaboración encu-bridora.

THOMSON
REUTERS

12.    La forma en que según las autoridades requirentes el im-putado actuó con otros miembros de la organización cri-minal para importar cocaína desde un lugar ajeno a los EE.UU., participa de una simple codelincuencia y no de un delito de asociación para delinquir.

Existió una reunión improvisada que es una forma de cons-piración. Esa forma del íter críminis no es penada en nues-tro derecho por lo menos para las actividades por las que se solicita la extradición en la especie.

13.    Frente a la concurrencia de pedidos se debe hacer lugar al pedido de EE.UU. porque la gravedad de los delitos por los que se requiere al imputado es evidentemente mayor que la acusación formulada por las autoridades españolas, tanto desde el punto de vista punitivo como del concurso delictual y del volumen de la actividad desplegada.

También utilizando el criterio subsidiario de la prelación, tiene preferencia el requerimiento de EE.UU. que intro-dujo el respectivo exhorto diplomático con anterioridad al de España (la instancia).

14.    Aunque el Tratado de Extradición de Criminales celebra-do entre nuestro país y España no comprende entre los delitos extraditables el tráfico de estupefacientes, ello no es óbice para dar curso al pedido, pues la convención debe complementarse con lo dispuesto en la Convención Unica de Estupefacientes de 1961, ratificada por el D.L. 14222, art. 36 párrafo 2 (1a. instancia).

15.    No es válido el agravio referente a la ilegalidad de la inter-ceptación telefónica admitida en el Estado requirente y llevada a cabo con la debida autorización judicial.

Por otra parte, aunque no es necesario que la prueba sea admitida por nuestro derecho adjetivo interno, la Sede admite la validez de dichas pruebas en virtud de lo estable-cido en el C.P.P., art. 212 (1a. instancia).

16.    Las Fiscalías Letradas Departamentales tienen ingerencia preceptiva en los diligenciamientos de exhortos de autori-dades extranjeras en materia penal dentro de su jurisdic-ción (1a. instancia).

Juzgado Letrado de 1ª Inst. de Maldonado de 4º Turno.

Tribunal de Apelaciones en lo Penal de 2º Turno.

Texto Completo:

PRIMERA INSTANCIA

Maldonado, 8 de mayo de 1991.

Vista:

Para sentencia de primera instancia estos autos referentes a las solicitudes de extradición de las autori-dades españolas y de los Estados Unidos de Norte

América, referentes a R.P., ficha P/42/91, seguidos con intervención del Sr. Fiscal Letrado Departamen-tal de Primer Turno, Dr. Carlos García Altolaguirre y con la participación del Sr. Defensor del requerido, Dr. Víctor Della Valle.

Resultando que:

I)       Con fecha 17 de febrero de 1991 se puso en conocimiento de la Sede que habrá sido detenido bajo el nombre de J.L.P. quien en realidad resultó ser R.P., cubano, de 54 años, nacido en M. del R., Cuba el 8 de diciembre de 1935, por hallarse requerido con miras a su extradición por parte de las autoridades españolas.

Con fecha 18 de febrero según surge de fs. 38 pres-tó declaración ante la Sede en presencia de la Sra. Fiscal Letrado subrogante y del Sr. Defensor de Ofi-cio, decretándose el 19 del mismo mes por auto No. 382 glosado a fs. 63 su arresto provisorio.

A fs. 64 fue examinado por ambos médicos fo-renses del departamento.

A fs. 110 se agrega el formal pedido de extradi-ción de las autoridades españolas y a fs. 172 y 183 y ss. el de la estadounidense.

A fs. 333 con fecha 12 de abril se hizo compare-cer al requerido en presencia de su defensor donde se le impuso de los requerimientos referidos, negándose a formular declaraciones, admitiendo únicamente ser la persona requerida, y manifestando además su opo-sición a ser extraditado. En la misma audiencia se resolvió conceder a la Defensa un plazo de tres días para realizar sus descargos (fs. 333v.).

II)      A fs. 338 y ss. el Sr. Defensor en tiempo y forma se presenta deduciendo la nulidad de las ac-tuaciones por no haber intervenido en las mismas el Sr. Fiscal Letrado en lo Penal de la Capital y

oponién-dose a la extradición por los argumentos expuestos a fs. 341 y ss., solicitando la denegatoria a los pedidos.

De dichas peticiones se confirió vista al Ministerio Público por auto No. 2298 de fecha 18 de abril de 1991 a fs. 345v., la que es evacuada a fs. 513 en fun-dado dictamen por el cual se aconseja desestimar la nulidad invocada y hacer lugar al pedido de extradi-ción de los Estados Unidos de Norte América.

A fs. 489 los abogados de la Embajada de los Es-tados Unidos de Norte América agregan traducción del requerimiento por traductor público, fotocopia de la nota verbal ingresada al Ministerio de Relaciones Exteriores y ejemplares en español e inglés del Trata-do de Extradición entre Estados Unidos y España.

III)     Consta además que el pedido de los EE.UU. fue introducido en cancillería con fecha 15 de marzo de 1991 (fs. 337) y el de España con fecha 21 de mar-zo de 1991.

Que el detenido R.P. admitió ser tal y por lo tan-to la persona requerida en estos procedimientos.

Que devueltos los autos por el Sr. Fiscal se pusie-ron al Despacho con fecha 6 de mayo de 1991 para dictar sentencia.

Considerando que:

I)     (SOBRE EL PROCEDIMIENTO)

No habiendo procedimiento alguno en los trata-dos vinculantes en la especie, la Sede ha seguido en líneas generales el previsto en los Tratados de Mon-tevideo dando oportunidad ala Defensa para oponer-se al pedido y antes de resolver, oír al Ministerio Pú-blico, como lo prescribe nuestro derecho interno (art. 12 Nral. 5, D.L. 14365). En cuanto a lo que la De-fensa calificó de demanda incidental de nulidad la misma, por evidentes razones de economía procesal habrá de resolverse en este provehimiento. El proce-dimiento extradicionario no es más que la tramitación de un exhorto con preceptiva intervención del Minis-terio Público y en el cual se debe brindar al requerido la oportunidad de ser oído, por lo que se cumple aca-badamente su fin resolviendo en una única sentencia todos los tópicos y excepciones referentes al mismo (vide art. 14 inciso 1o. Código General del Proceso). De igual modo se han acumulado en el presente los pedidos que penden sobre el requerido, con el evidente fin de evitar sentencias contradictorias e inútiles elongaderas.

II)     (SOBRE LA NULIDAD INVOCADA)

La misma, glosada en escrito de fs. 338 339, revis-te el carácter de cuestión de previo y especial pronun-ciamiento pues de acogerse la referida excepción de-berá re encausarse el proceso respectivo obstando en esta etapa a dilucidar la cuestión principal. Pues bien, para la Sede el aludido vicio no es tal. El requerido funda su pretensión en que el numeral 2o. del art. 17 del D.L. 14365, al edictar la competencia funcional de los Sres. Fiscales Letrados Departamentales se remite a los cometidos detallados en los numerales 1, 2 y 4 del art. 12 del mismo cuerpo normativo, no incluyendo el numeral 5o. de la últimamente citada donde se comete a los Sres. Fiscales Letrados en lo Penal intervenir "en el diligenciamiento de exhortos extranjeros en materia penal". A juicio del suscrito sentenciante, y con los debidos respetos al distingui-do defensor, la referida interpretación bien puede ca-lificarse de piedeletrista, ya que ello importaría con-cluir también en que tampoco podrían intervenir en contiendas de competencia entre jueces con materia penal en el interior de la República, ni en los inciden-tes de recusación que se deduzcan contra dichos jue-ces ni tampoco en todo trámite en que las leyes pres-criban su intervención. Por otra parte, la más califi-cada jurisprudencia del país ha resuelto ya el tema en un sentido contrario al sostenido por el Sr. Defensor. Cabe transcribir aquí lo expuesto por el Dr. José Luis Barbagelata, a la sazón Fiscal Letrado en lo Penal de la Capital en vista No. 3149 de 1989, dictada en los autos "V., R. Extradición" (ficha 86/1989). Allí se dijo:

"El suscrito no tiene el honor de convenir con tan respetada opinión, porque tiene para sí este Fis-cal que frente a todo el andamiaje del razonamiento hecho por tan distinguido profesor, lo simple, sencillo y obvio que, por encima de todas las disquisiciones académicas, nos dice, que las Fiscalías Letradas De-partamentales tienen ingerencia preceptiva en los di-ligenciamientos de exhortos de autoridades extranje-ras en materia penal dentro de su jurisdicción, porque:

"a) el Decreto Ley No. 15365 (ley orgánica del Minis-terio Público y Fiscal) el enumerar las atribuciones de las Fiscalías Letradas Departamentales en materia penal en su a. 17 inciso 2o., determina las mismas por remisión alas funciones fijadas a las Fiscalías Letra-das Nacionales de lo Penal en el a. 12 incisos 1o., 2o. y 4o. y éste a su vez, por remito a lo establecido en los numerales 2o. y 3o. del a. 10 por lo que en fun-ción y atribución de las Fiscalías Letradas Departa-mentales ejercer respecto a los órganos jurisdic-ciona-les de la materia dentro de su jurisdicción la defensa de la jurisdicción de los Jueces y Tribunales siempre que sea

desconocida o menoscabada. Por lo que sien-do el fundamento de la intervención que se acuerda al Ministerio Público en el diligenciamiento de exhor-tos extranjeros la de vigilar si los mismos no contie-nen pretensiones que sean contrarias a nuestras leyes y que importen un desconocimiento o menoscabo de nuestra jurisdicción nacional defendiendo la juris-dicción de los Tribunales, resulta obvio que las Fis-calías Letradas Departamentales que por disposición expresa de la ley tienen ingerencia preceptiva en el diligenciamiento de exhortos extranjeros en materia penal dentro de su jurisdicción;

"b) porque convalidar la interpretación doctri-naria efectuada por el citado procesalista conllevaría a consecuencias que ni el legislador quiso ni los intér-pretes de la ley orgánica han sostenido como las de negar a los Fiscales Letrados Departamentales toda intervención en las contiendas sobre jurisdicción pe-nal entre los Jueces Letrados Departamentales de su jurisdicción, prohibir también su ingerencia en los ,incidentes de recusación que se promuevan contra los Jueces Letrados Departamentales actuando en mate-ria penal y de intervenir en todo trámite de la materia penal en que las leyes prescriban expresamente su intervención;

"c) porque ese ha sido el criterio aplicado por esa Corporación no discutido por la Fiscalía de Corte, al remitir el pedido de extradición al Juez Letrado Departamental de Maldonado y al conocer en la cali-ficación del recurso de casación descartó la existencia del vicio insanable denunciado;

"d) porque partiendo de las nociones básicas sobre nulidades absolutas y relativas estudiadas am-pliamente por Couture y Véscovi y referidas a las nor-mas del proceso penal encontramos nulidades absolu-tas y relativas o como prefería llamarlas nulidades nables o insanables. Nuestro legislador no menciona el vocablo inexistencia. Las nulidades insanables es-tán especialmente previstas como nulidades absolu-tas. Un principio básico de nuestro sistema procesal es el de que no hay nulidad sin ley específica que lo establezca. Le compete al legislador regular el régimen de las nulidades (C.P.P. a. 97). La nulidad importa siempre violación de la ley y por tanto ella puede con toda libertad establecer las consecuencias de dicha violación. Por lo que aun cuando se entendiera que el Fiscal Letrado Departamental intervino excediendo sus atribuciones, dicha violación no aparece sancio-nada con nulidad absoluta por ley específica".

Sobre el mismo tópico y en los mismos autos, se pronunció también la Suprema Corte de Justicia en resolución No. 1 715 de 29 de noviembre de 1989, donde se expuso: "Sin perjuicio de los atendibles argumentos que ha expuesto el Sr. Fiscal Nacional en lo penal de tercer turno respecto de la competen-cia de los Sres. Fiscales Departamentales en estos asuntos (fojas 650 y siguientes), lo fundamental es que se pretende la declaración de una nulidad absolu-ta cuya naturaleza no se advierte. Porque para que así fuera, sería necesario que esa nulidad estuviera legal-mente prevista en forma expresa (principio de especi-ficidad, según el art. 97 del Código del Proceso Pe-nal), lo que no ocurre; que se hubiere infringido el principio de finalidad (art. 99 del mismo Código), lo que tampoco se aprecia, pues es evidente que la in-tervención del Sr. Fiscal Departamental ha cumplido la finalidad que hubiera tenido la del Sr. Fiscal Na-cional, sin que haya habido entonces agravio para el requerido; ni se ha procedido contrariando ley prohi-bitiva alguna (art. 100, ejusdem)".

Tales fundadas opiniones, que el sentenciante aco-ge y hace suyas, dan solución definitiva al punto al tenor de lo previsto en los arts. 97 y 99 del Código del Proceso Penal. En efecto, no se advierte la existen-cia de texto prohibitivo alguno que amerite sancionar con nulidad la intervención del Sr. Fiscal Letrado Departamental, pero además como lo destaca la sen-tencia citada, la actuación de dicho Magistrado cum-plió con la finalidad prevista por la ley, la defensa del orden jurídico nacional y evitar el menoscabo o desconocimiento de nuestra jurisdicción. Pero por si ello fuera poco, cabe traer a colación aquí lo previsto en el art. 110 del Código General del Proceso en cuanto dice que "la anulación no procede, aun en los casos establecidos precedentemente, si el acto, aunque irre-gular, ha logrado el fin a que estaba destinado, salvo que se hubiera provocado indefensión". Esta norma completa adecuadamente los arts. 97 y 99 del C.P.P. sin contradecir texto alguno de dicho cuerpo de nor-mas. Y ello es admisible, por cuanto como ya lo ha sostenido el sentenciante, determinadas normas del Código General del Proceso resultan aplicables a la materia penal, por supuesto que a modo de comple-mento de ésta y sin contradecir ninguno de sus prin-cipios específicos, lo que no sucede en el sub lite. Ello encuentra suficiente apoyatura en las palabras del co-dificador Dr. Gelsi Bidart en cuanto señala "debo de-cir que con este ante proyecto, hemos pretendido realizar un Código general del proceso, en el que se incluyan las principales disposiciones que pueden ser aplicadas en cualquier juicio, sea civil, laboral, penal, aduanero, etcétera, sin perjuicio de las peculiaridades que puedan tener algunos de ellos, de acuerdo con la materia de que se trata" (versión taquigráfica de la sesión de la Comisión de Constitución y Legislación de la Cámara de Senadores del día 28 de mayo de 1987, publicada en "Código General del Proceso"; ley No. 15982, ed. F.E.U.; col. "Texto y contexto", p. XXXVI). Y ello es así también porque el intérprete no puede separar tajantemente ambos órdenes adje-tivos sin atentar contra la plenitud hermética que ob-serva todo orden jurídico (Cfr., García Maynes: "In-troducción al estudio del derecho"; México, 1970; ed.

Porrúa, p. 205). Por ello, debe también aplicarse en la especie el principio edictado en el art. 14 C.G.P., por el cual la norma procesal ha de interpretarse te-niendo en cuenta que el fin del proceso en la efecti-vidad de los derechos sustanciales, lo que en materia de extradición puede traducirse como el cumplimien-to de las obligaciones de los tratados internacionales y el cumplimiento del fin para el cual los mismos fue-ron suscritos. En la especie la intervención del Sr. Fis-cal Letrado ha cumplido la finalidad que la ley le im-pone, sin que haya además un texto expreso y la san-ción con nulidad insanable.

III)         Aun si se entendiera que se está ante una nu-lidad relativa, ella habría sido subsanada por el trans-curso del tiempo necesario para ello. EL Sr. Fiscal Le-trado Departamental (su subrogante) intervino en la causa ab initio, fs. 32 a 47, y cumplidos los trámites de rigor la Sede decretó el arresto provisorio del re-querido (auto No. 382 del 19 de febrero de 1991 a fs. 63), el que se notificó al Sr. Defensor de Oficio con fecha 22 de febrero a fs. 76v., sin que éste dedu-jera nulidad por tal causa dentro de los cinco días de conocidos (art. 103 C.P.P.) norma aplicable por ser ley de foro. Puede admitirse que al asumir un nue-vo defensor, este particular, deben otorgársele los mis-mos derechos para hacer valer la defensa que conside-ra más adecuada. Pero véase que el actual patrocinan-te asume la defensa con fecha 1o. de marzo de 1991 (fs. 94v.) sin que dedujera a partir de ese entonces la nulidad que alega, lo que no hizo, por lo que de aceptarse que la misma existió, ha de tenérsele por subsanada. En la audiencia del 12 de abril el Sr. De-fensor tuvo conocimiento de los pedidos de extradición, pero es de destacar que la presunta nu-lidad incoada era muy anterior. Por ello, se rechazará también la pretensión invocada y se ingresará al aná-lisis de fondo, esto es, los respectivos pedidos de ex-tradición y el conflicto entre ambos.

