# EXHIBIT U

**Voces:** ESTADOS UNIDOS ~ EXTRADICION ~ PROCEDIMIENTO PENAL

**Publicado en:** LJU Tomo 101, 01/01/1990, 71
**Cita Online:** UY/JUR/27/1989

**Sumarios:**

1 . 1.    La exigencia de orden público interno es que exista en el estado peticionante las garantías del debido proceso le-gal, pero las características o modalidades concretas que en cada país asume esta esencialísima garantía, es propio de cada legislación y en ello no cabe inmiscuirse. De ahí que el interrogatorio previo del indagado, con asistencia profesional o constancia de su negativa a declarar, que es un presupuesto indispensable para procesamiento en nuestro derecho, no es trasladable a otros ordenamien-tos jurídicos.

2 . 2.    Cuando los documentos se introducen por vía diplomá-tica, no existe ninguna razón material o jurídica para ne-garle la debida autenticidad; lo contrario sería un agravio a un país con el cual Uruguay mantiene relaciones diplo-máticas. El requisito de la legalización no puede agregar ninguna nota mayor de autenticidad que los que ya están ínsitos en la introducción diplomática.

3 . 3.    Los defectos o vicios de forma que pueden afectar una so-licitud de extradición pueden ser reparados y una vez su-perados, no puede encontrar más obstáculos sobre tal aspecto.

4 . 4.    La traducción de los documentos aunque se hubiera com-pletado posteriormente con traducción de algunos textos y la correspondiente legalización, por disponerlo el Juez interviniente, la conclusión no puede variar en cuanto a que la petición es arreglada a derecho.

5 . 5.    Los tratados de extradición deben interpretarse en la for-ma que favorezca el fin por el que fueron convenidos, porque tienen su fundamento jurídico en las leyes natu-rales de las sociedades civiles y sus disposiciones, en rela-ción al espíritu que las informa, de tutela común a la so-ciedad, deben ser ampliamente interpretadas por ser lo más conforme al interés general que es el de asegurar el curso de la justicia de la manera más completa posible.

6 . 6.    Si el Tratado no define una expresión o concepto, para de-terminar su alcance, no debe irse al sistema normativo de uno u otro estado, sino que la solución deberá encon-trarse por la averiguación de la voluntad común de las par-tes, dentro del contexto y atendiendo la finalidad del instituto.

7 . 7.    Los cargos formulados son: conspiración para importar cocaína a los E.U., distribuirla y planear el cobro pro-veniente de la venta, delitos de droga, ocultamiento de dinero y delitos de conspiración, ayuda y participación en la comisión de un delito extraditable.No importa que ninguno de esos cargos se adecue típica-mente a las figuras delictivas previstas en el decreto?ley 14294, ni al resto del ordenamiento penal patrio, lo que importa es que el intérprete encuentre el sentido de una calificación jurídica en el marco general de las normas  creadas por la voluntad común de los Estados, suscrito-res del Tratado de Extradición y Cooperación en Materia Penal Uruguay y E.U., vigente desde el 11/4/84.

8 . 8.    Por otra parte, los hechos imputados se encuadran, sin vio-lencia, en una hipótesis de encubrimiento de introducción o venta, lo que claramente convierte a la imputación en una figura pasible de ser extraditada al tenor del Tratado.

9 . 9.    La conducta imputada, "lavado" (legitimación) de instru-mentos monetarios, es un delito susceptible de extradi-ción porque se trata de un delito a distancia (ejecutado fuera del territorio de E.U.) pero que cometido en si-milares circunstancias respecto del Uruguay, quedaría sometido a la jurisdicción nacional, como encubrimien-to de los tipos (figuras delictuales) establecidos en los arts. 32 a 33 del dec. ley 14294 ("organización o finan-ciación" o "introducción ilegal a países extranjeros").

10 . 10.   Desde una perspectiva interna o ya por la línea de polí-tica internacional seguida por el país en la materia, debe entenderse que la extradición de quien eventualmente pueda ser condenado a prisión perpetua por otro estado -pena que nunca nuestro país consideró inaplicable a los delitos por los que concedía la entrega? no es violatoria de la Constitución ni afecta el orden público interna-cional.

11 . 11.   La exigencia probatoria del Tratado ?en el máximo gra-do que puede asignársele?, se ubica, vincula o aproxima al concepto de verosimilitud ("fumus bonis juris"), es-to es, probabilidad o verosimilitud de los hechos impu-tados o derechos aducidos.

12 . 12.   Si bien se faculta al Estado requerido a solicitar la presen-tación de "pruebas suficientes" u otros "comprobantes o información adicional" (art. 10 No. 3o. in fine y art. 12), en modo alguno contraviene lo establecido en el Tra-tado la actitud de la parte requirente al presentar, sin serle solicitada, información adicional, la que, por lo demás, se inscribe en el espíritu de cooperación internacional con el cual fue suscrito y ratificado.

**Clasificación:**

EXTRADICIÓN

+ Procedimiento

+ Garantía de debido pro-ceso

+ Debe existir en Estado peticionante

+ Sus caracterís-ticas y modalidades son propias de cada país

+ Solicitud

+ Por vía diplomática

+ Es auténtica

+ Improcedencia de exigir legalización

+ Defectos o vicios de forma

+ Pueden ser subsana-dos

+ Traducción

+ Completada posteriormente

+ Es válida

+ Tratado

+ Interpretación

+ En forma que favorezca su finalidad

+ No definición de expresión o concepto

+ Debe averiguarse voluntad común de partos

+ De extradición y coopera-ción en materia penal con E. U. (vigencia: 1984)

+ Hechos imputados

+ No importa su adecuación a normas internas

+ Importan normas creadas por Tratado

+ Eventualidad de con-dena a prisión perpetua

+ No viola Constitución

+ Exigencia probatoria

+ Verosimilitud

+ Información adicional

+ Presen-tada sin requerimiento previo

+ Admisibilidad.

1.     La exigencia de orden público interno es que exista en el estado peticionante las garantías del debido proceso le-gal, pero las características o modalidades concretas que en cada país asume esta esencialísima garantía, es propio de cada legislación y en ello no cabe inmiscuirse. De ahí que el interrogatorio previo del indagado, con asistencia profesional o constancia de su negativa a declarar, que es un presupuesto indispensable

para procesamiento en nuestro derecho, no es trasladable a otros ordenamien-tos jurídicos.

2.    Cuando los documentos se introducen por vía diplomá-tica, no existe ninguna razón material o jurídica para ne-garle la debida autenticidad; lo contrario sería un agravio a un país con el cual Uruguay mantiene relaciones diplo-máticas. El requisito de la legalización no puede agregar ninguna nota mayor de autenticidad que los que ya están ínsitos en la introducción diplomática.

3.    Los defectos o vicios de forma que pueden afectar una so-licitud de extradición pueden ser reparados y una vez su-perados, no puede encontrar más obstáculos sobre tal aspecto.

4.    La traducción de los documentos aunque se hubiera com-pletado posteriormente con traducción de algunos textos y la correspondiente legalización, por disponerlo el Juez interviniente, la conclusión no puede variar en cuanto a que la petición es arreglada a derecho.

5.    Los tratados de extradición deben interpretarse en la for-ma que favorezca el fin por el que fueron convenidos, porque tienen su fundamento jurídico en las leyes natu-rales de las sociedades civiles y sus disposiciones, en rela-ción al espíritu que las informa, de tutela común a la so-ciedad, deben ser ampliamente interpretadas por ser lo más conforme al interés general que es el de asegurar el curso de la justicia de la manera más completa posible.

6.    Si el Tratado no define una expresión o concepto, para de-terminar su alcance, no debe irse al sistema normativo de uno u otro estado, sino que la solución deberá encon-trarse por la averiguación de la voluntad común de las par-tes, dentro del contexto y atendiendo la finalidad del instituto.

7.    Los cargos formulados son: conspiración para importar cocaína a los E.U., distribuirla y planear el cobro pro-veniente de la venta, delitos de droga, ocultamiento de dinero y delitos de conspiración, ayuda y participación en la comisión de un delito extraditable.

No importa que ninguno de esos cargos se adecue típica-mente a las figuras delictivas previstas en el decreto ley 14294, ni al resto del ordenamiento penal patrio, lo que importa es que el intérprete encuentre el sentido de una calificación jurídica en el marco general de las normas  creadas por la voluntad común de los Estados, suscrito-res del Tratado de Extradición y Cooperación en Materia Penal Uruguay y E.U., vigente desde el 11/4/84.

8.    Por otra parte, los hechos imputados se encuadran, sin vio-lencia, en una hipótesis de encubrimiento de introducción o venta, lo que claramente convierte a la imputación en una figura pasible de ser extraditada al tenor del Tratado.

9.    La conducta imputada, "lavado" (legitimación) de instru-mentos monetarios, es un delito susceptible de extradi-ción porque se trata de un delito a distancia (ejecutado fuera del territorio de E.U.) pero que cometido en si-milares circunstancias respecto del Uruguay, quedaría sometido a la jurisdicción nacional, como encubrimien-to de los tipos (figuras delictuales) establecidos en los arts. 32 a 33 del dec. ley 14294 ("organización o finan-ciación" o "introducción ilegal a países extranjeros").

10.    Desde una perspectiva interna o ya por la línea de polí-tica internacional seguida por el país en la materia, debe entenderse que la extradición de quien eventualmente pueda ser condenado a prisión perpetua por otro estado -pena que nunca nuestro país consideró inaplicable a los delitos por los que concedía la entrega  no es violatoria de la Constitución ni afecta el orden público interna-cional.

11.    La exigencia probatoria del Tratado  en el máximo gra-do que puede asignársele , se ubica, vincula o aproxima al concepto de verosimilitud ("fumus bonis juris"), es-to es, probabilidad o verosimilitud de los hechos impu-tados o derechos aducidos.

12.    Si bien se faculta al Estado requerido a solicitar la presen-tación de "pruebas suficientes" u otros "comprobantes o información adicional" (art. 10 No. 3o. in fine y art. 12), en modo alguno contraviene lo establecido en el Tra-tado la actitud de la parte requirente al presentar, sin serle solicitada, información adicional, la que, por lo demás, se inscribe en el espíritu de cooperación internacional con el cual fue suscrito y ratificado.

Juzgado Letrado de 1ª Ins-tancia en lo Penal y de Menores de 2do. Turno de Maldonado.

Tribunal de Apelaciones en lo Penal de 3er. Turno.

**Texto Completo:**

PRIMERA INSTANCIA

Maldonado, 19 de mayo de 1989.

Visto:

Para sentencia este exhorto procedente de los E. U. de A. que solicita la extradición de R.S.V. (Ficha P/129/89), con intervención de la Sra. Fiscal Letrada Departamental de Segundo Turno, Dra. Cristina Gon-zález de Saldivia.

Resultando:

I.    Que el día 22 de febrero del corriente año (fs. 1, 7 y 11) fue detenido por personal de la Jefatu-ra de Policía de Maldonado, el ciudadano argentino R.S.V. al tener conocimiento que la Embajada de los E. U. de A. había solicitado el arresto con el propó-sito de extradición.

II.    Que el día siguiente (fs. 1 y 3) el Senten-ciante tuvo conocimiento de ese acto y ordenó que la persona privada de su libertad fuera conducido de inmediato con memorando explicativo. Llevado que fue al Juzgado, se le intimó la designación de Defen-sor que lo patrocinara, se le hizo saber el derecho a comunicarse libre y privadamente con éste (fs. 10) y se le informó detalladamente sobre los motivos de su detención.

III.    Que en la declaración (realizada asimismo con la presencia de la Sra. Representante del Minis-terio Público a quien se le había hecho saber la ini-ciación del trámite  fs. 8v. ) se lo indagó a fin de determinar si se trataba de la misma persona requeri-da y sobre los cargos que se le realizaban; resultó ser el individuo sindicado por las autoridades extranje-ras, declarándose inocente (fs. 11 15).

IV.    Que por resolución No. 393, también de fecha 23 de febrero de 1989 (fs. 16 16v.), conside-rando que: el pedido de detención provisoria estaba debidamente documentado; que el detenido era la persona requerida, que se mencionaban debidamente los presuntos delitos inculpados y que se recibió de-claración con las garantías de la Defensa Letrada, atento a lo normado en el art. 11 del Tratado de Ex-tradición y Cooperación en Materia Penal suscrito entre nuestro país y los E. U. de A. en W. el 6 de abril de 1973, se resolvió disponer el arresto provisorio de R.S,V, comunicándose a Jefatura de Policía la or-den respectiva. Además, se hizo saber al Juez requi-rente que había comenzado el plazo que prevé el inciso final del art. 11 del Tratado vinculante en la es-pecie, librándose exhorto al efecto y radiograma por medio de INTERPOL; se solicitó a Jefatura de Poli-cía que enviara los datos identificatorios del arrestado y se incautaran los documentos personales de identi-dad. Se mandó notificar al Ministerio Público; que se reservara y en su oportunidad, volviera al Despacho.

V.    El día 4 de abril del corriente (fs. 180) fue recibido en esta Sede el formal pedido de extradición enviado por vía diplomática (fs. 34 a 180)  el que había llegado al Ministerio de Relaciones Exteriores de nuestro país el día anterior  fs. 36.

La relación circunstanciada del hecho incrimina-do es en síntesis, la siguiente:

El primer procesamiento contra V., lo acusa de un cargo por conspiración para ayudar e instigar a obtener la posesión y realizar la distribución de co-caína (infringiendo las Secciones 841 (a) (1) y 846, Título 21, del Código de los E.U. y la Sección 2, Título 18, del Código de los E.U.) y por "lavado" de instrumentos monetarios (infringiendo las Secciones 371 y 1956, Título 18 del Código de los E.U.); un cargo de a sabiendas e intencionalmente ayudar e instigar a la obtención de la posesión de cocaína con la intención de distribuirla (infringiendo la Sección 841 (a) (1), Título 21, del Código de los E.U. y la Sección 2, Título 18, del Código de los E.U.); y doce cargos de "lavar" fondos producidos por la venta ile-gal de estupefacientes peligrosos (infringiendo las Secciones 2 y 1956 (a) (1), Título 18, del Código de los E.U.).

El segundo procesamiento dictado contra V., lo acusa de un cargo de conspiración para ayudar e

Documento

ins-tigar a obtener la posesión y realizar la distribución de cocaína (infringiendo las Secciones 841 (a) (1) y 846, Título 21 del Código de los E.U., y la Sección 2 Título 18, del Código de los E.U.), y de "lavar" ins-trumentos monetarios (infringiendo las Secciones 371 y 1956, Título 18, del Código de los E.U.); y once cargos de "lavar" los fondos producidos por la venta ilegal de estupefacientes peligrosos (infringiendo las Secciones 2 y 1956 (a) (1), Título 18, del Código de los E.U.).

Los procesamientos mantienen en substancia que aproximadamente entre 1985 y febrero de 1989, V. y sus co-acusados trabajaron para personas en C. y otros lugares en la A. del S. que tenían el negocio de importar grandes cantidades de cocaína en los E.U. y de hacer los arreglos para su distribución. Co-mo parte del conjunto de la operación de tráfico de estupefacientes, V. y algunos de sus co-acusados coor-dinaron el cobro del producto de las ventas de la co-caína a los distribuidores en L.A., C., N.Y., N.Y. y en otros lugares de los E.U. Una vez cobrado el dine-ro, V. y otros supervisaban su transferencia y depósi-to en cuentas bancarias controladas por ellos, en L.A., desde las cuales era transferido por telégrafo o cable a cuentas en N.Y. y U., para su distribución final a los traficantes de cocaína de C.

Los cargos específicos contra V. incluyen que en 1986 compró un negocio de cambio de dinero y metales preciosos, en M., U., llamado C.I. o L.S.A., el cual utilizaba en beneficio de los traficantes de estu-pefacientes para los cuales trabajaba, como un medio de disfrazar el verdadero origen de grandes sumas de dinero transferidas a ellos desde los E.U. Usando C.I. y otros negocios en los E.U., se alega que V. y sus co-acusados se dedicaban a realizar ventas ficticias de oro, el que era cambiado por el dinero que habían cobrado los distribuidores de cocaína. Los registros de los bancos de los EE.UU. respecto a los negocios implicados indican que el dinero fue transferido a través de instituciones financieras de los E.U. a cuen-tas que incluían las cuentas uruguayas de C.I. y/o L.S.A. Las pruebas en que se basan los cargos contra V. indican además que cientos de millones de dólares del producto ilegal de estupefacientes se transfirie-ron a las cuentas del negocio de V. en U. y fueron remitidos luego a P., C. u otros lugares en beneficio de los traficantes de cocaína.

VI.   In continenti, se decretó (No. 933/181) practicar examen médico al arrestado por los dos Médicos Forenses de este Departamento y que se efectuara por odontólogo ficha dental con fines iden-tificatorios: asimismo, recibir declaración al Sr. V. fijando al efecto la audiencia del 5 de abril.

VII.   Se recabó declaración en la fecha fijada, la que prosiguió al día siguiente (fs. 187 198v.).

VIII.   Por auto No. 927 de fecha 7 de abril de 1989, de la demanda de extradición se confirió trasla-do a la Defensa por el término de seis días peren-torios.

