**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | )    **CRIMINAL NO. 16-065 (BAH)** |
| | ) |
| **v.** | ) |
| | ) |
| **GERARDO GONZALEZ-VALENCIA,** | ) |
|     **also known as "Lalo," "Flaco,"** | ) |
|     **"Silver," "Silverio," "Eduardo,"** | ) |
|     **and "Laline,"** | ) |
| | ) |
|           **Defendant.** | ) |

## GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

The United States respectfully submits this Supplemental Sentencing Memorandum in the case of Defendant Gerardo Gonzalez-Valencia (hereafter the "Defendant"), following an evidentiary hearing held May 2 through 4, 2023. On December 22, 2022, the Defendant pleaded guilty, absent a plea agreement, to conspiracy to distribute five kilograms or more of cocaine knowing and intending that such substance would be unlawfully imported into the United States. *See* Min. Entry 12/22/22.[1] For purposes of calculating the Defendant's applicable Sentencing Guidelines, the parties agreed that a two-level enhancement applies for use of a submersible vessel or semi-submersible vessel to import a controlled substance, pursuant to U.S.S.G. § 2D1.1(b)(3)(B). However, the parties dispute: (1) the applicable drug quantity pursuant to U.S.S.G. § 2D1.1; (2) application of a four-point leadership enhancement under U.S.S.G. § 3B1.1(a); (3) application of a two-point enhancement for use of violence under U.S.S.G. § 2D1.1(b)(2); (4) application of a two-point enhancement for possession of a dangerous weapon under U.S.S.G. § 2D1.1(b)(1); and (5) the Defendant's Criminal History Category. This

---

[1] A summary of the procedural history is included in the Government's Sentencing Memorandum, Dkt. No. 153, which is incorporated herein by reference.

Supplemental Memorandum demonstrates that the evidence presented during the evidentiary hearing and already on the record in this matter support the application of the disputed enhancements and establish that the Defendant's criminal history warrants a Criminal History Category III.

At the evidentiary hearing, the Government presented extensive evidence from three cooperating witnesses, Oscar Nava Valencia,[2] Elpidio Mojarro Ramirez, and Jose Maria Guizar Valencia, and one law enforcement witness, Drug Enforcement Administration (DEA) Special Agent Kevin Novick.  The Government's evidence showed that the Defendant was a leader of a powerful Mexican drug trafficking organization (DTO), known as the Los Cuinis DTO, and, in that capacity, the Defendant conspired to distribute tens of thousands of kilograms of cocaine for importation into the United States and Europe.  Through witness testimony, intercepted BlackBerry Messenger (BBM) communications of the Defendant and his co-conspirators, evidence of cocaine seizures, and corroborating documents, the Government established by a preponderance of the evidence that the Defendant conspired to distribute well over 450 kilograms of cocaine, directed the murders of multiple rival DTO members and their relatives, personally carried a pistol and brought armed bodyguards while arranging drug transactions, supplied firearms to allied drug traffickers, and employed dozens of workers who took direction from the Defendant.

Accordingly, with a base offense level of 38 determined by drug quantity, a four-level enhancement for leadership, and a two-level enhancement each for use of a semi-submersible, violence, and firearms, the Defendant's adjusted offense level is 48.  With a three-point

---

[2] An analysis of Nava Valencia's 18 U.S.C. § 3500 material, Gov. Ex. 53-81, is attached, as requested by the Court at the Sentencing Hearing.  Evid. Hr'g Tr., 84, May 2, 2023.

reduction for acceptance of responsibility, the total offense level is 45, which is treated as an offense level of 43 pursuant to Chapter 5, Part A (comment n.2). With a Criminal History Category III and an effective offense level of 43, the Defendant's Guideline sentence is life imprisonment. There are no mitigating circumstances in this case to justify a variance below the Guidelines range. *See* 18 U.S.C. § 3553(b)(1). Accordingly, the Court should impose the Guideline sentence—life imprisonment—to reflect the nature, circumstances, and seriousness of the Defendant's unlawful conduct.

## I.   Sentencing Guidelines

### a.   Drug Quantity

The Defendant and his brothers, Abigael Gonzalez-Valencia (Abigael) and Jose Gonzalez-Valencia (Jose), who were collectively referred to as "Los Cuinis," ran a well-funded and extensive cocaine distribution operation responsible for transporting ton quantities of cocaine from South America to Central America and Mexico for importation into the United States and Europe. *See* Evid. Hr'g Tr., 32-49, May 2, 2023 (hereinafter, "Hr'g Tr. 5/2/23"); Evid. Hr'g Tr., 60-68, May 3, 2023 (hereinafter, "Hr'g Tr. 5/3/23"); Hr'g Tr. 5/3/23 at 137-144; Evid. Hr'g Tr., 31-37, May 4, 2023 (hereinafter, "Hr'g Tr. 5/4/23"); U.S.S.G. § 2D1.1.