IV)     (LOS PEDIDOS DE EXTRADICION)

         La extradición es un instituto que atempera los rigorismos del territorialismo en materia penal, cons-tituyendo un acto de soberanía por el cual un Estado entrega a otro un sujeto acusado o condenado para que se lo enjuicie o se ejecute la pena (Cfr., Jiménez de Asúa: Tratado de Derecho Penal, T. II, ps. 771 y 892). La tendencia actual en materia de cooperación penal internacional finca en mitigar los rigores excesi-vos del territorialismo, cuya raíz ha de hallarse en la erección de las teorías del Estado Nación y en el exa-cerbamiento de la noción de soberanía, conceptos que hoy han entrado en franca crisis en un mundo donde los espacios regionales y la interdependencia entre los Estados han obtenido un lugar de privilegio. Ya Grocio había sostenido que "el deber de entregar un reo era una obligación jurídica independiente de los tratados", y Fauchille habló de una obligación impuesta por la Sociedad Internacional, en la medida que ella se ajusta a la ley universal, correspondiendo a cada nación, en virtud de su soberanía, apreciar la regularidad y justicia de la respectiva requisitoria (cit. por Urrutia Salas: "La extradición no requiere trata-dos internacionales", Revista de la Facultad de Dere-cho y Ciencias Sociales; Año XII, julio diciembre de 1961, Nos. 3 4, p. 807). En este marco, la comunidad internacional se ha dotado de instrumentos para la represión de los delincuentes interestatales entre los cuales hace particular acopio el derecho extradicio-nario. En un caso análogo, la Sede de 2o. turno de Maldonado dijo: "Corolario de lo anterior es que los tratados de extradición deben siempre interpretarse en forma que favorezca al fin para el cual fueron con-venidos. La posición del U. ha sido y es la colabora-ción en materia penal. Ya la Casación italiana en sen-tencia de 10 de marzo de 1914 había afirmado que teniendo la extradición su fundamento jurídico en las leyes naturales de las sociedades civiles, sus disposicio-nes deben ser ampliamente interpretadas en relación al espíritu que la informa, de tutela común de la so-ciedad; y desde el punto de vista doctrinario puede se-ñalarse que Travers (Le Droit Penal Internacional, T. IV, p. 383), critica también la interpretación restric-tiva y afirma que es el de asegurar el curso de la jus-ticia de la manera más completa (L.J.U., c. 3210; R.U.D.P., 2/88, c. 324 y Sent. No. 90/87 del Trib. Pen. 2o. Turno)."

         "En el mismo sentido: frente a las organizaciones dedicadas al tráfico de estupefacientes y a los medios materiales con que cuentan, son aplicables las ense-ñanzas de Quintano Ripolles (Trat. de Der. Penal In-ternacional e Internacional Penal, T. II, p. 116, Ma-drid, 1957) quien refiriéndose a la indispensable co-operación entre los países frente a tales casos, soste-nía que debía evitarse su frustración tolerando que mientras los criminales utilizaban aviones, los jueces viajen en diligencia." (L.J.U., Tomo CI, julio agosto 1990, c. 11475)

V)     El objeto del proceso de extradición no es condenar o absolver al reo, no se procede a su juzga-miento, sino a apreciar las razones de la solicitud y su regularidad formal para luego acceder o denegar la entrega del requerido. Debe pues analizarse si se cumplieron los requisitos previstos en el tratado res-pectivo como condición principal para acoger el pe-dido. Por ello, por no tratarse de un proceso en el sentido atribuido por el derecho interno, no son ad-misibles en aplicación de los tratados respectivos co-mo agravios la inobservancia de principios de derecho patrio que  en un proceso interno  generarían nuli-dad de hallarse ausentes. La jurisprudencia de nues-tros Tribunales ha destacado esta regla con singular agudeza (L.J.U., T.

LXI, c. 7334, cit. en L.J.U., T. CI, c. 11475), exponiendo que: "La aplicación de las normas constitucionales que establecen algunas ba-ses para la formación del proceso, como la necesidad de acusación de parte o del acusador público (art. 22), o la prohibición del juicio por comisión (art. 19), o la asistencia forzosa de defensor (art. 16), vinculan al derecho interno procesal... pero no al derecho in-terno relativo a la extradición."

"No puede hablarse, como requisito esencial pa-ra reconocer efectos a la sentencia condenatoria ex-tranjera, de la conciabilidad con las vigencias de nues-tro orden público, pues ello llevaría a erigir las normas procesales extranjeras coincidieran en múlti-ples aspectos con las nuestras, a dificultar el cumpli-miento de los tratados internacionales o a obstaculi-zar su colaboración, debiendo reconocerse, por el contrario, que cada Estado según sus tradiciones y peculiaridades jurídico sociales, organiza el proceso penal de modo diferente."

"En realidad, los requisitos de orden procesal válidos para dar curso a los pedidos de extradición, están contenidos en los Tratados y se refieren, en ge-neral, a la existencia de un proceso legal desarrolla-do, o de una condena legalmente dictada, de acuerdo con las normas locales, como no podía ser de otra manera, lo que cumple, por otra parte, la exigencia genérica y esencial de la Constitución (art. 12) de proceso y sentencia legal (debido proceso)."

"Aunque existiera en el derecho común interno una disposición específica, prohibiendo la extradi-ción del condenado en rebeldía, que no existe en mo-do alguno, no podría ésta prevalecer sobre lo dispues-to en el Tratado, que constituye ala vez la norma de derecho internacional y de derecho interno (por la aprobación legislativa) y que, como tal, por su enjun-dia internacional emanada de una convención y como norma especial, no puede ser invalidada por una de menor jerarquía, unilateral y, además de índole ge-neral."

"El precepto constitucional que prohibe el juicio criminal en rebeldía, está dirigido a proteger un dere-cho del individuo en nuestro país, no... en cualquier otro Estado; por tanto, si en éstos no se acepta, se rechaza o vulnera ese principio, ello nada tiene que ver con nuestra estructura institucional."

"De aceptarse la inconstitucionalidad que se pre-tende, nuestra justicia se expedirá respecto al juicio seguido en el extranjero contra determinado sujeto, no en función de la aplicabilidad de la ley del Estado requirente, sino de las normas que regulan el proce-dimiento penal en nuestro propio Estado ("La Jus-ticia Uruguaya", T. LXI, caso 7334)."

En consecuencia, debe hacerse una interpretación de los tratados como norma de derecho internacional, reguladora de un instituto específico con estricto ce-ñimiento al mismo y su finalidad y no con relación al ordenamiento constitucional y legal interno. Aco-ger esta última tesitura equivaldría a erigir vallas in-franqueables al derecho extradicionario, caminaría en sentido contrario a la finalidad manifiesta del mismo y a la tendencia de la Sociedad Internacional. Las ga-rantías con que cada derecho interno reviste al rito procesal de juzgamiento y ejecución de la pena perte-necen al fuero interno del Estado en cuestión, y no integran el elenco de excepciones al cumplimiento de los tratados vigentes en la materia, que por regla ge-neral deben ser interpretados "in ordine" y no "extra ordine". La vigencia de tales principios debe fundarse también en aventar toda posibilidad de confundirlos con la excepción de orden público internacional, por cuanto éste es una valla que se opone a la aplicación de determinada ley extranjera en un territorio dado, y cosa diferente resulta decidir la entrega o no de un individuo para que sea juzgado de acuerdo al derecho interno del Estado requirente.

En consonancia con lo expuesto no cabe exigir al Estado requirente para dictar auto de prisión o enjuiciamiento o deducir acusación formal observe los requisitos legales del Estado requerido, pues ello sig-nificaría sin más una indebida intromisión en un or-den jurídico soberano. Por otra parte, resultaría iló-gico y contrario a la recta razón exigir que el reque-rido haya prestado declaración en presencia de defen-sor como condición para su procesamiento u orden de prisión por cuanto el objeto de la extradición es precisamente el llevar al reo ante el tribunal requi-rente.

Pero aun cuando se aceptara que la inexistencia de tales requisitos vulneran el pedido, debería con-cluirse también en que desde el punto de vista del de-recho interno, no es requisito indispensable cumplir con el art. 126 C.P.P. para disponer auto de prisión preventiva u orden de arresto contra determinada per-sona, que no otra cosa han hecho las autoridades ju-diciales de los Estados requirentes. En efecto, técni-camente son deslindables el auto de procesamiento; que es la orden de iniciación penal contra determina-da persona con los efectos que la ley prescribe (art. 125 y ss. C.P.P.), para la cual debe existir una suje-ción fáctica del indagado al Tribunal, la que a través de la providencia de enjuiciamiento se traduce tam-bién y a la vez en sujeción jurídica. En nuestro dere-cho interno puede haber prisión preventiva sin pro-cesamiento (no más de 48 horas según los arts. 15 y 16 de la Constitución y 125 inc. 2o. C.P.P.) y proce-samiento sin prisión preventiva (art. 1o. Ley 15859 y 71 C.P.P.). Y como de suyo para dictar el encau-samiento debe existir una sujeción física del

indaga-do, aun cuando en caso de procesamiento sin prisión (argumento del inc. 1o. art. 147 C.P.P.), el Juez dic-ta orden de prisión preventiva aun sin darse los requi-sitos del art. 126 C.P.P., pues éstos son exigibles sólo para procesar pero no para librar orden de prisión, que se regirá por lo previsto en los arts. 118 y 119 C.P.P. Así, de suyo que si se dicta auto de procesamien-to contra un prófugo ello constituye una actuación en rebeldía y violatoria del art. 126 C.P.P., pero si en cambio se le decreta prisión preventiva y se libra orden de detención no acontece la situación descrip-ta, pues el objeto de ella es la aprehensión material del prófugo para proveer a su enjuiciamiento, el que habrá de dictarse según los requisitos que la ley pres-cribe una vez esté a disposición del Tribunal. Por ello, aun admitiendo la presente tesis, la resolución del Tribunal Español que a fs. 123 decreta la prisión provisional de R.P., en modo alguno vulnera nuestro derecho interno. De igual manera con la acusación del Gran Jurado de los Estados Unidos de Norte América y la orden de arresto librada por el Juez nor-teamericano. Todo ello, sin perjuicio de sostener que los requisitos establecidos por la ley del Estado reque-rido no son trasladables a la del Estado requirente.

VI)      (EL PEDIDO DE LAS AUTORIDADES ES-PAÑOLAS)

El mismo fue correctamente introducido por la vía diplomática que es lo que acredita suficientemen-te la autenticidad del mismo, sin que quepa exigir además, el requisito de la legalización (Cfr. L.J.U., T. CI, c. 11475). El mismo fue peticionado de go-bierno a gobierno y se funda en el Tratado de Ex-tradición de Criminales celebrado entre ambos paí-ses en 1885. Este tratado, sin embargo, contiene un listado de delitos por los cuales se habilita a pedir la extradición (art. 2), entre los cuales no se compren-de el tráfico de estupefacientes. Este sistema ha sido objeto de críticas en razón de las lagunas que puede provocar, más aun cuando el referido tratado no pre-vé una expresa disposición que consagre el carácter enunciativo y no limitativo de la lista, como sí sucede en el tratado con Italia de 1879. Ello sin embargo no es óbice para dar curso al pedido pues la conven-ción debe complementarse con lo dispuesto en la Convención Unica de Estupefacientes de 1961, ra-tificada por el D.L. No. 14222, cuyo art. 36 párrafo 2, expone que los delitos a que se refiere el texto "se considerarán incluidos entre los delitos que den lugar a extradición en todo tratado de extradición celebra-do entre las Partes...".

En cuanto ala prueba en que se funda el pedido, no debe ser evaluada de acuerdo a las normas de valo-ración exigidas por nuestro derecho interno para con-formar la noción de semiplena prueba hábil para dis-poner el enjuiciamiento de una persona. En ambos pedidos ha de bastar la verosimilitud de la misma, de-biendo acreditarse un "fumus bonis iuris" que por lo menos asegure que no se extraditará a la persona con probanzas inconducentes. Al respecto la declaración de C. de I.   que también posee profusas acusaciones por el Gran Jurado de los Estados Unidos   narra con detalle las actividades de R.P., al que obviamente co-noce por admisión del propio P. y al tenor de las con-versaciones telefónicas transcriptas en infolios. Por otra parte, no es de recibo el alegato de la Defensa en cuanto a la ilegalidad en nuestro derecho interno de la interceptación telefónica. Basta que dicha prueba sea admitida en el Estado requirente, en el cual se llevó a cabo aparentemente con la debida autorización judicial. Aun cuando con dicho argumento es bastan-te, la Sede admitirá también la validez de dichas prue-bas aun en nuestro derecho adjetivo interno al tenor de lo dispuesto por el art. 212 de nuestro Código del Proceso Penal, que habilita al Juez, por resolución fundada, interceptar la correspondencia postal o te-lefónica "o toda otra forma de comunicación en que el imputado intervenga...". Tan meridianamente clara disposición despeja toda duda en cuanto a que la interceptación de comunicaciones telefónicas resulta ilegal e inapta como prueba en nuestro derecho.

VII)      (EL PEDIDO DE LOS ESTADOS UNIDOS DE NORTE AMÉRICA)

También fue correctamente introducido por la vía diplomática, y se acreditó también su traducción por traductor público lo que debe admitirse pues na-da impide la subsanación de ciertas irregularidades formales aun durante el trámite de extradición, así como la agregación de nuevos elementos aun sin pe-dido de la Sede. En cuanto a las críticas de la Defen-sa acerca del pretenso procesamiento en rebeldía creemos deben desecharse de consuno con lo expues-to precedentemente.

En cuanto a la prueba aportada según las exi-gencias del Tratado vinculante en la especie (art. 10 Nral. 3o.) deberán justificar el requerimiento y que el pedido y la orden de arresto no son manifiestamente infundadas. El tema ha sido estudiado en profundidad por el Tribunal de Ser. Turno en los autos "V., R. Ex-tradición", donde dicha Sala expuso: "Lo estableci-do, impone adoptar algún criterio para valorar las pruebas aportadas y dentro del marco normativo con-vencional, sin hacer prevalecer categorías jurídicas o sistema procesal de alguna de las partes, como ya se puntualizó; esto es, que si el Tratado no define una expresión o concepto, para determinar su alcance, no debe irse al sistema normativo de uno u otro Estado, pues ello supone encontrar una solución "extra ordi-ne" y no "in ordine", inaceptable y contraria al prin-cipio de igualdad que debe regir las relaciones entre estados soberanos (Cfr. Alfonsín: Teoría del Derecho Privado


Internacional, págs. 390 y 404/406)."

"Para no despojar de su especialidad a la norma de derecho internacional, la solución deberá encon-trarse por la averiguación de la voluntad común de las partes, dentro del contexto normativo y atendiendo la finalidad del instituto."

"La apreciación de las pruebas, no puede hacer-se, por lo indicado precedentemente, siguiendo las leyes y sistema de valoración del Estado requerido, como postula la Defensa."

"La exigencia del Tratado en este aspecto, no es de significación, puede decirse que de extrema rela-tividad, pues si por un lado  en el mismo artículo- se reclaman "pruebas suficientes", pero con el adita-mento de "prima faccie" que atempera la exigencia, vista desde otra perspectiva la exigencia probatoria se vuelve menor, ya que se impone el rechazo cuando es manifiestamente insuficiente".

"En mérito a ello, teniendo en cuenta algunas precisiones efectuadas sobre la interpretación de los tratados y la función cautelar del instituto de la ex-tradición, la exigencia probatoria del Tratado  en el máximo grado que puede asignársele  se ubica, vincu-la o aproxima al concepto de verosimilitud ("fumus bonis iuris"), esto es, probabilidad o verosimilitud de los hechos imputados o derechos aducidos."

"El contenido de la exigencia probatoria, por lo expuesto, naturalmente, no puede asimilarse a térmi-nos aplicables en el orden interno ("semiplena prue-ba" o "elementos de convicción suficientes", arts. 15 de la Constitución y 125 del C.P.P.), ya no sólo porque no se trata de establecer el presupuesto o los presupuestos para juzgar al requerido, sino porque también el exhorto proviene de un país con un sis-tema procesal acusatorio, distinto al que impera en el Uruguay." (L.J.U., T. CI, c. 11475)

La exigencia de la mera verosimilitud o fumus bonis iuris en la valoración de las pruebas interpre-tando los tratados, ha sido recogida también por la jurisprudencia en interpretación del tratado que nos vincula con la Gran Bretaña e Irlanda celebrado en 1874. Al respecto, ha dicho el Juzgado Letrado de Primera Instancia en lo Penal de 12o. Turno: "Los poderes del Juez requerido están perfectamente de-finidos en el artículo Sexto del Tratado: debe oír los descargos del fugitivo, al que debe traer ante sí y tomar en consideración "las pruebas de criminali-dad y establecer si "dichas pruebas son suficientes para sostener la acusación". No se trata  el texto es bien claro , de juzgar al requerido, sino de estable-cer si las pruebas son fundadas respecto de la acusa-ción que se formula, esto es, si los cargos son verosí-miles."

"Si se tiene en cuenta que estamos en el marco de un instituto con función cautelar, la exigencia que consideramos se vincula a la idea de verosimilitud del derecho en cuestión o del 'fumas bonis iuris'."