IX.   El Sr. Defensor a fs. 210 240, se opuso a la solicitud del gobierno de los E. U. de A. por las si-guientes razones:

a) Que la cooperación internacional en materia penal es atípica y de excepción, por ello, si hay una sola carencia o irregularidad es suficiente para denegar la solicitud de asistencia.

b) Que la traducción del exhorto de autos ha sido hecha en el Departamento de Estado de los E.U., soslayándose lo que prevé el decreto ley 15441 que obliga a que ésta se realice por Traductor Públi-co matriculado en el país o en su defecto por el Agen-te Consular de la República en el país de origen de los documentos. Esta irregularidad es suficiente para rechazar la requisitoria.

c) Que el art. 10 del Tratado en su numeral 2 cuando expresa que la solicitud deberá ir acompaña-da de, entre otros requisitos esenciales "los textos legales que regulan la prescripción de la acción y de la pena" y en la especie, si bien se menciona que se agre-gan (fs. 84), no lo han hecho y simplemente el fir-mante dice que "he revisado acusio-sa-mente esta ley y doy fe de que la acción judicial contra R.V. en este asunto no ha prescripto". O sea se ha violado nueva-mente un requisito esencial, dejándose de enviar pre-meditadamente algo exigido claramente por el Tra-tado.

d) Que no se ha señalado la competencia del Tribunal o Juzgado que emite el pedido.

e) Que las pruebas acompañadas son franca-mente insuficientes, ilegales, no aceptadas por el De-recho positivo uruguayo, violatorias de la Constitu-ción Nacional y por lo tanto, violatorias de nuestra

Documento

soberanía por lo que deberían ser rechazadas en todos sus términos. La declaración jurada en la que se hace la síntesis de los cargos contra R.V. es una mera copia del memorando elevado por los investigadores (FBI y DEA) a la Fiscalía. Lías presuntas pruebas que deberían adjuntarse, no existen, sólo la declaración de un informante que puede ser tachada. El FBI rea-lizó una paciente investigación durante varios años en las que se recibieron cientos de testimonios, seguimientos, filmes en vídeos y grabaciones telefóni-cas contra los investigados; parte de esas pruebas fue-ron enviadas con este pedido y sin perjuicio de con-siderarlas pruebas ilegales, expresa que en ninguna de ellas se observa o se escucha a R.V. y ni siquiera se le menciona.

f) Que el trámite realizado en los E.U. (Tenien-te Fiscal da fe que V. es Culpable) colide con nuestra Constitución que prohibe el juicio en rebeldía.

g) Que no se adjuntó una sola factura, de las presuntas compras y ventas ficticias, ni cuentas co-rrientes de V. con grandes movimientos, ni facturas de las transportadoras de caudales investigadas, ni mucho menos contactos de V. con traficantes de cocaína.

h) Que los delitos por los cuales se solicita la extradición no están previstos en las 32 hipótesis que establece el tratado.

X.     Se corrió traslado a la Sra. Representante del Ministerio Público (No. 1021/241 241v.) y la Sra. Fiscal Letrada Departamental de Segundo Turno en fundado dictamen (fs. 243 254) abogó para que se es-timara la demanda al no advertir irregularidad alguna que obstara la concesión de la extradición.

XI.     Y se llamó para sentencia (No. 1231 de fecha 2 del corriente mes (fs. 254v.), subiendo la pieza al Despacho para dictarla.

XII.     Consta además en autos:

Que como medida para mejor proveer (No. 1269/255v.) dispuso que el Estado requirente presen-tara traducción del exhorto realizada por profesional habilitado en la República y asimismo que incorpo-rara relación de las normas sobre prescripción de la acción y de la pena;

Que la Embajada de los E. U. de A. con fecha 8 del presente mes cumplió con lo solicitado (fs. 256 311), mandándose (No. 1287/312) agregar los recaudos con noticia de la Defensa y del Ministerio Público;

Notificados que fueron personalmente las partes el 8 de mayo (fs. 313), el día 16 siguiente vol-vió el expediente al Despacho para sentencia (fs. 374);

En el ínterin, a fs. 314 344 se recibió (vía diplomática) exhorto donde se adjuntan tres páginas omitidas en la versión en inglés. Se dispuso tenerlo presente sin otro trámite (fs. 345). Asimismo, se pre-sentó otro exhorto (fs. 346 373) poniendo a dispo-sición información adicional (prueba testimonial de cargo). Se proveyó que se estuviera al auto No. 1287/312.

XIII.  Está probado en autos que el arrestado R.S.V. es la misma persona que requieren los E. U. de A. y de sus dichos surge que se trata de una perso-na que comercia con metales preciosos (en especial oro) a nivel internacional; que estuvo radicado en los E.U.; que conoce a la mayoría de las empresas sindi-cadas corro involucradas en actividades ilícitas, a sus titulares y también a quienes le acusan personal-mente.

Considerando:

I.     Que se irá a hacer lugar a la demanda de ex-tradición al configurarse los requisitos adjetivos y sustanciales normados en el Tratado de Extradición y Cooperación en Materia Penal suscrito entre la República O. del U. y los E. U. de A. en W. el 6 de abril de 1973, en vigencia desde el 11 de abril de 1984. Los fundamentos volcados por el Señor De-fensor carecen en concepto del Pretorio no sólo de virtualidad jurídica, sino de poder convictivo para dar cima a una solución diversa de la que aquí se adopta, siendo ello así, por lo que ha de expresarse seguidamente.

II.     La extradición es un acto de asistencia judi-cial interetático en materia penal que versa sobre el envío de un individuo penalmente inculpado o re-querido, de la esfera de soberanía de un Estado a la de otro.

Documento

---

Novda Monreal (Revue internacionale de droit pénal, 1969, p. 788) lo define como una medi-da destinada a salvaguardar los principios de derecho más fundamentales y generales reconocidos por el mundo civilizado y que consiste en entregar a una persona condenada o llamada a juicio a consecuencia de la violación de esos principios al Estado al cual pertenece el derecho de represión y en el cual la ac-ción será juzgada, ofrecidas todas las garantías de un Estado fundado sobre el derecho.

El derecho extradicional pertenece al género de la cooperación jurídica en materia internacional. De consumo con la concordante opinión del Ministerio Público, el punto de vista metodológico no ha de ser el restrictivo (que ve el alcance espacial del Derecho Penal en la esfera internacional desde una perspectiva territorialista, donde la extraterritorialidad consti-tuye un temperamento excepcional) como la pos-tula la Defensa.

En efecto, en conceptos trasladables de Vieira (El delito en el Espacio Derecho penal internacional y derecho internacional penal   Mont. FCU 1969 p. 17), las definiciones en materia jurídica están subor-dinadas a la posición a la cual se encuentra afiliado el jurista. Si nos encontramos ante un nacionalista, el acento de la definición se colocará en el aspecto nacional de Derecho Penal. Si por el contrario, nos encontramos frente a un internacionalista, resaltará la concepción solidarista y de cooperación interna-cional ante la ley penal.

Siempre que el Uruguay firmó un convenio bila-teral sobre cooperación jurídica en el último siglo, se incluyó a los exhortos en materia penal.

Véase:

1) Tratado U.B. para la Ejecución de Cartas Ro-gatorias (1879), Arts. 1 y 2 (Aprobado por Ley de 21 de mayo de 1879).

2) Tratado U.B., Protocolo sobre Cartas Roga-torias (1906), Art. 1 (Modifica y complementa el anterior).

3) Tratado U.E. Supresión de Legalizaciones en las comisiones rogatorias (Ley del 10 de junio de 1901).

4) Tratado U.A. Convenio ampliatorio del Tra-tado de Derecho Procesal de M. (1907). Arts. 1 y ss. (ley 3163 de 31 de mayo de 1907).

5) Tratado U.P. Convenio ampliatorio del Tratado de Derecho Procesal de M. (1915). Arts. 1 y ss. (ley del 18 de junio de 1920).

6) Tratado U.B. Convenio ampliatorio del Tra-tado de Derecho Procesal de M. (1918), Arts. 1 y ss. (ley 6189 de 16 de julio de 1918).

7) Tratado U.A.P. (1940) de Derecho Procesal. Art. 11 (ratificado por decreto ley del 12 de noviem-bre de 1942).

8) Tratado U.A. (1980 sobre Igualdad de Trato Procesal y Exhortos, Arts. 2 y ss. (Ley 15110 del 17 de marzo de 1981).

9) Tratado U.Ch. (1982) sobre Igualdad de Tra-to Procesal y Exhortos. Arts. 2 y ss. (decreto ley 15251 del 26 de marzo de 1982).

El auxilio judicial internacional en materia penal ofrece características similares al homónimo fenóme-no en materia civil (Werner Goldschmidt: Der. Int. Privado, 2a. Ed. Bs. As. 1974, p. 491).

Corolario de lo anterior es que los tratados de ex-tradición deben siempre interpretarse en forma que favorezca al fin para el cual fueron convenidos. La posición del U. ha sido y es la de colaboración en ma-teria penal. Ya la Casación italiana en sentencia de 10 de marzo de 1914 había afirmado que teniendo la extradición su fundamento jurídico en las leyes natu-rales de las sociedades civiles, sus disposiciones deben ser ampliamente interpretadas en relación al espíritu que las informa, de tutela común de la sociedad; y desde el punto de vista doctrinario puede señalarse que Travers (Le Droit Penal Internacional, T. IV p. 383), crítica

---

Documento

también la interpretación restrictiva y afirma la amplia, por ser la más conforme al interés general que es el de asegurar el curso de la justicia de la manera más completa posible (LJU C. 3210, RUDP 2/88 c. 324 y Sent. No. 90/87 del Trib. Pen. 2o. Turno).

En el mismo sentido: frente a las organizaciones dedicadas al tráfico de estupefacientes y a los medios materiales con que cuentan, son aplicables las ense-ñanzas de Quintano Ripolles (Trat. de Der. Penal In-ternacional e Internacional Penal, T. II p. 116, Ma-drid, 1957) quien refiriéndose a la indispensable coo-peración entre los países frente a tales casos, sostenía que debía evitarse su frustración tolerando que mien-tras los criminales utilizaban aviones, los jueces viajen en diligencia.

El debate actual acerca de estas ideas en varios ámbitos, la preparación incluso en carpetas del Parla-mento de una ley sobre extradición, unido a los fun-damentos antes referidos, permiten concluir que la cooperación penal internacional no es atípica ni excepcional.

III.    Los fines de la extradición y el criterio antes expuesto son la guía para la interpretación del tratado vinculante entre nuestro país y los E. U. de A.

El presente trámite no constituye un juicio crimi-nal, sino un procedimiento extraordinario y sumario tendiente a que el requerido sea puesto a disposición del Juez o Tribunal a quien jurídicamente correspon-da entender en el caso. Al no tratarse de un juzga-miento, el método no puede ser restrictivo. Tampoco tiene cabida el principio "in dubio pro reo" (porque no rige para la interpretación de las leyes penales o procesales   RUDP 2/88 c. 327) y si el procedimien-to es manifiestamente intentado de buena fe, no se debe permitir que la no ejecución técnica de alguna formalidad de nuestro ordenamiento criminal se oponga a la ejecución leal de nuestras obligaciones (Cf. Piñeiro Chain en Extradición, Parte III, Olarte, p. 95).

IV.    La demanda presentada por el Gobierno de los E. U. de A. se adecua a lo que prevé el art. 10 del Tratado ya mencionado. Se ha acompañado relación circunstanciada de los hechos con los datos necesarios para la identificación de la persona y de los textos le-gales aplicables al caso. Consta la legalización y la traducción.

Las alongaderas o dilatorias opuestas por la De-fensa que fincan en la ausencia de traducción legal del exhorto y en que no se acompañaron las normas de prescripción exigidas, han sido adecuadamente inficionadas por el dictamen fiscal y en definitiva se salvaron por vía de las medidas para mejor proveer.

V.    En cuanto a que las autoridades estadouni-denses hayan omitido notoriamente acreditar su com-petencia internacional, no es objeción válida si se tiene en cuenta que sólo cabe exigir que el Estado requirente sea competente y que el órgano jurisdic-cional donde ha de efectuarse el proceso penal tenga jurisdicción en dicho Estado,

Vieira (L'Evolution recente de l'extradition dans le continent Americain. Recueil des cours, tome 185. Academie de Droit Internacional, pág. 201) con su singular penetración establece que para que un Es-tado pueda reclamar de otro la remisión de una perso-na con fines penales, es necesario que el delito sea de competencia de sus tribunales y que haya una orden de arresto, siendo el vocabulario utilizado muy varia-ble, tanto que algunos Estados se refieren a la jurisdic-ción del Estado requirente y otros tienen la tendencia a establecer que para poder presentar la demanda es necesario que el delito haya sido cometido dentro de su territorio.

Es de claridad meridiana que para nada debe con-siderarse la competencia interna del órgano (v. gr. si debe conocer un Tribunal del Estado de C. o el de otro Estado de la U.), Olarte (op. cit. T. I p. 87 88) siguiendo a Travers dice que el Estado requerido de-be verificar si el Estado peticionante es competente para juzgar el acto que da lugar a la demanda, pero dicha competencia entendida de modo general, es decir, que no se tratará de inquirir si tal o cual magis-trado o tribunal es el competente según la legislación interna. En el mismo sentido Alfonsín (Escritos Ju-rídicos, T. III p. 21) al poner el ejemplo de un caso civil, expresa que una vez establecido que cierta sen-tencia extranjera que pretende ser ejecutada en el U., proviene de cierto Estado que, según el art. 2401 de nuestro Código Civil, era competencia para el caso, no es menester para acceder a la ejecución controlar si el Juez extranjero gozaba además de competencia interna, teniendo en cuenta que el art. 2402 del

Có-digo Civil confiere a la ley del lugar donde radicó el juicio el régimen del proceso.

El problema está como lo señala el dictamen fiscal, en el marco de qué normas de Derecho Inter-nacional Privado hay que examinar la competencia internacional del requirente al no existir previsión ex-presa en el Tratado. Empero, ya sea en las normas de DIP de uno o de otro Estado, el lugar de comisión del delito ha de hacerse de acuerdo con la conocida teoría de la actividad.

Cabe agregar a este respecto que, teorías aparte, es un principio establecido (que incluso fue recogido en el Tratado de Derecho Penal de 1889 suscrito por nuestro país) que si el delito se ha consumado en más de un país, tendrá jurisdicción el Estado que hubiere tomado conocimiento judicial en primer término. Y si se considera que se trata de delitos conexos cometi-dos en el territorio de dos o más estados, sería compe-tente el Estado en cuyo territorio se ha ejecutado el delito más grave (Cf. Carreras: Régimen procesal de la extradición, Rev. La Ley T. 138 Sec. Doct. p. 1202).

Y si alguna duda persistiera aún sobre el punto, basta pensar que en nuestro país se podrían haber cometido eventuales delitos de encubrimiento, pero corno éste exige para configurarse no ser partícipe en el ilícito principal y según se ve por los hechos atribuidos así como por las normas penales norteame-ricanas, el requerido es considerado partícipe, la hipó-tesis manejada resulta fácilmente descartable.

VI.    La pretendida ausencia de pruebas.

El tratado de Extradición con los E. U. de A. en parte de su art. 10 dice: "La Parte requerida podrá solicitar que la requirente presente pruebas suficien-tes para establecer "Prima facie" que la persona re-clamada ha cometido el delito por el cual la extradi-ción se formula. La parte requerida puede denegar la extradición si un examen del caso demuestra que la orden de arresto es manifiestamente infundada".

El Sentenciante conceptúa que el requerimiento de prueba ampliatoria sólo corresponde cuando la de-manda es manifiestamente infundada (por ejemplo si en este caso se pidiera por idénticos fundamentos de hecho y de derecho la extradición de una persona que nunca hubiera realizado negociaciones como las expresadas, que nunca hubiera salido del país y que desconociera a las personas y empresas mencionadas). Aquí sí sería de aplicación la norma que habilita a nuestro Estado para solicitar a la requirente que pre-sente pruebas suficientes para establecer "Prima fa-cie" que la persona reclamada ha cometido el delito, hipótesis que claramente no es la del sub examine. La improcedencia de la extradición que admite el Tratado vigente no es la que se refiere a la prueba de cargo habilitante del procesamiento, punto éste de re-sorte exclusivo del Estado requirente. Sólo al Juez competente pertenece la función instructoria que no puede ser usurpada por otro Magistrado (RUDP cit. c. 322). Se extrae de ello, sin hesitación alguna, que la misión del Juez requerido es la de verificar la existen-cia del "fumus bonis juris" (humo de buen derecho) que modernamente se traduce por probabilidad o ve-rosimilitud del derecho aducido.

Por último, debe tenerse presente que la aprecia-ción o valorización de las pruebas debe hacerse de acuerdo con las normas del lugar del proceso (lex fori) y aún para quien sostuviera que debe acudirse a nuestras normas, los elementos incorporados no co-liden manifiestamente con el conjunto de normas y principios de derecho en que nuestra sociedad asienta su individualidad. Véase que en cuanto a los testimo-nios, no obstante las consideraciones efectuadas, no se mencionan qué tachas previstas en nuestra legisla-ción serían aplicables a los mismos; respecto a la pre-sunta ilegalidad de las grabaciones y videos habría que acreditar que fueron efectuadas sin autorización de Juez competente (cuestión que no se hizo) y en este aspecto surge de la documentación acompañada que por lo menos algunas grabaciones de conversa-ciones telefónicas lo fueron con autorización judi-cial. Tampoco es de recibo el argumento de que la DEA y el FBI ofrecen recompensas, protección e impunidad a los informantes cuando según dice la Defensa, el informante en este caso estaba sometido a la Justicia uruguaya y los agentes en nada podrán incidir frente a la misma.