Oscar Nava Valencia testified that he sold 30,000 kilograms of cocaine to Los Cuinis between 2004 and 2009, and that more than half of that cocaine was sold to the Defendant personally. Hr'g Tr. 5/2/23 at 33. About 70 percent of the cocaine that Nava Valencia sold to Los Cuinis was sent to the United States, with the remainder going to Europe. *Id*. at 34. In addition to the cocaine that Nava Valencia got from his source of supply in South America and sold to Los Cuinis, Nava Valencia testified that he also invested in other cocaine shipments where Los Cuinis were responsible for getting the cocaine from their source of supply in

Colombia, known as "Rastrojo." *Id*. at 35.  Nava Valencia, Los Cuinis, and Rastrojo invested in three shipments, each containing at least 1,500 kilograms of cocaine, that were transported from Colombia to Mexico via single-use, go-fast boats in 2006.  *Id*. at 35-38.  The shipments were divided into three equal parts—one for Rastrojo, one for Nava Valencia, and one for Los Cuinis, specifically the Defendant and Abigael.  *Id*.  Then, in 2007, Nava Valencia invested in a 5,000-kilogram shipment with Los Cuinis and Rastrojo—again divided equally in thirds—that was transported from Colombia via semisubmersible to the Pacific Ocean off the coast of Chiapas, Mexico.  *Id*. at 39-40.  The shipment was interdicted by the U.S. Coast Guard and the crew of the semisubmersible scuttled the vessel before it could be seized.  *Id*. at 40-41; Hr'g Tr. 5/4/23 at 9-12.  The Coast Guard seized 280 kilograms of cocaine from the debris field in the vicinity of the last known position of the semisubmersible.  Hr'g Tr. 5/4/23 at 10, 12.

The Defendant was an investor in shipments of cocaine that were hidden in shark carcasses, television trucks, and commercial flights from Guadalajara to Tijuana and Guadalajara to Chicago.  Los Cuinis had a 50-percent stake in the shark carcass shipments, which each contained 500 to 700 kilograms of cocaine and were transported to Porto Progresso, Yucatan, Mexico.  Hr'g Tr. 5/2/23 at 43-44.  The final shipment was seized by law enforcement at Porto Progresso in 2009.  Hr'g Tr. 5/2/23 at 45; Hr'g Tr. 5/3/23 at 49, 143; Gov. Ex. 5.  Los Cuinis also used the television trucks of a Mexican news station, Televisa, to transport 2,000-kilogram shipments of cocaine from Central America to Mexico in 2007 to 2008.  Hr'g Tr. 5/2/23 at 46-48; Hr'g Tr. 5/3/23 at 138-40.  From 2004 to 2009, Los Cuinis used commercial aircraft to transport the cocaine from Guadalajara to Tijuana, near the U.S.-Mexico border.  Hr'g Tr. 5/2/23 at 48-49; Hr'g Tr. 5/3/23 at 143-44.  And, in 2006 to 2007, Los Cuinis used commercial aircraft

to transport cocaine from Guadalajara directly into the United States, 200 kilograms at a time. *Id*.

Guizar Valencia testified that the Defendant personally came to pick-up cocaine shipments from him on six or seven occasions between 2003 and 2005.  Hr'g Tr. 5/3/23 at 64. Guizar Valencia would hand over the amount that his brother Antonio told him to turn over to the Defendant, which was always 900 to 1,200 kilograms of cocaine.  *Id*. at 65.  The Defendant always arrived with his brother Jose, and several other people to pick up the cocaine, and the Defendant was the one making the decisions for the group.  *Id*. at 65–66.  The Defendant was present at these exchanges for the purpose of giving orders, according to Guizar Valencia.  *Id*. at 93.

The Defendant's Blackberry Messenger (BBM) communications, using the screen name "Silverio," also show the Defendant's active participation in arranging multiple cocaine shipments and setting the terms of sales with his brother Abigael.  *See,* Hr'g Tr. 5/4/23 at 31-37; Gov. Ex. 17 (Aug. 2, 2013 communications coordinating logistics for a 500-kilgram cocaine shipment from "Negro" in Brazil); Gov. Ex. 18 (June 26, 2013 communications discussing providing 100 kilograms of cocaine to Abigael to give to the "old man"); Gov. Ex. 20 (July 1, 2013 communications approving sale of 100 kilograms of cocaine to the "old man" and setting price at $26,000 per kilogram); Gov. Ex. 19 (July 3, 2013 communications discussing the sale of 200 kilograms of cocaine to the "old man" with Abigael).