"Se trata de un proceso adjetivo, incidental, vincu-lado a otro principal, que no tendrá lugar en la Juris-dicción del Estado requerido, pero con el cual está funcionalmente vinculado. Como ha dicho Gelsi: "En términos generales, el proceso de extradición está al servicio del proceso penal que se sigue en el extran-jero; por ende, su objeto (su "tema") es incidental con relación al de aquél, en el sentido de 'accesorio' y, además, de calidad `complementaria', para posibi-litarlo, para hacer posible su prosecución (op. cit., pág. 7). Y en relación con este proceso principal, apa-rece, el de extradición, como un proceso con función cautelar."

"En armonía con estas ideas, es de toda coheren-cia entender la exigencia que comentamos como la verificación del fumus bonis juris."

"Esta fórmula es independiente, aunque no deje de tener alguna analogía, con los presupuestos sustan-tivos del procesamiento, puesto que no se trata de considerar todo lo actuado por el Juez solicitante; que ello sería lesivo para el Estado Requirente. Por otra parte, esta fórmula, con ligeras variantes ha sido incluida en todos los Tratados que sobre extradición ha celebrado el Reino Unido (una compulsa completa de los mismos puede verse en V.E. Harley Booth: "British Extradition Law and Procedure", Vol. II) y por tanto, provienen de un país de sistema procesal acusatorio, muy diferente al nuestro. De ahí que pue-de conducir a erróneas conclusiones, la asimilación de estas soluciones a nuestra categoría procesal del "enjuiciamiento, con su presupuesto material de la 'semi plena prueba'." (L.J.U., T. 96, c. 10952)

Las declaraciones juradas del Fiscal James Mac Adams III y de Vichy Duane, lo son de funcionarios que han llevado adelante las indagaciones del presen-te caso, y emerge con claridad la vinculación de P. a I.I. (alias "A."), el cual al parecer tenía activo papel en el tráfico de cocaína a los Estados Unidos. En con-secuencia se da el fumus bonis iuris necesario para es-tablecer que la petición no es "manifiestamente" in-fundada, dándose las condiciones para acceder a la misma.

VIII)     (EL PROBLEMA DE LA PRISION PERPE-TUA)



En el caso del requerimiento de las autoridades norteamericanas pende sobre el requerido la posibili-dad de ser condenado a reclusión perpetua, lo que  a criterio de la defensa  impide el acogimiento de la demanda por vulnerar ello nuestro orden público in-ternacional. Finca dicha prohibición según la Defen-sa en el art. 26 de la Carta Política de nuestro país, extrayendo la misma de su inciso 2o. No comparti-mos tal postura. La norma prohibe exclusivamente la pena de muerte, siendo del caso que si el constitu-yente hubiera requerido extender la prohibición al ergástulo lo habría dispuesto tal como lo hizo con la pena capital. No se infiere de la norma la referida pro-hibición con claridad tal y en forma manifiesta de modo que amerite el incumplimiento de las obliga-ciones internacionales asumidas por el Estado. La ju-risprudencia nacional por regla general no ha hecho caudal de esta pretensa prohibición a fin de evitar la entrega del requerido, fincando sí en la pena de muer-te el único obstáculo de esta índole, que ameritó pre-visiones expresas de conmutación en varios de los tra-tados suscritos por la República, sin que el país se haya preocupado del mismo modo por excluir tam-bién la prisión perpetua. Que en tal caso de la con-vención de Caracas  no ratificada aún por Uruguay- se haya variado esa clara línea de política  internacio-nal no evidencia que por ello deban desconocerse tratado celebrado con anterioridad. En consecuencia, la eventualidad de que por alguno de los delitos de que se lo acusa pueda el requerido sufrir prisión per-petua no impide su entrega al Estado requirente, co-mo así también lo tiene decidido la jurisprudencia en aplicación de este mismo tratado (Cfr. LJU; T. CI, c. 11475). Por otra parte, el art. 7 del Tratado lo único que veda es la aplicación de la pena de muerte, y cabe pensar que de haberlo querido las Partes... cuando a lo dispuesto en el art. 2 Nales. 17 y 26 del Tratado respectivo amerita acceder al requerimiento.

X)      El requerido alega ser inocente en su primera declaración (referente a la acusación de las autorida-des españolas), sin embargo, al imponérsele de los pe-didos respectivos de extradición rehusó contestar so-bre los cargos concretos de que se lo acusa y se opo-ne a ser extraditado, de lo que en primera instancia estuvo de acuerdo y así lo manifestó. Se probó su vinculación a personas sindicadas como importantes figuras del narcotráfico (I.I., M.A.) y admitió conocer tratantes, hubieran excluido también el ergástulo, lo que no aconteció, por lo que en mérito a una posible interpretación del art. 26 de la Constitución Nacional no puede evitarse el cumplimiento de la Convención amparando un requisito que ésta no exige. Por estos argumentos y los concordantes del Ministerio Públi-co, debe desecharse la oposición en este tópico.

IX)     En ambos pedidos se cumple con el llamado principio de "doble incriminación", por el cual ha de requerirse que la imputación por la cual se solicita la entrega del reo esté también tipificada como delito en el orden jurídico del Estado requerido, apreciado ello con la debida flexibilidad y sin exigir el mismo nomen iuris en los tipos. En los Estados Unidos de Norteamérica se acusa a R.P. de asociarse y conspirar con la finalidad de traficar y poseer cocaína (cargo I del Gran Jurado) y el lavado de instrumentos mone-tarios provenientes de dicho tráfico. En España se lo acusa de actos de tráfico y contrabando de estupe-facientes y receptación del provecho de dicho tráfico. De fs. 113 a 114v. se relacionan los hechos base de tal imputación previstos como delito en los arts. 344 y 344bis a) 3 y 6, 344bis b) y 546bis f) del Código Penal Español. Los delitos por los que se lo acusa en los Estados Unidos y en España encartan sin mayor hesitación en las previsiones del Decreto Ley 14294, ya sea en las modalidades de importación o introduc-ción y distribución (art. 31), debiendo tenerse presen-te que al tenor del art. 32 se pena también al que or-ganizare o financiare las actividades descriptas aun cuando éstas no se cumplieren en el territorio nacio-nal. Por otra parte los cargos de asociación y conspira-ción formulados por el Gran Jurado, encuentran ca-lificación sin mayor obstáculo en la previsión del art. 150 de nuestro Código Penal ("Asociación para delin-quir").

En cuanto al "lavado"; esto es, la legitimación de instrumentos monetarios, la jurisprudencia ha deci-di-do que se trata de una hipótesis de encubrimiento de introducción o venta (arts. 197 C.P., 30 y 31 del D.L. 14294), figura extraditable al tenor de los arts. 2 Nal. 17 inciso 2o. del Tratado con los Estados Unidos de Norte América (Cfr. L.J.U., T. CI, c. 11475). Emerge de autos (según su primera declaración en presencia de defensor) que se hallaba vinculado a importantes mo-vimientos de dinero en los que también participó M. A., y operaba en el país bajo un nombre supuesto y con documentación falsa, de cuya existencia no brin-dó una explicación satisfactoria, por lo que no cabe aludir a la falta de fundamento de la solicitud de los Estados Unidos, debiendo destacarse, como muy bien lo señala el Sr. Fiscal, que en el caso del Tratado con España éste se afilia al sistema de análisis de la juris-dicción y los requisitos formales, no pudiendo recha-zarse el pedido por la falta de fundamento probatorio (sistema belga holandés).

XI)      (LA CONCURRENCIA DE PEDIDOS)

En la sub causa, el Tratado con España siguió el sistema de la gravedad, y en caso de igualdad, los cri-terios subsidiarios de la nacionalidad del acusado y seguidamente el de la prioridad en la solicitud (art. 5)

Documento

(Cfr. Vieira, Manuel Adolfo: "La Extradición en nuestro derecho positivo", en Revista de la Facultad de Derecho y Ciencias Sociales, Año XII, julio di-ciembre 1961, Nos. 3 4, p. 868).

Por su parte, el Tratado con los Estados Unidos establece como criterios el de la gravedad, seguida-mente el lugar de comisión del delito, la nacionalidad del acusado y las fechas de la solicitud (art. 14).

No parecen caber dudas al respecto de que la gravedad de los delitos por los que se requiere a P. en EE.UU. es evidentemente mayor que la acusación formulada por las autoridades españolas, tanto desde el punto de vista punitivo, como del concurso delic-tual y del volumen de la actividad desplegada. Al res-pecto, cabe remitirse a las certeras afirmaciones for-muladas en el excelente y ordenado dictamen del Sr. Fiscal en el numeral III de su vista. También utilizan-do el criterio subsidiario de la prelación posee prefe-rencia el requerimiento de los Estados Unidos de Norte América, que ingresó a Cancillería el 15 de marzo de 1991 mientras que el de España lo fue el 21 de marzo del mismo año. En los criterios principa-les y subsidiarios coinciden básicamente ambos tra-tados, por lo que no parece haber mayores dudas acerca de la solución arribada.

Tratándose del criterio de la gravedad debe aten-derse tanto a la ontología del bien jurídico tutelado, y tratándose de delitos homogéneos, a las razones ya aludidas de punición abstracta y concurso delictual. Tratándose de la prelación, a la introducción de los respectivos exhortos por vía diplomática, no pudién-dose tomar en cuenta la solicitud de arresto provi-sorio por vía diversa.

XII) Finca también la precedente solución en la existencia de tratado entre ambos Estados requiren-tes, lo que abriría la instancia de un ulterior extra-dición al Estado Español, como así también al Uru-guay de comprobarse la acaecencia de ilícitos por par-te del requerido en nuestro pías.

En cuanto a la gravedad de la acusación de las au-toridades norteamericanas consiste ella en cuatro car-gos (I, II, IV y VIII, vide fs. 252 y 253), de los cuales tres pueden comportar una pena máxima de prisión perpetua; siendo la actividad desplegada previa tam-bién a los hechos indagados por la Justicia Española. De la propia relación de hechos del Fiscal español se desprende lo expresado (fs. 118), alegándose incluso que es en Miami donde el requerido tiene establecida su infraestructura para el tráfico de drogas y el blan-queo de dinero (fs. 119). La solución que se postula, como se ha señalado al abrir este numeral, se funda también en la posibilidad de posterior extradición hacia España de acuerdo al Tratado vigente entre am-bos países, como asimismo hacia Uruguay en caso de requerirlo y emerger de las actuaciones pre sumariales llevadas a cabo en el país algún delito cometido por P. en territorio nacional. Esta última posibilidad reside en el fin de no obstaculizar la cooperación interna-cional y atender al fiel cumplimiento de las obliga-ciones asumidas por el Estado.

XIII)  La preferencia del pedido por el delito más grave ha sido también la solución adoptada en el art. 15 de la Convención de Caracas de 1981, remitiéndo-se ala ley del Estado requerido para efectuar dicha determinación. De analizarse al respecto la ley nacio-nal y tratándose como se dijo de delitos donde el bien jurídico tutelado es el mismo, el concurso delictual entre los arts. 150 y 197 C.P., 31, 32, 33 del D.L. 14294, hacen también prevalecer el pedido de los Estados Unidos de Norte América.

En cuanto al pedido español, se imputa a P. la participación en la remisión de dos transportes de co-caína a España, que al tenor del art. 31 del D.L. 14294 encartaría en el verbo importación, impután-dosele también una introducción de cocaína en Es-tados Unidos en 1983 y otra en 1986. Estos delitos habrían sido consumados en territorio norteamerica-no (importación).

En mérito a los cargos de uno y otro Estado se tiene que analizarlos a la luz de la legislación del Es-tado requerido, la penalidad mayor en atención a con-curso delictual, figuras imputadas y volumen de la actividad desplegados, resulta ser por los delitos que fundan el requerimiento norteamericano.

Aun no estando ratificada  sí suscripta  le es lícito al intérprete ocurrir a la Convención de Caracas a efectos de colmar vacíos o dudas, como doctrina más recibida en derecho extraordinario, siempre que con ello no se vulnere la letra ni el espíritu de los tratados suscriptos en anterioridad. Dicha recepción consagra y reafirma la solución a que se arribara ante la concurrencia de demandas.

Tampoco ha de verse entre este razonamiento y aquel por el cual se desechó que la posibilidad de re-caimiento de prisión perpetua obstara a la entrega una contradicción. En efecto, el art. 33 de la Conven-ción de Caracas declara que la misma no deja sin efecto tratados anteriores salvo expresa declaración de los Estados Partes, de ahí que aun en cambio en la política internacional seguida por el país no puede devenir en el incumplimiento de convenciones donde no se exigieron los requisitos que se plasmaron en la de Caracas, mucho menos cuando ésta se considera sólo como doctrina más recibida.

XIV)      Las consideraciones precedentemente ex-puestas fundan la continuidad de la política criminal internacional del Estado Uruguayo de cooperar in-ternacional-mente a la represión del delito. Grotio veía el fundamento de la extradición en razones de "iustitia" y otros, como Mittermaier, en la utilidad que el instituto reporta. Su fundamento principal re-posa  no obstante  en la defensa socia (Cfr. Cuello Calón: "Derecho Penal", T. I, parte general; p. 217), lo que cobra especial relevancia cuando se trata, como en la sub causa, de reprimir el crimen organizado y el tráfico internacional de estupefacientes, y esto sin pronunciarse sobre la culpabilidad o inocencia del re-querido, que no es tal el objeto de estos procedimien-tos. La alta disposición de medios técnicos y de co-municaciones que el mundo moderno pone al alcance de la delincuencia internacional debe tener su contra-peso en una amplia cooperación extradicionaria en-tre Estados que, por los tratados que los vinculan, y por otros convenios y declaraciones, han compromet-tido su lucha contra el narcotráfico. Como ha señala-do Ottati Folle "el criterio, tantas veces invocado, de la impenetrabilidad del orden jurídico ha ido perdien-do su rigidez, tal como lo demuestran los textos de los numerosos tratados (bilaterales y multilaterales) suscritos en materia de extradición en los últimos años. Por otra parte, esta tendencia ...coincide con la necesidad de reducir las trabas y obstáculos de este instituto resultantes de un antiguo y feliz-mente superado enfoque nacionalista del derecho" ("Convención Interamericana sobre extradición. Pri-meras reflexiones acerca de su contenido", Rev. INU-DEP, Año II, No. 3, p. 127).

XV)      Por último, y habiéndose desestimado en mérito a los criterios precedentemente expuestos el pedido de las autoridades españolas, habrá de decla-rarse también que la documentación solicitada por dichas autoridades en fax glosado a fs. 98, debe en consecuencia, ser objeto de un pedido por vía de rogatoria en forma habitual, que habrá de considerarse oportunamente.

Y ello es así porque dicha documentación fue in-cautada por la policía uruguaya en allanamientos au-torizados a pedido de la misma y no en cumplimiento de medidas probatorias rogadas por un Tribunal ex-tranjero.

XVI)      Tampoco obsta a la entrega del requerido el uso de documentos o certificados falsos en nuestro país (art. 243 C. Penal Uruguayo) puesto que el tenor de su primera deposición el mismo participó en la fal-sificación, según la previsión del art. 61 inc. 1o. C. Penal, por lo que no habría adecuación típica el de-lito del art. 243, que sólo castiga al que hiciere uso de documento o certificado sin haber participado en la falsificación. Por otra parte, claras razones de política criminal imponen no obstaculizar la extradición del reo por una infracción que  si se hubiera configura-do, lo que no habría acaecido  sería únicamente muy menor a los delitos por los que lo piden los Tri-bunales extranjeros. Así lo han entendido las más mo-dernas legislaciones, como la alemana que postula que siempre que exista una desproporción evidente entre el delito por el que se lo reclama y el cometido en el Estado requerido, se prescinda o se difiera la perse-cución de este último con el fin de no obstaculizar el trámite de extradición. Se funda ello en la más mo-derna admisión de los principios de oportunidad y trascendencia, recogidos expresamente en el art. 49 del proyecto de Código del Proceso Penal a estudio del Parlamento. Las doctrinas más recibidas en mate-ria penal fincan en dicha dirección, y tratándose de derecho extradicionario pueden hacerse valer dejando de lado la necesidad de la acción, cuya prescripción sería sólo para casos exclusivamente de derecho in-terno, que no rocen la normativa internacional. Pese a lo expuesto, no se daría en autos el pretenso delito como se señaló precedentemente, sino que el mismo, al estar a su primera declaración estaría atrapado por la jurisdicción panameña, sin que se dieran en la es-pecie tampoco los requisitos del art. 10 del Código Penal Patrio, sin perjuicio de lo dispuesto en Nal. XII in fine.

Por los fundamentos vertidos, y las disposiciones legales y convencionales citadas, FALLO:

Desestímese la nulidad invocada y accédase a la extradición de R.P. a los Estados Unidos de Norte América a efectos de ser juzgado por los cargos de que se lo acusa. Caratúlese en forma, y ejecutoriada hágase saber por vía diplomática a los Estados requirentes y vuel-van.

Gabriel Adriasola

SEGUNDA INSTANCIA

Montevideo, 9 de setiembre de 1991.