VII.   Los delitos atribuidos y el principio de la identidad de norma o doble incriminación.

En el Tratado de extradición vinculante en la es-pecie se recoge el denominado principio de la doble incriminación o de la identidad de la norma. Este exi-ge que el hecho que lo motive tenga carácter de delito en la legislación del estado requirente y en la legisla-ción del estado requerido. O sea que es necesario que el hecho

sea considerado delito en las dos legislacio-nes, aunque no tenga en las dos el mismo "nomen juris" o denominación jurídica. Está recogido en el art. 2, párrafo 1, al decir "siempre que sean puni-bles según las leyes de las partes contratantes" y en el mismo artículo, el parágrafo 3, al decir "y dicho delito es punible según la legislación de ambas par-tes contratantes". Y se descarta la exigencia del mis-mo "nomen juris" en el mismo párrafo citado al de-cir "la extradición será procedente cuando las leyes de ambas partes no consideren incluido el delito en la misma categoría de la lista o aunque no lo designen con la misma terminología" (Diario de Sec. del Cons. de Estado de fecha 18 de octubre de 1983 pág. 358).

La calificación hay que hacerla dentro del marco del Tratado porque como enseñaba el maestro Alfon-sín (Teoría del Derecho Privado Internacional; Mon-tevideo 1955, pág. 385) hay que calificar, esto, es ubicar la relación jurídica en una categoría del orden jurídico al cual pertenece la norma, por lo que volve-remos al Tratado.

Entonces, el fraude contra los E.U. se prevé en el art. 2 inc. 12 del Tratado; el lavado de instrumentos monetarios lo está en el inc. 26 porque el sindicado conocería el origen del dinero; la conspiración para ayudar e instigar a obtener la posesión y distribución de cocaína está incluido en el inc. 17 ya que "La ex-tradición será también concedida por la participación en los delitos mencionados, no sólo como autor, cóm-plice e instigador, sino también como encubridor, así como por la tentativa y la asociación ilícita para co-meter los mencionados delitos, siempre que estas cali-ficaciones resulten punibles por la legislación de las Partes Contratantes con penas privativas de libertad superiores a un año".

Del punto de vista criminológico, estamos en pre-sencia de típicos delitos de cuello blanco (S.), llama-do en los países anglosajones "occupational crime", o "criminalité d'affaire" del derecho francés. Es de toda evidencia que el derecho positivo los plasma en tipos penales prohibidos luego que las acciones son realiza-das y atento a ello, el Tratado debe ser interpretado con un criterio amplio, evolutivo.

VIII.  Los procesamientos dispuestos en el Estado requirente en ausencia del indagado y el orden públi-co internacional del Estado uruguayo.

Es principio elemental de derecho internacional que la excepción de orden público internacional funciona para desplazar las consecuencias lesivas que para un país produciría la aplicación de una ley ex-tranjera, no opera frente a una norma de un Tratado.

¿Qué sucede entonces con el orden público inter-nacional y los Tratados  Al celebrarse los mismos se suele incluir una cláusula de reserva de orden públi-co, pero aunque se haya incluido, enseñaba Alfonsín que los Estados no podían hacer uso de la cláusula de reserva para excluir las leyes extranjeras vigentes al tiempo de la aprobación del Tratado, puesto que se descuenta que los Estados no pueden prestar aproba-ción a las normas convencionales sin estudiar y calcu-lar sus repercusiones, habida cuenta de las institucio-nes que los demás Estados contratantes tienen esta-blecidas. Sólo pueden usar la cláusula para excluir la aplicación de las leyes extranjeras implantadas con posterioridad y cuya aplicación eventual no pudieron naturalmente prever en el momento de aprobación del Tratado (Alfonsín, Teoría cit. Mont. 1982 p. 579 580).

Las relaciones entre el Tratado y la Constitución han sido resueltas en el sentido de que las cortes de justicia carecen de competencia para pronunciarse, esto es, que no tienen jurisdicción para decretar la invalidez de un Tratado Internacional y la cuestión se remite a los mecanismos de derecho internacional. Así; Vieira (Recueil des cours, citado T. 185 p. 187) relata el caso de la Corte Suprema de P. que no decla-ró la invalidez de un tratado por estimar que ello su-peraba sus poderes y el de que en V., la Corte Supre-ma de Justicia ha puesto un "no ha lugar" a una de-manda de nulidad de la línea 14 del art. 3 de la ley de aprobación de un tratado de extradición suscrito entre V. y los E. U. de A. Y el fundamento radica en que ningún Estado detenta poder jurídico para ha-cer predominar su ley sobre la de otro y que existen otras vías en el Derecho Internacional para hacer cesar los efectos de un Tratado.

Que la persona requerida nunca haya declarado ante una autoridad judicial es una petición de prin-cipio, pues no se puede poner como condición lo que es precisamente el objeto del proceso de extra-dición y que ello sea un presupuesto del enjuiciamien-to en nuestro derecho, no cabe extenderlo a otras legislaciones.

Documento

El único requisito (y considerado al ra-tificar el Tratado) es que existan en el Estado peti-cionante, en su caso, las garantías del debido proce-so legal, pero las características o modalidades con-cretas que en cada país asume esta garantía es propio de cada Estado y en ello no cabe inmiscuirse.

IX.    En definitiva, debe otorgarse la extradición de R.S.V. por haberse cumplido los requisitos esta-blecidos en el Tratado vinculante con los E. U. de A., a los fines de su juzgamiento por las acusaciones rela-cionadas con el exhorto.

Y cabe rechazar las conclusiones de los profeso-res consultados por el Sr. Defensor, en cuanto a que el suscrito Juez incurriría en responsabilidades pre-vistas en distintas disposiciones de la Constitución si estimare la demanda. Sin perjuicio de que ya se ha ejercido el poder disciplinario correspondiente, de-be decirse que la extradición es extraconstitucional ya que los principios de ésta se refieren al orden ju-rídico nacional y las autoridades deben guiarse por las normas supranacionales contenidas en los Trata-dos que pertenecen a otro orden jurídico. En cam-bio si podría incurrirse en responsabilidad del Estado si se omitiera cumplir las obligaciones que asumió al ratificar el Tratado.

Por tales fundamentos; los concordantes del dic-tamen fiscal y preceptos que se incluyen, FALLO:

Hácese lugar a la demanda y en su mérito, concé-dese la extradición de R.S.V. Ejecutoriada, vuelvan.

Tabaré Sosa Aguirre

SEGUNDA INSTANCIA

Montevideo, julio 28 de 1989.

Vistos:

Para sentencia de segunda instancia estos autos caratulados "V., R. - Extradición" (Ficha No. 86/1989), elevados a conocimiento de este Tribunal en virtud del recurso de apelación interpuesto por los Sres. Defensores del requerido  en forma subsidia-ria del recurso de reposición , contra la sentencia No. 43 dictada el 19 de mayo de 1989 por el Sr. Juez Letrado de Primera Instancia en lo Penal y de Meno-res de Segundo Turno de Maldonado, Dr. Tabaré Sosa Aguirre.

Aceptando y dando por reproducida la relación de antecedentes, actos procesales y hechos dados por probados que contiene la decisión recurrida, por ajus-tarse a las resultancias de autos.

Resultando, además:

I.    Que, en base al Tratado de Extradición y Cooperación en Materia Penal, suscrito entre U. y los E. U. de A.  en W., el 6 de abril de 1973, aproba-do por decreto ley No. 15476, en vigencia desde el 11 de abril de 1984 , se ordenó y fundado pro-nunciamiento el Sr. Juez de primera instancia conce-dió la extradición de R.S.V. (fs. 378/388).

II.    Los señores Defensores, Dres. V.D.V. y J.C.D.G., fundándose en las consultas de ilustrados especialistas en la materia -Dres, E.T.B., C.A.C. y M.A.V. (una ya agregada y otra que acompañan) -y lo que exponen con amplitud, entienden que co-rresponde revocar la sentencia impugnada, denegan-do la extradición (fs. 550/560).

Los argumentos manejados, apuntan a destacar lo que estiman incumplimiento de ciertos requisitos en el pedido de entrega, insuficiencia de la prueba con la que se enjuició a V., violación e inobservancia de normas del Tratado y violación de nuestro orden público internacional (orden de arresto manifiesta-mente infundada, defectos formales y sustantivos que resultan irredimibles, mal valorada la prueba, etc.).

Insisten, en que la persona requerida fue procesa-da en rebeldía, en violación a nuestra Constitución (art. 21); que no se cumplió con el requisito indis-pensable del interrogatorio previo del indagado (art. 126 del Código del Proceso Penal); que no se puede dejar de observar el artículo 14 numeral 2o. del Có-digo Penal y la Convención Americana sobre Dere-chos Humanos (art. 7.2) y que no se cumple con la exigencia de la doble incriminación", pues ninguno de los cargos formulados se adecua típicamente a las figuras delictivas previstas

Documento

en el decreto ley No. 14294 ni al resto del ordenamiento penal del país.

Sobre el delito de lavado o blanqueo de instru-mentos monetarios afirman que creado por la legis-lación del país requirente el 27 de octubre de 1986 , dicen que no figuró ni podía figurar en la lista taxa-tiva del art. 2 del Tratado, por lo cual V. no puede ser entregado para ser juzgado por tal delito y jamás podía ser juzgado por quien lo reclama (el delito no figura en la legislación uruguaya).

Observan a la documentación presentada, por fal-ta de traducción y legalización en forma (vicios in-sanables); que no se acompañaron textos relativos a "la prescripción de la acción y de la pena"; que la prueba en que se apoya el pedido (pruebas inhábiles, ilegales o prohibidas), conduce a desestimarlo y que no se puede entregar a una persona que pueda pasar-se el resto de su vida en prisión, pues se viola el or-den público internacional.

III. La Fiscal Letrado Departamental de 2o. Turno de Maldonado, Dra. Cristina González de Sal-divia, al evacuar el traslado conferido de los recur-sos, luego de estudiar detenidamente los argumen-tos de la Defensa, los desestima y aboga por la con-firmación de la resolución impugnada (fs. 562/566).

IV. Consta que la prueba que aporta la parte requirente, para sostener los cargos formulados con-tra V., está constituida por una extensa y detallada relación de los hechos, con precisas referencias a la fuente de información (fs. 121/162 y 383/389), las declaraciones juradas de: R.H., Teniente Fiscal en el Distrito Central de C. (fs. 113/118 y 279/281vta.); F.B.W. (fs. 171/178 y 304vta./308), que es Agente Especial (SA) de la Oficina Federal de Inves-tigación (FBI); W.G., persona que estuvo vinculada a V. (fs. 163/165 y 303/304) y S.H., estrechamen-te vinculado a V. y a su actividad (fs. 355/359 y 364/372), así como la ocupación de 640 libras de cocaína y una importante suma de dinero en dóla-res durante la investigación.

G., ciudadano uruguayo residente en E.U., explicó que conoció a V. en 1985, siendo presentado por su cuñado H. y que se discutieron planes futuros en relación al "lavado de dinero", viajando en julio de 1985 a B., a buscar clientes para la operación de dinero, conociendo en tal oportunidad a R.R., el que accedió utilizarlos en tal operación por lo que obte-nía de la cocaína en L.A.

Informó de ello a V. y H., quienes se pusieron en contacto con R. y dice estar en conocimiento que por tal modalidad de mover y distribuir el dinero re-cibieron comisiones del 2% cada uno, no así él, que fue eliminado de los tratos futuros.

Ellos continuaron en tal empresa y en abril de 1986 compraron el Cambio I. (en U.), cuyo nombre corporativo es L.S.A., aun cuando la conexión de V. con el aludido negocio no aparece en los registros, pero es socio comanditario y principal responsable de las transacciones financieras.

Refiere como continuó enterándose de las opera-ciones que en C.I. se realizaban para narcotraficantes que deseaban ocultar sus ganancias y las fuentes del dinero, destacando que se enviaban barras de oro a los E.U., las cuales se comprarían con dinero pro-veniente de la droga, para aparentar que el dinero se estaba utilizando en un comercio legítimo.

Menciona que el dinero era depositado en cuen-tas bancarias en N.Y. controladas por quienes inter-venían en "lavar" dinero y luego girado telegráfi-camente a cuentas mantenidas por C.I. en bancos de M., siendo V. y H. los que supervisaban estas cuentas y hacían las transferencias a las cuentas de narcotra-ficantes en P. y C., teniendo entendido que se lavaron decenas de millones de dólares, recibiendo comisio-nes que fluctuaban entre el 7% y el 12%.

Por su parte H., también ciudadano uruguayo re-sidente en E.U. y detenido por su participación en el lavado de dinero proveniente del narcotráfico, declara que proporcionó información detallada del negocio lavado de dinero al que se encuentra de-dicado V., a quien conoció en 1985.

Relata que en 1986 V. abrió el C.I, y lo nombró vicepresidente y a R.P. como presidente, por no que-rer V. figurar en los documentos, pero al ofrecerle V. un empleo en E.U. (industria del oro), viajó hacia allí; en julio de 1986 fue a L.A. al ser llamado por V., para trabajar en un negocio de joyería, pero su tarea era contar dinero que era traído en cajas y que V. en L.A. tenía un refinería de oro (hacía barras de oro) y al mismo tiempo

Documento

recibía del U. barras de plomo enchapadas en oro, que eran pesadas en la Aduana de los E.U. y quedaba documentada la procedencia y peso.

Procedía luego V. a vender las barras de oro real hechas en la refinería a los bancos  los cuales creían, basándose en los documentos, que provenían del U.- y con las instrucciones recibidas, tales importes terminaban en cuentas del C.I. u otras cuentas en el exterior.

Por indicación de V., se traslada en enero de 1987 a N.Y.  en un supuesto negocio de compra y venta de oro comienza a trabajar , refiriendo en las operaciones que interviene, terminando en junio de 1988 su asociación de negocios con V., al huir de la oficina en N.Y. ante la llegada de oficiales de la Poli-cía, circunstancia que abandonó una importante suma de dinero.

H., luego de mencionar las funciones que ha de-sempeñado y desempeña, alude a los procesamientos que se han decretado contra V., los cargos contra el mismo y numerosos co-acusados  que trabajaban para personas radicadas en C. y otros lugares  y la forma que operaban (introducción de grandes canti-dades de cocaína a los E.U., arreglos para su dis-tribución, cobro del producto de las ventas en L.A. y N.Y., cómo V. supervisaba las transferencias por te-légrafo o cable a U. y destino final a los traficantes).

El C.I., lo usaba V. en beneficio de los trafican-tes para los cuales trabajaba, siendo un medio para disfrazar el verdadero origen de las grandes sumas de dinero transferidas a ellos desde los EE.UU. (ventas ficticias de oro, al que era cambiado por dinero que habían pagado los distribuidores de cocaína).

Por el registro de los bancos de los E.U., que-dó de manifiesto, que ciento de millones de dólares fueron transferidos a través de otras instituciones financieras a cuentas que incluían las uruguayas de C.I. o L.S.A., para ser remitidos después a P., C. y otros lugares.

W., que intervino personalmente en la investiga-ción  con un grupo especializado de funcionarios y representantes de organismos estatales y locales , manifiesta que revisó los registros de negocios, ban-cos, cintas electrónicas de vigilancia (intercepción oral y de los alambres telefónicos, autorizada por los tribunales), registro de publicación de sociedades anónimas, informes que le propor-cionaron otros agen-tes del FBI y el resultado de la vigilancia y seguimien-to de personas, etc., lo que le permite dar por justi-ficado que las transferencias que se efectuaban a P. y U., respondían alas ventas ilegales de estupefacientes en los E.U., estando V. y otras personas inves-tigadas, dedicadas al lavado de los fondos producidos por el tráfico ilegal (alude también a información confidencial, decomiso de una importante suma de dinero y una gran cantidad de cocaína a las personas sospechosas).

De acuerdo con tales testimonios, minuciosa re-lación de los hechos que se atribuyen a V. y demás co-acusados, detallada relación de las cuentas de em-presas que estarían vinculadas al narcotráfico (perte-necientes a un mismo grupo de personas) en cuanto a las cantidades depositadas, procedencia de las remi-siones, fecha, titulares de las cuentas, etc., así como los decomisos aludidos, se puede concluir  en una apreciación primaria  que existieron un conjunto de maniobras tendientes a "ocultar la naturaleza, fuente, ubicación y propiedad de los fondos" producidos por la cocaína introducida ilegalmente a los E.U.

V.    Que el Sr. Juez interviniene mantuvo lo de-cidido y concedió la alzada (fs. 567 y vta.).

Recibidos los autos por este Tribunal, se citó para sentencia, la que previo pasaje a estudio se acordó en forma legal (fs. 570 y sgts.).

Considerando:

I.    Que, aun cuando pudiera plantearse alguna duda sobre si la decisión final, que pone término a un procedimiento jurisdiccional de extradición es una sentencia definitiva o interlocutoria, a los efectos de la recurrencia, la interposición hecha por la Defensa no puede ser motivo de invalidación alguna.