Based on this evidence, the Defendant's base offense level is 38, as he was responsible for distributing far more than 450 kilograms of cocaine for importation into the United States. U.S.S.G. § 2D1.1(c)(1).

b. <u>Leadership</u>

The Defendant and his brothers ran the Los Cuinis DTO and aligned themselves with other powerful Mexican DTOs.  Hr'g Tr. 5/3/23 at 134–35, 145, 167; Hr'g Tr. 5/4/23 at 25.  The Defendant was a leader, if not the primary leader, of the Los Cuinis DTO, as Nava Valencia, Guizar Valencia, and Mojarro Ramirez all testified.[3]  Hr'g Tr. 5/2/23 at 31; Hr'g Tr. 5/3/23 at 92, 135.  As a high-ranking member of Los Cuinis, the Defendant exercised decision-making authority, was an active participant in planning and organizing cocaine shipments as part of an extensive distribution network, exercised control and authority over at minimum dozens of subordinates, and amassed substantial wealth, all of which are relevant factors in determining leadership.  *See* U.S.S.G. § 3B1.1, cmt. n.4.

From at least 2000 through approximately 2010, Los Cuinis were part of the Milenio Cartel and later partnered with the Cartel de Jalisco Nueva Generacion (CJNG), led by the Defendant's brother-in-law, Nemesio Oseguera Cervantes, also known as El Mencho.  Hr'g Tr. 5/2/23 at 27; Hr'g Tr. 5/3/23 at 153, 166–67.  Los Cuinis held positions of power within the Milenio Cartel, were well known within the Mexican drug-trafficking world, and had songs, or *corridos*, written about them, which is a sign of status.  Hr'g Tr. 5/2/23 at 92.  The Defendant negotiated and coordinated cocaine shipments directly with Nava Valencia, the top leader of the Milenio Cartel at the time, Hr'g Tr. 5/2/23 at 28, 31, 36, and the Defendant was seen as a partner of Nava Valencia, not a subordinate, Hr'g Tr. 5/3/23 at 137.  During the rise of the CJNG, Los Cuinis partnered with Oseguera Cervantes, providing the substantial money and resources needed for Oseguera Cervantes to run a drug cartel.  Hr'g Tr. 5/3/23 at 167; Hr'g Tr. 5/4/23 at 6.

---

[3] Notably, Guizar Valencia was a member Los Zetas, and Nava Valencia and Mojarro Ramirez were members of the Milenio Cartel.  Hr'g Tr. 5/3/23 at 71.

The Defendant, Abigael, and Jose had between 50 and 200 workers at a time, who were responsible for distributing and receiving cocaine, transporting money, and working as an "armed side" responsible for security and enforcement.  Hr'g Tr. 5/2/23 at 31; Hr'g Tr. 5/3/23 at 135.  Guizar Valencia stated that when the Defendant came to receive cocaine shipments from him on six or seven occasions between 2003 and 2005, the Defendant always arrived with six or seven people and was the one making the decisions for the group.  Hr'g Tr. 5/3/23 at 64–66.  The Defendant was present at these exchanges for the purpose of giving orders, according to Guizar Valencia.  *Id*. at 93.  Both Guizar Valencia and Nava Valencia saw the Defendant give orders to individuals who worked for him.  Hr'g Tr. 5/2/23 at 31; Hr'g Tr. 5/3/23 at 66, 93.

The Defendant not only gave orders to subordinates but also held decision-making authority within Los Cuinis leadership.  Although Abigael and Jose held leadership positions as well, Mojarro Ramirez explained that the Defendant's brothers often would ask the Defendant for his permission or approval prior to making decisions related to their cocaine-trafficking operation.  Hr'g Tr. 5/3/23 at 135–37.  Additionally, the Defendant's BBM communications, using the screen name "Silverio," show the Defendant's active participation in arranging multi-hundred-kilogram cocaine shipments and setting the terms of sales with his brother Abigael.  *See, e.g.,* Hr'g Tr. 5/4/23 at 31–37; Gov. Ex. 17 (coordinating logistics for a 500-kilgram cocaine shipment from Brazil); Gov. Ex. 18 (discussing providing 100 kilograms of cocaine to Abigael); Gov. Ex. 19 (discussing the sale of 200 kilograms of cocaine with Abigael); Gov. Ex. 20 (approving sale of 100 kilograms of cocaine and setting price).

Accordingly, the four-point enhancement for being an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," applies to the Defendant.  U.S.S.G. § 3B1.1(a).

c.  Violence

The Defendant ordered numerous murders of rival cartel members and their families, as recounted by witnesses with firsthand knowledge.  Because the Defendant "used violence, made a credible threat to use violence, or directed the use of violence" as part of the cocaine conspiracy, a two-point sentencing enhancement applies.  U.S.S.G. § 2D1.1(b)(2).[4]