Vistos:

Para sentencia en 2a. instancia este procedimiento por extradición de R.P.P., venido a conocimiento por apelación de la sentencia dictada por el Juzgado Le-trado de 1a. Instancia de Maldonado, de 4o. Turno (ficha 157/91). Resultando:



I)     La sentencia No. 62, de 8 de mayo de 1991, accedió a la extradición del titular de estos obrados a los Estados Unidos de Norte América, a efectos de que fuera juzgado por los cargos de que se le acusa.

II)     A fs. 553, la defensa interpuso recursos de reposición y apelación en subsidio contra el mencio-nado fallo. Sus argumentos pueden sintetizarse en los siguientes:

a) no es posible conceder la extradición a un re-quirente que ha tramitado un juicio en rebeldía del que va a ser extraditado.

b) la prueba en que se ha basado el Juez de pri-mer grado es irrelevante puesto que se trata del memorándum policial de las autoridades del país requi-rente.

c) que de muchos de los cargos imputados, P. fue absuelto, como ofrece probarlo la defensa.

d) uno de los delitos por los que se pide la ex-tradición y se concede en primera instancia, el lavado de dinero, fue creado por la legislación penal norte-americana como sección 1956 de su código represivo, por ley del 27 de octubre de 1988, mientras que el Tratado se suscribió el 8 de abril de 1973 y Uruguay lo aprobó el 28 de octubre de 1983.

Además, hay cargos que son de delitos estableci-dos por una ley previa a la firma del Tratado U.S.A. no empezó a incluir los delitos detallados en la llamada Ley R.I.C.O. (Racketeer Influenced Corrupt Or-ganization) en los tratados que se firmaron a partir de 1980, luego de la firma del tratado con Uruguay.

e) discrepa con la tesis del Juez respecto a que el lavado de dinero sea compatible con nuestro en-cubrimiento.

f) también respecto a la asimilación de la cons-piración con la asociación para delinquir.

g) no podrá recaer ninguna pena de cadena per-petua, lo que puede ocurrir según la legislación nor-teamericana.

En definitiva, pide que no se conceda la extradi-ción y en caso de que no se siga este criterio, que ella se condicione sólo a los cargos que se admitan como válidos por el Tribunal.

III)     El señor Fiscal Letrado Departamental de 1er. Turno, evacuó el traslado conferido a fs. 604, contestando en un extenso y fundado dictamen, las argumentaciones realizadas por la Defensa.

IV)    El Juez mantuvo su resolución en auto de fs. 625 y franqueó la alzada para ante este Tribunal donde se pasaron los autos a estudio por su orden, se citó para sentencia y se acordó ésta en forma legal.

Considerando:

I)     TANTUM APELLATUM QUANTUM DE-VOLLUTUM

Los efectos de la apelación son indudablemente dos: el devolutivo y el suspensivo. En la devolución, hay en realidad un envío para la revisión, la jurisdic-ción se pasa del Juez apelado al Juez superior que asu-me la facultad plena de revocación de la sentencia recurrida dentro de los límites del recurso.

Claro que este principio limitador de la instancia segunda no impide que se revise lo actuado en el gra-do introductorio del proceso, a efectos de ejercer un control integral del Tribunal sobre el desarrollo for-mal de aquél. Este es un procedimiento que se utiliza precisamente cuando ninguna de las partes ha expre-sado un agravio concreto en contra de la sentencia de primer grado. En esa situación, el Tribunal de alzada interviene haciendo uso de su natural facultad revisiva del proceso porque de no actuar de ese modo, la se-gunda instancia no tendría contenido prácticamente.

En la especie, la cuestión es distinta, existen agra-vios concretos en contra del fallo de primera instan-cia, por lo que, si bien la Sala dará como aceptados la relación de hechos y actos procesales contenidos en la sentencia apelada, pasará a examinar, por el efecto limitador, a que se hiciera referencia antes, cada uno de los agravios en que ha fundado su apela-ción la defensa.

II)     JUICIO EN REBELDIA

En primer término y como punto introductorio de este agravio es preciso examinar cual es la legisla-ción aplicable en esta materia propia del Derecho In-ternacional Privado.

Dice el Sr. Fiscal, a fs. 607 y vto., que en esta ma-teria rigen los Convenios Internacionales por encima del derecho interno de cada uno de los países. La Sala no discute esta afirmación, que en el ámbito del De-recho Internacional tiene plena validez, sin embargo, considera necesario precisar que no es posible que una

THOMSON REUTERS

Documento

norma de carácter internacional, acordada entre par-tes, pase por alto el orden público de una de esas par-tes contratantes. No es posible admitir como incues-tionable un acuerdo entre países, por el cual se obli-guen a no respetar mecanismos de orden interno que hacen a la defensa de la seguridad de los ciudadanos y en especial al debido proceso legal a que cada uno de estos tiene derecho precisamente por tratarse de un habitante de esos países.

El problema, en su justo término, es el de diluci-dar si el Tratado de extradición que vincula a nuestro país con Estados Unidos de Norte América viola en ese punto el orden público interno uruguayo.

Precisamente es este el punto cuestionado por la Defensa: si el procesamiento en rebeldía de P. ha vul-nerado las garantías del debido proceso en el país re-querido.

La Sala entiende, como lo ha hecho en anterio-res oportunidades en que le ha tocado decidir sobre tema similar, que la cuestión debe ser examinada des-de el punto de vista del orden jurídico del Estado re-quirente, en la especie: los Estados Unidos de Norte América.

Esto no puede tener otra interpretación, puesto que ella le haría perder sentido práctico a la extradi-ción, la que se tornaría totalmente inoperante.

La cuestión es pues saber si en el Estado requi-rente se han respetado las normas del debido proceso legal. Para el examen de este punto, es necesario re-mitirse a la legislación norteamericana.

No existe en ese país, la institución de la Justi-cia de Instrucción, ésta es llevada a cabo por el De-partamento de Justicia, integrado por Fiscales, agen-tes de investigación y Policía, que son quienes reú-nen las pruebas para someter a un sujeto a un pro-ceso penal.

Entiende el Tribunal que no se violan las garantías constitucionales del debido proceso, puesto que la extradición en sí misma no es un juicio, sino un pro-cedimiento por el que se enjuiciará a un sujeto y se determinará la culpabilidad o inculpabilidad del ex-traditado. En ese momento, cuando comience el juicio, el indagado tendrá a su disposición todas las ga-rantías procesales pertinentes, es decir: el derecho a ser asistido por un abogado, el derecho a ser juzgado por un jurado, según la ley norteamericana y la garan-tía de un Juez que emitirá el fallo según la decisión del jurado. Negar la extradición porque las leyes del país requirente son distintas es impensable, puesto que con ese mismo criterio se debería negar la conce-sión de ella para un país que no tiene el mismo siste-ma de Justicia que el nuestro porque, por ejemplo, posee la institución del jurado, que no rige en Uru-guay.

Si no se accediera a este procedimiento de extra-dición por la circunstancia que se está examinando, no se hubiera justificado lo acordado en el articulo 10 3, del Tratado vigente entre Estados Unidos y nuestro país, que dice: "Cuando el requerimiento se refiera a una persona que aún no ha sido condena-da, deberá ser acompañado de una orden de deten-ción o dé prisión o del auto de procesamiento judicial equivalente, emanado de la autoridad competente de la Parte requirente". El procedimiento fue reali-zado en los Estados Unidos, donde un Gran Jurado determinó que P. debió ser juzgado por los delitos por los que después se solicitó su extradición.

Esto está de acuerdo con el marco constitucional uruguayo, que permite también el arresto de una per-sona cuando hay semiplena prueba de un delito y sin que medie auto de procesamiento. Y ello porque en nuestro régimen constitucional, el Juez luego posee 48 horas para decretar el sumario o dejar en libertad al imputado.

De este régimen constitucional, cohonestado por lo dispuesto en los arts. 118 y 119 del Código del Pro-ceso Penal, resulta que en nuestra legislación también es posible librar una orden de arresto "en rebeldía"; por tratarse de una persona que jamás declaró ante Juez y que muy seguramente estará prófugo. Nuestra jurisprudencia ha sido muy precisa y clara respecto a esta aseveración como surge de la sentencia del si-milar de 1er. Turno, No. 202, de fecha 20 de diciem-bre de 1990 (Cfr. T. 3o., sent. 80/82).

Quiere decir que en el Estado requirente todavía no ha dado comienzo al juicio de P. y que la extra-dición se pide para poder llevar a cabo ese enjuiciamien-to, donde el imputado no carecerá de ninguna de las garantías del debido proceso legal.

La claridad de las explicaciones que suministra el señor Fiscal Letrado actuante en este caso, concreta-mente a fs. 609/610vto. exime de todo otro comen-tario a este Tribunal, respecto al punto tratado en el presente Considerando.

En resumen pues, en lo atinente al agravio de la defensa respecto a que se ha seguido un juicio en

re-beldía de su patrocinado, el Tribunal concluye, por los argumentos expuestos en esta Considerando, que aquél no tiene relevancia y por ende no es aceptado.

### III)   PRUEBA SUFICIENTE

Se ha impugnado la valoración realizada por el señor Juez de primera instancia respecto de la prueba presentada en autos y que tiene relación con la culpa-bilidad de su cliente.

La Sala debe precisar que la jurisprudencia prác-tica de los Tribunales de Apelaciones ha evaluado co-mo correcta la prueba producida en un tribunal de los Estados Unidos de Norte América, cuando ella se ha llevado a cabo en un procedimiento con respal-do jurídico penal y con autorización de un Magistra-do judicial de ese país, lo que torna incuestionable. En ese sentido se ha pronunciado el similar de Ser. Turno, en sentencia de 28 de julio de 1989, que está publicada en La Justicia Uruguaya, Caso No. 11475.

Para calificar una relación jurídica extranacional, hay que atenerse al cuadro de categorías que ofrece el sistema de normas de derecho internacional, pues-to que es el sistema que rige a la relación. Y para pre-cisar la extensión de las categorías es preciso interpre-tar las normas de derecho internacional según la téc-nica del sistema jurídico al cual pertenecen las normas que se han de interpretar (Quintín Alfonsín: "Dos estudios de Derecho Privado Internacional", Montevi-deo 1946, pág. 67).

En puridad entonces, la apreciación de las pruebas no debe hacerse siguiendo lo que establece la ley uru-guaya, sino las que surgen de la interpretación de lo acordado en el Tratado respectivo, que es el sistema de normas internacionales a las que se refiere el autor indicado precedentemente. Esta es la mejor solución de derecho internacional, porque permite una inter-pretación acorde con las divergencias legislativas en-tre los Estados partes del Tratado de que se trate (So-lución a la que también arriba la sentencia citada publi-cada en La Justicia Uruguaya como Caso No. 11475).

En la especie, además, no es sólo el memorándum policial a que se refiere la defensa la única prueba pre-sentada, sino que también deben considerarse como tales las declaraciones del Fiscal y demás investigado-res encargados del caso en el país requirente, puesto que forman parte del Departamento de Justicia y son los funcionarios encargados de realizar la imputación. Esas deposiciones fueron estudiadas por el Gran Ju-rado norteamericano que intervino en el caso y con-sideradas como prueba a efectos de pedir el procesa-miento por los delitos por los que luego se requirió a P. Como bien dice el Fiscal letrado actuante, eso es algo perfectamente equivalente a nuestro concepto de "elementos de convicción suficientes" que equivalen a una prueba incompleta o semiplena.

En un caso como el que ha sido sometido ala consideración de esta Sala no se requiere la plena cer-teza, sino solamente una verosimilitud, un juicio de probabilidad, un "fumus bonis juris" (Cfr. Quintín Alfonsín: "Teoría del Derecho Privado Internacional" pág. 390, 404/406).

Además, el art. 10 del Tratado referido, dice que el requerido podrá solicitar que el requirente presente pruebas suficientes para establecer "prima facie" que el reclamado ha cometido el delito por el que se pide su extradición, pero también dice que el requerido puede negar la extradición en caso de que el arresto sea manifiestamente infundado. Obsérvese que sólo le otorga una simple facultad al Juez del Estado re-querido, no se trata de un deber, de lo que se infiere a fortiori, que si la prueba es suficiente para el reque-rido, puede también conceder la entrega.

### IV)   ABSOLUCION DE VARIOS CARGOS

De la documentación agregada en autos en esta misma instancia, se desprende que un tal F. de L.M. fue absuelto de un cargo y que en una causa seguida a un tal C.Q., la Corte no aceptó como pruebas las evidencias logradas por aparatos de vigilancia elec-trónica y en su mérito abandonó el proceso y retiró los cargos. Sin embargo, no surge de esa documenta-ción agregada, debidamente legalizada y traducida, una relación directa con el caso que se cuestiona en este expediente. Es más, el nombre de P. no aparece para nada en ninguno de los documentos presentados.

Pero no aparece en autos ninguna prueba que per-mita inferir que se han destruido algunos cargos, co-mo por ejemplo:

a) en mayo de 1985 P. se hizo socio y asesor de I.I. y su empresa que estaba destinada a introducir cocaína de contrabando en Estados Unidos y le acon-sejó que usara empresas de Panamá para ocular al verdadero propietario de los bienes que se adquirieran con ese tráfico ilícito.

b) posteriormente, en setiembre de 1987 rea-lizó operaciones tendientes a introducir 800 kilogra-mos de



cocaína a bordo del O.S.

Quiere decir que, en el primer caso (literal a) exis-tió un acuerdo de voluntades con un fin ilícito, que después será examinada a la luz de la legislación vi-gente en nuestro país. Y en el caso del literal b) hay sin duda, eventualmente una conducta sancionada muy severamente por nuestra ley 14294, la que tam-bién será objeto de examen exhaustivo en Consideran-do aparte.

### V)   RETROACTIVIDAD DE NUEVOS DELI-TOS

Dice la defensa que el delito de lavado de dinero, que es uno de los ilícitos por los que se solicita la extradición, fue creado por la ley norteamericana con fecha posterior a la suscripción del Tratado de Extradición con Uruguay.

El caso es muy claro, uno de los principios más caros para el derecho penal es el de la irretroactivi-dad de las leyes que crean nuevos delitos. Si en el régimen del Tratado, el delito de lavado de dinero no se conoció, mal puede imputarse posteriormente, cuando una ley lo incorpore a la legislación interna de uno de los países firmantes del mencionado acuerdo. La regla es que debe privar el derecho del Tratado sobre los demás, pues es el que ha acorda-do una serie de conductas entre los firmantes. Pre-tender incorporar al Tratado un hecho delictivo que cuando aquél se firmó no estaba tipificado, es una clara violación a los principios del derecho penal li-beral.

Por esas razones, el Tribunal aceptará este agra-vio.

Esta razón provoca que el agravio respecto al de-lito de lavado de dinero y a su doble incriminación en nuestro derecho como encubrimiento, lo que no acep-ta la defensa, pierda razón de ser, aunque de todos modos la Sala lo examinará a mayor abundamiento en Considerando aparte.

### VI)   EL DELITO DE LAVADO DE DINERO

Como muy claramente lo ha examinado el señor Fiscal actuante en este expediente, a fs. 621 y vto., la conducta por la que se le imputa el delito de lavado de instrumentos monetarios a P., no puede de ningu-na manera ser atrapada por el tipo penal de encubri-miento previsto en el art. 197 de nuestro código penal. En efecto, P. coparticipaba en una actividad delicti-va con otras personas lo que lo sindica como un co-delincuente de esos tipos penales, por ejemplo el trá-fico de cocaína. Aunque después hubiera participado de operaciones tendientes a limpiar ese dinero mal ha-bido a través de esas actividades delictivas, ello de nin-gún modo puede considerarse encubrimiento a la luz de nuestra ley. El encubrimiento es una figura autó-noma que entre sus presupuestos requiere que el su-jeto no haya participado en la actividad delictiva que se encubre y que no tuviera conocimiento de ella an-tes de prestar su colaboración encubridora.

De modo pues, que como el propio señor Fiscal admite, en la especie no se puede asimilar el delito de lavado de instrumentos monetarios a nuestro encu-brimiento.

El principio de la doble incriminación en los Es-tados miembros pues, no se cumple en este caso.

El Tribunal, en consecuencia, considera relevante el agravio expresado en este sentido por el apelante.

### VII)   LA CONSPIRACION Y LA ASOCIACION PARA DELINQUIR

La forma en que según las autoridades requirentes se "asoció" P. con otros miembros de la organización criminal para cometer los hechos delictivos que se le imputan, en especial el de importación de cocaína desde un lugar ajeno a los Estados Unidos de Norte-américa, participa a juicio de la Sala de una simple codelincuencia y no de un delito de asociación para delinquir.

En efecto, las diferencias entre ambas formas de violar la ley penal son palmarias:

En primer lugar, codelincuencia supone un co-mienzo de ejecución, o sea un acuerdo para cometer un delito o varios, en grado de tentativa o de consu-mación. En cambio, la asociación para delinquir sig-nifica una simple intención de delito, sin que exista un comienzo de ejecución.

En segundo término, la codelincuencia es ocasio-nal, en cambio la asociación para delinquir es perma-nente. Es condición indispensable en esta última, que se constituya una organización coherente y durable, lo que permitirá identificar a sus integrantes como asociados antes que codelincuentes, a la vez que reconocer exteriormente al grupo, por la homogeneidad de sus fines, métodos utilizados y agentes de los eventos pro-yectados (Tribunal de Apelaciones en lo Penal de 1er. Turno, sentencia No. 159/77, publicada en Revista del Instituto Uruguayo de Derecho Penal, año I, No. 1, pág. 192).