Es de pacífica aceptación que el recurso no se per-judica por su presentación errónea, ya que la Ley manda atender a lo principal  manifestación de vo-luntad, efectuada dentro del plazo legal, de apelar la sentencia  y no a lo secundario, tal como incluso se desprende de lo dispuesto en el artículo 658 inc. 2o. del Código de

Documento

Procedimiento Civil.

Por tanto, debe tenerse por bien concedido el recurso de apelación, que abrió legalmente la presen-te instancia.

II.   Que determinada la procedencia de la alza-da, corresponde ingresar al estudio de las numerosas objeciones planteadas por la Defensa y para la cual, la decisión de entregar a R. V., de ninguna manera puede prosperar.

Muchos de los argumentos esgrimidos ya habían sido formulados en la oposición a la solicitud de los E.U. (fs. 232/240) y desestimados con buenos fun-damentos, tanto por el Ministerio Público (fs. 243/ 254), como por el Sr. Juez "a quo", que la Sala, en general, comparte.

El Tribunal va a confirmar la sentencia apelada por lo que pasará a exponer.

III.   La extradición, como lo ha precisado el ilus-tre penalista Jiménez de Asúa, "consiste en la entrega que un Estado hace a otro Estado de un individuo acusado o condenado, que se encuentra en su territo-rio, para que en ese país se le enjuicie penalmente o se ejecute la pena" ("Tratado de Derecho Penal", Tomo II, pág. 771).

Es un instituto que posibilita la colaboración en-tre los Estados en materia penal, permitiendo según Bettiol, atemperar las consecuencias que se derivan necesariamente de la aceptación del criterio de la te-rritorialidad "y con el cual se vincula la cuestión de la eficacia de la ley penal en el espacio. Si tal cuestión se regulase sobre la base de criterios universales, no sería necesario crear un medio a través del cual los Estados colaborasen entre sí en la lucha contra la delincuencia" (G. Bettiol: "Derecho Penal", Parte General, pág. 135).

Y, es con ese espíritu de necesaria colaboración entre los estados, que subraya Bettiol, que se suscri-bió el Tratado, cuya interpretación ocupa la atención de la Sede, al establecer en su proemio: "la R. O. del U. y los E. U. de A., deseando hacer más eficaz la cooperación entre los dos países en la represión del delito, acuerdan...".

Es por ello de pleno recibo la prestigiosa jurispru-dencia y doctrina que cita el Sr. Juez de primera ins-tancia (fs. 383), determinando el criterio que debe guiar al intérprete de este tipo de tratados.

Los tratados de extradición, "deben interpretar-se en la forma que favorezca el fin por el que fueron convenidos", porque tiene su fundamento jurídico en las leyes naturales de las sociedades civiles y sus disposiciones, "en relación al espíritu que las informa, de tutela común de la sociedad" deben ser amplia-mente interpretadas, por ser la más conforme "al interés general que es el asegurar el curso de la justi-cia de la manera más completa posible..." (Conf. "La Justicia Uruguaya", T. XXI, caso 3210).

Interpretación ésta, que está de acuerdo con la posición y espíritu de cooperación internacional que ha sustentado siempre el Uruguay, como lo des-taca el Sr. Juez de primer grado.

Por ello y porque los tratados  al igual que el invocado por el país requirente  constituyen la fuen-te de obligaciones asumidas ("Las Partes Contratan-tes se comprometen a la entrega recíproca...", co-mienza disponiendo el art. 2) y "la ley entre las par-tes, o sea entre los estados...", como "el contrato es la ley entre los particulares", tiene cada estado el deber "de ajustarse a las previsiones del Tratado y, contra ellas, no puede invocarse normas internas" (los conceptos que se transcriben entre comillas fue-ron extraídos de la sentencia No. 344/1987, dictada por la Suprema Corte de Justicia; ver "L.J.U.", To-mo XCVIII, caso 11221).

En el mismo sentido, es muy ilustrativo lo que se-ñala Jiménez de Asúa, diciendo que las leyes inter-nas que coexisten con los tratados internacionales que "disciplinan la actividad de los órganos del Es-tado en orden a la extradición" y aunque concep-tualmente son distintas, existiendo entre ambas rela-ciones de indeclinable integración -sin que pueda hablarse de jerarquía- , tanto el Código Penal, como las restantes leyes penales sustantivas "pierden su rango privilegiado como norma de directa aplicación cuando se trata de enjuiciar a delincuentes entregados por un Estado extranjero en virtud de un Convenio internacional, porque en este caso la ley fundamen-tal es el Convenio de extradición, al que debe subor-dinarse las restantes leyes penales"; y,

Documento

concluye el citado tratadista manifestando que "si una Conven-ción internacional ejecutiva regula una determinada materia, es ésa la que se aplica, aunque contraríe el derecho interno en la materia..." (Tratado citado, T. II, págs. 787 y 788).

IV.    Que, efectuadas las precedentes y breves consideraciones de carácter general, dará la Sala las razones por las cuales descarta las severas críticas a la decisión apelada, como los argumentos en que se sustenta la impugnación.

Frente a lo que puede calificarse como incumpli-miento de ciertos requisitos de orden formal en la so-licitud de extradición (no haberse acompañado tex-tos que establezcan "las normas que regulan la pres-cripción..." irregular e incompleta traducción de la documentación y falta de legalización), "brevitatis causae" se remite el Tribunal a lo que lúcidamente expusieron el Ministerio Público (último dictamen de fs. 563vta.) y el Sr, Juez (Considerando IV).

Sin perjuicio de ello, señala que los textos so-bre prescripción pueden consultarse a fs. 161 y 372 (Sección 3282 del Código de los E.U.), resultando de los mismos que nadie puede ser enjuiciado por ningún delito punible con pena capital "a no ser que se dicte el procesamiento o se establezca la acu-sación formal por el fiscal dentro del plazo de cinco años a partir de la comisión de dicho delito", por lo que en virtud de la documentación que acompaña el requerimiento, es evidente que no se ha operado la prescripción (los delitos los habría perpetrado V. en-tre 1986 y febrero de 1989).

La traducción de los documentos, "al idioma de la Parte requerida", fue un requisito satisfecho con la presentación de la solicitud, aunque se hubiera complementado posteriormente con traducción de algunos textos y la correspondiente legalización, por disponerlo el Juez interviniente, la conclusión no pue-de variar (fs. 296/311), en cuanto la petición es arreglada al Tratado.

En consecuencia, deben entenderse colmadas las exigencias del Tratado (art. 10) y sin relevancia las objeciones sobre tales puntos, en los que también se finca el rechazo de la demanda de extradición; jurisprudencia de gran significación, ha decidido que los defectos o vicios de forma, que pueden afectar una solicitud de extradición, pueden ser reparados; y, una vez superados, no puede encontrar más obs-táculos sobre tal aspecto (Cf. "La Justicia Urugua-ya", T. LXVII, caso No. 7947).

Como en la última consulta se reitera que los documentos no fueron legalizados en forma, se permi-tirá el Tribunal transcribir una decisión judicial que entiende, resuelve en forma definitiva toda discusión. Se sostuvo: "Cuando los documentos se introducen por la vía diplomática (situación de autos), no existe ninguna razón material o jurídica para negarle la de-bida autenticidad; lo contrario sería un agravio a un país con el cual U. mantiene relaciones diplomá-ticas."

"El requisito de la legalización no puede agregar ninguna nota mayor de autenticidad que los que ya están ínsitos en la introducción diplomática. Así lo ha reconocido el U. en los acuerdos de 1879, 1903, 1915 y 1917, ratificados los tres últimos por las leyes Nos. 3163 y 6189, concertados con B., A., P. y B., por los cuales los exhortos trasmitidos por las autoridades diplomáticas o consulares están exentos de legalización. En el Tratado con S. también la do-cumentación estará exenta de legalización cuando se utilice la vía diplomática (art. 9) (M. A. Vieira: "La extradición en nuestro derecho positivo", Rev. de la Fac. de Derecho, año XII, No. 3 y 4, pág. 872 y 873)" (Ver: "La Justicia Uruguaya", T, LXI, c. 7334).

V.    En cuanto a las violaciones de orden consti-tucional y legal  invocadas por la Defensa , por ha-berse dispuesto el procesamiento en rebeldía, sin oír al indagado (requerido) y sin asistencia letrada, la Sala se remite en primer término a lo que expone el Sr. Juez "a quo", por compartir sus fundamentos (Considerando VIII, págs. 386vta./387vta.), pero agrega que este procedimiento especial tiene objetivo verificar el cumplimiento de los requisitos estableci-dos en el Tratado; no es, en cambio, un proceso judi-cial para juzgar al requerido, como lo ha señalado la Suprema Corte de Justicia en reciente pronuncia-miento, ya citado, al decir que el instituto de la ex-tradición responde a principios de asistencia inter-judicial y a razones de colaboración dentro de la co-munidad internacional. El Juez requerido, en estos casos, a diferencia de lo que ocurre sólitamente en la actividad doméstica, no condena ni absuelve al im-putado, sino que se limita a apreciar las

Documento

razones de la solicitud del magistrado extranjero y los documen-tos que la acompañan, y luego concede o no la ex-tradición; la entrega a las autoridades del otro estado ("extradir" proviene, precisamente, del latín "ex", fuera y "tradire", entregar) (L.J.U., caso 11221).

Que el interrogatorio previo del indagado, con asistencia profesional o la constancia formal de su negativa a declarar sea un presupuesto indispensable para el procesamiento en nuestro derecho (art. 126 del C.P.P.), no es trasladable a otros ordenamientos jurídicos, que organizan su sistema procesal y de ga-rantías individuales según sus propias peculiaridades sociales, culturales, económicas, etc. y sus nece-sidades,

En elaborada resolución judicial, enteramente trasladable al sub caso se ha sostenido, que invocar que el requerido nunca ha declarado ante una autori-dad judicial, es "una petición de principio, pues no se puede poner como condición lo que es precisamen-te el objeto del proceso de extradición. Y que ello sea presupuesto del enjuiciamiento en nuestro derecho, no podemos extenderlo a otras legislaciones. Lo que se requiere y es exigencia de orden público interno, es que exista, en el Estado peticionante, las garantías del debido proceso legal, pero las características o modalidades concretas que en cada país asume esta esencialísima garantía, es propio de cada legislación y en ello no cabe inmiscuirse" ("L.J.U.", T, XCVI, caso No. 10952).

Pero, además de no constituir el procedimiento de extradición un juicio criminal (Cf. L.J.U. T. IV caso 692), tampoco éste se ha iniciado en el Estado requirente, pues como lo precisa en su declaración jurada H., de acuerdo al derecho federal de los E.U., "un veredicto de procesamiento por un gran jurado, no significa que se le haya encontrado culpa-ble al acusado de los delitos que se le acusa. Significa, en cambio, que el gran jurado ha encontrado que existe evidencia suficiente como para que se lleve al acusado ante el Tribunal, para que se le enjuicie por los cargos que haya contra él" (fs. 114 y 280).

La inconsistencia de los agravios, relacionados con supuestas violaciones de nuestro ordenamiento cons-titucional y legal, ha sido demostrada por uno de nuestros Tribunales, hace bastante tiempo (pronun-ciamiento del 11 de agosto de 1970). Se dijo, en lo sustancial: "El precepto constitucional que veda el juicio criminal en rebeldía, carece de aplicación en materia de extradición... La Constitución nacional sólo influye al derecho interno procesal, de modo que las leyes nacionales deben ajustarse a esas normas, y no al instituto de la extradición, de orden, inter-nacional ."

"La aplicación de las normas constitucionales, que establecen algunas bases para la formación del proceso, como la necesidad de acusación de parte o del acusador público (art. 22), o la prohibición del juicio por comisión (art. 19), a la asistencia forzosa de defensor (art. 16), vinculan al derecho interno procesal..., pero no al derecho interno relativo a la extradición."

"No puede hablarse, como requisito esencial para reconocer efectos a la sentencia condenatoria extran-jera, de la confiabilidad con las vigencias de nuestro orden público, pues ello llevaría a erigir que las nor-mas procesales extranjeras coincidieran en múltiples aspectos con las nuestras, o dificultar el cumplimiento de los tratados internacionales y a obstaculizar su colaboración, debiendo reconocerse, por el contrario, que cada Estado según sus tradiciones y peculiarida-des jurídico sociales, organiza el proceso penal de modo diferente".

"En realidad, los requisitos de orden procesal váli-dos para dar curso a los pedidos de extradición, están contenidos en los Tratados y se refieren, en general, a la existencia de un proceso legal desarrollado, o de una condena legalmente dictada, de acuerdo con las normas locales, como no podía ser de otra manera, lo que cumple, por otra parte, la exigencia genérica y esencial de la Constitución (art. 12) de "proceso y sentencia legal (debido proceso)."

"Aunque existiera en el derecho común interno una disposición específica, prohibiendo la extradición del condenado en rebeldía, que no existe en modo alguno, no podría ésta prevalecer sobre lo dispuesto en el Tratado, que constituye a la vez la norma de derecho internacional y de derecho interno (por la aprobación legislativa) y que, como tal, por su enjun-dia internacional emanada de una convención y como norma especial, no puede ser invalidada por una de menor jerarquía, unilateral y, además de índole general."

"El precepto constitucional que prohibe el jui-cio criminal en rebeldía, está dirigido a proteger un derecho del individuo en nuestro país, no... en cual-quier otro Estado; por tanto, si en éstos no se acep-ta, se

Documento

rechaza o vulnera ese principio, ello nada tiene que ver con nuestra estructura institucional."

"De aceptarse la inconstitucionalidad que se pre-tende, nuestra justicia se expediría respecto al juicio seguido en el extranjero contra determinado sujeto, no en función de la aplicabilidad de la ley del Estado requirente, sino de las normas que regulan el proce-dimiento penal en nuestro propio Estado." ("La Jus-ticia Uruguaya", T. LXI, caso 7334)

Con ello, queda también delimitada la aplicación que puede tener en un procedimiento de extradición, la Convención Americana sobre Derechos Humanos  invocada por la Defensa , pues tiene la misma je-rarquía que la ley, por su aprobación legislativa.

Corresponde, en consecuencia, desestimar los agravios en los aspectos analizados.

VI.    Por encontrarse el Tratado aplicable afilia-do al sistema anglo americano de extradición, el Es-tado requirente deberá presentar "pruebas suficien-tes" para establecer "prima facie" que la "persona, requerida ha cometido el delito por el cual la extra-dición se formula", pues de lo contrario ("si un exa-men del caso demuestra que la orden de arresto es manifiestamente infundada"), el Estado requerido va a denegar la entrega (art. 10 numeral 3o. in fine).

Lo establecido, impone adoptar algún criterio para valorar las pruebas aportadas y dentro del marco normativo convencional, sin hacer prevalecer catego-rías jurídicas o sistema procesal de alguna de las par-tes, como ya se puntualizó; esto es, que si el Tratado no define una expresión o concepto, para determinar su alcance, no debe irse al sistema normativo de uno u otro Estado, pues ello supone encontrar una solu-ción "extra ordine" y no "in ordine", inaceptable y contraria al principio de igualdad que debe regir las relaciones entre estados soberanos (Cf. Q. Alfonsín: "Teoría del Derecho Privado Internacional", págs. 390 y 404/406).

Para no despojar de su especialidad a la norma de derecho internacional, la solución deberá encontrar-se por la averiguación de la voluntad común de las partes, dentro del contexto normativo y atendiendo la finalidad del instituto.

La apreciación de las pruebas, no puede hacerse, por lo indicado precedentemente, siguiendo las leyes y sistema de valoración del Estado requerido, como postula la Defensa.

La exigencia del Tratado en este aspecto, no es de significación, puede decirse que de extrema relativi-dad, pues si por un lado  en el mismo artículo  se reclaman "pruebas suficientes", pero con el aditamen-to de "prima facie" que atempera la exigencia, vista desde otra perspectiva la exigencia probatoria se vuel-ve menor, ya que se impone el rechazo cuando es "manifiestamente insuficiente".

En mérito a ello, teniendo en cuenta algunas pre-cisiones efectuadas sobre la interpretación de los tratados y la función cautelar del instituto de la ex-tradición, la exigencia probatoria del Trabajo  en el máximo grado que puede asignársele , se ubica, vin-cula o aproxima al concepto de verosimilitud ("fumus bonis iuris"), esto es, probabilidad o verosimilitud de los hechos imputados o derechos aducidos.

El contenido de la exigencia probatoria, por lo expuesto, naturalmente, no puede asimilarse a térmi-nos aplicables en el orden interno ("semiplena prue-ba" o "elementos de convicción suficientes", arts. 15 de la Const. y 125 del C.P.P.), ya no sólo porque no se trata de establecer el presupuesto o los presupues-tos para juzgar al requerido, sino porque también el exhorto proviene de un país con un sistema proce-sal acusatorio, distinto al que impera en el Uruguay.

La prueba que corresponde examinar, es la incor-porada a los autos de acuerdo a lo dispuesto en el Tratado  acompañada con la solicitud o agregada posteriormente, a petición del requerido o volunta-riamente por el Estado requirente , por no consi-derarse admisible la interpretación restrictiva de la Defensa, que cercena un derecho, facultad o prerro-gativa de la Parte requirente, como es la de presen-tar "información adicional" o prueba complementa-ria, sin que exista ninguna prohibición expresa en el acuerdo bilateral internacional.