i.  Antonio Guizar Valencia

One of the Defendant's victims was Antonio Guizar Valencia (Antonio).  As Nava Valencia and Mojarro Ramirez both testified, the Defendant, Abigael, and Jose asked Nava Valencia at an in-person meeting for gunmen to find Antonio and make him "pay" for stealing a shipment of cocaine belonging to Los Cuinis.  Hr'g Tr. 5/2/23 at 51–52; Hr'g Tr. 5/3/23 at 19, 48, 133, 145.  On January 22, 2005, the group sent by Nava Valencia at the Defendant's request found Antonio at his ranch in Ostuacan, Chiapas, Mexico, and executed Antonio and six other people.[5]  Hr'g Tr. 5/2/23 at 52; Hr'g Tr. 5/3/23 at 68–69.  Nava Valencia and Mojarro Ramirez testified that the Defendant and Abigael paid the gunmen who carried out the execution, Hr'g Tr. 5/2/23 at 52, Hr'g Tr. 5/3/23 at 146, and Mojarro Ramirez, who was the accountant for the Milenio Cartel at the time, personally collected the money from Los Cuinis to pay the group that carried out Antonio's murder, Hr'g Tr. 5/3/23 at 146–47.  Nava Valencia stated that the Defendant also provided Nava Valencia's group of gunmen with gear and weapons to carry out the attack.  Hr'g Tr. 5/2/23 at 52.

_____

[4] This enhancement may apply to acts committed in Mexico against Mexican victims where such conduct served to protect the DTO's lucrative drug routes to the United States.  *See United States v. Flores*, 995 F.3d 214, 222 (D.C. Cir. 2021) (applying U.S.S.G. § 2D1.1(b)(2) in RICO case).

[5] Nava Valencia recalled the ranch being in Tabasco, Mexico. Hr'g Tr. 5/2/23 at 52.  Ostuacan, Chiapas, is near the border between the Mexican States of Chiapas and Tabasco.  *See* Gov. Ex. 50.

8

Guizar Valencia, who is Antonio's brother, corroborated Nava Valencia's and Mojarro Ramirez's testimonies regarding Antonio's murder. Guizar Valencia knew from two of his uncles, who were present and survived the ambush, that gunmen had murdered six people, including Antonio, at Antonio's ranch. Hr'g Tr. 5/3/23 at 68. Guizar Valencia testified that while he was at the wake of his brother Antonio, the Defendant called Guizar Valencia's Uncle Beto, who put the call on speakerphone. *Id.* at 69, 95. Guizar Valencia heard the Defendant bluntly state that the Defendant had ordered Antonio killed because the Defendant believed Antonio had stolen a ton of cocaine from Los Cuinis. *Id.* at 69, 95. In the same call, the Defendant said that he wanted $12 million from the Guizar Valencia to resolve the dispute over the missing cocaine. *Id.* at 69, 95. Guizar Valencia heard his Uncle Beto tell the Defendant that he would not agree to make the payment because the Defendant had killed Antonio, and the harm had already been done. *Id.* at 69.

Further, Guizar Valencia testified that, while Guizar Valencia and the Defendant's brother Abigael were detained in adjoining cells at the Altiplano prison in Juarez, Mexico, for eight months in 2018, Abigael told Guizar Valencia that the Defendant was responsible for the murder of Antonio, as well as the murders of Efrain Teodoro Torres and Guizar Valencia's father, discussed below. *Id.* at 80–85.

### ii. *Efrain Teodoro Torres*

Another individual killed at the Defendant's direction was Los Zetas member Efrain Teodoro Torres, also known as "Chispa" and "Zeta 14." In March 2007, the Defendant and Abigael coordinated the killing of Teodoro Torres at a horse race in Veracruz, Mexico, as retribution for Los Zetas sending gunmen to throw grenades at Los Cuinis during a rooster fight. Hr'g Tr. 5/2/23 at 54–57; Hr'g Tr. 5/3/23 at 29, 71–72, 74–75; Gov. Ex. 7A (describing

shooting).  Guizar Valencia, who was present at the racetrack the day of the attack, recounted the chaos as a lone kamikaze gunman ran yelling and shooting at Teodoro Torres, killing Teodoro Torres and injuring others until the assassin was himself shot and killed by some of Teodoro Torres's 50 to 80 gunmen who were present.  Hr'g Tr. 5/3/23 at 72–73.  After Guizar Valencia and others who had been with Teodoro Torres took the cell phone of the slain assassin, a person called on the assassin's cell phone and identified himself as "La Barbie," who Guizar Valencia knew to be a member of the Arturo Beltran Leyva DTO, which was aligned with the Milenio Cartel at the time.  *Id*. at 73–74.

Nava Valencia was aware that the Defendant ordered the murder because Nava Valencia discussed the incident with La Barbie and another member of the Arturo Beltran Leyva DTO who went by the nickname "El Indio."  Hr'g Tr. 5/2/23 at 56–57.  Nava Valencia stated that La Barbie and El Indio were supporting the effort to kill Teodoro Torres, and they told Nava Valencia that they were present in Mexico City with the Defendant as the events unfolded.  *Id*. at 56–57.  Nava Valencia was also aware from La Barbie and El Indio that the Defendant asked them to contribute money for the $2 million needed to pay the assassin and the other gunmen involved in carrying out Teodoro Torres' murder.  *Id*. at 58.