Lo importante pues es que se trate de una plurali-dad de planes y que pueda de hecho afirmarse ese ele-mento de permanencia, y que caracteriza una asocia-ción verdadera, diferenciándola de un acuerdo crimi-nal referido a varios delitos, pero transitorio (Soler: "Derecho Penal Argentino", Tomo IV, pág. 550).

A juicio de la Sala no surge probado debidamente en autos que P. se hubiera asociado permanentemente con otros sujetos para realizar las conductas lesivas de la legislación sobre estupefacientes. Sólo aparece probado el hecho que en un lugar no determinado del territorio norteamericano, introdujeron cocaína en el buque ya mencionado.

No está probado que ese acuerdo de voluntades hubiera realizado otras actividades delictivas que ten-gan incriminación en nuestro derecho, salvo el lavado de dinero, que ya fuera rechazado por lo establecido en Considerandos anteriores. No está probado que ha-ya existido una organización con carácter estable, per-manente, que se haya dedicado a otras actividades de-lictivas o haya incurrido en la conducta lesiva de la legislación sobre drogas en alguna otra oportunidad. Todo hace suponer, por lo menos con la prueba que se ha reunido en estos autos, que existió una reunión improvisada, lo que sin duda es una forma de conspi-ración y no un delito de asociación para delinquir. Y si en alguna oportunidad se cometió el delito de introducción de cocaína al territorio de U.S.A. fue en una sola oportunidad, a estar a lo que resulta de au-tos. Se necesita la prueba de que ha habido un pacto criminoso con el fin de cometer delitos, sin el cual, la acción debe contenerse en cada manifestación de-lictuosa, dentro de los límites de un simple concurso de delincuentes en el delito especifico.

Aunque en el caso se diera por probado que ha existido una conspiración, esa forma del íter críminis no es penada en nuestro derecho, por lo menos para las actividades por las que se solicita la extradición en la especie.

VIII)       POSIBLE PENA DE ERGASTULO

La defensa se agravia también porque es posible que recaiga pena de cadena perpetua, la que no exis-te en nuestro país.

En principio, cabe desechar esta argumentación, porque no parece que eventualmente recaiga una pe-na de este tipo en la sentencia que se referirá sólo a algunos delitos y no todos por los cuales se solicitó la extradición.

Esta consideración es válida frente a la declara-ción que hará esta Sala respecto a que la extradición debe condicionarse únicamente a algunos de los car-gos solicitados y al cumplimiento de pautas de orden formal y procesal.

IX)       LOS DELITOS POR LOS QUE SE CONCE-DE LA EXTRADICION

De lo expuesto precedentemente resulta que sólo han quedado en pie algunos de los cargos que se han formulado contra P., por las autoridades requirentes.

En efecto, el Tribunal reconoce como válida la reclamación de los Estados Unidos de Norte América, respecto al siguiente hecho: desde una fecha desco-nocida, que se ubica aproximadamente en 1982, en forma continua hasta el 29 de noviembre de 1988, el requerido, junto con otras personas, se asociaron para importar cocaína al territorio de los Estados Uni-dos, desde un lugar fuera de él.

Puede darse por probado que P. por lo menos pla-nificó y organizó un envío de cocaína a borde de un buque de carga en el año 1985.

Esta conducta, que es ilícita según las leyes nor-teamericanas, cumple con el principio de la doble in-criminación, puesto que en nuestro país está tipifi-cada como delito en el artículo 31 del decreto ley 14294.

Uno de los núcleos verbales del art. 31 del citado decreto ley es el de "importar" y se ha interpretado por parte de la doctrina y de la jurisprudencia nacio-nales en sentido amplio: como cualquier entrada o sa-lida de las mercaderías contenidas en las listas I y II de la Convención de Nueva York y I de la de Viena. La sustancia "importada" por P. desde otro país (Co-lombia) es la cocaína, que está incluida en la lista I del convenio de Nueva York de 1961.

Pero además, según el cargo que se ha dado como probado y pasible de extradición, P. organizó las ope-raciones tendientes a introducir esa droga en los Es-tados Unidos, lo que se adapta también a nuestra for-ma tipo prevista en el art. 32 del decreto ley citado, uno de cuyos verbos es organizar, que significa orde-nar, distribuir, estructurar.

También en esa norma se sanciona la forma ver-bal de financiar esas operaciones.

Cabe suponer asimismo, que se cumplió por par-te de P. alguna de las actividades castigadas por el art. 34 de la citada normativa, puesto que sin duda la in-troducción de la droga fue para colocar comercial-mente el producto suministrando, entregando, pro-moviendo, facilitando, que son todas formas típicas previstas en el art. 34 del mencionado decreto ley.

No cabe duda entonces, que cualquiera de esos cargos tienen doble incriminación en nuestro país y el requirente.

Opinion:
**UNITED STATES ~ EXTRADITION ~ CRIMINAL PROCEDURE**
Published in: LJU Volume 104, 7/1/1992, 5
Online Citation: UY/JUR/15/1991

Summaries:

1.1.     The Extradition Treaty binding our country to the United States does not violate the constitutional guarantees of due process, because extradition itself is not a trial, but rather a procedure by which a subject will be prosecuted and the guilt or inculpability of the extradited person will be determined.

2.2.     The grievance consisting of the possibility of a life sentence, which does not exist in our law, must be dismissed because it does not seem likely that a penalty of this type will be part of the judgment that will refer only to some offenses and not to all for which extradition was requested. Extradition is conditioned on the fulfillment of the precepts of public order that are in force in our Constitution.

3.3.     The proceeding in the United States, where a Grand Jury determines that a subject must be tried for certain crimes and then requests his extradition, does not constitute a trial in absentia. The requesting state has not yet begun the trial and the extradition is requested in order to carry out that prosecution.

4.4.     The evidence produced in a court in the United States is correct when it has been carried out in a proceeding with criminal legal support and with the authorization of a judicial magistrate in that country.

5.5.     The police report, the statements of the Prosecutor's and other investigators in the case in the requesting country, which are part of the Department of Justice and are the officials responsible for carrying out the accusation, must be considered as evidence. These depositions were studied by the American Grand Jury that intervened in the case and were considered as evidence for the purpose of requesting prosecution. This is perfectly equivalent to our concept of "sufficient evidence", which amount to partial or semi-complete proof.

6.6.     The conduct by which the accused planned and organized a shipment of cocaine on board a cargo vessel to bring it into the US complies with the principle of dual criminality since in our country it is classified as a crime under Article 31 of Law 14294.

7.7.     The core verb "import" must be interpreted broadly as any entry or exit of goods contained in lists I and II of the New York Convention and I of the Vienna Convention.

8.8.     The operations aimed at bringing cocaine into the United States are adapted to our criminal type provided for in Article 32 of the aforementioned law, one of whose verbs is to "organize", which means to order, distribute, structure.

9.9.     It should be assumed that any of the activities punished by Art. 34 of the aforementioned regulation were carried out on the part of the accused, since without a doubt the introduction of the drug was to commercially place the product supplied, delivering, promoting, facilitating, which are all typical forms provided for in the aforementioned provision.

10.10.   It is not appropriate to grant extradition for the crime of money laundering because it was created by American law after the signing of the Extradition Treaty with Uruguay.

11.11.   It does not form the cover-up provided for in Article 197 of the C.P., participating in operations aimed at laundering ill-gotten money through criminal activities in which the accused participated with other persons, which charges him as a co-delinquent in other criminal types, in this case, cocaine trafficking. Concealment is an autonomous concept that, among its presuppositions, requires that the subject not be a participant in the criminal activity that is concealed and was not aware of it before collaborating in its concealment.

12.12.   The way in which, according to the requesting authorities, the accused acted with other members of the criminal organization to import cocaine from somewhere outside the United States, is simple co-delinquency and not criminal association to commit a crime. There was an impromptu meeting that is a form of conspiracy. This form of the iter criminis is not penalized under our law, at least not for activities for which extradition is requested in this case.

13.13.   Faced with the concurrence of requests, the US request must be accommodated because the seriousness of the crimes for which the subject is being summoned for extradition is obviously greater than the accusation made by the Spanish authorities, both from a punitive point of view and the overlapping of offenses and the amount of activity carried out. Also using the subsidiary criterion of priority, the request of the US, which introduced the respective diplomatic warrant prior to that of Spain (1st instance), has preference.

14.14.   Although the Treaty of Extradition of Criminals between our country and Spain does not include the trafficking of narcotics among extraditable offences, this is not an obstacle to granting the request, since the

convention must be supplemented with the provisions of the Single Convention on Narcotic Drugs of 1961, ratified by D.L. 14222, Art. 36 paragraph 2 (1st instance).

15.15.   The grievance relating to the illegality of the telephone intercept allowed in the requesting State and carried out with due judicial authorization is not valid. Moreover, although it is not necessary that the evidence be admitted by our internal adjective law, the Court admits the validity of such evidence under the provisions of the C.P.P., Art. 212 (1st instance).

16.16. The Prosecutors' Offices must intervene in fulfilling requests in criminal matters from foreign authorities within their jurisdiction (1st instance).

Classification:

EXTRADITION

> +Requested by US (Treaty Approved 10/28/83)
>
> +Does not violate constitutional guarantees
>
> +There is due process
>
> +Because extradition is not a trial
>
> +Prohibition on life imprisonment
>
> +It is not probable because the judgment must only refer to crimes law 14294, arts. 31, 32 and 34
>
> +Requirement State Proceeding
>
> +Grand Jury
>
> +It is not trial in absentia
>
> +Evidence
>
> +Validity
>
> +By being carried out in criminal proceedings and with the authorization of the Magistrate +It is constituted

+Police Report

> +Statements of officials in charge of carrying out imputation +Origin
>
> +Plan and organize shipment of cocaine to be brought into the U.S. (offenses Arts. 31, 32 and 34 law 14294)
>
> +Inadmissibility
>
> +Money Laundering
>
> +By occurring after the signing of the treaty
>
> +Co-participate in cocaine trafficking and then co-participate in money laundering as a result of this criminal

activity

> +Does not constitute cover-up
>
> +Co-offenders improvised meeting
>
> +Does not constitute criminal association
>
> +Concurrence of requests
>
> +Preference by seriousness of offenses
>
> +Subsidiary priority criterion application
>
> +Treaty with Spain
>
> +Single Convention on Narcotic Drugs 1961 +Evidence
>
> +Telephone intercept
>
> +Validity
>
> +Procedure
>
> +Departmental Prosecutors' Offices
>
> +Prescriptive interference.
>
> OFFENSES LAW 14294 (NARCOTIC DRUGS)
>
> +"Import" (Art. 31) +Broad Interpretation

+Any entry or exit of goods listed, N.Y. Convention (I and II) and Vienna (I)

+"Organize" (Art. 32)

+It means arranging, distributing, structuring.

1.  The Extradition Treaty binding our country to the United States does not violate the constitutional guarantees of due process, because extradition itself is not a trial, but rather a procedure by which a subject will be prosecuted and the guilt or inculpability of the extradited person will be determined.

2.  The grievance consisting of the possibility of a life sentence, which does not exist in our law, must be dismissed because it does not seem likely that a penalty of this type will be part of the judgment that will refer only to some offenses and not to all for which extradition was requested.

1.  Extradition is conditioned on the fulfillment of the precepts of public order that are in force in our Constitution.

2.  The proceeding in the United States, where a Grand Jury determines that a subject must be tried for certain crimes and then requests extradition, does not constitute a trial in absentia.

3.  The requesting state has not yet begun the trial and extradition is requested in order to carry out this prosecution.

4.  The evidence produced in a court in the United States is correct when it has been carried out in a proceeding with criminal legal support and with the authorization of a judicial magistrate in that country.

5.  The police report, the statements of the Prosecutor's and other investigators in the case in the requesting country, which are part of the Department of Justice and are the officials responsible for carrying out the accusation, must be considered as evidence. These depositions were studied by the American Grand Jury that intervened in the case and were considered as evidence for the purpose of requesting prosecution. This is perfectly equivalent to our concept of "sufficient evidence", which amount to partial or semi-complete proof.

6.  The conduct by which the accused planned and organized a shipment of cocaine on board a cargo vessel to bring it into the US complies with the principle of dual criminality since in our country it is classified as a crime under Article 31 of Law 14294.

7.  The core verb "import" must be interpreted broadly as any entry or exit of goods contained in lists I and II of the New York Convention and I of the Vienna Convention.

8.  The operations aimed at bringing cocaine into the United States are adapted to our criminal type provided for in Article 32 of the aforementioned law, one of whose verbs is to "organize", which means to order, distribute, structure.

9.  It should be assumed that any of the activities punished by Art. 34 of the aforementioned regulation were carried out on the part of the accused, since without a doubt the introduction of the drug was to commercially place the product supplied, delivering, promoting, facilitating, which are all typical forms provided for in the aforementioned provision.

10. It is not appropriate to grant extradition for the crime of money laundering because it was created by American law after the signing of the Extradition Treaty with Uruguay.

11. It does not form the cover-up provided for in Article 197 of the C.P., participating in operations aimed at laundering ill-gotten money through criminal activities in which the accused participated with other persons, which charges him as a co-delinquent in other criminal types, in this case, cocaine trafficking.

Concealment is an autonomous concept that, among its presuppositions, requires that the subject not be a participant in the criminal activity that is concealed and was not aware of it before collaborating in its concealment.

*Document*

12.  The way in which, according to the requesting authorities, the accused acted with other members of the criminal organization to import cocaine from somewhere outside the United States, is simple co-delinquency and not criminal association to commit a crime.

There was an impromptu meeting that is a form of conspiracy. This form of the iter criminis is not penalized under our law, at least not for activities for which extradition is requested in this case.

13.  Faced with the concurrence of requests, the US request must be accommodated because the seriousness of the crimes for which the subject being summoned for extradition is obviously greater than the accusation made by the Spanish authorities, both from a punitive point of view and the overlapping of offenses and the amount of activity carried out.

Also using the subsidiary criterion of priority, the request of the US, which introduced the respective diplomatic warrant prior to that of Spain (1st instance), has preference.

14.  Although the Treaty of Extradition of Criminals between our country and Spain does not include the trafficking of narcotics among extraditable offences, this is not an obstacle to granting the request, since the convention must be supplemented with the provisions of the Single Convention on Narcotic Drugs of 1961, ratified by D.L. 14222, Art. 36 paragraph 2 (1st instance).

15.  The grievance concerning the illegality of the telephone intercept allowed in the requesting State and carried out with due judicial authorization is not valid.

On the other hand, although it is not necessary that the evidence be admitted by our internal adjective law, the Court admits the validity of such evidence under the provisions of the C.P.P., Art. 212 (1st instance).

16.  The Prosecutors' Offices must intervene in fulfilling requests in criminal matters from foreign authorities within their jurisdiction (1st instance).

Customs and Criminal Court 1 Maldonado Inst. of 4th Rotation.

Criminal Court of Appeals 2nd Rotation

Full Text:

FIRST INSTANCE

Maldonado, May 8, 1991.

Hearing:

For judgment of first instance, these orders concerning the extradition requests from Spanish authorities and the United States of

America, referring to R.P., file P/42/91, followed by the intervention of the Departmental Prosecutor's Office of the First Rotation, Dr. Carlos García Altolaguirre and with the participation of the Public Defender of the subject being summoned for extradition, Dr. Víctor Della Valle.

Resulting in:

I)  On February 17, 1991, the Seat of Power was informed that R.P., Cuban, 54 years old, born in M. del R., Cuba on December 8, 1935, had been detained under the name of J.L.P. as he was wanted by the Spanish authorities for his extradition.

On February 18, according to page 38, he issued a statement to the Seat of Power in the presence of the Subrogated Prosecutor and the Public Defender, decreeing on the 19th of the same month by order No. 382 filed on page 63 of his provisional arrest.

On page 64 he was examined by both department forensic doctors.

The formal request for extradition of the Spanish authorities is included on page 110 and on pages 172 and 183 et seq. that of the United States.

On page 333 dated April 12, the party subject to the extradition request had to appear with his Public Defender where the aforementioned summons were imposed on him; he refused to make statements, admitting only that he was the party subject to the extradition request and also expressing his opposition to being extradited. At the same hearing, it was decided to grant the Defense a period of three days to make its rebuttals (p. 333v.).

II)    On page 338 et seq., the Public Defender in due time and form appears to present the defense of nullity since the Attorney General in Criminal Matters of the Capital had not participated in them, and opposing the extradition based on the arguments set forth on page 341 et seq., requesting the summons be denied.

From these petitions, the Attorney General was granted a hearing by order No. 2298 dated April 18, 1991, on page 345v., which is issued on page 513, in a founded opinion for which it is advised to dismiss the nullity invoked and admit the extradition request from the United States of America.

On page 489, the lawyers of the Embassy of the United States of America add translation of the request by sworn translator, with a photocopy of the note entered to the Ministry of Foreign Affairs and copies in Spanish and English of the Extradition Treaty between the United States and Spain.