Si bien se faculta al Estado requerido a solicitar la presentación de "pruebas suficientes" u otros "comprobantes o información adicional" (art. 10 numeral 3o. in fine y art. 12), en modo alguno con-traviene lo

Documento

establecido en el Tratado la actitud de la parte requirente al presentar, sin serle solicitada, información adicional; la que por lo demás, se ins-cribe en el espíritu de cooperación internacional con el cual fue suscrito y ratificado.

De acuerdo a las directivas u orientaciones aludi-das y que deben guiar al intérprete en la valoración de las pruebas ya reseñadas , el Tribunal estima que resultan suficientes para establecer "prima facie "que R.S.V. ha incurrido en los delitos por los cuales se le acusa y reclama para ser juzgado (de ninguna mane-ra resultan "manifiestamente infundada").

Las declaraciones juradas, proceden de personas habilitadas para deponer sobre los hechos imputados por haberlos percibido, intervenido o tener informa-ción de la forma en que ocurrieron, que motivan sus conocimientos en modo que impresiona como veraz y que se han prestado a declarar en forma voluntaria y sin ningún tipo de coacción.

Acrecienta la fuerza de convicción de tales testi-monios, los elementos de juicio manejados en la proli-ja articulación de los cargos contra V. y otro impor-tante número de sujetos, que resultaron también pro-cesados por los mismos o similares delitos, con varios de los cuales o sus empresas, admite haber tenido vinculación (fs. 191/198), así como otras circunstan-cias corroborantes indicadas (decomisos de sospecho-sos de actividades negociales con los narcotrafican-tes, en la misma investigación y vinculados a V.).

Revela G. en su testimonio, múltiples detalles de la vida y negocios de V., que sólo pueden conocer-se en una relación de cierta permanencia y no por dos encuentros accidentales y muy distanciados en el tiempo, como declara W. (fs. 187 y vta.), el que por otra parte comienza declarando -en presencia de su Defensor , que es socio capitalista en el C.I. y se está "por quedar con el 75% del mismo", lo que en alguna medida y en aspecto relevante, confirma los dichos de G. (fs. 11 y vta).

H. por su parte, mantuvo una extensa y estrecha vinculación con el requerido, aspecto que éste no desvirtúa, sino que por el contrario corrobora (fs. 189 y sgts.) y aparece conociendo, hasta en detalles, la actividad desarrollada por V. tanto en los E.U. como en el U. esta última a través del C.I. , bajo cuyas órdenes trabajó en L.A. (lo que acepta V.) y en N.Y. (lo que no acepta V., pues dice que en dicha ciudad estuvo asociado con personas de nacionalidad hebrea, para refinar oro).

La declaración de H. es la de un alto funcionario, que estuvo en contacto directo con toda la informa-ción en que se sustentan los cargos contra V., la que verificó en los registros que menciona.

W. a su vez, motiva sus dichos por la directa inter-vención que tuvo en la investigación y en la verifica-ción que afirma realizó de los informes de distinta índole y registros de empresas y bancos de los E.U.

El requerido V., que niega toda vinculación con personas procesadas por tráfico de estupefacientes y no encuentra explicación para las acusaciones (fs. 13) y anuncia que va a "llegar hasta el final" (fs. 13), no se allana, sin embargo, a ser extraditado (fs. 187vta.), pero descalifica al testigo G. cuando en-tra en conocimiento de que fue acusado por el testigo de estar en contacto con los narcotra-ficantes para ocultarle sus ganancias , tildándole de "extor-sionador"; "delirante" y "drogadicto" (fs. 187 y 187vta.).

El valor del testimonio de G., es para este proce-dimiento importante y de escasa significación los mo-tivos aducidos para disminuir su fuerza de convicción; ello, naturalmente, es sin perjuicio que tales tachas se deduzcan y prueben, en el lugar en que V. es re-querido para ser juzgado y de acuerdo con las normas imperantes en tal jurisdicción.

Que aún cuando el Tratado no admite una instan-cia probatoria o contraprueba, sobre la prueba apor-tada por el Estado requirente, señala la Sala que en la causa seguida a G. por encubrimiento, se ha agrega-do un informe psiquiátrico no una pericia , efec-tuado con urgencia (al día siguiente de recibido el ex-pediente) y con falta de datos (investigación social ex-haustiva), en el que se estima, "por el tipo de delitos que ha estado implicado, presenta trastornos caracte-riales con rasgos mitómanos" y por los mismos ante-cedentes, "demuestra una vulnerabilidad específica para este tipo de delitos que implican tramar un ar-did para engañar o perjudicar a terceros (fs. 469 y vta.; fotocopia del expediente mencionado, agregado por la Defensa al apelar).

Dadas las circunstancias en que se produjo el informe  que el mismo informante reconoce  y el tiempo transcurrido, en modo alguno puede prescin-dirse de tal testimonio, pues por ahora, no puede considerarse disminuida o destruida la fe del testigo.

La declaración jurada de S.H., que una vez recibida se agregó a los autos  notificándose por nota lo proveído a su respecto , robustece la prueba de las incriminaciones que motivan el pedido de entrega.

Las circunstancias que aduce la Defensa, para que se prescinda de considerar el testimonio de H. pide su rechazo "in limine", no son de recibo.

No se alegó que lo declarado por H. fuera falso ni se invocó ningún hecho, motivo o circunstancia tendiente a invalidar o disminuir la veracidad de lo relatado por el calificado testigo, que habiliten a en-contrar otro sentido a la oposición de la Defensa, más allá de la deficiencia formal que invoca.

Los principios aplicables en todo proceso judi-cial  atinentes a la producción y agregación de las pruebas , que se pretenden extender al procedi-miento de extradición, correspondería contemplar-los si se estuviera juzgando criminalmente al reque-rido; esto último, como se dijo, no es lo que ocurre en el sub caso, donde sólo se resuelve acerca de la en-trega al país requirente y para ser sometido a juicio por aquellas imputaciones que se entienda adecuadas a las previsiones del Tratado.

En consecuencia y dado lo ya expuesto sobre la agregación voluntaria por el Estado requirente, no procede excluir el testimonio de H.

Que si bien resulta importante el testimonio de H., no menos significación tiene el de F.B.W., por la tarea cumplida en la investigación de personas, movi-miento de cuentas bancarias y empresas, etc., que pu-so al descubierto un intrincado conjunto de operacio-nes, que tenían por finalidad última, hacer llegar a manos de los traficantes el producido de la cocaína, introducida y comercializada ilegalmente en los E.U., sin que fuera detectado por las autoridades.

La Defensa pide el rechazo de la prueba, porque habría sido obtenida "mediante intercepciones tele-fónicas y videos grabados clandestinamente, respecto a personas que, en base a tales elementos de cargo, son enjuiciados "en ausencia" (por considerarla ilícita), sin mencionar que fuera W. quien alude en su declaración jurada a tales medios de información.

Corresponde efectuar algunas precisiones, en tor-no a las afirmaciones antes señaladas, como las si-guientes: a) se engloba con la calificación de ilícita a toda la prueba, por las circunstancias que se refie-ren, que obviamente no pueden alcanzar a los testi-monios o declaraciones juradas, relacionadas en sus aspectos sustanciales y analizadas; b) no pueden tampoco ser alcanzados por las supuestas tachas, los decomisos de cocaína y dinero, realizados en el curso de los procedimientos; c) las verificaciones efectuadas en las cuentas de los bancos  que corres-pondían a remisiones y transferencias de determina-das empresas, pertenecientes al mismo grupo de personas , tampoco puede considerarse inhábil o ilíci-to; d) las facturas falsas, en las que se instrumentaba -por los acusados, entre los que se encuentra V.- -la venta de grandes cantidades de oro a personas fic-ticias que supuestamente lo pagaban con dinero, pa-ra ocultar la verdadera fuente de los fondos (que se mencionan reiteradamente en toda la información), son medios de prueba, que escapa ala calificación hecha por la Defensa; e) no se distingue  aunque la diferencia puede ser muy relativa , entre vía de in-formación y medio probatorio y f) W. alude en su declaración, a diversas vías de información  entre las que se encuentran aquellas que la Defensa califica como ilícitas o prohibidas  y a medios de prueba.

De acuerdo a las precedentes puntualizaciones, se advierte que lo que habría que desechar  de se-guirse el criterio de la Defensa  es relativamente es-caso y no tiene mayor significación, siendo suficien-te el, restante material probatorio incorporado a este procedimiento de extradición, para tener por verifi-cado, con holgura, en el grado requerido en el Trata-do, los cargos formulados contra R.S.V. (probabili-dad o verosimilitud de los hechos aducidos

).

**Opinion:** UNITED STATES ~ EXTRADITION ~ CRIMINAL PROCEDURE

**Published in:** LJU Volume 101, 01/01/1990, 71
**Online Citation:** UY/JUR/27/1989

**Summaries:**

1 . 1.    The internal public order requirement is that there be guarantees of legal due process in the requesting state, but the specific characteristics or modalities assumed by this essential guarantee in each country are inherent to each legislation and one should not delve into it. Hence, the prior interrogation of the investigated party, with professional assistance or proof of his/her refusal to declare, which is an indispensable element for processing in our law, is not transferable to other legal systems.

2 . 2.    When the documents are entered through diplomatic channels, there is no material or legal reason to deny the due authenticity; otherwise, it would be an affront to a country with which Uruguay maintains diplomatic relations. The legalization requirement cannot add any greater notes of authenticity than those already inherent in diplomatic introduction.

3 . 3.    The defects or vices as regards form that may affect a request for extradition can be repaired and once overcome, it is not possible to find more obstacles to that aspect.

4 . 4.    In the translation of the documents, even if it had been subsequently completed with translation of some texts and the corresponding legalization, as established by the intervening Judge, the conclusion cannot vary since the request is pursuant to law.

5 . 5.    Extradition treaties must be interpreted in the form that favors the purpose for which they were agreed, because they have their legal basis in the natural laws of civil companies and their provisions, in relation to the spirit that informs them, of common protection to society, and must be broadly interpreted as being in accordance with the general interest that is to ensure the course of justice in the most complete way possible.

6 . 6.    If the Treaty does not define an expression or concept, in order to determine its scope, one must not resort to the regulatory system of one state or another, but rather the solution must be found by the inquiry of the common will of the parties, within the context and addressing the purpose of the legal concept.

7 . 7.    The charges brought are: conspiracy to import cocaine into the U.S., distribute it and plan for the collection of the sale, drug offenses, concealment of money and crimes of conspiracy, assistance and participation in the commission of an extraditable offense. It does not matter that none of these charges typically conform to the crimes provided for in the decree Law 14294, or the rest of the national criminal system, what matters is that the interpreter finds the meaning of a legal classification within the general framework of the rules created by the common will of the States, which signed the Treaty between the United States of America and Uruguay on Extradition and Mutual Legal Assistance in Criminal Matters, effective as from 4/11/84.

8 . 8.    On the other hand, the charged facts are framed, without violence, in a hypothesis of concealment of introduction or sale, which clearly turns the accusation into a figure liable to be extradited pursuant to the Treaty.

9 . 9.    The accused conduct, "laundering" (standing) of monetary instruments, is a crime susceptible to extradition because it is a remote crime (executed outside the territory of the U.S.) but that committed in similar circumstances with respect to Uruguay, would be subject to national jurisdiction, as concealment of the types (offenses) established in Arts. 32 to 33 of dec. law 14294 ("organization or financing" or "illegal introduction to foreign countries").

10 . 10.   From an internal perspective or already by the international policy line followed by the country on the subject, it should be understood that the extradition of whoever may eventually be sentenced to life imprisonment by another state -a penalty that our country never considered inapplicable to the crimes for which the delivery was granted- does not violate the Constitution nor does it affect the internal public order.

11 . 11.   The evidentiary requirement of the Treaty to the maximum extent that it can be assigned is found, linked to or approximates the concept of likelihood ("fumus bonis juris"), that is, probability or likelihood of the alleged facts or claimed rights.

12 . 12.   Although the requested State is empowered to request the submission of "sufficient evidence" or other

"proofs or additional information" (Art. 10 No. 3 in fine and Art. 12), the attitude of the requesting state in no way contravenes the provisions of the Treaty when submitting, without being requested, additional information, which is otherwise established in the spirit of international cooperation with which it was signed and ratified.

**Classification:**

EXTRADITION

+ Procedure

+ Guarantee of due process

+ Must exist in the requesting State

+ Its characteristics and modalities are specific to each country

+ Request

+ Through diplomatic channels

+ It is authentic

+ Inadmissibility of requiring legalization

+ Defects or vices as regards form

+ They can be remedied

+ Translation

+ Completed later

+ It is valid

+ Treaty

+ Interpretation

+ In a way that favors its purpose

+ No definition of expression or concept

+ Common will of the parties must be found out

+ On extradition and cooperation in criminal matters with the U.S. (validity: 1984)

+ Attributed facts

+ Its adequacy to internal rules does not matter

+ Rules created by Treaty matter

+ Possibility of life sentence

+ Does not violate the Constitution

+ Evidentiary requirement

+ Likelihood

+ Additional information

+ Submitted without prior requirement

+ Admissibility.

    1.    The internal public order requirement is that there be guarantees of legal due process in the requesting state, but the specific characteristics or modalities assumed by this essential guarantee in each country are inherent to each legislation and one should not delve into it. Hence, the prior interrogation of the investigated party, with professional assistance or proof of his/her refusal to declare, which is an indispensable element for processing in our law, is not transferable to other legal systems.

    2.    When the documents are entered through diplomatic channels, there is no material or legal reason to

deny the due authenticity; otherwise, it would be an affront to a country with which Uruguay maintains diplomatic relations. The legalization requirement cannot add any greater notes of authenticity than those already inherent in diplomatic introduction.

3.   The defects or vices as regards form that may affect a request for extradition can be repaired and once overcome, it is not possible to find more obstacles to that aspect.

4.   In the translation of the documents, even if it had been subsequently completed with translation of some texts and the corresponding legalization, as established by the intervening Judge, the conclusion cannot vary since the request is pursuant to law.

5.   Extradition treaties must be interpreted in the form that favors the purpose for which they were agreed, because they have their legal basis in the natural laws of civil companies and their provisions, in relation to the spirit that informs them, of common protection to society, and must be broadly interpreted as being in accordance with the general interest that is to ensure the course of justice in the most complete way possible.

6.   If the Treaty does not define an expression or concept, in order to determine its scope, one must not resort to the regulatory system of one state or another, but rather the solution must be found by the inquiry of the common will of the parties, within the context and addressing the purpose of the legal concept.

7.   The charges brought are: conspiracy to import cocaine into the U.S., distribute it and plan for the collection of the sale, drug offenses, concealment of money and crimes of conspiracy, assistance and participation in the commission of an extraditable offense.

It does not matter that none of these charges typically conform to the crimes provided for in the decree Law 14294, or the rest of the national criminal system, what matters is that the interpreter finds the meaning of a legal classification within the general framework of the rules created by the common will of the States, which signed the Treaty between the United States of America and Uruguay on Extradition and Mutual Legal Assistance in Criminal Matters, effective as from 4/11/84.

8.   On the other hand, the charged facts are framed, without violence, in a hypothesis of concealment of introduction or sale, which clearly turns the accusation into a figure liable to be extradited pursuant to the Treaty.

9.   The accused conduct, "laundering" (standing) of monetary instruments, is a crime susceptible to extradition because it is a remote crime (executed outside the territory of the U.S.) but that committed in similar circumstances with respect to Uruguay, would be subject to national jurisdiction, as concealment of the types (offenses) established in Arts. 32 to 33 of dec. law 14294 ("organization or financing" or "illegal introduction to foreign countries").

10.   From an internal perspective or already by the international policy line followed by the country on the subject, it should be understood that the extradition of whoever may eventually be sentenced to life imprisonment by another state -a penalty that our country never considered inapplicable to the crimes for which the delivery was granted- does not violate the Constitution nor does it affect the internal public order.

11.   The evidentiary requirement of the Treaty to the maximum extent that it can be assigned is found, linked to or approximates the concept of likelihood ("fumus bonis juris"), that is, probability or likelihood of the alleged facts or claimed rights.

12.   Although the requested State is empowered to request the submission of "sufficient evidence" or other "proofs or additional information" (Art. 10 No. 3 in fine and Art. 12), the attitude of the requesting state in no way contravenes the provisions of the Treaty when submitting, without being requested, additional information, which is otherwise established in the spirit of international cooperation with which it was signed and ratified.

Court of 1st Instance in Criminal and Juvenile Matters 2nd. Rotation of Maldonado.

Criminal Court of Appeals of the Third Rotation.


**Full Text:**

FIRST INSTANCE

Maldonado, May 19, 1989.

Having regard to:

For judgment, this letter rogatory from the U.S. requesting the extradition of R.S.V. (File P/129/89), with the intervention of the Departmental Attorney General of the Second Rotation, Dr. Cristina González de Saldivia.

RESULTING IN:

I.     That on February 22 of this year (pages 1, 7 and 11) personnel of the Office of the Chief of Police of Maldonado arrested the Argentine citizen R.S.V., upon becoming aware that the U.S. Embassy had requested the arrest with the purpose of extradition.