Although there may have been rumors that Miguel Trevino Morales, also known as "Zeta 40" and "Z40," ordered the murder of Teodoro Torres, *see* Def. Ex. 22 at 130, Guizar Valencia confidently testified that those rumors were not true, Hr'g Tr. 5/3/23 at 78–80.  Guizar Valencia worked directly with Trevino Morales from March of 2007 through 2012 and was often with Trevino Morales for weeks or months on end.  *Id*. at 77.  Despite all of this time spent in the company of Trevino Morales and other top leaders of Los Zetas, at no point did Guizar Valencia obtain any information indicating that Trevino Morales participated in or ordered the murder of

Teodoro Torres. *Id*. at 79. To the contrary, the top leadership of Los Zetas was aware that the Defendant and Los Cuinis ordered the murder. *Id*. Guizar Valencia recalled that after the death of Teodoro Torres, the leaders of Los Zetas, which included Trevino Morales, gathered at a baseball field in Tampico, Tamaulipas, to unite against Los Cuinis and the Milenio Cartel in response to the murder. *Id*. at 77, 79–80. Moreover, the Defendant pointed to no evidence to support his claim that Trevino Morales was responsible for the murder other than prior testimony from Jose Hinojosa in which Hinojosa repeated the rumor that "[s]upposedly, it was Zeta 40" who killed Teodoro Torres, without having any independent basis of knowledge. Def. Ex. 22 at 130; Def. Ex. 57.

### iii. *Domingo Mendoza Sandoval*

The Defendant ordered the murder of his brother-in-law, Domingo Mendoza Sandoval, also known as "Mingo," who worked as the Defendant's secretary receiving cocaine in Europe. Hr'g Tr. 5/2/23 at 34; Hr'g Tr. 5/3/23 at 147–48. Mojarro Ramirez testified that, in 2011, Mendoza Sandoval asked Mojarro Ramirez for help because the Defendant had ordered Mendoza Sandoval murdered over an accounting dispute. Hr'g Tr. 5/3/23 at 148. Mendoza Sandoval explained to Mojarro Ramirez that the Defendant's brother-in-law, Oseguera Cervantes, arrived at Mendoza Sandoval's ranch with three or four trucks full of people; Mendoza Sandoval hid; and when Oseguera Cervantes and his people could not find Mendoza Sandoval, they killed Mendoza Sandoval's brother and three workers. *Id*. at 148–49.

Intercepted BBM communications document that in 2013, Oseguera Cervantes and Los Cuinis were still actively looking for Mendoza Sandoval in order to kill him. Hr'g Tr. 5/4/23 at 37–38; Gov. Ex. 21 (Abigael states, "Mingo is in Colima …. And you give my brother-in-law the information and have them get the drop on that punk."); Gov. Ex. 22 (Abigael states, "Yes,

tell him that what we want is to find that dumbass Mingo."); Gov. Ex. 23 (Oseguera Cervantes states, "Minjo [*sic.*] is going to arrive there to see the house. Have the guys be ready so that when the dude arrives, they hit him, and don't screw it up, please.").  Not long after the exchange of these BBM messages, Mendoza Sandoval was killed.  Hr'g Tr. 5/3/23 at 149.

### iv.  Family in Aguililla

Nava Valencia testified that, in 2007, the Defendant personally ordered the murder of an innocent couple and their minor children in the Aguililla region of Michoacan, Mexico, because the individuals were related to members of La Familia Michoacana, a DTO that had been at war with the Milenio Cartel and Los Cuinis.  Hr'g Tr. 5/2/23 at 60–61; Hr'g Tr. 5/3/23 at 36–37. Nava Valencia learned about the murders when La Familia Michoacana members complained to Nava Valencia because La Familia Michoacana thought they had a truce with the Milenio Cartel, and this act of violence was a clear violation of their agreement.  Hr'g Tr. 5/2/23 at 60–61; Hr'g Tr. 5/3/23 at 38.  When Nava Valencia confronted the Defendant, the Defendant admitted that he had been drinking and ordered the murders without concern for the consequences.  Hr'g Tr. 5/2/23 at 61.  Nava Valencia testified that during meetings with La Familia Michoacan members, the Defendant admitted that he ordered the murder and apologized for what had happened.  Hr'g Tr. 5/3/23 at 49–50.

### v.  Additional Violence

Guizar Valencia testified that as revenge for the grenade attack at the rooster fight, the Defendant sent a group of gunmen to kill Guizar Valencia's father, in addition to ordering the murder of Teodoro Torres.  Hr'g Tr. 5/3/23 at 74–75.  Guizar Valencia stated that the group captured and decapitated Guizar Valencia's father and other family members in Chiapas, Mexico.  *Id*. at 74–75.

Given the numerous acts of violence directed by the Defendant, which were proven by a preponderance of the evidence, a two-point enhancement pursuant to U.S.S.G. § 2D1.1(b)(2) applies.

    d.  <u>Dangerous Weapons</u>

The Defendant regularly carried a pistol during meetings to negotiate and receive cocaine shipments. This alone warrants a two-point enhancement for possession of a dangerous weapon pursuant to U.S.S.G. § 2D1.1(b)(1).[6] The Defendant also caused others to carry firearms in furtherance of the cocaine conspiracy.