III)     It also states that the US request was received by the Chancellery on March 15, 1991 (pages 337) and that of Spain on March 21, 1991.

The detainee R.P. admitted to be said person and therefore the party subject to the extradition request in these proceedings.

After the proceedings were returned by the Prosecutor, they were sent to the Office on May 6, 1991, for a judgment.

Whereas:

I)     (ABOUT THE PROCEDURE)

There being no procedure in the binding treaties in the case, the Court has generally followed that provided for in the Treaties of Montevideo, giving the Public Defender an opportunity to object to the summons and before resolving, hear the Attorney General as prescribed by our domestic law (Art. 12 No. 5, D.L. 14365). Regarding what the Public Defender considered an incidental claim for nullity, for obvious reasons of procedural economy, this provision must be resolved. The extradition procedure is nothing more than processing an appeal with mandatory intervention by the Attorney General's Office and, in which the party subject to the extradition request must be given the opportunity to be heard. Therefore, its purpose is completely fulfilled, resolving in a single judgment all the matters and exceptions referring to it (see Article 14, paragraph 1, General Code of Process). Similarly, the two requests that hang over the party subject to the extradition request have accumulated herein, in order to avoid contradictory and useless lengthy sentences.

II)     (ON THE NULLITY INVOKED)

Annotated in the brief on pg. 338 339, the nullity invoked is a matter of prior and special pronouncement since if the aforementioned exception is accepted, the respective process must be redirected, preventing the main issue from being explained at this stage. However, for the Court, the aforementioned defect is not such. The party subject to the extradition request bases his claim on the fact that number 2 of Art. 17 of D.L. 14365, when issuing the functional competence of District Public Prosecutors, refers to the tasks detailed in numbers 1, 2 and 4 of Art. 12 of the same regulatory body, not including number 5 of the section last cited where Prosecutors in Criminal Matters intervene "in fulfilling foreign warrants in criminal matters." In the opinion of the undersigned Court, and with due respect to the distinguished Public Defender, the aforementioned interpretation can well be considered as - literal , since it would also be important to conclude that they could not intervene in competencies between judges in criminal matters within the Republic, nor in incidents of recusal that are presented against said judges or in any procedure in which the laws prescribe their intervention. On the other hand, the country's most qualified case law has already resolved the matter in a manner contrary to that held by the Public Defender. It is worth transcribing here what was stated by Dr. José Luis Barbagelata at the time of the District Attorney in Capital Criminal Matters in hearing No. 3149 of 1989, issued in the "V., R. Extradition" case (record 86/1989). There he said:

"The undersigned does not have the honor of agreeing with such a respected opinion, because he has for himself this Prosecutor who, faced with all the scaffolding of reasoning done by such a distinguished professor, the simple, straightforward and obvious thing that, above all the academic disquisitions, tells us that the District Prosecutors' Office must interference in the processing of letters rogatory by foreign authorities in criminal matters within their jurisdiction, because

"a) Decree Law No. 15365 (organic law of the Attorney General and Prosecutor's Office) the listing of the powers of the District Prosecutors' Offices in criminal matters in a. 17 subsection 2, determines the same by reference to the functions set forth by the National Prosecutors' Offices in a. 12 subsections 1, 2 and 4 and this in turn, referencing the provisions of numbers 2. and 3 of a. 10 depending on the function and attribution of the Prosecutors' Office to exercise, with respect to the jurisdictional bodies of the matter within their jurisdiction, the defense of the jurisdiction of the Judges and Courts whenever it is unknown or detrimental.

Therefore, the basis of the intervention that is agreed upon by the Public Prosecutor's Office in fulfilling foreign warrants is to monitor whether they contain claims that are contrary to our laws and that amount to a lack of knowledge of or detriment to our national jurisdiction defending the jurisdiction of the Courts; it is obvious that the Prosecutors' Office which, by express provision of law, must intervene in fulfilling foreign warrants in criminal matters within their jurisdiction;

"b) because validating the doctrinal interpretation made by the aforementioned proceduralist would lead to consequences that neither the legislator wanted nor the interpreters of the organic law have sustained, such as denying the District Prosecutors' Office any intervention in disputes over criminal jurisdiction among the District Judges in their jurisdiction, and prohibit their intervention in incidents of recusal that are brought against the District Judges acting in criminal matters and intervening in all criminal proceedings, in which the laws expressly prescribe their intervention;

"c) because that has been the criterion applied by that Body not discussed by the Court Prosecutor's Office, by sending the request for extradition to the Maldonado District Judges and by hearing in the qualification of the appeal for cassation ruled out the existence of the denounced incurable defect;

"d) because starting from the basic notions about absolute and relative nullities extensively studied by Couture and Véscovi and referring to the rules of criminal procedure, we find absolute and relative nullities or, as he preferred to call them, curable or incurable nullities. Our legislator does not mention the word non-existence. Incurable nullities are especially foreseen as absolute nullities. A basic principle of our procedural system is that there is no nullity without a specific law to establish it. It is the responsibility of the legislator to regulate the system of nullities (C.P. a. 97). Nullity always amounts to a violation of the law and therefore can freely establish the consequences of such violation. Therefore, even if it is believed that the Departmental Prosecutor's Office intervened exceeding it powers, said violation is not sanctioned with absolute nullity by specific law."

On the same topic and in the same cases, the Supreme Court of Justice also ruled in resolution No. 1715 of November 29, 1989, where it stated: "Without prejudice to the compelling arguments that the National Prosecutor has made in the third rotation criminal case with respect to the jurisdiction of Public Prosecutors in these matters (pages 650 et seq.), the fundamental thing is that the declaration of an absolute nullity whose nature is not noticeable is intended. For this to be, it would be necessary that this nullity be expressly legally foreseen (principle of specificity, according to Art. 97 of the Criminal Procedure Code), which does not happen; the principle of finality has been violated (Art. 99 of the same Code), which is also not appreciated, since it is evident that the intervention of the Departmental Prosecutor has fulfilled the purpose that the National Prosecutor would have had, without there having been injury to the party subject to the extradition request; nor has it proceeded contrary to any prohibitive law (Art. 100, ejusdem)".

Such well-founded opinions, which the Court accepts and makes its own, give a definitive solution to the point in accordance with the provisions of Articles 97 and 99 of the Code of Criminal Procedure. In fact, there is no warning of the existence of any prohibitive text that merits sanctioning the intervention of District Attorney with nullity, but also, as highlighted in the cited ruling, the actions of said Magistrate fulfilled the purpose provided by law, the defense of the national legal order and avoiding the impairment or disregard of our jurisdiction. But, as if that were not enough, it is necessary to bring the provisions of Article 110 of the General Code of the Process up here when it says that "annulment is not appropriate, even in the previously established cases, if the act, although irregular, has achieved the end intended, unless it caused defenselessness." This standard adequately completes Articles 97 and 99 of the C.P.P. without contradicting any text of said body of standards. And this is admissible, since, as the Court has already held, certain rules of the General Process Code are applicable to criminal matters, of course, as a complement thereto and without contradicting any of its specific principles, which does not happen in the dispute. This finds sufficient support in the words of the encoder Dr. Gelsi Bidart when he points out that "I must say that with this project, we have sought to use a General Process Code, which includes the main provisions that can be applied in any trial, whether civil, labor, criminal, customs, etc. without prejudice to the peculiarities that some of them may have, in accordance with the subject matter" (shorthand version of the session of the Senate Constitution and Legislation Committee of May 28, 1987, published in "General Process Code"; Law No. 15982, ed. F.E.U.; col. "Text and context", p. XXXVI). This is also so because the interpreter cannot categorically separate both adjective orders without going against the hermetic fullness that all legal orders observe (Cf., García Maynes: "Introduction to the Study of Law"; Mexico, 1970; ed. Porrúa, p. 205).

Therefore, the principle issued in Art. 14 CGP, by which the procedural rule must be interpreted taking into account that the end of the process in the effectiveness of substantial rights, which in matters of extradition can be translated as fulfillment of the obligations of international treaties and of the purpose for which they were signed. In the case, the District Attorney's intervention has fulfilled the purpose imposed by law, without there also being an express text and the sanction with incurable nullity.

III)      Even if it were believed that there is relative nullity, it would have been remedied over the course of time necessary. District Attorney General (his deputy) intervened in the case ab initio, pages 32 to 47, and once the required procedures were completed, the Court order the provisional arrest of the party subject to the extradition request (rule No. 382 of February 19, 1991, pages 63), which was notified to the Public Defender by Official Letter dated February 22, pages 76v., without the latter presenting a defense for nullity for such cause within five days of becoming aware of the (Art. 103 C.P.P.) applicable rule for forum rule. It can be admitted that by assuming a new defender, he or she should be granted the same rights to assert the defense that he or she considers most appropriate. But note that the current attorney assumes the defense on March 1, 1991 (p. 94v.), without, from that time, presenting a defense for the alleged, so if it is agreed that it existed, it must be considered as remedied. At the hearing on April 12, the Public Defender was formally aware of the extradition warrants, but it should be noted that the alleged nullity initiated was much earlier. Therefore, the claim invoked will also be rejected and the merits analysis will be entered, that is, the respective requests for extradition and the conflict between the two.

IV)      (EXTRADITION ORDERS)

Extradition is an institute that tempers the rigors of territorialism in criminal matters, constituting an act of sovereignty by which a State hands to another an accused or convicted individual to be prosecuted or sentenced (Cf. Jiménez de Asúa: Treaty of Criminal Law, T. II, ps. 771 and 892). The current tendency in terms of international criminal cooperation is to mitigate the excessive rigors of territorialism, which must be rooted in constructing theories of the Nation State and exacerbating the notion of sovereignty, concepts that have now entered into an open crisis in a world where regional spaces and interdependence between States have gained a place of privilege. Grocio had already argued that "the duty to surrender a defendant was a legal obligation independent of treaties," and Fauchille spoke of an obligation imposed by the International Society to the extent that it conforms to universal law, corresponding to each nation, by virtue of its sovereignty, assess the regularity and fairness of the respective request (cited by Urrutia Salas: "Extradition does not require international treaties", Magazine of the Faculty of Law and Social Sciences; Year XII, July December 1961, Nos. 3, 4, p. 807). Within this framework, the international community has been equipped with instruments for controlling interstate criminals, among which extradition law is particularly added. In an analogous case, Maldonado's 2nd-rotation Court said: "Corollary of the foregoing is that extradition treaties must always be interpreted in a manner that favors the purpose for which they were agreed. The position of the U. has been and is collaboration in criminal matters. The Italian Cassation in judgment of March 10, 1914, affirmed that the extradition with its legal basis in the natural laws of civil societies, their provisions must be broadly interpreted in relation to how they are informed, the common guardianship of society; and from the doctrinal point of view, it can be pointed out that Travers (Le Droit Penal Internacional, T. IV, p. 383), also criticizes the restrictive interpretation and states that it is to ensure the course of justice in the most complete manner (L.J.U., c. 3210; R.U.D.P., 2/88, c. 324 and Sent. No. 90/87 of Trib. Pen. 2nd. Rotation)."

"In that regard, faced with organizations dedicated to the trafficking of narcotics and their material means, the teachings of Quintano Ripolles (Treaty of International and International Criminal Law, Vol. II, p. 116, Madrid, 1957) are applicable, who, referring to the indispensable cooperation between countries in the face of such cases, argued that their frustration should be avoided by tolerating that while criminals use planes, judges travel by stagecoach." (L.J.U., Volume CI, July August 1990, c. 11475)

V)      The purpose of the extradition process is not to sentence or absolve the accused, judging is not appropriate, but to assess the reasons for the request and its formal regularity to later agree to or deny the delivery of the party subject to the extradition request. It must therefore be analyzed whether the requirements set forth in the respective treaty were met as the main condition for accepting the request. Therefore, because it is not a process in the sense attributed by domestic law, the non-observance of principles of national law that in a domestic process would generate nullity if absent are not admissible under the respective treaties as torts. The case law of our Courts has emphasized this rule with singular acuity (L.J.U., T. LXI, c. 7334, cit. in L.J.U., T. CI, c. 11475), stating that:

"Applying the constitutional rules that establish some bases to develop the process, such as the need for prosecution by the public prosecutor (Art. 22), or the prohibition of trial by commission (Art. 19), to the forced assistance of a defense attorney (Art. 16), relate to internal procedural law... but not to internal law relating to extradition."

"It is not possible to speak, as an essential requirement to recognize the effects of the foreign sentence, of the compatibility with the validity of our public order, since this would lead to constructing foreign procedural norms that coincide in many aspects with ours, to make it difficult to comply with international treaties and hinder their collaboration, recognizing, on the contrary, that each State, according to its traditions and social legal peculiarities, arranges the criminal process differently."

"In reality, the requirements of a valid procedural order for the processing of extradition requests are contained in the Treaties and refer, in general, to the existence of a developed legal process or a legal judgment, in accordance with local rules, how could it be otherwise, which complies, on the other hand, with the generic and essential requirement of the Constitution (Art. 12) on legal process and judgment (due process)."

"Although there was a specific provision in domestic common law, prohibiting the extradition of the accused in absentia that does not exist any way, it could not prevail over the provisions of the Treaty, which constitutes the norm of international law and domestic law (by legislative approval) and which, as such, due to its international substance emanating from a convention and as a special norm, it cannot be invalidated by a lower-ranking, unilateral and, in addition, general one."

"The constitutional precept that prohibits the criminal trial in absentia is aimed at protecting an individual's right in our country, not in any other Country; therefore, if this principle is not accepted or is rejected or violated in those Countries, it has nothing to do with our institutional structure."

"If the alleged unconstitutionality is accepted, our justice will be issued with respect to the trial followed abroad against a certain individual, not based on the applicability of the law of the requesting State, but on the rules that regulate the criminal procedure in our own State ("Uruguayan Justice", T. LXI, case 7334)."

Consequently, an interpretation of the treaties must be made as a rule of international law, regulating a specific institute with strict adherence to it and its purpose and not in relation to the internal constitutional and legal order. Accepting this last position would be equivalent to building insurmountable fences to extradition law and be contrary to the manifest purpose of the law and the tendency of the International Society. The guarantees with which each domestic law covers the procedural ritual of trial and execution of the sentence belong to the internal jurisdiction of the State in question and are not part of the list of exceptions for compliance with the treaties in force on the matter, which generally must be interpreted "in ordine" and not "extra ordine". The validity of these principles must also be based on avoiding any possibility of confusing them with the exception of international public order since this is a wall that opposes the application of certain foreign law in a given territory, and it is a something different to determine the surrender or not of an individual to be judged according to the domestic law of the requesting State.

In accordance with the foregoing, the requesting State cannot be required to issue an arrest warrant or prosecution or present a formal accusation observing the legal requirements of the requested State, as this would simply be the undue interference in a sovereign legal order. On the other hand, it would be illogical and contrary to proper reasoning to require that the requesting party give a statement in the presence of the public defender as a condition for the prosecution or arrest warrant because the purpose of the extradition is precisely to bring the defendant before the requesting court.

But even if it was accepted that the non-existence of such requirements violated the request, from the point of view of domestic law, it should be concluded that it is not an indispensable requirement to comply with Article 126 C.P.P. to order a warrant for preventive detention or arrest warrant against a certain person, which have not otherwise been issued by the judicial authorities of the requesting States. Indeed, the order for prosecution is technically definable; it is the criminal initiation order against a certain person with the effects prescribed by law (Art. 125 et seq. C.P.P.), for which there must be a factual assumption of the defendant to the Court, which through the prosecution order also translates into legal assumption. In our domestic law, there may be preventive detention without prosecution (no more than 48 hours according to Articles 15 and 16 of the Constitution and 125 paragraph 2. C.P.P.) and prosecution without pretrial detention (Art. 1o. Law 15859 and 71 C.P.P.).

And, on its own, to issue the prosecution, there must be a physical presence of the defendant, even in the case of prosecution without imprisonment (argument of Article 1. 147 C.P.P.), the Judge ordered preventive detention even without the requirements of Art. 126 C.P.P., as these are only required to prosecute but not to issue a prison order, which will be governed by the provisions of Articles 118 and 119 C.P.P. Thus, it is true that if a prosecution order is issued against a fugitive, it constitutes in absentia and violates Article 126 CPP, but if instead, a preventive detention is order and an arrest warrant is issued, the situation described does not occur, since the purpose is the material apprehension of the fugitive to delivery for prosecution, which will have to be issued according to the requirements of the law once the accused is available to the Court. For this reason, even admitting this thesis, the Spanish Court's decision, on page 123 orders the pretrial detention of R.P., in no way violates our domestic law. Likewise the indictment of the Grand Jury of the United States and the arrest warrant issued by the U.S. Judge. All of this, without prejudice to arguing that the requirements established by the law of the requested State are not transferable to that of the requesting State.