II.     That the following day (pages 1 and 3) the Judge became aware of that act and ordered that the person deprived of his freedom be brought to the case immediately with an explanatory memorandum. Upon taking him to the Court, he was informed of the appointment of a sponsoring Defense Attorney, he was informed of the right to communicate freely and privately with him (pages 10) and was informed in detail about the reasons for his arrest.

III.     That in the statement (also made in the presence of the Representative of the Public Prosecutor's Office who had been informed about the initiation of the procedure p. 8v.) he was examined in order to determine whether he was the same person required and as regards the charges that were made; he turned out to be the individual accused by the foreign authorities, declaring himself innocent (p. 11 15).

IV.     That by resolution No. 393, also dated February 23, 1989 (pg. 16 16v.), considering that: the temporary detention request was duly documented; that the detainee was the required person, that the alleged offenses indicted were duly mentioned and that declaration was received with the guarantees of the Counsel, in accordance with the provisions of Art. 11 of the Extradition and Mutual Legal Assistance in Criminal Matters Treaty signed between our country and the U.S. in W. on April 6, 1973, the interim arrest of R.S.V. was ordered, communicating to the Office of the Chief of Police the respective order. In addition, the requesting Judge was informed that the term provided for in the final paragraph of Art. 11 of the Binding Treaty in the matter had begun, issuing a letter rogatory for this purpose and a radiogram through INTERPOL; the Office of the Chief of Police was requested to send the identification data of the arrested and the personal identification documents were seized. Order was given to notify the Public Prosecutor's Office; that it be reserved and, at the time, returned to the Office.

V.     On April 4 of this year (page 180) this Court venue received the formal extradition request sent by diplomatic channels (pages 34 to 180), which had arrived at the Ministry of Foreign Affairs of our country on the previous day, p. 36.

The list of circumstances of the incriminating event is, in summary, the following:

The first indictment against V., accuses him with a charge for conspiracy to help and instigate to obtain possession and distribute cocaine (in violation of Sections 841 (a) (1) and 846, Title 21, of the U.S. Code and Section 2, Title 18, of the U.S. Code) and for "laundering" monetary instruments (in violation of Sections 371 and 1956, Title 18 of the U.S. Code); a charge for knowingly and intentionally assisting and instigating the obtaining of possession of cocaine with the intention to distribute it (in violation of Section 841 (a) (1), Title 21, of the U.S. Code and Section 2, Title 18, of the U.S. Code); and twelve charges for "laundering" funds resulting from the illegal sale of dangerous narcotics (in violation of Sections 2 and 1956 (a) (1), Title 18, of the U.S. Code).

The second indictment issued against V., accuses him with a charge for conspiracy to help and instigate to obtain possession and distribute cocaine (in violation of Sections 841 (a) (1) and 846, Title 21, of the U.S. Code and Section 2, Title 18, of the U.S. Code) and for "laundering" monetary instruments (in violation of

Sections 371 and 1956, Title 18 of the U.S. Code); and eleven charges for "laundering" funds resulting from the illegal sale of dangerous narcotics (in violation of Sections 2 and 1956 (a) (1), Title 18, of the U.S. Code).

The indictments argues in substance that approximately between 1985 and February 1989, V. and his co-defendants worked for people in C. and other places in A. of S. who had the business of importing large amounts of cocaine into the U.S. and arranging its distribution. As part of the whole operation of narcotic trafficking, V. and some of his co-defendants coordinated the collection of the proceeds from the sales of cocaine to distributors in L.A., C., N.Y., N.Y. and in other places in the U.S. Once the money had been collected, V. and others monitored its transfer and deposit into bank accounts controlled by them, in L.A., from which it was transferred by telegraph or cable to accounts in N.Y. and U., for final distribution to C cocaine traffickers.

The specific charges against V. include the fact that in 1986 he bought a precious metal and money exchange business, in M., U., known as C.I. or L.S.A., which he used for the benefit of the traffickers of narcotics for whom he worked, as a means of disguising the true origin of large sums of money transferred to them from the U.S. Using C.I. and other businesses in the U.S., it is alleged that V. and his co-defendants were engaged in making fictitious sales of gold, which was exchanged for the money that the cocaine distributors had collected. Records from U.S. banks regarding the businesses involved indicate that the money was transferred through U.S. financial institutions to accounts that included Uruguayan accounts of C.I. and/or L.S.A. The evidence on which the charges against V. are based further indicates that hundreds of millions of dollars of the illegal drug proceeds were transferred to accounts of V's business in U. and were then sent to P., C. or other places for the benefit of cocaine traffickers.

VI.    Immediately, it was decreed (No. 933/181) to carry out a medical examination on the arrested person by the two Forensic Physicians of this Department and that a dentist prepared a dental card for identification purposes: likewise, receive a declaration from Mr. V. establishing for this purpose the hearing of April 5.

VII.  A declaration was obtained on the established date, which continued the following day (pages 187 198v.).

VIII.  By order No. 927 dated April 7, 1989, notice was served of the claim for extradition to the Defense for the fixed term of six days.

IX.    The Defense Attorney, on pages 210 240, objected to the request of the U.S. government for the following reasons:

a) That international cooperation in criminal matters is atypical and exceptional, therefore, if there is only one deficiency or irregularity, it is sufficient to deny the request for assistance.

b) That the translation of the letter rogatory of the proceedings has been made in the U.S. Department of State, getting around what is provided for in Decree Law 15441 that requires it to be carried out by a Public Translator registered in the country or, failing that, by the Consular Agent of the Republic in the country of origin of the documents. This irregularity is sufficient to reject the requirement.

c) That Art. 10 of the Treaty in its section number 2 when it states that the request must be accompanied by, among other essential requirements, "the legal texts that regulate the statute of limitations of the action and the penalty" and in the case at hand, although it is mentioned that they are added (p. 84), they have not done so and the signatory simply says that "I have reviewed this law conscientiously and I attest that the legal action against R.V. in this matter has not prescribed". In other words, an essential requirement has been violated once again, failing to send something clearly required by the Treaty.

d) That the jurisdiction of the Court or Tribunal issuing the order has not been indicated.

e) That the accompanying evidence is frankly insufficient, illegal, not accepted by the Uruguayan positive law, in violation of the National Constitution and, therefore, in violation of our sovereignty, so they should be rejected in all their terms. The sworn statement in which the summary of the charges against R.V. is

made is a mere copy of the memorandum sent by the investigators (FBI and DEA) to the Prosecutor's Office. The alleged evidence that should be attached does not exist, only the statement of an informant that can be crossed out. The FBI carried out a patient investigation for several years in which hundreds of testimonies, follow-ups, videotapes and telephone recordings were received against the investigated parties; part of that evidence was sent with this request and without prejudice to being considered illegal evidence, it states that in none of them it is possible to observe or hear R.V. and he is not even mentioned.

f) That the procedure carried out in the U.S. (Assistant Prosecutor attests that V. is Guilty) is in line with our Constitution that prohibits the open judgement.

g) That not even a single invoice was attached, of the alleged fictitious purchases and sales, nor V's checking accounts with large movements, nor invoices of the armored cars under investigation, nor less still contacts of V. with cocaine traffickers.

h) That the crimes for which extradition is requested are not provided for in the 32 hypotheses established by the treaty.

X.     The Representative of the Public Prosecutor's Office (No. 1021/241 241v.) was served notice and the Departmental Attorney General of the Second Rotation in a well-founded opinion (pages 243 254) advocated for the claim to be considered upon not noticing any irregularity whatsoever that would prevent the granting of extradition.

XI.     And the case was set for entering judgment (No. 1231 dated 2 of the current month (p. 254v.), raising the piece to the Office to issue it.

XII.     The proceedings also state for the record:

That as a measure to take further steps (No. 1269/255v.) it provided that the requesting State submits translation of the letter rogatory made by a professional authorized in the Republic and also that it included a list of the rules on the statute of limitations of the action and the penalty;

That the U.S. Embassy on the 8th of this month complied with the request (p. 256 311), ordering (No. 1287/312) to add the supporting documents with news from the Defense and the Public Prosecutor's Office;

Having personally notified the parties on May 8 (p. 313), on the following 16th, the file returned to the Office for judgment (p. 374);

In the meantime, on p. 314 344, a letter rogatory was received (through diplomatic channel) where three omitted pages in the English version are attached. It was arranged to keep it in mind without another procedure (p. 345). In addition, another letter rogatory (p. 346 373) was submitted, making available additional information (testimonial evidence for prosecution). It was provided to observe proceedings No. 1287/312.

XIII.   It is proven in the proceedings that the arrested person R.S.V. is the same person required by the U.S. and from his statements it is clear that he is a person who trades with precious metals (particularly gold) at an international level; that he was based in the U.S.; that he knows most of the aforementioned companies as involved in illicit activities, their owners and also those who personally accuse him.

Whereas:

I.     That the claim for extradition will be admitted upon existence of the adjective and substantial requirements regulated in the Treaty between the United States of America and Uruguay on Extradition and Mutual Legal Assistance in Criminal Matters in W. on April 6, 1973, effective as from April 11, 1984. The grounds set forth by the Defense Attorney lack, in the opinion of the Praetor, not only legal status, but also conviction power to raise a diverse solution to that adopted here, this being the reason why it must be expressed below.

II.     The extradition is an act of inter-State judicial assistance in criminal matters that deals with the sending of a criminally charged or requested individual, from the sphere of sovereignty of one State to that of

another. Novda Monreal (Revue internacionale de droit pénal, 1969, p. 788) defines it as a measure aimed at safeguarding the most fundamental and general principles of law recognized by the civilized world and consisting of delivering a person convicted or called to trial as a result of the violation of those principles to the State to which the right of repression belongs and in which the action will be judged, offering all the guarantees of a State based on the law.

Extradition law belongs to the gender of legal cooperation in international matters. By common consent with the concordant opinion of the Public Prosecutor's Office, the methodological point of view must not be restrictive (which sees the spatial scope of Criminal Law in the international sphere from a territoriality perspective, where extraterritoriality constitutes an exceptional temperament) such as established by the Defense.

Indeed, in transferable concepts of Vieira (The crime in the international criminal Law Sphere and international criminal law   Mont. FCU 1969 p. 17), the definitions in legal matters are subordinated to the position to which the juror is affiliated. If we are faced with a nationalist, the accent of the definition will be placed in the national aspect of Criminal Law. If, on the contrary, we face an internationalist, he or she will highlight the solidaristic and international cooperation conception regarding criminal law.

Whenever Uruguay signed a bilateral agreement on legal cooperation in the last century, the letters rogatory in criminal matters were included.

See:

1) U.B. Treaty for the Execution of Letters Rogatory (1879), Arts. 1 and 2 (Approved by Law of May 21, 1879).

2) U.B. Treaty, Protocol on Letters Rogatory (1906), Art. 1 (Modifies and supplements the previous one).

3) E.U. Treaty, Suppression of Legalizations in the rogatory commissions (Law of June 10, 1901).

4) U.A. Treaty, Convention extending the Treaty on Procedural Law of M. (1907). Arts. 1 et seq. (Law 3163 of 31 May 1907).

5) U.P. Treaty, Convention extending the Treaty on Procedural Law of M. (1915). Arts. 1 et seq. (law of June 18, 1920).

6) U.B. Treaty, Convention extending the Treaty on Procedural Law of M. (1918), Arts. 1 et seq. (Law 6189 of July 16, 1918).

7) U.A.P. Treaty (1940) on Procedural Law. Art. 11 (ratified by decree law of November 12, 1942).

8) U.A. Treaty (1980 on Equal Procedural Treatment and Letters Rogatory, Arts. 2 et seq. (Law 15110 of March 17, 1981).

9) U.Ch. Treaty (1982) on Equal Procedural Treatment and Letters Rogatory. Arts. 2 et seq. (Decree Law 15251 of March 26, 1982).

International judicial aid in criminal matters offers similar characteristics to the homonym phenomenon in civil matters (Werner Goldschmidt: Private Int. Law, 2nd. Ed. Bs. As. 1974, p. 491).

Corollary of the foregoing is that extradition treaties must always be interpreted in a manner that favors the purpose for which they were agreed. The position of U. has been and is collaboration in criminal matters. The Italian Cassation in judgment of March 10, 1914, had already affirmed that considering that the extradition has its legal basis in the natural laws of civil societies, their provisions must be broadly interpreted in relation to how they are informed, the common protection of society; and from the doctrinal point of view, it can be pointed out that Travers (Le Droit Penal Internacional, V. IV, p. 383), also criticizes the restrictive interpretation and affirms the broadest, since it is more consistent with the general interest that is to ensure the course of justice in the most complete manner possible (LJU C. 3210, RUDP 2/88 c. 324 and Judg. No. 90/87 of

the Crim. Crt. 2nd. Rotation).

In the same sense: faced with organizations dedicated to the trafficking of narcotics and the material means they have, the teachings of Quintano Ripolles (Treaty of International and International Criminal Law, Vol. II, p. 116, Madrid, 1957) are applicable, who, referring to the indispensable cooperation between countries in the face of such cases, argued that their frustration should be avoided by tolerating that while criminals use planes, judges travel by stagecoach.

The current debate as regards these ideas in various areas, the preparation even in the Parliament folders of a law on extradition, together with the aforementioned measures, make it possible to conclude that international criminal cooperation is not atypical or exceptional.

III.    The purposes of the extradition and the criterion set out above are the guidance for the interpretation of the binding treaty between our country and the U.S.

This procedure does not constitute a criminal trial, but rather an extraordinary and summary procedure aimed at making the requested one available to the Judge or Court that is legally responsible for hearing in the case. Since this is not a judgment, the method cannot be restrictive. Nor does the principle "in dubio pro reo" apply (because it does not govern for the interpretation of criminal or procedural laws   RUDP 2/88 c. 327) and if the procedure is manifestly attempted in good faith, the non-technical execution of any formality of our criminal system must not be allowed to oppose the fair execution of our obligations (Cf. Piñeiro Chain in Extradition, Part III, Olarte, p. 95).

IV.    The claim filed by the U.S. Government is in accordance with the provisions of Art. 10 of the aforementioned Treaty. A list of circumstances of the facts has been attached with the data necessary for the identification of the person and the legal texts applicable to the case. The legalization and translation are included for the record.

The dilatory defenses opposed by the Defense that they place in the absence of a legal translation of the letter rogatory and in the fact that the required rules on statutes of limitations were not attached, have been adequately contaminated by the prosecutor's opinion and were ultimately remedied through the measures to provide additional evidence.

V.    Insofar as the United States authorities have notably omitted to prove their international competence, it is not a valid objection if it is taken into account that it is only necessary to require that the requesting State be competent and that the jurisdictional body where the criminal process is to be carried out has jurisdiction in said State,

Vieira (L'Evolution recente de l'extradition dans le continent Americain. Recueil des cours, volume 185. Academie de Droit Internacional, p. 201) with its unique penetration establishes that in order for a State to be able to claim from another the delivery of a person for criminal purposes, the offence must be within the jurisdiction of its courts and there must be an arrest warrant, the vocabulary used being very varied, so much so that some States refer to the jurisdiction of the requesting State and others have a tendency to establish that in order to file the claim it is necessary for the crime to have been committed within their territory.

It is crystal clear that, in no way, should the internal competence of the body be considered (e.g. if a Court of the State of C. or that of another State of the U. must hear), Olarte (op. cit. V. I p. 87 88) following Travers says that the requested State must verify whether the requesting State is competent to judge the act giving rise to the claim, but said competence being generally understood, that is, that it will not be attempted to inquire if such or such judge or court is competent according to internal legislation. In the same sense, Alfonsín (Legal Documents, T. III p. 21) upon setting the example of a civil case, states that once it has been established that a certain foreign sentence intended to be executed in U., comes from a certain State that, according to Art. 2401 of our Civil Code, was competence for the case, it is not necessary to access the enforcement to control whether the foreign Judge enjoyed in addition to internal competence, taking into account that Art. 2402 of the Civil Code confers on the law of the place where the trial was filed the regime of the process.

The problem is as indicated in the prosecutor's opinion, within the framework of which rules of Private International Law must the international competence of the petitioner be examined as there is no express provision in the Treaty. However, either in the DIP rules of one or another State, the place of commission of the crime must be made in accordance with the known theory of activity.

It should be added in this regard that, leaving theories aside, it is an established principle (which was even included in the 1889 Treaty on International Penal Law signed by our country) that if the crime has been perpetrated in more than one country, the State that has first become judicially aware will have jurisdiction. And if it is considered that these are related offenses committed in the territory of two or more states, the State in which territory the most serious offense has been executed would be competent (Cf. Carreras: Extradition procedural regime, La Ley Mag. V. 138 Sec. Doc. p. 1202).

And if any doubt persists even on the point, it is sufficient to think that possible crimes of concealment could have been committed in our country, but since it requires to establish this not to be a participant in the main illicit act and as seen by the facts attributed as well as by the North American criminal rules, the requested is considered a participant, the hypothesis handled is easily ruled out.

VI.    The alleged absence of evidence.

The Extradition Treaty with the U.S. in part of its Art. 10 reads: "The requested state may request that the requesting state submits sufficient evidence to establish "Prima facie" that the person claimed has committed the offense for which the extradition is raised. The requested state may deny extradition if an examination of the case shows that the arrest warrant is manifestly unfounded".