Multiple witnesses testified that the Defendant personally carried a firearm during drug-related meetings. Nava Valencia recalled that when he met with the Defendant to discuss drug trafficking, the Defendant would carry a .38 super or a 9mm pistol. Hr'g Tr. 5/2/23 at 54. Similarly, Guizar Valencia stated that on the six or seven occasions when the Defendant personally received cocaine from Guizar Valencia, the Defendant was always armed with a .38 super pistol. Hr'g Tr. 5/3/23 at 66.

Witnesses testified that the Defendant's workers sometimes carried rifles to these meetings as well. Guizar Valencia testified that when the Defendant met with Guizar Valencia to receive cocaine, the Defendant's workers had AK-47 rifles in their vehicles for additional protection. *Id.* at 66. Nava Valencia also testified that the Defendant would sometimes arrive at meetings to discuss drug trafficking with armed bodyguards who looked after him, particularly after the grenade attack at the rooster fight. Hr'g Tr. 5/2/23 at 54.

---

[6] The violence enhancement in Section 2D1.1(b)(2) may be applied cumulatively with the firearm enhancement in Section 2D1.1(b)(1). U.S.S.G. § 2D1.1, cmt. n.11(b).

13

Furthermore, the Defendant supplied weapons to help the Milenio Cartel gain control of territory and power.  Nava Valencia testified that in 2008, the Defendant provided Nava Valencia with approximately 200 rifles, AK-47s, and AR-15s, as well as gear, at no cost to Nava Valencia in order to support the Milenio Cartel in its war against rival cartels.  *Id*. at 59–60.  The Defendant also gave the Milenio Cartel "weapons, people, supplies, money, [and] information" on a regular basis for years.  Hr'g Tr. 5/3/23 at 14.

Together, this conduct warrants a two-level enhancement for use of a dangerous weapon pursuant to U.S.S.G. § 2D1.1(b)(1).

e.   Criminal History

The Defendant's Criminal History Category is III.  Although the U.S. Probation Office determined in the Presentence Investigation Report (PSR) that the Defendant's Criminal History Category was II, PSR ¶ 28, the Court advised the parties during the evidentiary hearing that the U.S. Probation Office had revised its Criminal History Category determination to align with the Government's position that the Defendant's applicable Criminal History Category is III.  Hr'g Tr. 5/4/23 at 174.

As the U.S. Probation Office noted in the PSR, three points apply for the Defendant's prior felony methamphetamine conviction in the Northern District of Georgia.  PSR ¶ 27.  The Defendant does not contest that those three points apply.  *See* PSR ¶ 6.

However, an additional two criminal history points apply because the Defendant committed the instant offense while on escape status.  U.S.S.G. § 4A1.1(d).  Specifically, on January 31, 2001, while serving the 48-month sentence for the methamphetamine conviction, the Defendant signed out of a halfway house, under the pretense that he was searching for

employment, and never returned.  *See* Dkt. No. 153-2.  Where, as here, the defendant committed

the instant offense while on escape status, two points are added.  U.S.S.G. § 4A1.1(d).

With a criminal history score of 5, the Defendant's Criminal History Category is III.

U.S.S.G. § 4A1.1.  With a total offense level of 45, treated as 43 for purposes of calculating the

sentence, and the Criminal History Category of III, the Defendant's Guidelines' sentence is life

imprisonment.

## II.     Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)

The Government's Sentencing Memorandum, Dkt. No. 153, which is incorporated herein

by reference, includes a statement of law regarding the Court's consideration of the applicable

Sentencing Guidelines and 18 U.S.C. § 3553(a) factors, as well as facts relevant to the Court's

analysis of the § 3553(a) factors in this case.  Dkt. No. 153 at 9–19.  The following is intended to

supplement the information provided in the Government's Sentencing Memorandum.

### A.  Nature and Circumstances of the Offense, and Need for the Sentence to Reflect the Severity of the Offense

The Defendant was a leader of an extensive cocaine trafficking network for many years,

and his involvement in cocaine trafficking continued long after his claimed withdrawal from the

conspiracy in 2009.  Although the Defendant told the U.S. Probation Office that when he moved

to Argentina in 2009, he started a new life and was no longer involved in drug trafficking, PSR ¶

14, that story is contradicted by the Defendant's own admission in his statement of facts and to

the Court at his change of plea hearing "that his participation in the conspiracy continued

through April 19, 2016," Dkt. No. 139 ¶ 4; Change of Plea Hr'g Tr., 15, Dec. 22, 2022.