VI)   (THE REQUEST OF THE SPANISH AUTHORITIES)

It was properly submitted by diplomatic means, thus sufficiently accrediting the authenticity of the same, without the need for the authentication requirement (Cf. L.J.U., T. CI, c. 11475). It was requested between governments and is based on the Criminal Extradition Treaty concluded between both countries in 1885. This treaty, however, contains a list of crimes for which an extradition request is authorized (Art. 2), among which drug trafficking is not included. This system has been criticized for the omissions it may cause, even more so when the treaty does not have an express provision that encompass the enunciative and non-limiting nature of the list, like it does in the treaty of 1879 with Italy. This, however, is not an obstacle to giving effect to the request, since the convention must be supplemented by the provisions of the 1961 Single Convention on Narcotic Drugs, ratified by D.L. No. 14222, whose Article 36, paragraph 2, states that the offenses referred to in the text "shall be considered included among the offenses that give rise to extradition in any extradition treaty entered between the Parties...".

The evidence on which the order is based should not be evaluated in accordance with the assessment standards required by our domestic law to conform to the notion of partial evidence to prosecute an individual. In both requests, the plausibility thereof must be sufficient, and a "fumus bonis iuris" must be accredited that at least ensures that the individual will not be extradited with inconsequential evidence. In this regard, C. de I.'s statement that he also has profuse accusations by the United States Grand Jury narrates in detail the activities of R.P., which he evidently knows by admission of P. himself and according to the telephone conversations transcribed on folios. On the other hand, the Defense's allegation regarding the illegality of telephone intercept in our domestic law is not acceptable. It suffices that such evidence is admitted in the requesting State, in which it was apparently carried out with due judicial authorization. Even if this argument is sufficient, the Court will also admit the validity of such evidence even in our domestic adjective law as provided for in Article 212 of our Code of Criminal Procedure, which enables the Judge, by a founded decision, to intercept postal or telephone correspondence "or any other form of communication in which the accused may take part..." Such a very clear disposition eliminates any doubt as to whether the interception of telephone communications is illegal and inappropriate as evidence in our law.

VII)   (THE REQUEST OF THE UNITED STATES)

It was also correctly submitted by diplomatic means and its translation was also certified by a sworn translator, which must be admitted, since nothing prevents the correction of certain formal irregularities even during the extradition process, as well as addition of new elements even without the request of the Court. As for the criticism of the Defense about the alleged trial in absentia, we believe they should be dismissed together with what was stated above.

As for the evidence provided in accordance with the requirements of the binding Treaty in the case (Art. 10 No. 3.) they must justify the request and that the request and the arrest warrant are not manifestly unfounded. The subject has been studied in depth by the Court of Rotation in the "V., R. Extradition" case, where said Court stated: "What is established, requires adopting some criteria to assess the evidence provided and within the conventional regulatory framework, without the legal categories or procedural system of any of the parties prevailing, as already pointed out; in other words, if the Treaty does not define an expression or concept to determine its scope, one must not go to the regulatory system of one or another State since this means finding an "extra ordine" solution and not an "in ordine" solution, unacceptable and contrary to the principle of equality that must govern relations between sovereign states (cf. Alfonsín: Theory of Private International Law, pp. 390 and 404/406)."

[logo] **THOMSON REUTERS**                                   *Document*

"In order not to deprive their specialty of the international law standard, the solution must be found through the investigation of common will of the parties, within the normative context and adhering to the purpose of the institute."

"The assessment of the evidence cannot be made, as indicated above, following the laws and assessment system of the requested State, as proposed by the Defense."

"The requirement of the Treaty in this respect is not of significance. It can be said that it is of extreme relativity, because if on the one hand, in the same article, "sufficient evidence" is claimed, but with the addition of "prima faccie" that tempers the requirement, on the other, the evidentiary requirement becomes less, since it is rejected when it is manifestly insufficient".

"In light of this, taking into account some clarifications made on the interpretation of the treaties and the precautionary function of the extradition institute, the evidentiary requirement of the Treaty, to the highest degree that can be assigned to it, is located, linked to or approximates the concept of plausibility ("fumus bonis iuris") that is, probability or plausibility of the alleged facts or alleged rights."

"The content of the evidentiary requirement, as naturally stated, cannot be assimilated to terms applicable in the domestic order ("partial evidence" or "elements of sufficient certainty", Articles 15 of the Constitution and 125 of the C.P.P.); not only because it is not a matter of establishing the presupposition or the presuppositions to try the party subject to the extradition request, but also because the warrant comes from a country with a different procedural system. (L.J.U., T. CI, c. 11475)

The requirement of mere plausibility or fumus bonis iuris in the assessment of the evidence interpreting the treaties has also been taken up by case law in the interpretation of the treaty of 1874 that binds us to Great Britain and Ireland. In this regard, the 12th Criminal Court of First Instance said, Rotation: "The powers of the requested Judge are perfectly defined in Article Six of the Treaty, he or she must hear the rebuttals from the fugitive, who must be brought before the Judge and consider "the criminal evidence and establish whether "such evidence is sufficient to uphold the prosecution." It is not a question of the text, judging the party subject to the extradition request, rather of establishing whether the evidence is founded on the accusation filed that is, whether the charges are plausible."

"If we consider that we are within a framework of an institute with a precautionary function, the requirement that we consider is linked to the idea of plausibility of the law in question or 'fumas bonis iuris'."

"This is an adjective, incidental process, linked to another principal, which will not take place in the Jurisdiction of the requested State, but with which it is functionally linked. As Gelsi said: "In general terms, the extradition process is at the service of the criminal process followed abroad; therefore, its object (its "topic") is incidental in relation to the former, in the sense of an "accessory" and, moreover, of a "complementary" quality, to make it possible; to make the prosecution possible (op. cit., p. 7). And, in relation to this main process, extradition appears as a process with a precautionary function."

"In harmony with these ideas, it is entirely coherent to understand the requirement we are discussing as the verification of fumus bonis juris."

"This formula is independent, although it is not without some analogy, with the substantive prosecution presuppositions, since it is not a matter of considering everything that the requesting Judge has done; that would be harmful to the Requesting State. On the other hand, this formula, with slight variations, has been included in all the Treaties that the United Kingdom has entered on extradition (a complete copy can be seen in V.E. Harley Booth: "British Extradition Law and Procedure", Vol. II) and therefore, come from a country with an accusatorial procedural system, very different from ours. Hence, it can lead to erroneous conclusions; the assimilation of these solutions to our procedural category of "trial, with its material presupposition of "partial evidence." (L.J.U., T. 96, c. 10952)

The affidavits of Attorney James Mac Adams III and Vichy Duane are from officials who conducted the investigations in this case, and the link between P. to I.I. (alias "A."), who apparently had an active role in cocaine trafficking in the United States, clearly emerges. As a result, there is the necessary fumus bonis iuris to establish that the petition is not "manifestly" unfounded, having the conditions to access it.

(VIII)  (THE PROBLEM WITH LIFE IMPRISONMENT)

In the case of the request from US authorities, the possibility of being sentenced to life in prison hangs over the party subject to the extradition request, which, in the opinion of the defense, prevents the lawsuit from being accepted since it violates our international public order. Said prohibition is found according to the Defense in Art. 26 of our country's Political Charter, extracting it from its 2nd paragraph. We do not share such a position. The rule exclusively prohibits the death penalty being the case that if the constituent had requested the extension of the prohibition to Ergastulum, it would have ordered it as it did with the capital punishment. The aforementioned prohibition is not clearly inferred from the standard in such a way as to merit a breach of international obligations assumed by the State. National case law, as a general rule, has not provided for this intentional prohibition to avoid the delivery of the person in question. However, the only obstacle of this nature is the death penalty, which merited express commutation provisions in several of the treaties signed by the Republic, without the country concerning itself the same way to also exclude life imprisonment. In the case of the Caracas convention not yet ratified by Uruguay, this clear line of international policy has changed, which does not show that a treaty previously concluded must be ignored. Consequently, the possibility that any of the offenses the person is accused of may be subjected to life imprisonment does not prevent the person from being delivered to the requesting State, as also decided by case law in application of this same treaty (cf. LJU; T. CI, c. 11475). On the other hand, Article 7 of the Treaty only forbids the application of the death penalty and it is conceivable that if the Parties wanted it... when it is provided for in Article 2 Nales 17 and 26 of the respective Treaty warrants agreeing to the request.

X)    The applicant alleges to be innocent in his first statement (in reference to the accusation by the Spanish authorities); however, when the respective extradition requests were imposed on him, he refused to reply to the specific charges that he is accused of and opposes being extradited, to which he agreed in the first instance and so stated. His link to people accused of being important figures in drug trafficking, M.A., was proved and he admitted to knowing dealers; they would have also excluded the Ergastulum, but did not, so in merit of a possible interpretation of Article 26 of the National Constitution, compliance with the Convention cannot be avoided by covering a requirement that is not requested. Because of these arguments and those of the Attorney General, the opposition to this matter must be dismissed.

IX)    Both requests comply with the so-called "double criminality" principle, which requires that the accusation for which the delivery of the accused is requested also be classified as a crime in the legal order of the requested State, with due flexibility and without requiring the same nomen iuris in the offense types. In the United States, R.P. is accused of associating and conspiring with the purpose of trafficking and possessing cocaine (grand jury charge I) and of laundering monetary instruments from such trafficking. In Spain, he is accused of trafficking and smuggling narcotics and receiving the benefit of such trafficking. From pages 113 to 114v, the facts of such accusation provided for as a crime are provided for in Articles 344 and 344bis a) 3 and 6, 344bis b) and 546bis f) of the Spanish Criminal Code. The crimes for which he is accused in the United States and in Spain are considered without further consideration in the provisions of Decree Law 14294, whether in the modalities of importation or introduction and distribution (Article 31), and it must be borne in mind that Article 32 also penalizes whoever organizes or finances the activities described even when they are not carried out in national territory. On the other hand, the charges of association and conspiracy issued by the Grand Jury, find qualification without further obstacle in the provision of Article 150 of our Criminal Code ("association to commit crime").

As for the "laundering"; in other words, the legitimation of monetary instruments, case law has decided that it is a concealment hypothesis of introduction or sale (arts. 197 C.P., 30 and 31 of D.L. 14294), extraditable in accordance with Arts. 2 Nal. 17(2) of the Treaty with the United States of America (Cf. L.J.U., T. CI, c. 11475). This is the case for several of those named in the prison order issued by the Spanish Magistrate (D., I., etc.). From the case, according to his first statement in the presence of a defense attorney, he was found to be linked to significant money movements in which M.A. also participated and operated in the country under an assumed name with false documentation of which he did not provide a satisfactory explanation. Therefore, the lack of grounds for the United States' request cannot be referred to, underlining, as the Prosecutor points out very well that in the case of the Treaty with Spain, it is associated with the jurisdiction analysis system and the formal requirements and the request cannot be rejected due to the lack of evidence (Dutch Belgian system).

XI)    (REQUEST CONCURRENCE)

In the sub-cause, the Treaty with Spain followed the seriousness system, and in the case of being the equivalent, the subsidiary criteria of the defendant's nationality and then the request's priority (Art. 5)

(Cf. Vieira, Manuel Adolfo: "Extradition in our positive law", in Revista de la Facultad de Derecho y Ciencias Sociales, Year XII, July December 1961, Nos. 3 4, p. 868).

For its part, the Treaty with the United States establishes seriousness as criteria, followed by the place the crime was committed, the defendant's nationality and the request's date (Art. 14).

There seems to be no doubt that the seriousness of the crimes for which P. is subject to extradition to the US is greater than the accusation made by the Spanish authorities, both from the punitive point of view, as well as from the criminal competence and the amount of activity performed. In this regard, it is worth referring to the accurate statements made by the Prosecutor in his excellent and orderly opinion in number III of his hearing. Also, using the subsidiary criterion of the priority, the request from the United States has preference, which was recorded with the Foreign Ministry on March 15, 1991, while that of Spain was on March 21 of that same year. The main and subsidiary criteria basically coincide in both treaties, so there seems to be no further doubt about the solution.

In the case of the criterion of seriousness, both the ontology of the protected legal right must be taken into account, and, in the case of homogeneous crimes, the aforementioned reasons of non-specific punishment and criminal act. In the case of priority, the introduction of the respective warrants by diplomatic means, without taking into account the request for provisional arrest by different means.

XII)   Also build the precedent solution through the existence of a treaty between both requesting States, which would open an instance of another extradition to the Spanish State, as well as to Uruguay if the occurrence of illicit acts by the required in our country is verified.

The seriousness of the accusation by US authorities consists of four charges (I, II, IV and VIII, see pages 252 and 253), of which three may carry a maximum sentence of life imprisonment; the activity carried out before the events investigated by the Spanish Courts. From the Spanish Prosecutor's own list of facts, the statement is clear (pg. 118), even alleging that the party subject to the extradition request has established its infrastructure for drug trafficking and money laundering in Miami (pg. 119). The proposed solution, as pointed out at the beginning of this section, is also based on the possibility of subsequent extradition to Spain according to the Treaty in force between both countries as well as to Uruguay if necessary and emerging from the investigative proceedings conducted in the country where a crime is committed by P. in national territory. This last possibility lies in not hindering international cooperation and addressing the faithful fulfillment of the obligations assumed by the State.

XIII)   The preference of the request for the most serious offense has also been the solution adopted in Article 15 of the Caracas Convention of 1981, referring to the law of the requested State to make said determination. If the national law is analyzed in this regard and in the case, as was said, it deals with crimes where the protected legal right is the same, the overlapping of offenses between Articles 150 and 197 C.P., 31, 32, 33 of D.L. 14294, the request of the United States also prevails.

As for the Spanish request, P. is charged with participating in the transfer of two shipments of cocaine to Spain, which, according to Article 31 of D.L. 14294, would be included in the word import, and was also charged with bringing cocaine into the United States in 1983 and again in 1986. These crimes would have been occurred in United States territory (importation).

In light of the charges of both States, it is necessary to analyze them in light of legislation of the requesting State, the highest penalty in respect of overlapping of offenses, accusations and the amount of activity carried out, turns out to be for the crimes that underpin the United States' request.

Even if it is not ratified, if signed, it is lawful for the interpreter to refer to the Caracas Convention for the purpose of filling gaps or doubts as a doctrine most accepted in extraordinary law, provided that this does not violate the letter or spirit of the previously signed treaties. Said receipt establishes and reaffirms solution that was reached before the concurrence of demands.

Nor should this reasoning and that which was dismissed discard the possibility of life imprisonment hindering a contradiction. Indeed, Article 33 of the Caracas Convention declares that it does not render previous treaties null and void unless expressly stated by the Party States; hence, even in contrast to the international policy followed by the country, it cannot become a breach of conventions where the requirements set forth in the Caracas Convention were not required, much less when it is only considered as the most accepted doctrine.

XIV)  The foregoing considerations underpin the continuity of the Uruguayan State's international criminal policy of cooperating internationally to suppress crime. Grotio saw the foundation of extradition in terms of "iustitia" and others, such as Mittermaier, in the usefulness that the institute generates. Its main foundation lies, however, in the social defense (cf. Calón Neck: "Criminal Right", Vol. I, general part; p. 217), which becomes particularly relevant when it comes, as in the sub-cause, to suppressing organized crime and international drug trafficking, and this without ruling on the guilt or innocence of the requested party, which is not the object of these proceedings. The high availability of technical and communications media that the modern world puts within the reach of international crime must have its counterweight in a broad cooperation of extradition between States that, through the treaties binding them, and through other agreements and declarations, have committed them to the fight against drug trafficking. As Ottati Folle pointed out, "the criterion, so often invoked, of the impenetrability of the legal order has been losing its inflexibility, as demonstrated by the texts of the numerous treaties (bilateral and multilateral) signed in the subject matter of extradition in recent years. On the other hand, this tendency ... coincides with the need to reduce the hindrances and obstacles of this institute resulting from an antiquated and happily outdated nationalist approach to law" ("Inter-American Convention on Extradition. First reflections on its content", Rev. INUDEP, Year II, No. 3, p. 127).

XV)  Finally, and having rejected the request from the Spanish Authorities based on the aforementioned criteria, it must also be stated that the documentation requested by these authorities by fax record on page 98 must, therefore, be subject to a request by means of a regular letter rogatory, which will be considered in due course.

This is because the documentation was seized by Uruguayan police in authorized raids at the request of the police force and not by evidentiary measures requested by a foreign Court.

XVI)  Nor does the use of false documents or certificates in our country (Art. 243 Uruguayan Penal Code) prevent the delivery of the requested document, since from the content his first deposition he participated in the falsification according to the provision of Art. 61 inc. 1st. C. Criminal, therefore, there would be no appropriate typification of the crime in Article 243, which only punishes the person who makes use of a document or certificate without having participated in the forgery. On the other hand, clear reasons of criminal policy state not to hinder the extradition of the defendant for an offense that if established, what would not have happened would be ontically very minor compare to the crimes for which the foreign Courts request it. This is what the most modern legislations have understood. For example, the German legislation postulates that whenever there is an obvious disproportion between the crime for which it is accused and that committed in the requested State, the persecution of the latter is either withheld or deferred in order not to hinder the extradition process. This is based on the most modern admission of the principles of opportunity and transcendence, expressly set out in Art. 49 of the draft Code of Criminal Procedure for consideration by Parliament. The doctrines most accepted in criminal matters are in that direction and in the case of extradition law, they can be asserted setting aside the need for action, whose statute of limitations would only be in domestic law cases exclusively, which do not violate international regulation. In spite of the above, the alleged crime would not occur in the proceedings as indicated above, but rather at its first declaration, trapped by Panamanian jurisdiction, without the requirements of Art. 10 of the National Penal Code and without prejudice to the provisions of Nal. XII in fine.