The Judge considers that the request for additional evidence only corresponds when the claim is manifestly unfounded (for example, if in this case the extradition of a person who had never carried out negotiations such as those expressed, who had never left the country and who did not know the aforementioned persons and companies was requested by identical grounds of fact and law). Here, the rule that enables our State to request the petitioner to submit sufficient evidence to establish "Prima facie" that the person claimed has committed the crime would be applicable, a hypothesis that is clearly not that in the instant case. The inadmissibility of the extradition admitted by the current Treaty is not the one that refers to the evidence for the prosecution enabling the processing, this being an exclusive spring point of the requesting State. The preliminary investigation function that cannot be usurped by another Magistrate belongs only to the competent Judge (RUDP cit. c. 322). It is extracted from this, without any hesitation, that the mission of the required Judge is to verify the existence of the "fumus bonis juris" (smoke of a good right) that modernly translates by probability or likelihood of the law argued.

Finally, it should be kept in mind that the assessment or evaluation of the evidence must be done in accordance with the rules of the place of the process (lex fori) and even for those who argue that our rules must be used, the incorporated elements are not clearly consistent with the set of rules and principles of law in which our society establishes its individuality. See that in terms of the testimonials, notwithstanding the considerations made, they do not mention which grounds for disqualification provided for in our legislation would be applicable thereto; regarding the alleged illegality of the recordings and videos, it would be necessary to prove that they were carried out without the authorization of the competent Judge (something that was not done) and in this regard it arises from the accompanying documentation that at least some recordings of telephone conversations were performed with judicial authorization. Nor is the argument accepted that the DEA and the FBI offer rewards, protection and impunity to the informants when, according to the Defense, the informant in this case was subject to Uruguayan Justice and the agents will not be able to affect it at all.

VII.    Attributed crimes and the principle of identity of norm or double jeopardy.

The Treaty of binding extradition in the case at hand includes the so-called principle of double jeopardy or the identity of the norm. This requires that the fact that motivates it is a crime in the legislation of the requesting state and in the legislation of the requested state. In other words, it is necessary for the fact to be considered a crime in the two legislations. even if it does not have the same "nomen juris" or legal name in both

legislations. It is included in Art. 2, paragraph 1, when saying "provided that they are punishable under the laws of the contracting parties" and in the same article, paragraph 3, when saying "and said crime is punishable according to the laws of both contracting parties". And the requirement of the "nomen juris" itself in the same paragraph cited upon stating "extradition will be appropriate when the laws of both parties do not consider the crime included in the same category of the list or even if they do not designate it with the same terminology" (Journal of the Sec. of the State Coun. dated October 18, 1983 p. 358) is ruled out.

The classification must be made within the framework of the Treaty because, as teacher Alfonsín taught (Theory of International Private Law; Montevideo 1955, p. 385) it is necessary to qualify, this is, to place the legal relationship in a category of the legal system to which the rule belongs, reason why we will return to the Treaty.

So, fraud against the U.S. is provided for in Art. 2 Sec. 12 of the Treaty; laundering of monetary instruments is provided for in Sec. 26 because the accused would know the origin of the money; conspiracy to help and instigate to obtain the possession and distribution of cocaine is included in Sec. 17 since "The extradition will also be granted for the participation in the aforementioned crimes, not just as an author, accomplice and instigator, but also as an accessory, as well as for the attempt and illicit association to commit the aforementioned crimes, provided that these classifications are punishable by the legislation of the Contracting Parties with imprisonment of more than one year".

From a criminological point of view, we are in the presence of typical white collar (S.) crimes, known in English countries as "occupational crime", or "criminalité d'affaire" in French law. It is clear from all evidence that the positive law sets them in prohibited criminal types after the actions are carried out and, pursuant to that, the Treaty must be interpreted with a broad, evolutionary criterion.

VIII.  The proceedings provided in the requesting State in the absence of the investigated party and the international public order of the Uruguayan State.

It is an elementary principle of international law that the exception of international public order works to displace the harmful consequences that the application of a foreign law would cause to a country and is not applicable against a rule of a Treaty.

What happens then to the international public order and the Treaties? When they are entered into, a public order reserve clause is usually included, but even if it was included, Alfonsín taught that the States could not make use of the reserve clause to exclude foreign laws in effect at the time of the approval of the Treaty, since it is taken for granted that the States cannot approve conventional rules without studying and calculating their impacts, taking into account the institutions that the other contracting States have established. They can only use the clause to exclude the application of foreign laws implemented later and which eventual application they could not naturally foresee at the time of approval of the Treaty (Alfonsín, Theory cit. Mont. 1982 p. 579 580).

The relations between the Treaty and the Constitution have been resolved in the sense that the courts of justice lack jurisdiction to rule, this is, that they have no jurisdiction to decree the invalidity of an International Treaty and the issue is referred to mechanisms of international law. Thus; Vieira (Recueil des cours, cit. V. 185 p. 187) describes the case of the Supreme Court of P. that did not declare the invalidity of a treaty for considering that it went beyond its powers and that in V's., the Supreme Court of Justice has established an "inadmissibility" on a claim for annulment of line 14 of Art. 3 of the law to approve an extradition treaty signed between V. and the U.S. And the basis lies in the fact that no State has the legal power to prioritize its law over those of another and that there are other avenues in International Law to cease the effects of a Treaty.

That the requested person has never declared before a judicial authority is a petition for principle, since what is precisely the object of the extradition process cannot be established as a condition and that this is a trial requirement in our law, it is not possible to extend it to other legislations. The only requirement (and considered when ratifying the Treaty) is the existence in the requesting State, if applicable, of the guarantees of

due process of law, but the specific characteristics or modalities that this guarantee assumes in each country is a matter of each State and it is not possible to interfere with this.

IX.     Ultimately, the extradition of R.S.V. must be granted because the requirements established in the binding Treaty with the U.S. have been met, for the purposes of his trial for the accusations related to the letter rogatory.

And it is worth rejecting the conclusions of the professors consulted by the Defense Attorney, insofar as the undersigned Judge would incur in liabilities established in different provisions of the Constitution if he admitted the claim. Without prejudice to the fact that the corresponding disciplinary power has already been exercised, it should be said that the extradition is extraconstitutional since the principles of this refer to the national legal system and the authorities must be guided by the supranational rules contained in the Treaties belonging to another legal system. On the other hand, the State could incur liability if it were to omit to comply with the obligations it assumed when ratifying the Treaty.

For these reasons, the concordant provisions of the prosecutor's report and the precepts included, I RULE:

To admit the claim and on its merits, grant the extradition of R.S.V. Final, set.

Tabaré Sosa Aguirre

SECOND INSTANCE

Montevideo, July 28, 1989.

RECITALS:

For second instance judgment, these proceedings entitled "V., R. - Extradition" (File No. 86/1989), submitted for hearing of this Court by virtue of the appeal filed by the Defense Attorneys of the requested person in a subsidiary manner to the appeal for reconsideration against judgment No. 43 issued on May 19, 1989 by the Attorney Judge of First Instance in Criminal and Juvenile Matters of the Second Rotation of Maldonado, Dr. Tabaré Sosa Aguirre.

Accepting and incorporating by reference the list of background facts, procedural acts and facts considered proven contained in the decision under appeal, due to the fact that they are consistent with the outcome of the proceedings.

Also resulting in:

I.      That, based on the Treaty on Extradition and Mutual Legal Assistance in Criminal Matters signed between the United States of America and Uruguay in W., on April 6, 1973, approved by decree law No. 15476, in force since April 11, 1984, in extensive and well-founded pronouncement, the Judge of first instance granted the extradition of R.S.V. (p. 378/388).

II.     The Defense Attorneys, Dr. V.D.V. and J.C.D.G., based on the consultations of illustrated specialists in the field -Dr., E.T.B., C.A.C. and M.A.V. (one already added and one accompanying) and what they set forth broadly, understand that it is appropriate to revoke the contested judgment, denying the extradition (p. 550/560).

The arguments handled aim at highlighting what they consider to be non-compliance with certain requirements in the delivery order, insufficiency of the evidence with which V. was prosecuted, violation and failure to observe the Treaty rules and violation of our international public order (manifestly unfounded arrest warrant, formal and substantive defects that are irredeemable, evidence poorly assessed, etc.).

They insist that the requested person was prosecuted in absentia, in violation of our Constitution (Art. 21); that the essential requirement of the prior examination of the defendant was not met (Art. 126 of the Code of Criminal Procedure); that it is not possible to fail to observe Article 14, section number 2 of the Criminal Code and the American Convention on Human Rights (Art. 7.2) and that the requirement for double jeopardy is

not met", since none of the charges filed typically conform to the criminal figures provided for in Decree Law No. 14294 or the rest of the country's criminal system.

Regarding the crime of laundering or whitewashing of monetary instruments, they state that created by the law of the requesting country on October 27, 1986, they say that it did not appear nor could it appear on the restricted list of Article 2 of the Treaty, reason why V. cannot be delivered to be prosecuted for such a crime and could never be prosecuted by the party claiming it (the crime does not appear in Uruguayan legislation).

They make observations as regards the documentation submitted, due to lack of translation and legalization in form (irremediable defects); that no texts related to "the statute of limitations of the action and of the penalty" were attached; that the evidence on which the request relies (inadequate, illegal or prohibited evidence), leads to dismissal and that it is not possible to deliver a person who can spend the rest of his/her life in prison, since the international public order is violated.

III.   The Departmental Attorney General of the Second Rotation of Maldonado, Dr. Cristina González de Saldivia, upon making the record available as ordered, after carefully studying the arguments of the Defense, dismisses them and advocates for the confirmation of the contested resolution (p. 562/566).

IV.   It is stated for the record that the evidence provided by the requesting state to support the charges filed against V. is constituted by an extensive and detailed description of the facts, with precise references to the source of information (p. 121/162 and 383/389), the sworn statements of: R.H., Assistant Prosecutor in the Central District of C. (p. 113/118 and 279/281rev.); F.B.W. (p. 171/178 and 304rev./308), who is Special Agent (SA) of the Federal Bureau of Investigation (FBI); W.G., a person who was related to V. (p. 163/165 and 303/304) and S.H., closely related to V. and his activity (p. 355/359 and 364/372), as well as the occupation of 640 pounds of cocaine and a significant sum of money in dollars during the investigation.

G., a Uruguayan citizen residing in the U.S., explained that he met V. in 1985, being introduced by his brother-in-law H. and that future plans were discussed in relation to "money laundering", traveling in July 1985 to B., to search for clients for the money transaction, meeting at that time R.R., who agreed to use them in such transaction for what he obtained from cocaine in L.A.

He informed V. and H. of it, who contacted R. and said he was aware that because of this modality of moving and distributing the money they received commissions of 2% each, not him, who was eliminated from future deals.

They continued in that company and in April 1986 they bought Cambio I. (in U.), which corporate name is L.S.A., even when V's connection to the aforementioned business is not on record, but is a limited partner and principal responsible for financial transactions.

He reports how he continued to find out about the transactions that were made in C.I. for drug traffickers who wanted to hide their profits and the sources of the money, highlighting that gold bars were sent to the U.S., which would be bought with money from the drug, to show that the money was being used in a legitimate trade.

He mentions that the money was deposited in bank accounts in N.Y. controlled by those who intervened in the "laundering" of money and then wire transferred to accounts held by C.I. in banks of M., with V. and H. being the ones who supervised these accounts and made the transfers to the drug trafficker accounts in P. and C., with the understanding that tens of millions of dollars were laundered, receiving commissions ranging from 7% to 12%.

For his part, H., also a Uruguayan citizen residing in the U.S. and arrested for his participation in money laundering from drug trafficking, declares that he provided detailed information about the money laundering business to which V is dedicated, who he met in 1985.

He declares that in 1986 V. opened the C.I., and appointed him as vice president and R.P. as president, because V. did not want to appear in the documents, but upon V. offering him a job in the U.S. (gold industry), he traveled there; in July 1986 he went to L.A. when he was called by V. to work in a jewelry

business, but his task was to count money that was brought in boxes and that V. in L.A. had a gold refinery (making gold bars) and at the same time received from U. gold plated lead bars, which were weighed in U.S. Customs and the origin and weight were documented.

Then, V. proceeded to sell the real gold bars made in the refinery to the banks which believed, based on the documents, that they came from U.- and with the instructions received, such amounts ended up in C.I. accounts or other accounts abroad.

By indication of V., in January 1987, he moves to N.Y., he starts to work in an alleged business of purchase and sale of gold, referring to the operations involved, ending his business association with V. in June 1988, when escaping from the office in N.Y. upon the arrival of Police officers, a circumstance that made him abandon a significant amount of money.

H., after mentioning the functions that he has performed and performs, refers to the prosecutions that have been decreed against V., the charges against him and numerous co-defendants who worked for people based in C. and other places and the way they operated (introduction of large quantities of cocaine to the U.S., arrangements for its distribution, collection of the proceeds from sales in L.A. and N.Y., how V. supervised transfers by telegraph or cable to U. and final destination to traffickers).

V. used the C.I. for the benefit of the traffickers for whom he worked, being a means to disguise the true origin of the large sums of money transferred to them from the U.S. (fictitious sales of gold sales, which was exchanged for money that had been paid by the distributors of cocaine).

Through U.S. bank records, it became clear that hundreds of million dollars were transferred through other financial institutions to accounts that included the Uruguayan C.I. or L.S.A., to be later sent to P., C. and other places.

W., who personally participated in the investigation with a specialized group of officials and representatives of state and local bodies, declares that he reviewed the business, bank records, electronic surveillance tapes (oral and telephone wire interception, authorized by the courts), public record of corporations, reports provided to him by other FBI agents and the outcome of the surveillance and follow-up of people, etc. which allows him to justify that the transfers made to P. and U. responded to illicit sales of narcotics in the U.S., V. and other persons under investigation being devoted to the laundering of funds produced by illegal trafficking (also refers to confidential information, seizure of a large amount of money and a large amount of cocaine from suspicious people).

According to such testimonies, thorough description of the facts attributed to V. and other co-defendants, detailed description of the accounts of companies that would be linked to the drug trafficking (belonging to the same group of people) in terms of the amounts deposited, source of the remittances, date, account holders, etc. as well as the aforementioned seizures, it can be concluded in a primary assessment that there was a set of maneuvers aimed at "hiding the nature, source, location and ownership of funds" produced by cocaine illegally introduced into the U.S.

V.     That the intervening Judge maintained the decision and granted the appeal (p. 567 and rev.).

Once the proceedings were received, there was a judgment summons, which, after being admitted to examination, was legally agreed (p. 570 et seq.).

Whereas:

I.     That, even if any doubt could be raised as to whether the final decision, which terminates a jurisdictional extradition procedure is a final or interlocutory judgment, for the purposes of the recurrence, the filing made by the Defense cannot be grounds for any invalidation whatsoever.

It is peacefully accepted that the appeal is not harmed by its erroneous presentation, since the Law addresses the main issue and manifestation of will, made within the legal term, to appeal the judgment and not the secondary one, as it is also clear from the provisions of Article 658 section 2 of the Code of Civil Procedure.

Therefore, the appeal that legally opened this instance must be considered to be well granted.

II.    That, having determined the admissibility of the appeal, it is appropriate to include in the study the numerous objections raised by the Defense and for which, the decision to deliver R.V. in no way can succeed.

Many of the arguments put forward had already been raised in opposition to the request of the U.S. (p. 232/240) and dismissed with good grounds, both by the Public Prosecutor's Office (p. 243/254), and by the "a quo" Judge, which the Chamber, in general, shares.

The Court is going to confirm the sentence under appeal for what it will state below.

III.    The extradition, as specified by the illustrious criminal attorney Jiménez de Asúa, "consists of the delivery that one State makes to another State of an accused or convicted person, who is in its territory, so that in that country he/she can be prosecuted criminally or the penalty can be executed" ("Criminal Law Treaty", Volume II, p. 771).

It is a legal concept that enables collaboration between the States in criminal matters, allowing, according to Bettiol, the moderation of the consequences that necessarily derive from the acceptance of the criterion of territoriality "and with which the question of the effectiveness of criminal law in space is related. If such a matter were regulated on the basis of universal criteria, it would not be necessary to create a means by which States collaborate with each other in the fight against crime" (G. Bettiol: "Criminal Law", General Part, p. 135).

And, it is with that spirit of necessary collaboration between the states, that Bettiol underlines, that the Treaty was signed, which interpretation occupies the attention of the Court venue, upon establishing in its prologue: "the O. R. of U. and the U.S., desiring to make cooperation between the two countries in the repression of crime more effective, agree...".

That is why the prestigious case law and academic legal opinion cited by the Judge of First Instance (p. 383) is fully received, determining the criterion that must guide the interpreter of this type of treaties.

Extradition treaties, "must be interpreted in the manner that favors the purpose for which they were agreed", because they have their legal basis in the natural laws of civil societies and their provisions, "in relation to the spirit that informs them, of common protection of society" must be broadly interpreted, because they are the most in accordance "with the general interest that is to ensure the course of justice in the most complete way possible..." (Conf. "The Uruguayan Justice", V. XXI, case 3210).

This interpretation is in accordance with the position and spirit of international cooperation that Uruguay has always supported, as the First Degree Judge specifies.

Therefore, and because the treaties as well as the one invoked by the requesting country constitute the source of obligations assumed ("The Contracting Parties undertake the reciprocal delivery...", Art. 2 starts providing) and "the law between the parties, that is, between the states...", as "the contract is the law between private individuals", each state has a duty "to conform to the provisions of the Treaty and, against them, no internal rules can be invoked" (the concepts transcribed in quotation marks were taken from judgment No. 344/1987, issued by the Supreme Court of Justice; see "L.J.U.", Volume XCVIII, case 11221).