Moreover, the Defendant's withdrawal from the conspiracy is contradicted by the

evidence.  The Defendant's own BBM communications from 2013 show the Defendant

arranging cocaine shipments, setting the prices of cocaine for sale, discussing transportation

routes and logistics, and providing a sample kilogram of cocaine in furtherance of a larger

cocaine sale.  Gov. Exs. 17–20.  Although the Defendant disputes that he was the user of the

BBM devices with the "Silverio" screen name, the Government presented ample evidence that

the Defendant's passport, travel records, and hunting trophy records match the personal travel

discussed by the user of the Silverio device, confirming that the Defendant is Silverio.  Hr'g Tr.

5/4/23 at 21, 25–31, 131–43; *Compare* Gov. Ex. 40 & 41 *with* Gov. Exs. 11–16, 85.

Furthermore, the Defendant's brother Abigael referred to the user of the Silverio device as

"Lalo" in a discussion among siblings about who was at the hospital with their father.  Hr'g Tr.

5/4/23 at 88–89, 124–28; Gov. Exs. 11 & 12.  As Mojarro Ramirez and Nava Valencia testified,

the Defendant was the only Gonzalez-Valencia sibling who went by the nickname Lalo.  Hr'g

Tr. 5/3/23 at 134; Hr'g Tr. 5/2/23 at 29; *see also* Hr'g Tr. 5/4/23 at 128 (Investigator Joseph

Smith testifying that he was not aware of a "Lalo" in the Defendant's family other than the

Defendant).

   The Defendant's evidence to support his claimed withdrawal included little more than the

photographs of a convenience store and self-serving statements of the Defendant and his partner,

Wendy Amaral, in an interview with defense investigator Smith.  *See* Def. Ex. 9–10.  Notably,

the Defendant and Amaral also represented to Smith that Amaral was the Defendant's wife, even

though the Defendant represented to the U.S. Probation Office that he and Amaral were

divorced.  Hr'g Tr. 5/4/23 at 99, 157–58; *see also* PSR ¶ 50 (describing divorce decree provided

by the Defendant).  The Defendant also provided no financial records to establish that he was

running a legitimate business with legitimate income after 2009.  Hr'g Tr. 5/4/23 at 162–64.  His

actions at the time of his arrest, including apparent intended flight and destruction of his

cellphone, also strongly suggest that his criminal conduct continued to the date of his arrest. Hr'g Tr. 5/4/23 at 39–40, 45–46, 154–55; Gov. Ex. 42.

The nature and circumstances of the offense—including its duration, the massive quantities of cocaine involved, and the violence the Defendant employed—warrant a Guideline sentence of life.

B.  <u>History and Characteristics of the Defendant</u>

The Defendant's history and characteristics also warrant a sentence of life in prison, as the Defendant has repeatedly shown disregard for the law.  The Defendant has a prior methamphetamine conviction, PSR ¶ 27, and escaped from a halfway house while serving his sentence on that conviction, PSR ¶ 31; Dkt. Nos. 153-1 & 153-2.  Following the Defendant's escape, he returned to Mexico and, wasting little time, resumed drug trafficking by at least 2003, resulting in the charges in this case.

The Defendant's attempt to evade the law continued during his arrest.  As Uruguayan law enforcement approached the Defendant to arrest him, the Defendant smashed his iPhone so that Uruguayan law enforcement could not access the contents of the device.  Hr'g Tr. 5/4/23 at 39–40; Gov. Ex. 42.  Uruguayan law enforcement searched the Defendant's vehicle and discovered that it was full of luggage, important documents, multiple pieces of electronic equipment, and over 75 pieces of jewelry and watches, indicating that the Defendant was attempting to flee the country.  Hr'g Tr. 5/4/23 at 45–46, 154–55.  At the time of his arrest, the Defendant was in possession of multiple false identification documents, including a fraudulent Mexican passport bearing the Defendant's photo but the name "Alonso Ibarra Torres," a fraudulent Mexican identification card in the name of Ibarra Torres, and two birth certificates bearing the

Defendant's name—one stating he was born in Mexico and the other stating that he was born in California.  Hr'g Tr. 5/4/23 at 40–42; Gov. Exs. 43–46.

The Defendant's disregard for the law continued even after his arrest.  Upset with his conditions of confinement, the Defendant signed a statement threatening Uruguayan Minister of the Interior Eduardo Bonomi asserting, "If Interior Minister Bonomi continues to send his guards to torture me, let him look for the highest bridge in Uruguay, and I am going to hang him from it."  Hr'g Tr. 5/4/23 at 43–44; Gov. Ex. 48A.  In October 2019, the Defendant took advantage of a lock malfunction to leave his cell, and upon being returned to his cell, he told the two guards who had secured him that he was going to kill the guards.  Hr'g Tr. 5/4/23 at 44.  In February 2020, the Defendant threw bleach at another guard who was walking by the Defendant's cell, requiring the guard to receive medical attention.  Hr'g Tr. 5/4/23 at 44.  A few days later, the Defendant threatened to strangle another guard using his handcuffs.  Hr'g Tr. 5/4/23 at 45.  The Defendant's long history of drug trafficking and repeated disregard for the rule of law, even while incarcerated, warrant a serious sentence.