Based on the grounds stated and the legal and conventional provisions cited, THE COURT RULED:

Let the nullity invoked be dismissed and let the extradition of R.P. to the United States be accessed for the purpose of being tried on the charges of which he is accused. Prepare a declarations page and let the requesting states know by diplomatic means and return it.

Gabriel Adriasola

SECOND INSTANCE

Montevideo, September 9, 1991.

RECITALS:

For judgment in 2nd instance, this extradition procedure for P.R.P., which came to hear the appeal of the judgment issued by the 1st Law Court. Instance of Maldonado, 4th. Rotation (File 157/91). RESULTING IN:

I)      Judgment No. 62, of May 8, 1991, granted the extradition of the person in the heading to the United States to be tried on the charges of which he is accused.

II)     On page 553, the defense filed appeals for reconsideration with a supplementary appeal against the aforementioned judgment. Their arguments can be summarized as follows:

a) it is not possible to grant extradition to an applicant who has filed a trial in absentia of the person who is to be extradited.

b) the evidence used by the first instance judge is irrelevant since it is a police report from the authorities of the requesting country.

c) P. was acquitted of many of the charges as the defense offers to prove.

d) one of the crimes for which extradition is sought and granted in the first instance, money laundering, was created by U.S. criminal law as section 1956 of its Law Enforcement Code, by law of October 27, 1988, while the Treaty was signed on April 8, 1973, and Uruguay approved it on October 28, 1983.

In addition, there are charges that are offenses established by a law prior to the signing of the Treaty, The U.S.A. did not begin to include the crimes described in the so-called R.I.C.O. (Racketeer Influenced Corrupt Organization) Act in the treaties signed in 1980 after the signing of the Uruguayan treaty.

e) It disagrees with the judge's opinion that money laundering is compatible with our concealment.

f) also with respect to the assimilation of the conspiracy with the association to commit crimes.

g) no sentence of life imprisonment may be imposed, which may occur according to US law.

In short, it asks that extradition not be granted and in the event that this criterion is not followed, it be conditioned only on the charges that are admitted as valid by the Court.

III)    The 1st Attorney General In turn, vacated the transfer conferred on page 604, responding to the arguments made by the Defense in an extensive and well-founded opinion.

IV)     The Judge kept his resolution in the order on page 625 and allowed the appeal before this Court where the proceedings were sent for review by his order, he was summoned for sentencing and it was legally agreed.

Whereas:

I)      [BILINGUAL TEXT:] TANTUM APELLATUM QUANTUM DEVOLLUTUM

There are undoubtedly two effects of the appeal: returnable effect and the suspensive effect. In the returnable effect, there is actually a submission for review, the jurisdiction is passed from the Appellate Judge to the Superior Judge, who assumes full power of revoking the appealed judgment within the limits of the appeal.

Of course, this limiting principle of the second instance does not prevent a review of the proceedings in the preliminary process to exercise comprehensive control of the Court over the formal development of the latter. This is a procedure that is used precisely when neither party has expressed a concrete grievance against the first instance judgment. In this situation, the Court of Appeals intervenes by using its natural process reviewing power because acting otherwise, the second instance would have practically no content.

In the case, the issue is different. There are specific grievances against the judgment of first instance. Therefore, although the Court will consider the facts and procedural acts contained in the appealed judgment, it will examine, by the restrictive effect referred to above, each of the grievances on which the defense has founded its appeal.

II)     TRIAL IN ABSENTIA

First and foremost, as an introductory point of this grievance, it is necessary to examine what is the applicable legislation in this matter in Private International Law.

The Prosecutor says, on pages 607 et. seq., that International Conventions govern before domestic law in each country. The Court does not dispute this assertion, which in the context of International Law, is fully valid; however, it considers it necessary to state that it is not possible for an international standard, agreed between parties, to overlook the public order of any of these contracting parties. It is not possible to admit as unquestionable an agreement between countries, by which they are obliged not to respect internal order mechanisms that defend the security of citizens and especially the due process of law to which each one of them has the right precisely because they are inhabitants of those countries.

The problem, in due time, is to clarify whether the extradition treaty binding our country to the United States of America violates Uruguayan internal public order in that area.

This is precisely the point questioned by the Defense; whether the prosecution in absentia of P. has violated the guarantees of due process in the requested country.

The Court believes, as it has on previous occasions when it has had to decide on a similar matter, that the question must be examined from the point of view of the legal order of the requesting State, in this case, the United States of America.

This cannot be interpreted in any other way since it would make extradition lose its practicality, which would become totally ineffective.

The question is, therefore, whether the rules of due process have been respected in the requesting State. To examine this point, it is necessary to refer to U.S. legislation.

There is no Instruction Court in that country. The Department of Justice, comprised of Prosecutors, investigators and Police, carries out that function and are the ones who gather evidence to bring a subject to criminal proceedings.

The Court believes that the constitutional guarantees of due process have not been violated, since extradition itself is not a trial, but a procedure by which a subject will be prosecuted and the extradited person will be determined to be guilty or not guilty. At that time, when the trial begins, the accused will have at his or her disposal all relevant procedural guarantees; In other words, the right to be an attorney, the right to be tried by a jury, according to U.S. law and the guarantee that the judge will pronounce judgment according to the jury's decision. Denying extradition because the laws of the requesting country are different is unthinkable, given that with that same criterion, it should not be granted to a country that does not have the same legal system as ours because, for example, it has the jury, which Uruguay does not.

If this extradition procedure had not been agreed based on the circumstance being examined, what was agreed in Article 10 3 of the Treaty in force between the United States and our country, would not have been justified, which reads: "When the request refers to a person who has not yet been convicted, it must be accompanied by a bench warrant or arrest warrant or an equivalent indictment issued by the competent authority of the requesting Party." The proceeding was conducted in the United States, where a Grand Jury determined that P. should be tried for the crimes for which his extradition was later requested.

This is in accordance with the Uruguayan constitutional framework, which also allows for the arrest of a person when there is partial evidence of a crime and without prosecution. This is because in our constitutional system, the Judge has 48 hours to make a summary ruling or release the accused.

From this constitutional system, covered by the provisions of Articles 118 and 119 of the Code of Criminal Procedure, finds that in our legislation, it is also possible to issue an arrest warrant "in absentia"; because it is a person who never declared before the Judge and who will most likely be a fugitive. Our case law has been very precise and clear regarding this assertion as it arises from the judgment of the similar 1st. Rotation, No. 202, dated December 20, 1990 (Cf. Vol. 3rd., sent. 80/82).

It means that in the requesting State, the trial of P. has not yet begun and that extradition is requested in order to carry out this prosecution, where the accused will not lack any guarantees of due process of law.

The clarity of the explanations provided by the Attorney General in this case, specifically on page 609/610 et. seq. exempts this Court from all other comments, with respect to the matter discussed in this Recital.

In summary, then, with regard to the defense's grievance that a trial has been carried out in absentia of its client, the Court concludes, based on the arguments presented in this Recital, that it is not relevant and therefore it is not accepted.

III)    SUFFICIENT EVIDENCE

The assessment made by the Judge of First Instance has been challenged with respect to the evidence presented in the courts and that is related to the guilt of its client.

The Court must state that case law practiced in the Courts of Appeals has assessed as correct the evidence produced in a court in the United States of America, when it has been carried out in a procedure with criminal legal support and with the authorization of a judicial Magistrate of that country, which makes it unquestionable. In that sense, the same was pronounced by Rotation, in a judgment of July 28, 1989, which is published in La Justicia Uruguaya, Case No. 11475.

To determine an extranational legal relationship, we must abide by the category table offered by the system of international law standards, since it is the system that governs the relationship. Moreover, to specify the extent of the categories, it is necessary to interpret the regulations of international law according to the approach of the legal system to which the regulations to be interpreted belong (Quintín Alfonsín: "Two Studies on International Private Law", Montevideo 1946, p. 67).

Strictly speaking, then, the assessment of the evidence must not be done in accordance with Uruguayan law, but rather with those derived from the interpretation of what is agreed in the respective Treaty, which is the system of international standards referred to by the author indicated above. This is the best solution of international law, because it allows for an interpretation in accordance with the legislative divergences between the States, parties to the Treaty in question (a solution to which also the aforementioned sentence published in Uruguayan Justice as Case No. 11475 arrives).

In this case, moreover, the only evidence presented is not only the police memorandum to which the defense refers. The statements of the Prosecutor and other investigators in charge of the case in the requesting country should also be considered as such, since they are part of the Department of Justice and are the officials in charge of the indictment. These depositions were studied by the US Grand Jury that intervened in the case and considered as evidence in order to request the prosecution for the crimes for which P was later summoned. As the acting Attorney General rightly says, that is something perfectly equivalent to our concept of "sufficient conviction elements" that are equivalent to partial or incomplete evidence.

In a case like the one that has been subjected to the consideration of this Court, complete certainty is not required but only plausible, a judgment of probability, a "fumus bonis juris" (cf. Quintín Alfonsín: "Theory of Private International Law" p. 390, 404/406).

In addition, Article 10 of the aforementioned Treaty states that the requested party may ask that the requesting party provide sufficient evidence to establish "prima facie" that the accused has committed the crime for which his extradition is requested. He also states that the requested party may deny extradition in the event the arrest is manifestly unfounded. Note that it only grants a simple power to the Judge of the requested State. It is not a duty, which infers a fortiori. If the evidence is sufficient for the required party, it may also grant delivery.

IV)    ACQUITTAL OF VARIOUS CHARGES

From the documentation added in the case in this same instance, it can be seen that a certain F. de L.M. was acquitted of a charge and in a following case of a certain C.Q., the Court did not accept the evidence obtained by electronic surveillance apparatus and on its merit, it abandoned the process and withdrew the charges. However, from this added documentation, duly legalized and translated, there is no direct relationship with the case that is questioned in this file. Moreover, the name of P. does not appear at all in any of the documents submitted.

But there is no evidence in case records that allows us to infer that some charges have been destroyed, such as:

a) in May 1985, P. became a partner and adviser to I.I. and his company whose purpose was to smuggle cocaine into the United States and he advised him to use Panamanian companies to hide the real owner of the goods acquired with that illegal trafficking.

b) subsequently, in September 1987, it carried out operations aimed at introducing 800 kilograms of cocaine aboard the O.S.

This means that, in the first case (letter a) there was an agreement of wills with an illegal purpose, which will then be examined in light of the legislation in force in our country. And in the case of letter b), there is, without a doubt, a conduct possibly punished very severely by our law 14294, which will also be subject extensive examination in a separate Recital.

### V)    RETROACTIVITY OF NEW CRIMES

The defense says that the crime of money laundering, which is one of the illegal acts for which extradition is requested, was created by US law after the signing of the Extradition Treaty with Uruguay.

The case is very clear, one of the most expensive principles for criminal law is the non-retroactivity of laws that create new crimes. If the crime of money laundering is not acknowledge under the Treaty, the wrong can be charged later, when a law incorporates it into the domestic legislation of one of the signatory countries of the treaty. The rule is that it must deprive the right of the Treaty on others, since it is the one that has agreed to a series of behavior between the signatories. To attempt to incorporate a criminal act into the Treaty that, when it was signed, was not classified as a clear violation of the principles of liberal criminal law.

For these reasons, the Court will accept this grievance.

This reason results in the offense of money laundering and its double criminality in our law as concealment, which does not accept the defense, losing its reason of being, although the Court will examine it at greater length in a separate Recital.

### VI)    THE CRIME OF MONEY LAUNDERING

As the Prosecutor in this case has very clearly examined, on pages 621 and reverse, the conduct for which P. is charge with the crime of laundering of monetary instruments cannot in any way be included in the criminal typification of concealment provided for in Article 197 of our penal code. Indeed, P. was involved in criminal activity with other people, which charges him as a co-delinquent in these types of crimes, for example, the trafficking of cocaine. Although he might have later participated in operations aimed at laundering this dirty money through these criminal activities, this cannot in any way be considered as concealment under our law. Concealment is an autonomous concept that, among its presuppositions, requires that the subject not be a participant in the criminal activity that is concealed and was not aware of it before collaborating in its concealment.

Thus, as the Prosecutor himself admits, the crime of laundering monetary instruments cannot be included under our concealment.

The principle of double criminality in the Member States is therefore not fulfilled in this case.

The Court, therefore, considers relevant the grievance expressed in this regard by the appellant.

### VII)    CONSPIRACY AND CRIMINAL ASSOCIATION

The way in which, according to the requesting authorities, P. was "associated" with other members of the criminal organization to commit criminal acts he is charged with, especially that of importing cocaine from a place outside the United States of America, in the opinion of the Court, he participates in simple co-delinquency and not in criminal association to commit a crime.

Indeed, the differences between the two forms of violation of criminal law are plausible:

First of all, co-delinquency implies a beginning of execution, that is, an agreement to commit one or several crimes, in a degree of attempted or committed. Instead, the criminal association to commit crimes is simple criminal intent, without the execution.

Secondly, co-delinquency is occasional, while the criminal association to commit crime is permanent. The latter has an indispensable condition that a coherent and durable organization is constituted, which allows for the identification of its members as partners rather than co-delinquents, while at the same time recognizing the group externally, for the homogeneity of its purposes, methods used and agents anticipated acts (Criminal Court of Appeals 1st. Rotation, judgment No. 159/77, published in Revista del Instituto Uruguayo de Derecho Penal, Year I, No. 1, p. 192).

The important thing, then, is that it involves a plurality of plans and that this element of permanence can in fact be affirmed and that characterizes a true association, differentiating it from a criminal agreement referring to various crimes, but transitory (Soler: "Argentine Criminal Law" , Volume IV, page 550).

In the opinion of the Court, it is not duly proven in the court records that P. had permanently associated with other subjects to carry out harmful conduct in narcotics legislation. The only fact that appears proven is that in an undetermined place in US territory, they imported cocaine in the aforementioned ship.

It is not proven that this agreement of wills would have carried out other criminal activities which are crimes in our law, except for money laundering, which was already rejected by the provisions of previous Recitals. It is not proven that there is a stable permanent organization engaged in other criminal activities or that has engaged in harmful conduct under the drug law at any other time. Everything makes us suppose, at least with the evidence that has been presented in these cases, that there was an impromptu meeting, which is undoubtedly a form of conspiracy and not a criminal association to commit crimes. And, if at any time, the crime of importing cocaine into U.S. territory was committed on a single occasion based on court records. Evidence is needed that there has been a criminal agreement to commit crimes, without which, the action must be contained in every criminal manifestation, within the limits of a simple overlapping of offenses in the specific crime.

Although it was proven in the case that there was a conspiracy, this form of the iter criminis is not punishable under our law, at least for the activities for which extradition is requested in the case.

VIII)   POSSIBLE SENTENCE OF ERGASTULUM

The Defense is also aggravated because a life sentence is possible, which does not exist in our country.

In principle, this argument should be dismissed, because it does not appear that a sentence of this type will be ordered in the sentence that will refer only to some crimes and not all for which extradition was requested.

This consideration is valid faced with the declaration that this Court will make on the extradition being conditioned only on some of the charges requested and the fulfillment of formal and procedural order guidelines.

IX)   OFFENCES FOR WHICH EXTRADITION IS GRANTED

Based on the foregoing, only some of the charges brought against P. by the requesting authorities have been left standing.

Indeed, the Court recognizes as valid the United States' claim regarding the following fact, from an unknown date, sometime in 1982 continuing until November 29, 1988, the party subject to the extradition request, along with others, joined together to import cocaine into the territory of the United States from somewhere outside of it.

It can be proven that P. at least planned and organized a shipment of cocaine onboard a cargo ship in 1985.

This conduct, which is unlawful according to U.S. laws, complies with the principle of double criminality, since in our country, it is classified as a crime under Article 31 of Decree Law 14294.

One of the main parts of Article 31 of the aforementioned decree is that of "importing" and has been interpreted by national doctrine and extensive case law: as any entry or exit of the goods contained in lists I and II Conventions of New York and I Convention of Vienna. The substance "imported" by P. from another country (Colombia) is cocaine, which is included in list I of the 1961 New York Convention.

Moreover, according to the charge that has been proven and subject to extradition, P. organized the operations aimed at importing this drug into the United States, which also adapts to our standard type provided for in Art. 32 of the aforementioned decree law, one which includes the verbs to organize, which means ordering, distributing, structuring.

[logo] **THOMSON REUTERS**                                        Document

Also in that norm the financing of these operations is punishable.

It should also be assumed that P. carried out some of the activities punished by Art. 34 of the aforementioned regulations, since, undoubtedly, the importing of the drug was to market, supply, deliver, promote and facilitate the product, which are all typical offenses provided for in Art. 34 of the aforementioned decree law.

There is no doubt then that some of these charges have double criminality in our and the requesting party's country.



TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Exhibit T**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

_____
Jacqueline Yorke

Sworn to before me this
April 15, 2022

_____
Signature, Notary Public

WENDY POON
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in
Queens County
01PO6356754
MY COMMISSION EXPIRES 04-03-2025

_____
Stamp, Notary Public