In the same sense, what Jiménez de Asúa points out is very illustrative, when stating that the internal laws that coexist with the international treaties that "discipline the activity of the bodies of the State in order of extradition" and even though they are conceptually different, there being between the two relations of indeclinable integration -without being able to talk about hierarchies, both the Criminal Code, and the remaining substantive criminal laws "lose their privileged rank as a rule of direct application when it comes to prosecuting offenders delivered by a foreign State under an International Convention, because in this case, the fundamental law is the Extradition Convention, to which the remaining criminal laws must be subordinated"; and, the aforementioned treatise writer concludes by stating that "if an International Executive Convention regulates a certain matter, that's the one that applies, even if it contradicts internal law in the matter..." (cited Treaty, V. II,

p. 787 and 788).

IV.    That, having made the foregoing and brief general considerations, the Chamber will give the reasons why it dismisses the severe criticism of the decision under appeal, as well as the arguments on which the challenge is based.

In view of what may be classified as failure to comply with certain formal order requirements in the extradition request (not having attached texts that establish "the rules that regulate the statute of limitations..." irregular and incomplete translation of the documentation and lack of legalization), "brevitatis causae" the Court refers to what the Public Prosecutor's Office (last opinion on p. 563rev.) and the Judge (Recital IV) clearly stated.

Without prejudice to this, it points out that the texts on statute of limitations can be consulted on p. 161 and 372 (Section 3282 of the U.S. Code), resulting therefrom that no one can be prosecuted for any crime punishable with a capital penalty "unless the prosecution is issued or formal accusation is established by the prosecutor within the term of five years from the commission of said crime", so by virtue of the documentation that accompanies the request, it is clear that the statute of limitations has not been applied (the crimes would have been perpetrated by V. between 1986 and February 1989).

The translation of the documents, "into the language of the Requested State", was a requirement satisfied with the submission of the request, even if it had subsequently been supplemented with the translation of some texts and the corresponding legalization, as the Intervening Judge ordered, the conclusion cannot vary (p. 296/311), as the request is pursuant to the Treaty.

Consequently, it should be understood that the requirements of the Treaty (Art. 10) have been complied with and that the objections on such points are irrelevant, points in which the rejection of the claim for extradition is also pursued; jurisprudence of great significance has decided that the defects or vices in form, which may affect a request for extradition, can be repaired; and, once overcome, it cannot find any more obstacles on such aspect (Cf. "Uruguayan Justice", V. LXVII, case No. 7947).

As in the last consultation it is reiterated that the documents were not duly legalized, the Court will allow itself to transcribe a judicial decision that, it understands, it definitively resolves any discussion. It was argued: "When the documents are entered through diplomatic channels (proceedings situation), there is no material or legal reason to deny the due authenticity; otherwise, it would be a grievance to a country with which U. maintains diplomatic relations."

"The requirement of legalization cannot add any greater note of authenticity than those already included in the diplomatic introduction. This has been recognized by U. in the agreements of 1879, 1903, 1915 and 1917, the last three ratified by laws No. 3163 and 6189, entered into with B., A., P. and B., by which the letters rogatory transmitted by the diplomatic or consular authorities are exempt from legalization. In the Treaty with S. the documentation shall also be exempt from legalization when the diplomatic channel is used (Art. 9) (M. A. Vieira: "Extradition in our positive law", Mag. of the Fac. of Law, year XII, No. 3 and 4, p. 872 and 873)" (See: "Uruguayan Justice", V, LXI, c. 7334).

V.    As regards the violations of a constitutional and legal order invoked by the Defense, because the prosecution in absentia has been established, without hearing the inquired (requested) and without legal assistance, the Chamber first refers to what the Judge "a quo" states, for sharing his fundamentals (Recital VIII, p. 386rev./387rev.), but adds that this special procedure aims to verify compliance with the requirements established in the Treaty; it is not, instead, a judicial process to judge the requested, as the Supreme Court of Justice has pointed out in a recent pronouncement. already cited, upon saying that the legal concept of the extradition responds to principles of legal assistance and to reasons for collaboration within the international community. The requested Judge, in these cases, unlike what occurs exclusively in the domestic activity, does not condemn or acquit the accused, but is limited to appreciating the reasons for the request of the foreign magistrate and the documents that accompany it, and then grants or not the extradition; the delivery to the authorities of the other state ("extradite" comes, precisely, from the Latin "ex", out and "tradire", deliver)

(L.J.U., case 11221).

That the prior questioning of the investigated party, with professional assistance or the formal proof of his refusal to declare is an indispensable condition for prosecution in our law (Art. 126 of the C.C.P.), is not transferable to other legal systems, which organize their procedural system and individual guarantees according to their own social, cultural, economic peculiarities, etc. and their needs,

In an elaborate judicial decision, entirely transferable to the sub-case, it has been held that invoking that the requested has never declared before a judicial authority, is "a request of principle, since one cannot put as a condition what the object of the extradition process precisely is. And the fact that this is a condition of the trial in our law, we cannot extend it to other legislations. What is required and is a requirement of the internal public order is that there are, in the requesting State, the guarantees of legal due process in the requesting State, but the specific characteristics or modalities assumed by this essential guarantee in each country are inherent to each legislation and one should not delve into it" ("L.J.U.", V, XCVI, case No. 10952).

But, in addition to the fact that the extradition procedure does not constitute a criminal trial (Cf. L.J.U. V. IV case 692), it has not been initiated in the requesting State either, since as specified in his affidavit H., according to U.S. federal law, "a verdict of prosecution by a grand jury does not mean that the accused has been found guilty of the crimes accused of. It means, on the other hand, that the grand jury has found that there is sufficient evidence for the defendant to be brought before the Court, to be prosecuted for the charges against him" (p. 114 and 280).

The inconsistency of the grievances, related to alleged violations of our constitutional and legal order, has been demonstrated by one of our Courts, quite a while ago (pronouncement of August 11, 1970). Substantially it was said: "The constitutional precept that prohibits criminal trial in absentia, lacks application in matters of extradition... The national Constitution only influences procedural internal law, so national laws must conform to those rules, and not to the legal concept of extradition, of international order ."

"Applying the constitutional rules that establish some bases to develop the process, such as the need for accusation of a party or the prosecuting attorney (Art. 22), or the prohibition of trial by commission (Art. 19), to the forced assistance of a defense attorney (Art. 16), relate to internal procedural law..., but not to internal law relating to extradition."

"It is not possible to speak, as an essential requirement to recognize the effects of the foreign conviction, of the reliability with the validities of our public order, since this would lead to constructing foreign procedural norms that coincide in many aspects with ours, or to make it difficult to comply with international treaties and hinder their collaboration, having to recognize, on the contrary, that each State, according to its traditions and social legal peculiarities, organizes the criminal process differently".

"In reality, the valid requirements of procedural order for the processing of extradition requests are contained in the Treaties and refer, in general, to the existence of a developed legal process or a legal judgment, in accordance with local rules, as it could not be otherwise, which complies, on the other hand, with the generic and essential requirement of the Constitution (Art. 12) on "legal process and judgment (due process)."

"Even if there was a specific provision in domestic common law, prohibiting the extradition of the accused in absentia that does not exist in any way whatsoever, it could not prevail over the provisions of the Treaty, which constitutes, at the same time, the norm of international law and domestic law (by legislative approval) and which, as such, due to its international substance emanating from a convention and as a special norm, it cannot be invalidated by a lower-ranking, unilateral and, in addition, general one."

"The constitutional precept that prohibits the criminal trial in absentia is aimed at protecting an individual's right in our country, not in any other State; therefore, if in these this principle is not accepted or is rejected or violated, it has nothing to do with our institutional structure."

"If the intended unconstitutionality is accepted, our justice would rule with respect to the trial followed abroad against a certain individual, not based on the applicability of the law of the requesting State,

but of the rules that regulate the criminal procedure in our own State." ("Uruguayan Justice", V. LXI, case 7334)

With this, the application that the American Convention on Human Rights invoked by the Defense may have in an extradition procedure is also defined, since it has the same hierarchy as the law, for the legislative approval.

It is therefore appropriate to dismiss the grievances in the aspects analyzed.

VI.    As the applicable Treaty is affiliated with the Anglo–American extradition system, the requesting State must submit "sufficient evidence" to establish "prima facie" that the "requested person has committed the crime for which the extradition is raised", because otherwise ("if an examination on the case shows that the arrest warrant is manifestly unfounded"), the requested State will deny the delivery (Art. 10 section number 3 in fine).

What is established, requires adopting some criteria to assess the evidence provided and within the conventional regulatory framework, without the legal categories or procedural system of any of the parties prevailing, as already pointed out; in other words, if the Treaty does not define an expression or concept to determine its scope, one must not go to the regulatory system of one or another State since this means finding an "extra ordine" and not an "in ordine" solution, unacceptable and contrary to the principle of equality that must govern relations between sovereign states (Cf. Q. Alfonsín: "Theory of Private International Law", p. 390 and 404/406).

In order not to deprive the international law standard of its specialty, the solution must be found through the investigation of common will of the parties, within the normative context and adhering to the purpose of the legal concept.

The assessment of the evidence cannot be made, for what was indicated above, following the laws and assessment system of the requested State, as proposed by the Defense.

The requirement of the Treaty in this respect is not of significance; it can be said that it is of extreme relativity, because if on the one hand, in the same article, "sufficient evidence" is claimed, but with the addition of "prima facie" that moderates the requirement, from another perspective, the evidentiary requirement becomes less, since rejection is imposed when it is "manifestly insufficient".

In light of this, taking into account some clarifications made on the interpretation of the treaties and the precautionary function of the extradition legal concept, the evidentiary requirement of the Treaty to the maximum extent that it can be assigned is found, linked to or approximates the concept of likelihood ("fumus bonis juris"), that is, probability or likelihood of the alleged facts or claimed rights.

The content of the evidentiary requirement, naturally, for the aforementioned, cannot be assimilated to terms applicable in the domestic order ("partial evidence" or "sufficient evidential elements", Articles 15 of the Constitution and 125 of the C.P.C.), not only because it is not a matter of establishing the condition or the conditions to try the requested person, but also because the warrant comes from a country with an adversarial procedural system that is different to the one prevailing in Uruguay.

The evidence to be examined is that incorporated into the proceedings in accordance with the provisions of the Treaty accompanied by the request or added subsequently, at the request of the requested state or voluntary by the requesting state, for not considering admissible the restrictive interpretation of the Defense that impairs a right, power or prerogative of the requesting person, such as that of submitting "additional information" or complementary evidence, without any express prohibition in the international bilateral agreement.

Although the requested State is empowered to request the submission of "sufficient evidence" or other "proof or additional information" (Art. 10 section number 3 in fine and Art. 12), the attitude of the requesting state in no way contravenes the provisions of the Treaty when submitting, without being requested, additional information, which is otherwise established in the spirit of international cooperation with which it

was signed and ratified.

In accordance with the directives or guidelines referred to above and which must guide the interpreter in the assessment of the evidence already mentioned, the Court considers that it is sufficient to establish "prima facie" that R.S.V. has incurred in the crimes for which he is accused and claims to be tried (in no way are they "manifestly unfounded").

The sworn statements come from persons authorized to depose on the facts accused of having received them, intervened in them or having information on the way they occurred, which motivate their knowledge in a way that comes out as truthful and that they have appeared to declare voluntarily and without any kind of coercion.

The strength of conviction of such testimonies increases, the elements of judgement handled in the tidy articulation of the charges against V. and another important number of subjects, who were also prosecuted for the same or similar crimes, with several of which or their companies, he admits to having been linked (p. 191/198), as well as other corroborating circumstances indicated (seizures of those suspected of business activities with drug traffickers, in the same investigation and linked to V.).

G. reveals in his testimony, multiple details of the life and business of V., which can only be known in a relationship of a certain permanence and not by two accidental and very distant encounters in time, as W. declares (p. 187 and rev.), who on the other hand begins by declaring - in the presence of his Defense Attorney, that he is a capitalist partner in the C.I. and is "about to keep 75% thereof", which to some extent and in a relevant aspect, confirms the statements of G. (p. 11 and rev.).

H., on the other hand, maintained an extensive and close relationship with the requested person, an aspect that he does not undermine, but rather corroborates (p. 189 et seq.) and appears knowing, in detail, the activity carried out by V. both in the U.S. and in U. the latter through the C.I. , under whose orders he worked in L.A. (which V. accepts) and in N.Y. (which V. does not accept, since he says that in said city he was associated with people of Hebrew nationality, to refine gold).

H's statement is that of a senior official, who was in direct contact with all the information on which the charges against V. are based, which he verified in the records mentioned.

W., in turn, bases his statements by the direct intervention he had in the investigation and in the verification performed of the reports of a different nature and records of companies and banks of the U.S.

The requested V., who denies any relationship with people prosecuted for drug trafficking and finds no explanation for the allegations (p. 13) and announces that he will "get to the end" (p. 13), does not acquiesce, however, to be extradited (p. 187rev.), but disqualifies witness G. when he became aware that he was accused by the witness of being in contact with the drug traffickers to hide his profits, considering him a "blackmailer"; "delirious" and "drug addict" (p. 187 and 187rev.).

The value of G's testimony is important for this procedure and the reasons alleged to reduce its force of conviction is of little significance; this, of course, is without prejudice to the fact that such grounds for disqualification are deduced and proven, in the place where V. is requested to be tried and in accordance with the rules prevailing in such jurisdiction.

That even when the Treaty does not admit an evidentiary instance or counter-evidence, on the evidence provided by the requesting State, the Chamber points out that in the case against G. for concealment, a psychiatric report not an expert report has been added that was made urgently (the day after receipt of the file) and with lack of data (thorough social investigation). in which it is estimated, "for the type of crimes in which he has been involved, he shows character disorders with mythomaniacal features" and for the same precedents, "he demonstrates a specific vulnerability for these types of crimes that involve planning a scheme to deceive or harm third parties (p. 469 and rev.; photocopy of the aforementioned file, added by the Defense upon appealing).

Given the circumstances in which the report occurred that the same informant acknowledges and the

time elapsed, in no way can such testimony be waived, since for now, the witness's faith cannot be considered diminished or destroyed.

The sworn statement of S.H., which, once received, was added to the proceedings notifying by note what was provided in this regard, strengthens the evidence of the incriminations that motivate the request for delivery.

The circumstances alleged by the Defense, so that it does not consider the testimony of H. who requests its rejection "in limine", are not received.

It was not alleged that what H. declared was false nor was any fact, reason or circumstance invoked aimed at invalidating or reducing the veracity of what was reported by the qualified witness, which enable finding another sense to the opposition to the Defense, beyond the formal deficiency invoked.

The principles applicable in all judicial proceedings related to the production and addition of evidence, which are intended to extend to the extradition procedure, should be contemplated if the requested was being criminally judged; the latter, as said, is not what happens in the sub-case, where it is only decided on the delivery to the requesting country and to be subject to trial for those allegations that are deemed appropriate to the provisions of the Treaty.

Consequently, and given the foregoing on voluntary addition by the requesting State, it is not appropriate to exclude the testimony of H.

That while the testimony of H. is important, that of F.B.W. is no less significant, due to the task carried out in the investigation of people, movement of bank accounts and companies, etc., that unveiled an intricate set of operations, which had the ultimate purpose of providing to the traffickers the proceeds of cocaine, illegally introduced and marketed in the U.S., without being detected by the authorities.

The Defense requests the rejection of the evidence, because it would have been obtained "by means of telephone interceptions and videos recorded clandestinely, with respect to persons who, based on such elements for prosecution, are prosecuted "in absentia" (for considering it illegal), without mentioning that it was W. who refers in his sworn statement to such means of information.

It is appropriate to make some clarifications, as regards the abovementioned statements, like the following: a) all the evidence is classed as illicit, for the circumstances referred to, that obviously cannot reach testimonies or sworn statements, related in their substantial aspects and analyzed; b) the seizures of cocaine and money, performed in the course of procedures cannot also be reached by the alleged grounds for disqualification; c) the verifications made on the accounts of the banks that corresponded to remittances and transfers of certain companies, belonging to the same group of people, also cannot be considered incompetent or illicit; d) the false invoices, which were prepared -by the accused, among them V.- for the sale of large amounts of gold to fictitious individuals who allegedly paid for it with money, to hide the true source of the funds (repeatedly mentioned in all the information), are means of proof, beyond the qualification made by the Defense; e) there is no distinction, although the difference can be very relative, between information channel and means of evidence and f) W. refers to in his statement, to various information channels including those that the Defense qualifies as illegal or prohibited and to means of proof.

In accordance with the preceding points, it is noted that what would have to be discarded if the criterion of the Defense were to be followed is relatively scarce and it is not of greater significance, the remaining evidentiary material incorporated into this extradition procedure being sufficient in order to easily consider as verified and in the degree required in the Treaty, the charges made against R.S.V. (probability or likelihood of the facts alleged

).

Document

© Thomson Reuters Legal Information


**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Exhibit U**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

_____
Jacqueline Yorke

Sworn to before me this
April 15, 2022

_____
Signature, Notary Public

_____
Stamp, Notary Public