Following his extradition to the United States, the Defendant has continued to minimize his involvement in the charged conspiracy and avoid accountability.  The Defendant's refusal to take responsibility for his conduct is reflected in the minimalist statement of facts he submitted at his Rule 11 hearing, Dkt. No. 139, his statement to the U.S. Probation Office downplaying his involvement in the conspiracy, PSR ¶ 14, and the evidence the Defendant presented at the evidentiary hearing attempting to establish, inaccurately, that he had fully removed himself from any involvement in drug trafficking in 2009.  As the testimony established, the Defendant's criminal conduct far exceeded that for which the Defendant was willing to take responsibility.  The Defendant's conduct since his initial arrest and escape demonstrates that the Defendant has

18

avoided both taking responsibility and accepting accountability for his criminal conduct.  A life sentence is therefore appropriate.

      b.  <u>Adequate Deterrence</u>

Given the adverse impact that drug trafficking has on society and the serious detrimental effects of cocaine in communities in the United States and abroad, it is important that the Court impose a sentence that deters others from undermining the rule of law.  A life sentence provides critical general deterrence to other DTO leaders that their participation in narcotics importation into the United States and use of violence to achieve their drug-trafficking objectives will result in substantial prison sentences.

      b.  <u>Protect the Public from Further Crimes of the Defendant</u>

As explained in the Government's Sentencing Memorandum, the Defendant has the means and connections to return to the same criminal conduct, regardless of whether he remains in the United States or relocates to another country, such as Mexico, where he has substantial familial ties.  Through his connection to his brother-in-law Oseguera Cervantes and the CJNG, the Defendant has ample opportunity to resume drug trafficking and carry out acts of violence upon his release.  Only a life sentence, as recommended by the Guidelines, will be sufficient to protect the public from the Defendant returning to criminal activity.

      e.  <u>Need for Sentence Imposed to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants</u>

For the reasons set forth in the Government's Sentencing Memorandum, the Government's recommendation of a Guideline sentence of life is consistent with sentences received by defendants engaged in similar conduct and holding similar positions within international DTOs.  Dkt. No. 153 at 16–19.

During the evidentiary hearing, defense counsel emphasized the sentences that Nava Valencia and Guizar Valencia received, seemingly comparing those sentences to the Guidelines sentence that the Government recommends for the Defendant. *See* Hr'g Tr. 5/2/23 at 62–64; Hr'g Tr. 5/3/23 at 100–02. However, Nava Valencia and Guizar Valencia are not similarly situated to the Defendant and therefore are not apt comparators under Section 3553(a)(6). Unlike the Defendant, Nava Valencia and Guizar Valencia entered into cooperation plea agreements with the Government, and the judges who sentenced them were aware of their cooperation at the time of sentencing. Hr'g Tr. at 5/2/23 at 62–64; Hr'g Tr. at 5/3/23 at 100–02. Also unlike the Defendant, Nava Valencia and Guizar Valencia took full responsibility for their criminal conduct. As demonstrated by their testimony, Nava Valencia and Guizar Valencia have admitted their criminal culpability, including their leadership positions within DTOs, the large quantities of illegal drugs that they trafficked, and their use of violence and weapons. In contrast, the Defendant has admitted to little more than investing in and arranging transportation for a shipment of 280 kilograms of cocaine on a semi-submersible, and he staunchly denies much of his other criminal conduct. Dkt. No. 139 ¶¶ 2–3; PSR ¶ 14 (Defendant stating, "I never carried or used a firearm and never threatened anyone with violence during the period that I played a financial role in the conspiracy . . . nor was I ever a leader of any such illegal activities.").

As the evidence at the hearing showed, the Defendant has not fully accepted responsibility for the full nature and scope of his conduct. The applicable Guideline sentence of life is therefore appropriate for the Defendant and would not cause an unwarranted sentencing disparity with other similarly situated defendants.

IV.     **Conclusion**

For the reasons set forth above and in the Government's Sentencing Memorandum, the Government respectfully requests that the Court impose a Guideline range sentence of life imprisonment which is reasonable, appropriate, and matches the severity of the crime committed by the Defendant.  A life sentence is sufficient, but not greater than necessary, to hold the Defendant accountable for his crimes, promote respect for the law, deter the Defendant and others from committing similar serious crimes and protect the public.

Respectfully Submitted,
MARLON COBAR
Acting Chief, Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice


By:     */s/ Kate Naseef*
Kate Naseef
Kirk Handrich
Trial Attorneys
Kaitlin Sahni
Acting Assistant Deputy Chief
Narcotic and Dangerous Drug Section
Criminal Division, U.S. Department of Justice
Washington, D.C.  20530
Telephone: (202) 514-0917

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing

(ECF) system with the United States District Court for the District of Columbia to counsel of

record for the Defendant, this 16th day of June, 2023.



By:     /s/  *Kate Naseef*

Kate Naseef
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

22